NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BANXCORP,<br><br>　　　　　　　　Plaintiff,<br><br>　　v.<br><br>BANKRATE, INC.,<br><br>　　　　　　　　Defendant. | Civil Action No. 07-3398 (SDW)<br><br>OPINION<br><br>July 7, 2008 |

**WIGENTON**, District Judge.

Before the Court is Defendant, Bankrate, Inc.'s, ("Bankrate" or "Defendant") Motion to Dismiss ("Motion") Plaintiff, BanxCorp's, ("BanxCorp" or "Plaintiff") Complaint for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6). The Court, having considered the parties' submissions and having decided the motion without oral argument pursuant to Fed. R. Civ. P. 78, and for the reasons set forth below, **DENIES** Defendant's Motion.

**I.　JURISDICTION AND VENUE**

The Court has original jurisdiction over Defendant's federal claims pursuant to 28 U.S.C. §§ 1331 and 1337. The Court exercises supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Venue is proper pursuant to 28 U.S.C. §§ 1391(b), (b)(2) and §§ 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22.

**II.　FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

BanxCorp is a provider of bank rate tables listing interest rates from financial institutions.

1

(Compl. ¶ 14.) Bankrate is a provider of various financial information and advice, including bank rate tables listing interest rates from financial institutions. (Def.'s Mot. Dismiss at 5.) Both companies publish rate tables in print media as well as online. (*Id.* at 5, 7.) Bankrate also owns and operates FastFind.com, a lead aggregation company. (*Id.* at 5.)

BanxCorp filed a five count complaint against Bankrate alleging, *inter alia*, anti-competitive conduct as follows: (1) illegal restraint of trade in violation of §1 of the Sherman Act, 15 U.S.C. §1 (Compl. ¶¶ 167-170); (2) monopoly maintenance, in violation of §2 of the Sherman Act, 15 U.S.C. §2 (*Id.* at ¶¶ 171-177); (3) attempted monopolization in violation of §2 of the Sherman Act, 15 U.S.C. §2 (*Id.* at ¶¶ 178-182); (4) prohibited merger in violation of §7 of the Clayton Act, 15 U.S.C. §15 (*Id.* at ¶¶ 183-187) and (5) various New Jersey Antitrust Act violations (*Id.* at ¶¶ 188-194). The specific anti-competitive practices set forth in the Complaint include: "predatory pricing, vendor lock-in, exclusionary product and distribution bundling and tie-in arrangements, anti-competitive acquisitions and market division agreements." (*Id.* at ¶ 1.)

Bankrate subsequently filed the instant Motion pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. Bankrate contends that BanxCorp has failed to adequately allege the following in its complaint: (1) a plausible relevant market, (2) monopolization or attempted monopolization, (3) conspiracy in restraint of trade and (4) plausible competitive harm. (Def.'s Mot. Dismiss at 1.) The Court will address Bankrate's Motion solely on the motion record presented.

### III.  LEGAL STANDARD

The court must review Defendant's Motion according to the standard set forth in Fed. R. Civ. P. 12(b)(6). The court must accept as true all material allegations of the complaint and

construe the complaint in favor of the plaintiff. *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir. 1998). Generally, when reviewing a 12(b)(6) motion, the court may only consider the complaint, exhibits attached to the complaint, matters of public record and undisputedly authentic documents if the plaintiff's claims are based upon those documents. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The court, however, may consider documents relied upon by the complaint. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). The court may also take judicial notice of relevant legal proceedings. *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999). A complaint should be dismissed "only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Trump*, 140 F.3d at 483. While the complaint is to be construed in the light most favorable to the plaintiff, the court need not accept the plaintiff's legal conclusions or draw unwarranted factual inferences. *Lewis v. ACB Bus. Serv., Inc.*, 135 F.3d 389, 405-06 (6th Cir. 1998).

With respect to antitrust complaints such as BanxCorp's, the Third Circuit has instructed that antitrust complaints should be liberally construed. *Commonwealth of Pa. ex. rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 179 (3d Cir. 1988) (quoting *Knuth v. Erie-Crawford Dairy Coop.*, 395 F.2d 420, 423 (3d Cir. 1968), *cert. denied*, 410 U.S. 913 (1973)). Nevertheless, in *Bell Atlantic Corp. v. Twombly* ("*Twombly*") the Supreme Court held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-1965 (2007) (affirming the dismissal of a §1 Sherman Act claim) (alteration in original) (internal citations omitted). The plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face" sufficient to "nudg[e] [its] claims across the line from conceivable to plausible." *Id.* at 1974. The Third Circuit recently summarized the *Twombly* pleading standard as follows: "'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element." *Phillips v. Country of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 127 S.Ct. at 1965). The Third Circuit has commented on the pleadings by determining that it "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Id.* (quoting *Twombly*, 127 S.Ct. at 1965).

