# CANTER LAW FIRM P.C.

ATTORNEYS AT LAW
123 MAIN STREET – 9TH FLOOR
WHITE PLAINS, NEW YORK 10601
www.canterlawfirm.com

Nelson E. Canter*  
John D. Megerian**  
*Also admitted in New Jersey  
** Also admitted in Connecticut

TEL:  (914) 948-3011  
FAX:  (914) 948-3066  
ncanter@canterlawfirm.com

March 28, 2010

*Via ECF and FedEx*

Honorable Madeline C. Arleo, U.S.M.J.
United States District Court for the District of New Jersey
M.L. King, Jr. Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

      Re:    *BanxCorp v. Bankrate, Inc.*, Civ. No.:  07-03398-SDW-MCA

Dear Judge Arleo:

      We represent Plaintiff BanxCorp and write (i) in response to Defendant Bankrate's unauthorized letter dated March 24, 2011 impermissibly filed as a sur-reply (the "Sur-Reply") after its motion to compel had already been fully briefed; and (ii) to provide an overview of Defendant's ongoing failure to comply with its discovery obligations.

## DEFENDANT'S SUR-REPLY EXHIBIT CORROBORATES PLAINTIFF'S CLAIMS

      Defendant's motion to compel [Doc. No. 187-2] related to the following documents:

> "Bankrate requested production of several categories and types of documents. Bankrate requested documents relating to BanxCorp's *contracts with co-brand partners and customers, accounts receivable and financial documents, investments in BanxCorp, invoices, insertion orders, and traffic reports, and pricing information*." [Doc. No. 194, at 1]

      Thus, Defendant's argument that Plaintiff refused to produce an e-mail in response to a discovery demand is baseless.  Plaintiff had never received an e-mail from Bankrate's COO Cutter Cunningham, nor did any merger discussions take place as a result of the e-mail exchange with Bankrate's CEO Tom Evans in late 2005, nor did that e-mail relate to Defendant's moving papers.  Indeed, Plaintiff never purposely hid or destroyed this or any other relevant responsive documents, nor did it have a reason to do so since these e-mails are 100% consistent with Plaintiff's claims.  Defendant instead continues to attempt to divert the Court's attention from Defendant's *per se* violations of the Sherman Act, which are conclusively presumed to be illegal.

Hon. Madeline C. Arleo, U.S.M.J.
March 28, 2011
Page 2

In its March 24, 2011 Sur-Reply, Defendant provided even further proof of Defendant's anticompetitive conduct which forced competitors such as Plaintiff out of the market. Indeed, on November 28, 2011, within days of Bankrate's acquisition of its competitor MMIS/Interest.com, Bankrate's former COO Cotter Cunningham acknowledged to Bankrate's CEO Tom Evans as follows (*see* enclosed Doc. No. 199, at 3-4, labeled BR00042867/8):

> "*We have approached him* [BanxCorp] 2x [twice] I think. Once was *bill anderson* [referring to Bill Anderson, Bankrate's CEO in 1998] and *peter* [referring to Peter Morse, Bankrate's chairman] the other was *elisabeth* [referring to Elisabeth DeMarse, Bankrate's CEO in 2000]. They [BanxCorp] are I believe, tiny. Would be interested in the book. Could be a decent [acquisition] fit if the $ wasn't too high…"

Consequently, we now have further corroboration that Defendant not only knew who BanxCorp was, but Defendant has finally tendered documentary proof that Bankrate's chairman Peter Morse and Bankrate's successive CEOs including Bill Anderson and Elisabeth DeMarse approached and met with Plaintiff on several occasions to discuss a merger or acquisition.

Notwithstanding, on August 2, 2007 during Defendant's Q2-2007 Earnings Conference Call made pursuant to S.E.C. Fair Disclosure regulations, Tom Evans made the following misrepresentation (*see* enclosed document labeled BR00000876):

> "We have one housekeeping item that we wanted to mention *for the sake of full disclosure*. Two weeks ago an antitrust complaint was filed in the district -- in the New Jersey District Court against Bankrate by a company named BanxCorp. …, *I don't recall that I'd ever even heard of it, the name of this company.*"

Furthermore, Defendant's Sur-Reply flatly contradicts its responses to most of Plaintiff's related RFAs. By way of example, Defendant's most egregious responses include the following:

1. In response to Plaintiff's RFA No. 113 (1st Set), Defendant **DENIED** "that Defendant and Plaintiff engaged in possible merger discussions several times between 1996 and 2000."