Although the Supreme Court in *Twombly* applied its pleading standard to a §1 Sherman Act claim, the Third Circuit has held that it will not limit the case's holding to §1 Sherman Act pleadings, much less to the general antitrust context. *Id.* at 232, 234. *See also Wilkerson v. New Media Technology Charter School, Inc.*, 522 F.3d 315, 322 (3d Cir. 2008) (reaffirming the holding of *Phillips* that the plausibility standard is not restricted to the antitrust context, and subsequently extending it to the employment discrimination context). The Court analyzes and adjudicates Bankrate's Motion on this standard.

## IV. DISCUSSION

### A. The Relevant Law

#### 1. Proper Relevant Market Definition

The Third Circuit recognizes "that in most cases, proper market definition can be

4

determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (citing *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481 (1992)). *See also, e.g., Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992) ("[T]he determination of a relevant product or submarket . . . is a highly factual one best allocated to the trier of fact."); *Weiss v. York Hosp.*, 745 F.2d 786, 825 (3d Cir. 1984) ("Market definition is a question of fact . . . ." (citing *Borough of Lansdale v. Philadelphia Electric Co.*, 692 F.2d 307, 311-312 (3d Cir. 1982)). However, the Third Circuit does not read the need for a factual inquiry as a "*per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market." *Queen City Pizza*, 124 F.3d at 436. It stresses that the plaintiff has the burden of defining the relevant market in an antitrust matter. *Id.* (citing *Pastore v. Bell Telephone Co. of Pennsylvania*, 24 F.3d 508, 512 (3d Cir. 1994)). In *Queen City Pizza*, the Third Circuit memorialized its antitrust suit dismissal position with respect to relevant market definition by stating that:

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss *may* be granted.

*Id.* (emphasis added) (internal citations omitted).

The Third Circuit defines interchangeability as one product being "roughly equivalent to another for the use to which it is put; while there might be some degree of preference for the one over the other, either would work effectively." *Allen-Myland, Inc. v. Int'l Business Machine Corp.*, 33 F.3d 194, 206 (3d Cir. 1994). For example "[a] person needing transportation to work could accordingly buy a Ford or Chevrolet automobile, or could elect to ride a horse or bicycle,

5

assuming those options were feasible." *Id.* "When assessing reasonable interchangeability, '[f]actors to be considered include price, use, and qualities.'" *Queen City Pizza*, 124 F.3d at 437 (quoting *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991), *cert. denied*, 505 U.S. 1221 (1992)). The Third Circuit further explains that substitute products are "those that 'have the ability–actual or potential–to take significant amounts of business away from each.'" *Allen-Myland*, 33 F.3d at 206 (citing *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir.), *cert. denied*, 439 U.S. 838 (1978)). The key test for identifying substitute products is "whether there is a cross elasticity of demand between them: in other words, whether the demand for the second good would respond to changes in the price of the first." *Id.* (citing *Tunis Bros.*, 952 F.2d at 722).

Interchangeability of use and the cross elasticity of demand between the product and its substitutes define the outer boundaries of the relevant product market. *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). A broad product market may encompass submarkets, "which, in themselves, constitute product markets for antitrust purposes." *Id.* (citing *U.S. v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593-595 (1957)). The boundaries of a submarket "may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized venders." *Id.* (citation and footnote omitted).

### 2. Illegal Restraint of Trade under §1 of the Sherman Act

Count One of the Complaint alleges illegal restraint of trade in violation of §1 of the Sherman Act, 15 U.S.C. §1. (Compl. ¶¶ 167-170.) §1 of the Sherman Act provides that, "[e]very

contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states . . . is declared to be illegal." 15 U.S.C. §1. The Third Circuit has ruled that "[t]o establish a section 1 violation for unreasonable restraint of trade, a plaintiff must prove (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as proximate result of the concerted action." *Queen City Pizza*, 124 F.3d 4 at 442 (internal citation omitted). The Supreme Court has expressly held that in stating a §1 claim, there must be "enough factual matter (taken as true) to suggest that an agreement was made," but that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 127 S.Ct. at 1965.