2. In response to RFA No. 114 (1st Set), Defendant stated that it *lacks sufficient information to admit or deny* that on or about June 27, 2000, a meeting to discuss a possible merger and respective company valuations was held between Plaintiff's CEO Norbert Mehl, and Defendant's CEO at the time, Elisabeth DeMarse, at the offices of Plaintiff's investment banker PaineWebber (currently known as UBS). [1]

---

[1] Defendant's RFA responses are directly contradicted by the e-mail correspondence between Norbert Mehl, Elisabeth DeMarse and PaineWebber from June 21, 2000 to July 5, 2000 documenting the M&A negotiations between BanxQuote and Bankrate, including BanxQuote's

Hon. Madeline C. Arleo, U.S.M.J.
March 28, 2011
Page 3

3. In response to RFA No. 115 (1st Set), Defendant stated that it *lacks sufficient information to admit or deny* that e-mail correspondence including a valuation matrix prepared by PaineWebber (currently known as UBS) was exchanged between the parties subsequent to the June 27 meeting. [2]

4. In response to RFA Nos. 14-23 (1st Set), Defendant stated that it *lacks sufficient information to admit or deny* that Defendant and Plaintiff competed between 1997 and 2006.

5. Plaintiff's 3rd Request for Production of Documents ("RPD") dated February 14, 2011, Nos. 13-25 specifically requested Defendant to "Produce all documents, communications and e-mails concerning a meeting between Bankrate's chairman Peter Morse, Bankrate's previous CEO Bill Anderson, and Plaintiffs CEO Norbert Mehl at the offices of Milbank Winthrop & Co. in New York City in 1998, and between Messrs. Anderson and Mehl at Bankrate's main office in Florida in 1998;" and "all communications and emails sent and received by Peter Morse [and Elisabeth DeMarse] concerning BanxQuote or Norbert Mehl" in 1998-2004.

   On February 18, 2011, Defendant evasively responded to the 3rd RPD Nos. 13-25, as follows:

   > "Bankrate objects that Request No. 13 [to No. 25] seeks documents that are outside the production parameters set forth in the October 18, 2010 Supplemental Pretrial Scheduling Order. In particular, paragraph 11 of the October 18 Order limits the production of responsive internal emails, based upon agreed upon search terms, to three Bankrate custodians for the time period January 1, 2005 through December 31, 2007. Paragraph 9 of the Order also limits the production of responsive communications to 20 third parties domain names (selected by plaintiff) within 7 agreed-upon Bankrate custodians for the time period January 1, 2003 through December 31, 2007. This request fails to comply with those limitations. Bankrate also objects to Request No. 13 on the grounds that it is overly broad and unduly burdensome in light of plaintiff's prior document requests and Bankrate's review and production of documents to date."

6. As early as March 31, 2009 Plaintiff's 1st RPD No. 18 had requested "All documents, records of documents, valuations analysis, and communications, including board of directors' presentations, reports or minutes, relating to Bankrate's chairman and

---

valuation matrix produced by PaineWebber. *See* Plaintiff's Doc. No. 191-2, Exh. F, documents labeled BX000009-13.

[2] *Id*.

Hon. Madeline C. Arleo, U.S.M.J.
March 28, 2011
Page 4

> successive CEOs merger discussions with BanxCorp, from 1997 until 2000, inclusive."

On May 7, 2009, Defendant responded to the 1st RPD No. 18, as follows:

> "Bankrate objects to Request No. 18 on the grounds that the phrases 'Bankrate's chairman and successive CEOs merger discussions' and 'records of documents' are vague and ambiguous. Subject to and without waiving its reservation of rights and general and specific objections, *Bankrate will produce documents,* if any exist, that relate to merger discussions between Bankrate and Plaintiff."

Except for Cunningham's sole internal e-mail relating to merger discussions between Bankrate and Plaintiff as enclosed to the Sur-Reply, Defendant never produced the documents that were requested by Plaintiff in March 2009, and which are still pending after two years.