### 3. Monopolization/Attempted Monopolization under §2 of the Sherman Act

Counts Two and Three of the Complaint allege monopolization and attempted monopolization, respectively, in violation of §2 of the Sherman Act, 15 U.S.C. §2. (Compl. ¶¶ 171-182.) §2 of the Sherman Act provides that, "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty . . . ." 15 U.S.C. §2. The Third Circuit has imparted that a §2 violation of monopoly maintenance claim has two general elements: "(1) possession of monopoly power and (2) '. . . maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *U.S. v. Dentsply Int'l*, 399 F.3d 181, 186 (3d Cir. 2005)

(citing *Eastman Kodak Co. v. Image Technical Servs., Inc.* 504 U.S. 451, 480 (1992)). "To state a claim for attempted monopolization, a plaintiff must allege '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 413 (3d Cir. 1997) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 (1993)).

Our Supreme Court has held that there are "two prerequisites to recovery" under a §2 Sherman Act claim regarding predatory pricing: (1) "plaintiff must prove that the prices complained of are below an appropriate measure of its rival's costs[,]" or in other words, "below-cost prices[,]" and (2) plaintiff must demonstrate that the competitor has a "dangerous probability . . . of recouping its investment in below-cost prices." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 221-224 (1993) (affirming the trial court's grant of competitor's motion for judgment not withstanding the verdict) (internal citations omitted). The Third Circuit has ruled that "'a dangerous probability of monopoly may exist where the defendant firm possesses a significant market share when it undertakes the challenged anticompetitive conduct.'" *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir. 1992). Nonetheless, alleging solely market share is not sufficient to properly plead monopoly power or attempted monopolization. *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 141 (3d Cir. 1998). A proper pleading "requires something more, which may include 'the strength of competition, probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct, and the elasticity of consumer demand.'" *Id.* (citing *Barr Labs.*, 978 F.2d at 112).

8

### 4. Antitrust Injury and Harm to Competition

"[T]he existence of antitrust injury is not typically resolved through motions to dismiss." *Schuylkill Energy Res., Inc. v. PA Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997) (citing *Brader v. Allegheny General Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995)). Nevertheless, "[a]ntitrust injury is a necessary . . . condition of antitrust standing." *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997) (citing *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1166 (3d Cir. 1993)). The Third Circuit has explained that "[b]y this we mean that the district court should first address the issue of whether the plaintiff suffered antitrust injury" and "[i]f antitrust injury is not found, further inquiry is unnecessary." *City of Pittsburgh v. West Penn Power Comp.*, 147 F.3d 256, 265 (3d Cir. 1998). Our Supreme Court defines antitrust injury as "the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The injury should be "'the type of loss that the claimed violations . . . would be likely to cause.'" *Id.* (modification in the original) (internal citation omitted). The Supreme Court has encapsulated antitrust law's conceptual foundation by commenting that, "antitrust laws . . . were enacted for 'the protection of competition, not competitors.'" *Id.* at 488 (quoting *Brown Shoe*, 370 U.S. at 320).

### B. Defendant's Claims[1]

#### 1. Relevant Market

Bankrate contends that BanxCorp has not properly alleged a plausible relevant market,

---

[1] As Defendant's Motion merely references in passing Plaintiff's Clayton Act and New Jersey Antitrust Act claims in Counts Four and Five, the Court will not address the sufficiency of Plaintiff's pleadings under these counts at this juncture. (*See*, Def.'s Mot. Dismiss at 15 & n.3, 39, 40.) Nevertheless, the Court recognizes that relevant market and antitrust injury are essential elements to pleading any antitrust claim (see Sections A(1) and A(4), *infra*).

9

and therefore, failed to state any claim for relief under state or federal antitrust law. (Def.'s Mot. Dismiss at 15.) Bankrate argues that BanxCorp's definition of the relevant market as the aggregation and publication of bank rate information is: (1) "implausibly narrow" as it only considers one form of advertising (bank rate tables) and fails to encompass other forms of advertising that financial institutions may purchase (*Id.* at 15, 19; Def.'s Reply Br. at 4); (2) deficient as it does not address the requisite elements of interchangeability of products and cross-elasticity of demand (Def.'s Mot. Dismiss at 15-17); and (3) erroneous as it improperly identifies the product end-user (Def.'s Reply Br. at 5).