### DEFENDANT'S DEFICIENT RESPONSES AND FAILURE TO COMPLY WITH COURT ORDERS

While the Court "specifically directed the parties to proceed with document discovery" [January 20, 2011 Transcript of Proceedings 4:3], Defendant failed to comply and to properly respond to Plaintiff's requests as set forth below.  While Plaintiff apologizes for burdening the Court with such a voluminous exhibit, it is necessary to adequately convey to the Court the extent of Defendant's discovery abuses.

**Defendant's Non-Compliance with Court's Scheduling Orders:**

1. Defendant failed to produce all responsive documents in their possession and control with respect to e-mail searches of three custodians pursuant to Paragraph 11 of the Court's October 18, 2010 Supplemental Scheduling Order, particularly regarding Peter Morse and Tom Evans. [3]

2. Defendant failed to produce 18 of the co-branding contracts that it was ordered to produce on or before November 4, 2010 pursuant to Paragraph 6 of the Court's October 18, 2010 Scheduling Order. [4]

---

[3] *See* attached Exhibit 1.

[4] *See* attached Exhibit 2.

Hon. Madeline C. Arleo, U.S.M.J.
March 28, 2011
Page 5

**Defendant's Deficient Responses to Requests for Admission:** [5]

3. Deficient Responses to Plaintiff's 3rd RFAs (3-21-11)
4. Deficient Responses to Plaintiff's 2nd RFAs (3-7-11)
5. Deficient Responses to Plaintiff's 1st RFAs (2-25-11)

Most of Defendant's RFA responses are improper. By way of example, Defendant's most egregious responses include the following:

(a) In response to RFA No. 1 (1st Set), Defendant stated that it *lacks sufficient information to admit or deny* that any and all of Defendant's statements by its officers and directors at Bankrate's quarterly earnings conference calls and investor presentations from 2002 until 2009 are true;

(b) In response to RFA No. 3 (1st Set), Defendant stated that it *lacks sufficient information to admit or deny* that any and all of Defendant's S.E.C. filings are true and correct;

(c) In response to RFA Nos. 34-36 (1st Set), Defendant **DENIED** that *Bankaholic.com* provided bank rate table listings on the Internet prior to entering into a co-branding agreement with Defendant, that *Bankaholic.com* provided bank rate table listings on the Internet prior to being acquired by Defendant, and that *Interest.com* provided bank rate table listings on the Internet prior to being acquired by Defendant.

(d) In response to RFA Nos. 53-57 (1st Set), which requested that Defendant admit that its co-branding agreements gave Bankrate the sole authority or exclusive right to sell Internet rate table listings or Hyperlink Advertisements on the co-branded website pages, Defendant responded that the *request for admission is unduly burdensome because it would require Bankrate to review and analyze over 100 contracts in order to respond;*

(e) In response to RFA No. 69 (1st Set), Defendant stated that it *lacks sufficient information to admit or deny* that Defendant's online network includes Bankrate.com, Interest.com, Bankaholic.com as well as Defendant's co-branded websites.

(f) In response to RFA Nos. 85-89 (1st Set), which requested that Defendant admit that it had the sole authority to decide what CPC prices to charge for Internet rate table listings or Hyperlink Advertisements sold on behalf of the co-branded websites, Defendant responded that the *request for admission is unduly burdensome because it would require Bankrate to review and analyze over 100 contracts in order to respond;*

---

[5] *See* attached Exhibits 3-5.

Hon. Madeline C. Arleo, U.S.M.J.
March 28, 2011
Page 6

(g) In response to RFA No. 106 (1st Set), Defendant stated that *after reasonable inquiry, Bankrate lacks sufficient information to admit or deny* that Defendant publicly declared during its earnings conference calls for the second and fourth quarter of 2006 that Defendant and its co-branding partners split or share revenues 50-50 or basically 50-50.