This Court agrees with Defendant's position that Plaintiff has not properly plead a relevant market for antitrust purposes. BanxCorp defines the relevant market as "the compilation, classification, centralization, tabulation, publication, dissemination and sale ('aggregation') [sic] . . . of bank rates quoted by multiple third-party financial service providers." (Compl. ¶ 2.) As determining the relevant market is a highly factual inquiry (*see infra*), however, this Court declines to address Defendant's "implausibly narrow" market contention or Plaintiff's purported failure to encompass other forms of online advertisement, as discovery is necessary on these issues. *See, e.g., In re Hypodermic Products Antitrust Litigation*, 2007 WL 1959225, at *10 (D.N.J. Jun. 29, 2007) (declining to address defendant's contention on a motion to dismiss that the combining of two allegedly separate markets into one general market by the plaintiff creates an implausible product market); *Ansell, Inc. v. Schmid Laboratories, Inc.*, 757 F.Supp 467 (D.N.J. 1991) (holding a multi-day evidentiary hearing with expert testimony to determine the relevant product market in an antitrust matter).

With respect to Defendant's second contention that BanxCorp has not referenced the elements of interchangeability of use and cross elasticity of demand in defining its proposed relevant market, as required by *Queen City Pizza*, this Court concurs. (Def.'s Mot. Dismiss at 15.) In failing to do so, Plaintiff's pleadings are deficient and unclear as to whether there is any other product that can be reasonably substituted for bank rate tables. In discussing "alternative delivery channels" of disseminating bank rates to consumers from financial institutions, BanxCorp lists a myriad of options and notes that "[t]hese more traditional banking and mortgage delivery channels do not enable financial service providers to efficiently substitute the principle means of access to End-User consumers." (Compl. ¶ 11.) In distinguishing bank rate websites from other "advertising sites and mediums" that financial service providers may use, BanxCorp claims that such alternatives "must serve exponentially more advertising impressions to get anywhere near the conversion yields experienced by participating financial service providers on Bank Rate websites." (*Id.* at ¶ 46.) Alternatively, Plaintiff argues that Defendant overlooks its use of other relevant market indicia beyond interchangeability of use and cross elasticity of demand, such as industry or public perception of separate markets. (Pl.'s Opp'n Br. at 6.) As noted in *Brown Shoe*, these factors only apply where a party is attempting to define the *submarket* boundaries within a larger product market. *Brown Shoe*, 370 U.S. at 325. Therefore, Plaintiff's availment to such criteria in an attempt to establish a viable general relevant market is fundamentally misplaced. *See Id.*

Although Plaintiff's claim assertions infer that there is no reasonable substitute for bank rate tables, they fall short of the requisite specific pleading standard set forth in *Queen City*

*Pizza*.[2] This Court specifically references these two pleading assertions as they are the only allusions to the rule of interchangeability and cross elasticity of demand in the Complaint. As such, Plaintiff's relevant market pleading definition is *prima facie* inadequate as a matter of law. Additionally, the Court will not address the parties' various contentions regarding who the proper end-user is in the relevant product market, except to agree with Defendant's position that Plaintiff "cannot have it both ways: if the relevant market is consumers, it must allege injury to consumers" and "[i]f the injury alleged is to financial institutions, it must define its relevant market from the perspective of those financial institutions, and must account for the interchangeability of advertising products." (Def.'s Reply Br. at 6, n.3.) Although Plaintiff defines the end-user in the bank rate market as "the consumers, who can view and compare Bank Rates for free," it defines the customer in the bank rate market as the "banks or financial service providers, who must pay to be listed" in the bank rate tables. (Compl. ¶ 7.) This Court interprets these two divergent assertions to set forth two different end-users who presumably do not use bank rate tables for the same purposes. Plaintiff further confounds who the proper end-user of the product is in its discussion of alternative delivery channels. (*Id.* at ¶ 8.)

In sum, Plaintiff shall amend the Complaint with respect to its relevant market definition in order to encompass the rule of interchangeability and cross elasticity of demand, as well as to clarify the proper end-user.