(h) In response to all of Plaintiff's 2nd and 3rd Sets of RFAs pertaining to predatory pricing practices and commingling of paid rate listings with free rate listings, Defendant **DENIED** that numerous banks individually identified in attached website screenshots, including for example EverBank, *"were listed free of charge except Bankrate admits that those financial institutions appear in Editorial Listings."* Bankrate further stated that *"Editorial Listings … were researched and compiled by Bankrate's research staff. Bankrate does not sell Editorial Listings to financial service providers and financial service providers do not solicit Bankrate to be listed on an Editorial Listing."*

Not only are these falsely labeled *editorial listings* indeed <u>free</u> rate listings, but more significantly, Defendant's evasive and untrue RFA responses are flatly contradicted by a document labeled EB000944 produced by EverBank, which states as follows:



EverBank's document proves that Defendant's free rate listings sold under the guise of *editorial listings* constitute false advertising, as well as predatory pricing.

**Defendant's Deficient Responses to Requests for Production of Documents:** [6]

6. Deficient Responses to Plaintiff's 5th RPDs (3-21-11)
7. Deficient Responses to Plaintiff's 4th RPDs (3-16-11)
8. Deficient Responses to Plaintiff's 3rd RPDs (2-18-11)
9. Deficient Responses to Plaintiff's 2nd RPDs (10-9-09)
10. Deficient Responses to Plaintiff's 1st RPDs (5-7-09)

---

[6] *See* attached <u>Exhibits 6-10</u>.

Hon. Madeline C. Arleo, U.S.M.J.
March 28, 2011
Page 7

Defendant produced only one document in response to Plaintiff's 3rd, 4th and 5th RPDs. By way of example, in response to Plaintiff's 5th RPD Nos. 1-24, and 4th RPD Nos. 3-14, asking for "all documents, including website screenshots with dates of publication, listing any specific rates of financial service providers that were listed at no charge by Bankrate within its Internet rate table listings" or "a list identifying all financial service providers that were listed at no charge" during 2000 to 2011, Defendant stated that "documents responsive to [these] request[s] are not within its possession, custody, or control."

**Bankrate's Deficient Responses to Interrogatories:** [7]

      11. Deficient Responses to Plaintiff's 2nd Interrogatories (2-18-11)
      12. Deficient Responses to Plaintiff's 1st Supplemental Interrogatories (1-21-10)
      13. Deficient Responses to Plaintiff's 1st Interrogatories (5-7-09)

Plaintiff failed to adequately respond to practically all of Plaintiff's Interrogatories, as set forth in the annexed exhibits. Nevertheless, with respect to Section 1 of the Sherman Act under the *per se* rule applicable to this case Defendant's horizontal agreements in restraint of trade are conclusively presumed to be anticompetitive and illegal. In horizontal price-fixing and market allocation cases where the *per se* rule applies, the only inquiry is whether there was an agreement to restrain trade, since the unreasonableness of the restraint is conclusively presumed regardless of whether the rule of reason would lead to a different result.[8]

## CONCLUSION

Given Defendant's willful and contumacious refusal to properly and timely comply with its discovery obligations, we respectfully request that the Court issue severe sanctions against Defendant, including the application of adverse inference instructions at trial.

    Respectfully submitted,

    CANTER LAW FIRM P.C.

By: *[signature]*
    Nelson E. Canter

cc.    All Counsel of Record (*via ECF*)

Encls.

---

[7] *See* attached Exhibits 11-13.

[8] See e.g., *Arizona v. Maricopa County Med. Society*, 457 U.S. 332, 344, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982).

| | |
|---|---|
| **From:** | Cotter Cunningham <cotterc@brm.com> |
| **Sent:** | Monday, November 28, 2005 10:50 PM |
| **To:** | Tom Evans <TEvans@bankrate.com> |
| **Subject:** | Re: Exploring sale of BanxQuote |

Wow. Crawling out of the woodwork now... I don't know 'em personally. We have approched him 2x I think. Once was bill anderson and peter the other was elisabeth.

They are I believe, tiny. Would be interested in the book. Could be a decent fit if the $ wasn't too high....

Cc

---------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Tom Evans <tevans@bankrate.com>
To: Cotter Cunningham <ccunningham@bankrate.com>
Sent: Mon Nov 28 16:48:58 2005
Subject: Fw: Exploring sale of BanxQuote

Ever run into these cats ?


---------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Norbert Mehl <norbert.mehl@banx.com>
To: Tom Evans <tevans@bankrate.com>
Sent: Mon Nov 28 14:15:32 2005
Subject: Exploring sale of BanxQuote

Dear Tom,

I would like to explore the sale of BanxQuote.com.