2.      **Count One**

Plaintiff alleges illegal restraint of trade in Count One of the Complaint through exclusive

---

[2]See *In re Hypodermic Products Antitrust Litigation*, wherein the court denied defendant's motion to dismiss, and subsequently rejected its relevant market contention that substitutability was improperly plead. *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959225, at *10.

dealing; exclusionary product and distribution bundling and tie-in arrangements with customer banks; and collusion and conspiracy with LendingTree, a mortgage lead aggregator, to form a cartel and erect barriers to entry in the bank rate and mortgage lead aggregation markets. (Compl. ¶¶ 131, 168.)[3] BanxCorp claims that Bankrate and LendingTree entered into a "quid pro quo" agreement to "share, allocate and divide markets, products, customers and anticompetitive information." (*Id.* at ¶¶ 131, 133.) Particularly, it alleges that Bankrate agreed to "wind down" its mortgage lead aggregator, FastFind ("FastFind" or "BankrateSelect.com"), while allocating its mortgage leads exclusively to LendingTree. (*Id.* at ¶¶ 131, 133-140.) In exchange, LendingTree allegedly agreed to exclusively allocate its high-yield savings account market place consisting of deposit bank rates to Bankrate. (*Id.*) Essentially, "all traffic and clicks" for such products on LendingTree's website were "passed exclusively" to Bankrate. (*Id.* at ¶ 134.)

Bankrate contends that BanxCorp's allegation of a "quid pro quo" agreement is conclusory and fails to meet the plausibility standard set forth in *Twombly*. (Def.'s Mot. Dismiss at 36.)[4] This Court disagrees with Defendant's assertion. BanxCorp provides sufficient, if not detailed, factual allegations regarding the LendingTree agreement. It cites and quotes from a series of publications and announcements from Bankrate itself, describing the LendingTree

---

[3]Defendant addresses Plaintiff's allegations of exclusionary conduct, bundling and tie-in arrangements in its challenge of Counts Two and Three, but asserts that its arguments apply equally to its Count One challenge. (Def.'s Mot. Dismiss at 37, n.11.) Thus, it is appropriate to assess the sufficiency of Plaintiff's pleadings regarding such practices in its Count Two and Three analysis.

[4]Defendant alternatively argues that even if Plaintiff satisfies the plausibility standard, it does not have standing to bring such a claim because it fails to sufficiently plead antitrust injury as a result of the LendingTree agreement. (Def.'s Mot. Dismiss at 37-38.) This contention will be addressed under Section B(4), *infra*.

mortgage lead aggregation agreement and the high-yield savings account allocation. (*Id.* at ¶¶ 137-140.) In alleging a "quid pro quo" relationship between the two partnerships, BanxCorp carefully notes the close proximity in time of each release. (*Id.* at ¶¶ 129, 138, 139, 140, 141.) It further clearly details the specifics of what each party to the alleged illicit agreement received. (*Id.* at ¶¶ 134-135.)

Consequently, there are "plausible grounds to infer an agreement" with respect to the LendingTree-related pleadings. Plaintiff has presented enough factual matter to support the contention that an agreement was made and that discovery may reveal evidence of an illegal agreement. Plaintiff is therefore allowed to proceed on this claim.

### 3. Counts Two and Three

BanxCorp alleges in Count 2 of the Complaint that Bankrate has attained monopoly power in the bank rate market, and has maintained and extended such power through predatory and exclusionary conduct. (Compl. ¶¶ 1, 172-173.) It further states that Bankrate "did not obtain a monopoly in the Bank Rate Market as a result of a superior product, business acumen or historic accident." (*Id.* at ¶ 27.) In parity, BanxCorp alleges in Count 3 of the Complaint that Bankrate engaged in such conduct with the intent to monopolize the bank rate market with "a dangerous probability that [it] would succeed . . . ." (*Id.* at ¶¶ 179-180.) In opposition, Bankrate contends that BanxCorp has failed to adequately plead monopolization and attempted monopolization claims predicated on allegations of its: (1) predatory pricing scheme, (2) offering of free services to consumers, financial institutions and distribution partners, (3) bundling of products, (4) tying of products, and (5) market power or probability of achieving monopoly power. (Def.'s Mot. Dismiss at 21, 25 29, 31, 33.) Each of these of contentions will be

14

addressed, in turn, below.[5]