I founded BanxQuote in 1984 and kept it as a small annuity-type business, running practically on auto-pilot (most recent ttm annual revenues under half a million dollars). As part of a larger company in a related industry or an aggressive comparison shopping site, BanxQuote could grow significantly with minimal effort. Furthermore, two years ago I launched an unrelated luxury lifestyle magazine called Panache (see www.panachemag.com <http://www.panachemag.com/> ), which takes up most of my time and resources.

I haven't been keen on growing BanxQuote on my own as a stand-alone business, and have been waiting for favorable market conditions that would allow me to cash out at a decent price. This may be a good time, in light of several recent transactions in this field.

I have been approached by other interested parties and, as a result, I am beginning to test the waters among a short list of potential buyers. Let me know if you are interested. I look forward to hearing from you.

Best regards,

Norbert Mehl | BanxCorp
222 Bloomingdale Road, Suite 116
White Plains, NY 10605
Tel. 914-644-1800 | Fax 914-644-1840
www.banx.com <http://www.banx.com/>
BanxQuote was established in 1984. Current and past clients of the firm include most of the nation's leading financial institutions.

BR00042867

BanxQuote provides daily and real-time (high, low, avg) market rates for comparison shopping of deposits and loans from financial institutions in all fifty states and Washington, DC, with state-by-state, regional, and national composite benchmarks. BanxQuote also licenses its proprietary data and financial applications to third parties, including Bloomberg, UBS, GE Capital, Discover, MetLife Bank, Bear Stearns, CapitalOne, Ford Credit, etc.

During the past two decades, BanxQuote has been featured by leading news media, including Dow Jones, The Wall Street Journal, Reuters, Bloomberg, Knight-Ridder, The New York Times, CBS, Business Week, Fortune, Forbes, American Banker, Advance Publications, and many others.

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

| **Bankrate, Inc.**  *Company*▲ | RATE  *Ticker*▲ | Q2 2007 Earnings Call  *Event Type*▲ | Aug. 2, 2007  *Date*▲ |
|---|---|---|---|

corrected transcript :callstreet

Dynamic page generation should generate higher inventory yields and higher CPFs. That's just one example that will make the new site more effective and more consumer and advertiser friendly. We've done a lot of work on the design already, but there's surely a lot more to do before it's ready to launch. But we're very excited about how it will improve Bankrate for both the consumer and the advertiser.

Last, our thoughts on guidance. You'll remember that when we guided at the beginning of the year, we projected revenue of between 95 and $100 million, and EBITDA between 36 and $40 million. Given the decline in print, we're not going to change the revenue guidance for the year. However, given the growth in the online part of our business, we are confident that we will continue to do well, in raising our EBITDA guidance to between 39 and $43 million, from the 36 to $40 million previously projected. Just to summarize, we expect revenue for the year to be between 95 and $100 million, and EBITDA for 2007 to be between 39 and $43 million.

Two other quick mentions that we're sure to get asked about. One, we're still actively engaged in M&A activity but have nothing to announce at this time. And two, we are still experimenting with behavioral targeting. I'd say today our results on behavioral targeting tests have been somewhat lackluster. In part that's due to the approach we took where we wanted to do a limited amount of testing and didn't want our customer data to be shared with any outside vendors or advertisers. We're now rethinking that approach. We'll keep working on it to see if we can find ways of using behavioral targeting to drive more ad opportunities, mostly with inventory off the Bankrate sites.

Finally, as we're now a month into Q3, you should know that July traffic has held up pretty well, up approximately 13% above July 2006 traffic numbers, and advertising demand continues to be strong.

We have one housekeeping item that we wanted to mention for the sake of full disclosure. Two weeks ago an antitrust complaint was filed in the district -- in the New Jersey District Court against Bankrate by a company named BanxCorp. The complaint claims that Bankrate is a monopoly and has used that position to foreclose competition, thereby harming competitors. At the time the suit was filed, I don't recall that I'd ever even heard of it, the name of this company. I'm told that BanxCorp is a five-person company based in White Plains, New York. Obviously, we disagree with the claims made in the complaint and intend to defend our position vigorously. We are not sure this is material, but in the interest of full disclosure we'll be disclosing it in the 10-Q so we wanted to mention it today.

And with that, I'd now be happy to take your questions.

BR00000876