I) <u>Predatory Pricing</u>

Bankrate argues that BanxCorp failed to sufficiently allege either of the two *Brooke Group* elements (see Section A(3), *supra*) with respect to Bankrate's cost-per-click ("CPC") pricing structure. (*Id.* at 21.) Although probative in nature, the *Brooke Group* elements were espoused by the Supreme Court in discussing what a plaintiff must *prove*, not assert, in order to prevail on a predatory pricing claim. *Brooke Group*, 509 U.S. at 221-225. As a result, BanxCorp's pleading allegations are sufficient to infer plausibility of these elements (*See,* Compl. ¶¶ 81-83, 86-88, 97-100.) In claiming that Defendant initially charged a CPC price below its average variable cost of implementing the CPC system, BanxCorp provides specific rationale and justification as to how it reached this conclusion. (Compl. ¶¶ 81-84.) It further states that "competitors, including Plaintiff, were forced to switch from a flat fee structure to an unreasonably low and unsustainable cost-per click pricing structure, nibbling and scrambling for whatever few clicks remain available in the market, to be able to match Bankrate's pricing." (*Id.* at ¶ 87.) BanxCorp also properly alleges recoupment of investment in below-cost pricing in citing Defendant's three rate increases in CPC pricing in 2006. (*Id.* at ¶¶ 97-101.)

Plaintiff has alleged sufficient facts to plausibly infer a predatory pricing scheme by Defendant.

ii) <u>Free Services and Product Bundling/Tying</u>

Defendant asserts that Plaintiff has not adequately plead with the requisite factual

---

[5] To the extent that Defendant's contentions under Counts Two and Three also apply to Plaintiff's allegations under Count One (as noted above in Section B(2)), this Court's findings shall apply, in turn, to Defendant's Count One challenge.

specificity its free services and product bundling and tying claims. (Def.'s Mot. Dismiss at 25, 29-30, 31-32.) BanxCorp blanketly alleges in the beginning of the Complaint that "[b]y consciously offering free service to consumers, financial institutions and distribution partners – including principally newspapers and major websites . . . [and] implementing exclusionary bundling strategies with customers and distribution partners . . . Bankrate thus set out to monopolize and control access to the Bank Rate Market . . . ." (Compl. ¶ 26.) BanxCorp describes Bankrate's interference with its contractual data licensing relationship with the *Wall Street Journal* as well as Defendant's break-up of a data licensing relationship between CNNMoney and Informa Research Services, another bank rate competitor. (*Id.* at 50-51.) It further states that Bankrate's "modus operandi" in such interference "has characterized its business dealings stretching over a span of years." (*Id.* at 51.) Irrespective, BanxCorp provides no further factual allegations to allow this Court to reasonably infer that Defendant engaged in any such conduct illicitly, much less pervasively, over the referenced time period.

With respect to BanxCorp's bundling and tying allegations, BanxCorp's pleadings are vague, ambiguous, and conclusory as drafted. BanxCorp's complaint provides only general allegations or hypothetical examples of the "mechanics" of Defendant's alleged bundling scheme. (Compl. ¶¶ 74, 117-123.) Bankrate correctly notes that BanxCorp "pleads a series of hypothetical illustrations of bundling, which lack the requisite 'factual matter.'" (Def.'s Mot. Dismiss at 30.) Plaintiff's tying claim likewise only references one alleged instance involving eLoan. BanxCorp consequently *prima facie* fails to properly set forth or apply the mechanics of a tying arrangement to eLoan's interaction with Defendant. (*See,* Compl. ¶¶ 115-116.) The Supreme Court defines "a tying arrangement . . . as an agreement by a party to sell one product

but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 5-6 (1958). Here, Plaintiff has not adequately set forth any conditional agreement between eLoan and Defendant which would evidence a general tying scheme. (Compl. ¶ 116.)

In light of these cited deficiencies, BanxCorp's free services and exclusionary bundling and tying of products allegations do not provide "enough facts to raise a reasonable expectation that discovery will reveal evidence" of such illicit conduct, *Twombly*, 127 S.Ct. at 1965. As these claims are insufficient as plead, Plaintiff shall amend its complaint to include the requisite factual specificity with respect to its free services and bundling and tying of products claims.

    iii)    <u>Market Power and Probability of Achieving Monopoly Power</u>

Defendant argues that Plaintiff failed to sufficiently plead Defendant's alleged market power or probability of achieving monopoly power. (Def.'s Mot. Dismiss at 33.) Particularly, it asserts that Plaintiff's allegation of its 90% market share is "not based upon relevant metrics such as sales to financial institutions" and that Plaintiff fails to reference any of the aforementioned factors listed in *Barr Labs*. (*Id.* at 34-35.) The Court finds Defendant's argument unpersuasive. BanxCorp claims it based its Bankrate marketshare determination "on a number of metrics, including . . ., market capitalization[,] revenue [,] the number of financial institutions covered . . . [,] the number of unique visitors . . ., and the number of pages viewed by consumers . . . ." (Compl. ¶ 58.) BanxCorp further notes that Bankrate's total revenue for 2006 was $79.6 million, and that even Bankrate claims to be the dominant player in the market, citing the same metrics listed above. (*Id.* at ¶¶ 59, 60.) Synonymously, Plaintiff's allegations meet the

17

additional *Barr Labs* pleading requirements vis-a-vis its citation to Defendant's: (1) dominance in certain industry areas industry such as internet "incoming links" and bank rate table distribution in print media (*Id.* at 66, 71-76), (2) acquisition of Mortgage Market Information Systems ("MMIS") (*Id.* at ¶¶ 102-114) and (3) own characterization of the barriers to entry in the bank rate market. (*Id.* at ¶ 10.) Hence, Plaintiff has adequately plead Defendant's market share and monopoly power and these claim elements are sufficient as drafted.

### 4. Antitrust Injury

Defendant proffers that Plaintiff generally "makes only isolated, conclusory allegations" regarding its antitrust injury. As such, Counts One through Four of the Complaint should be dismissed. (Def.'s Mot. Dismiss at 39-40.) Bankrate further argues that BanxCorp failed to adequately allege antitrust injury as a direct result of the LendingTree agreement, and therefore, Count One of the Complaint should be dismissed despite the plausible inference of an agreement. (*Id.* at 37-38.) This Court disagrees. Plaintiff has specifically alleged that as a result of Bankrate's purported illicit conduct, its "market share and consequential revenues have declined at a rate of approximately 25% annually, year after year, for the last four years." (Compl. ¶ 161.) BanxCorp thus not only asserted anticompetitive harm to itself (beyond revenue and market share depletion), but also as to other competitors, as well as general competition in the bank rate market. (*See, Id.* at ¶¶ 10, 28, 61, 87-89, 90, 148, 153, 156-159, 161-165.) Plaintiff's allegations constitute more than mere "labels and conclusions" allowing it "to nudg[e] [its] claims across the line from conceivable to plausible." *Twombly*, 127 S.Ct. at 1965, 1974. Thus, Plaintiff has sufficiently alleged general antitrust injury as a matter of law.

Bankrate concurrently contends that BanxCorp failed to sufficiently plead antitrust injury to itself or other entities in the bank rate market as a specific result of its alleged "quid pro quo" agreement with LendingTree. (Def.'s Mot. Dismiss at 37-38.) BanxCorp claims that the LendingTree agreement served to "[erect] barriers to entry into the Bank Rate Market, in order to suppress and preclude competition with Bankrate's monopoly . . . while simultaneously suppressing and precluding competition in the mortgage lead aggregation oligopoly market, in which LendingTree has a dominant market position." (Compl. ¶ 131.) It further alleges that "[t]he partnership . . . to share and divide markets by allocating customers or lines of commerce is . . . likely to harm competition . . . ." (*Id.* at 142.) Plaintiff's pleadings in this regard are inadequate as drafted and devoid of "enough facts to *plausibly* support injury to competition." *Trans World Technologies, Inc. v. Raytheon Co. and Lockheed Martin Corp.*, 2007 WL 3243941, at *5-6 (D.N.J. Nov. 1, 2007) (emphasis in original) (finding sufficiency in plaintiff's pleading of the actual agreement or conspiracy in restraint of trade, but dismissing the count due to plaintiff's failure to adequately plead harm to competition as a result of the agreement). Consequently, Plaintiff is granted leave to amend its complaint to provide enough factual specificity to plausibly infer injury to itself and competition in the relevant market as a direct result of the LendingTree agreement.

## V.   CONCLUSION

Based on the foregoing, Defendant's Motion to Dismiss Plaintiff's Complaint for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6) is hereby

**DENIED**. Plaintiff is granted leave to file an amended complaint[6] sufficiently detailing and alleging facts, definitions, contentions, claims and theories for Counts One, Two and Three under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2.

**SO ORDERED.**

s/Susan D. Wigenton, U.S.D.J.

cc: Judge Madeline Cox Arleo

---

[6] In an abundance of caution, this Court grants BanxCorp the opportunity to replead its §§1 and 2 Sherman Act claims under Counts One, Two, and Three, but if sufficient information to address the Complaint's cited deficiencies are not alleged in the amended complaint, BanxCorp's Sherman Act claims may be subject to dismissal with prejudice.