**JOINT LETTER**

November 14, 2011

**Via CM/ECF & FedEx**
Hon. Cathy L. Waldor, U.S.M.J.
United States Court for the District of New Jersey
King Federal Building & Courthouse
50 Walnut Street
Newark, New Jersey 07101

> Re:   ***BanxCorp v. Bankrate, Inc.***, Civ. No.  07-3398 (ES-CLW)
> ***BanxCorp v. LendingTree, LLC***, Civ. No. 10-2467 (ES-CLW)

Dear Judge Waldor:

Defendant LendingTree, LLC ("Defendant" or "LendingTree") and Plaintiff BanxCorp respectfully submit this joint letter concerning alleged deficiencies in Plaintiff's responses to LendingTree's Third Set of Interrogatories (the "Interrogatories").  A copy of Plaintiffs' October 12, 2011 Responses to the Interrogatories is attached as Exhibit A (the "Responses").  Counsel held a meet and confer on November 3, 2011, but were unable to resolve the issues raised in LendingTree's letter dated October 24, 2011, which it recites herein.

**I.**

## LendingTree's Issues With Plaintiff's "Objections Pursuant To Antitrust Liability"

### LendingTree's Position:

Pages 6 through 11 of Plaintiff's responses to the Interrogatories contain Plaintiff's "Objections Pursuant To Antitrust Liability."  However, these so-called objections actually are disjointed assertions of legal concepts such as the *per se* standard of analysis, "joint and several liability," causation, burden of proof, damages, and a regurgitation of Plaintiff's allegations. None of the foregoing is in any way a proper response to the Interrogatories.  Most troubling is that Plaintiff continues to recite the *per se* standard of review that sometimes applies in antitrust cases and concludes "only issues of damage may require discovery for private recovery under Section 4 of the Clayton Act."

Plaintiff's attempt to employ the *per se* rule of analysis to block discovery of information that is "reasonably calculated to lead to the discovery of admissible evidence," Fed. R. Civ. P. 26(b)(1), is not only without merit, but in direct contravention of the Court's explicit instructions that "we are going to conduct discovery on both [the *per se* and rule of reason standards].  Is that clear?"  *See* August 10, 2011 Hearing Transcript ("Hearing Tr.") at 17:25-18:7.  Based on the foregoing, Plaintiff's "Objections Pursuant To Antitrust Liability" and similar objections included in the responses to specific Interrogatories must be withdrawn, and amended responses to each of the Interrogatories should be served.

Hon. Cathy L. Waldor, U.S.M.J.                                                                 Page 2
November 14, 2011

**Plaintiff's Position:**

Plaintiff BanxCorp objects to all of LendingTree's alleged deficiency claims which are being interposed for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

Plaintiff objected to these Interrogatories on the grounds that they were belatedly served by LendingTree on **September 20, 2011,** after the two week deadline agreed upon during the parties' August 10, 2011 Status Conference, and after the **September 16, 2011** deadline for BanxCorp and Bankrate to respond to supplemental discovery requests and deficiencies, as Ordered by the Court on September 1, 2011.

Nevertheless, LendingTree, presumably acting in concert with Bankrate (pursuant to an indemnification clause in their February 2, 2007 Agreements subject to Plaintiff's antitrust claims in both actions [reference is made to documents labeled LT0000002-LT0000087]), has unfairly sought a "second bite at the apple" by deliberately delaying service of these Interrogatories until after the deadline set by the Court.

In addition, during the August 10, 2011 conference with Judge Salas, LendingTree's counsel ambiguously indicated that LendingTree *may* also be done with discovery. Moreover, pursuant to Paragraph 17 of the Pretrial Scheduling Order entered in Civil Action No. 10-2467 on April 4, 2011, as amended by order dated June 29, 2011, which governs proceedings in these consolidated actions, "the parties may serve interrogatories limited to twenty-five (25) single questions and requests for production of documents **on or before May 2, 2011**, to be responded to within thirty (30) days of receipt." Despite LendingTree's statement in its concluding footnote, there is no information on the record showing that "the May 2, 2011 deadline [for interrogatories] was previously rejected by Magistrate Judge Arleo."

Finally, on October 24, 2011, after the Court convoked the parties to a joint conference for scheduling of depositions, LendingTree served its baseless deficiency letter as a means to endlessly delay depositions, as a diversionary and dilatory tactic, and to forestall any sanctions due to LendingTree's own discovery violations.

As a further example, LendingTree's CEO Doug Lebda's approximately 6,800 pages of ESI and e-mails [labeled LT0076094-LT0082917] which revealed his direct involvement with Bankrate-related matters and his interaction with Bankrate's CEO Tom Evans, were inexplicably withheld or suppressed by LendingTree for over nine months until **September 20, 2011**, i.e., several days after the September 16, 2011 deadline set by the Court for Plaintiff's response to Bankrate's alleged deficiency notice. Notwithstanding, such evidentiary materials and information were originally requested pursuant to Plaintiff's Am. Doc. Subpoena to LendingTree issued on November 24, 2010.

**Plaintiff has not withheld any responses based on the *per se* rule of analysis.**

Plaintiff has not blocked or withheld any responses based on the *per se* rule of analysis. However, pursuant to the Court's instructions that discovery will proceed both based on the *per*

Hon. Cathy L. Waldor, U.S.M.J.                                                     Page 3
November 14, 2011

se and rule of reason standards, Plaintiff has responded and interposed objections in reliance upon both of these standards, not just the one standard that suits LendingTree. [1]

To further preserve its rights, Plaintiff interposed valid objections based on discovery standards pertaining to joint and several liability, causation, burden of proof and damages that are specifically applicable to antitrust cases such as this, which for the avoidance of misunderstandings are recited herein.

**Antitrust liability under Section 1 of the Sherman Act is joint and several.**

Since antitrust liability under Section 1 of the Sherman Act is joint and several, liability in this action and the related action against *Bankrate Inc.* (the "Bankrate Action") is joint and several.  Therefore, Plaintiff is not required to prove a causal connection between each of the injuries jointly caused by Bankrate and a particular co-conspirator, either LendingTree or any of Bankrate's 130 co-branding partners/competitors. *See In re Uranium Antitrust Litigation*, 617 F.2d 1248 (7th Cir.1980). While the liability of each defendant may present separate and distinct issues entirely independent of each other, there is a single unified damage to the plaintiff. Plaintiff is therefore entitled to shift the burden of proof on the issue of causation to Defendant. *See generally Hall v. DuPont*, 345 F.Supp. 353, 370-380 (E.D.N.Y.1972); *see also Bogosian v. Gulf Oil Corp.,* 562 F.2d 434, 454 (3d Cir. 1977).

**Plaintiff has shown antitrust injury as a matter of law.**

Plaintiff has shown antitrust injury as a matter of law, and anticompetitive injury to itself, any other remaining independent competitors, and consumers.  *See* this Court's July 7, 2007 Opinion in the related Bankrate Action at 18; *see also* this Court's Feb. 7, 2011 Opinion in the LendingTree Action at 6-7 [Doc. No. 94].

**"Plaintiff has adequately pleaded a horizontal price-fixing agreement
between Bankrate and LendingTree."**

Defendant's Interrogatories are not warranted by existing law.  Defendant is aware that this Court concluded that "Plaintiff has presented enough factual matter to support the contention that an agreement was made [with LendingTree] and that discovery may reveal evidence of an

---

[1] **Plaintiff's fn:** A clear distinction must be drawn between the causes of action brought by Plaintiff against LendingTree and Bankrate, and the applicable standard pertaining to each respective cause of action.  Otherwise, the simultaneous application of the *per se* and rule of reason standards within the same cause of action would be contradictory and mutually exclusive, and if that were the case Plaintiff would have certainly appealed such ruling. Further reference is made to Plaintiff's pending motion for bifurcation of the *per se* antitrust claims pursuant to Fed. R. Civ. P. 42(b). [*See* Doc. Nos. 219, 214-1/2 and 230 in the Bankrate Action]

For example, Plaintiff's Sherman Act Section 1 claims for horizontal price-fixing and market allocation agreements between competitors which are common to both the LendingTree and Bankrate actions are presumably governed under the *per se* standard.  On the other hand, the claims that are unique to the Bankrate Action, i.e., claims for monopolization, attempted monopolization, and predatory pricing, as well as claims for anticompetitive acquisitions, are governed under the rule of reason.

Hon. Cathy L. Waldor, U.S.M.J.                                                       Page 4
November 14, 2011

illegal agreement … Plaintiff has adequately pleaded a horizontal price-fixing agreement
between Bankrate and LendingTree." *See* this Court's Opinion at 8 and 10 (Doc. No. 94).

**"Proof that a combination was formed for the purpose of fixing prices and that it caused
them to be fixed or contributed to that result is proof of the completion of a price-fixing
conspiracy under § 1 of the Act."**

In horizontal price-fixing and market allocation cases such as this, the only inquiry is
whether there was an agreement, since the unreasonableness of the restraint is conclusively
presumed. *See, e.g., Maricopa County Medical Soc'y*, 457 U.S. at 344, 102 S.Ct. 2466).
"Certain agreements, such as horizontal price fixing and market allocation, are thought so
inherently anti-competitive that each is illegal *per se* without inquiry into the harm it has actually
caused." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 81
L.Ed.2d 628 (1984); *see also United States v. Topco Associates, Inc.*, 405 U.S. 596, 60(1972);
*NCAA v. Bd. of Regents*, 468 U.S. 85, 100 (1984); *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997);
*Broad. Music, Inc. v. Columbia Broad. Sys.*, 441 U.S. 1, 19-20 (1979); *Business Electronics
Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988);
*Pace Elecs., Inc. v. Canon Computer Sys., Inc.*, 213 F.3d 118, 123 (3d Cir. 2000).

"[T]he machinery employed by a combination for price-fixing is immaterial. Under the
Sherman Act a combination formed for the purpose and with the effect of raising, depressing,
fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is
illegal per se. Where the machinery for price-fixing is an agreement on the prices to be charged
or paid for the commodity in the interstate or foreign channels of trade, the power to fix prices
exists if the combination has control of a substantial part of the commerce in that commodity ...
In such a case that power may be established if as a result of market conditions, the resources
available to the combinations, the timing and the strategic placement of orders and the like,
effective means are at hand to accomplish the desired objective ... Proof that a combination was
formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that
result is proof of the completion of a price-fixing conspiracy under § 1 of the Act." *United States
v. Socony-Vacuum Oil Co*., 310 U.S. 150, 223-24, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

"The price fixing within the scope of the *per se* prohibition of § 1… is an agreement to
fix the price to be charged in transactions with third parties, not between the contracting parties
themselves." *Sitkin Smelting & Ref. Co. v. FMC Corp*., 575 F.2d 440, 446 (3d Cir.), cert. denied,
439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978), citing *United States v. Parke, Davis & Co.*,
362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). "Since a *per se* violation is conclusively
presumed to be unreasonable, no trial is necessary to show the nature, extent, and degree of the
market effect of the practice." *Sitkin Smelting, supra*, 575 F.2d at 446, citing *White Motor Co. v.
United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

**Inquiry under the rule of reason ended once a price-fixing agreement was proved.**

As cited by the Supreme Court in *Maricopa County Medical Soc'y*, the Court in *Standard
Oil* recognized that inquiry under its rule of reason ended once a price-fixing agreement was
proved, for there was "a conclusive presumption which brought [such agreements] within the

Hon. Cathy L. Waldor, U.S.M.J.                                              Page 5
November 14, 2011

statute." 221 U. S., at 65. By 1927, the Court was able to state that "it has . . . often been decided and always assumed that uniform price-fixing by those controlling in any substantial manner a trade or business in interstate commerce is prohibited by the Sherman Law." *United States v. Trenton Potteries Co.*, 273 U. S. 392, 398.

> "The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed. Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints, without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed and without placing on the government in enforcing the Sherman Law the burden of ascertaining from day to day whether it has become unreasonable through the mere variation of economic conditions." *Id.,* at 397-398.

The Supreme Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful *per se* under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense." *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 218 (1940).

> "Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies. It has no more allowed genuine or fancied competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination. If such a shift is to be made, it must be done by the Congress. Certainly Congress has not left us with any such choice. Nor has the Act created or authorized the creation of any special exception in favor of the oil industry. Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." *Id*, at 221-222.

Finally, the argument that the per se rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules, which in part is to avoid "the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable — an inquiry so often wholly fruitless when undertaken." *Maricopa County Medical Soc'y*, *supra* (citing *Northern Pacific R. Co. v. United States*, 356 U. S., at 5).

Neither a relevant market nor an estimate of LendingTree's or Bankrate's market power must be established to prove that the restraint is unlawful *per se*. "As Professor Hovenkamp explains, "[c]ourts often say that a `naked' horizontal restraint is illegal `per se.' What this label means in practice is that (a) neither a relevant market nor an estimate of the defendants' market power must be established to prove that the restraint is unlawful; (b) harmful effects are presumed; and (c) the range of permissible defenses is severely limited." 11 H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 1910a at 252 (1998 ed.) (footnotes omitted)."  *In re Cardizem CD Antitrust Litig.,* 105 F.Supp.2d 682, 693 (E.D.Mich.2000).

**Discovery revealed evidence of two concurrent illegal agreements between horizontal competitors Bankrate and LendingTree dated February 2, 2007.**

The factual record already *revealed evidence* of two concurrent illegal agreements between Bankrate Inc. ("Bankrate")  and LendingTree dated February 2, 2007, as well as market division, customer and revenue allocation, and price fixing across Bankrate's online "network" or cartel.   Reference is made to Defendant's documents labeled LT0000002-LT0000087 consisting of the February 2, 2007 agreements between LendingTree and Bankrate.  Additional evidence of price fixing on a "network basis" is based on Bankrate's periodic rate sheets, customer invoices and pricing documents and responses received by Plaintiff from third party subpoenas, as produced on the record in the related Bankrate Action, e.g., Dkt. No. 169, Exhibit 4: Bankrate's S.E.C 8-K filings and Excerpts of Quarterly Earnings Call Transcripts; Dkt. No 169, Exhibit 5: Bankrate's network fixed cost-per click (CPC) prices charged to Ally Bank, HSBC's ad agency JWT, and Banco Popular/E-Loan.

The factual record already *revealed evidence* that as a result of the February 2, 2007 contract between LendingTree and its co-conspirator Bankrate entitled "Deposits Content Licensing Agreement" (see LendingTree's documents labeled LT0000002-LT0000058), High Yield Savings Accounts or "HYSA", as that term is referred in communications between LendingTree and Bankrate, were allocated and passed exclusively to Bankrate through a revenue share arrangement. A new LendingTree High-Yield Savings sub-segment of Bank Rate Websites, made accessible through a Deposits Tab at www.lendingtree.com/savings was set up specifically for their mutual benefit. Pursuant to paragraph 4.A.i. of the HYSA agreement, "During the Term, Bankrate shall have the sole and exclusive right to sell Deposit Rate Table Listings on LendingTree.com. Bankrate shall sell Deposit Rate Table Listings as part of Bankrate's multi-site network." As a result of this agreement, Bankrate sold LendingTree's HYSA Internet rate table listings at a fixed price throughout its cartel on a network basis, as that

Hon. Cathy L. Waldor, U.S.M.J.                                                    Page 7
November 14, 2011

term is referred to by Bankrate in its approximately 130 co-branding partnership agreements with competitors, and in its 10-K annual reports filed with the S.E.C. from approximately 1999 to 2009.

Plaintiff can irrefutably claim at this stage of litigation, that discovery has revealed evidence of an illegal price fixing and market allocation agreement between two horizontal competitors at the same level of market structure. Therefore, it is futile for LendingTree to attempt to overturn numerous Supreme Court rulings during the past century pertaining to the *Sherman Act of 1890*, particularly given that one of the classic examples of a *per se* violation of Section 1 is an agreement between competitors at the same level of market structure.

Since the antitrust injury and anticompetitive effects of the restraint of trade between LendingTree and Bankrate are conclusively presumed, with no consideration given to the intent behind the restraint, the only inquiry is whether there was an agreement between LendingTree and Bankrate that restrained trade.

Accordingly, only issues of damages may require discovery for private recovery under Section 4 of the Clayton Act, 15 U.S.C. § 15.   Plaintiff's burden of proving the fact of damage under § 4 of the Clayton Act would be satisfied by its proof of some damage flowing from Defendants' unlawful conduct; inquiry beyond this minimum point goes only to the amount and not the fact of damage. *See Zenith Radio v. Hazeltine Research,* 395 U. S. 100 (1969).

## II.

### LendingTree's Issues With Plaintiff's Specific Interrogatory Responses

**1.     Interrogatory No. 1:**

Interrogatory No. 1 provides: "Identify with specificity the prices that you contend were fixed by Lending Tree during 2007 and 2008, broken down by product and by month."

### LendingTree's Position:

In response to Interrogatory No. 1, which requests Plaintiff to "Identify with specificity the prices that you contend were fixed by Lending Tree during 2007 and 2008, broken down by product and by month," Plaintiff "refers to *Bankrate's* CPC Program Pricing Rate Sheets for the period of 2007 and 2008" (emphasis added) and an exhibit purportedly "consisting of *Bankrate's* CPC prices charged to customers." (emphasis added)

The obvious problem with this response is that Plaintiff has not identified any prices allegedly fixed by LendingTree, yet attempts to improperly imply that LendingTree fixed the prices of some product by referring to allegations against a co-defendant.  If, as it appears, Plaintiff does not contend that *LendingTree* fixed the price of any product, then Plaintiff's response should not refer to alleged price fixing of products by others.

Hon. Cathy L. Waldor, U.S.M.J.                                                    Page 8
November 14, 2011

     Plaintiff's response should actually respond to the interrogatory by either stating that Plaintiff does not allege that *LendingTree* fixed the price of any product or identifying any such prices by product and month. Accordingly, Defendant demands that Plaintiff amend its response to Interrogatory No. 1.

**<u>Plaintiff's Position:</u>**

     Plaintiff's Responses to this Interrogatory were adequate. Plaintiff objected to this Interrogatory on various grounds as set forth in pages 11 to 13 of its Responses, including that the phrase "the prices that you contend were fixed by LendingTree," contains incomplete, inaccurate or misleading descriptions or characterizations of facts, events and pleadings, and the Interrogatory is based upon a misleading legal theory or conclusion, particularly given that LendingTree's and Bankrate's antitrust liability under Section 1 of the Sherman Act is joint and several.

     Plaintiff's further response in reference to price fixing by LendingTree's co-conspirator Bankrate is certainly appropriate in this case. As set forth above, pursuant to paragraph 4.A.i. of the February 2, 2007 *HYSA* agreement, "During the Term, Bankrate shall have the sole and exclusive right to sell Deposit Rate Table Listings on LendingTree.com. Bankrate shall sell Deposit Rate Table Listings as part of Bankrate's multi-site network." [See documents labeled LT0000002-LT0000058] As a result of this agreement, Bankrate sold LendingTree's HYSA Internet rate table listings at a fixed price throughout its cartel on a network basis.

     If this type of conduct were immune from § 1, then any cartel "could evade the antitrust law simply by creating a 'joint venture' to serve as the exclusive seller of their competing products." Am. Needle, Inc. v. NFL, No. 08-661, 2010 WL 20207 (U.S. May 24, 2010), at *8. When the agreement joins together independent centers of decisionmaking, "the entities are capable of conspiring under § 1 . . ." Id. at *9. Furthermore, "joint selling would eliminate important price competition between them" (NCAA, supra), "competitors 'cannot simply get around' antitrust liability by acting "through a third-party intermediary or 'joint venture'." Id. (quoting Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F. 3d 290, 336 (CA2 2008) (Sotomayor, J., concurring in judgment)).

     "[A] court would not hesitate in enjoining a domestic selling arrangement by which, say, Ford and General Motors distributed their automobiles nationally through a single selling agent." See NCAA, supra, fn 39. (internal citation omitted) "Even without a trial, the judge will know that these two large firms are major factors in the automobile market, that such joint selling would eliminate important price competition between them, that they are quite substantial enough to distribute their products independently, and that one can hardly imagine a pro-competitive justification actually probable in fact or strong enough in principle to make this particular joint selling arrangement 'reasonable' under Sherman Act § 1." Id.

     As set forth in Plaintiff's Responses and as described in further detail in response to Interrogatory No. 5, by 2008 *Bankrate and by extension LendingTree*, by virtue of Defendants' February 2, 2007 *HYSA* agreement, "had well over a thousand CPC advertisers." [See document labeled BX000582]

Hon. Cathy L. Waldor, U.S.M.J.                                                          Page 9
November 14, 2011

As further set forth in Plaintiff's Responses, according to Bankrate's October 19, 2007 Brief at page 27, "*Bankrate and the web-sites [including LendingTree] jointly charged financial institutions for each instance where a consumer clicks on a hyperlink for a financial institution listed in a rate table.*" [*See, BanxCorp v. Bankrate Inc.,* Civ. No. 07-3398 (ES)(CLW), Dkt. No. 7] Accordingly, in its Responses Plaintiff properly refers to Bankrate's CPC Program Pricing Rate Sheets for the period of 2007 and 2008 as shown in documents labeled BR00038225-BR00038249 and corresponding AEO documents. Further reference is made to *BanxCorp v. Bankrate Inc.,* Dkt. No. 169, Exhibit 4 consisting of Bankrate's 8-K S.E.C filings and excerpts of Quarterly Earnings Call Transcripts; and Dkt. No. 169, Exhibit 5 consisting of Bankrate's CPC prices charged to its customers Ally Bank, HSBC's ad agency JWT, and Banco Popular/E-Loan. In addition, Plaintiff is aware that Bankrate routinely sent emails to its customers announcing its periodic price increases.

Based on the foregoing, Plaintiff's responses are proper.

**2.      Interrogatory Nos. 2 and 3: Improper Responses Of
          "insufficient information to identify with specificity "**

Interrogatory No. 2 provides: "Excluding your contention that LendingTree entered into the Agreements, identify any other oral or written agreement(s) between LendingTree and any other party that you contend violated the antitrust laws, or state that there are no such allegations." The "Agreements" are defined in the Interrogatories as meaning the February 2, 2007 Deposits License Agreement between LendingTree and Bankrate and the February 2, 2007 Marketing Agreement between LendingTree and Bankrate.

Interrogatory No. 3 provides: "Excluding your allegation that LendingTree entered into the Agreements, do you contend that LendingTree had a role in any antitrust violation, including, without limitation, during the periods prior to and/or following the termination of the Agreements? If so, identify with specificity (i) LendingTree's role in any such antitrust violation, (ii) all facts in support thereof, and (iii) the Bates-numbers of any documents that support any such claim."

**LendingTree's Position:**

Interrogatory No. 2 requests the following. "Excluding your contention that LendingTree entered into the Agreements, identify any other oral or written agreement(s) between LendingTree and any other party that you contend violated the antitrust laws, or state that there are no such allegations."

As described above, Plaintiff's objections contain a kitchen sink of legal arguments that do not in any way constitute appropriate objections to Interrogatories. In fact, many of the objections have nothing at all to do with what is requested in the Interrogatory and rather appear to be "cut and pasted" from objections to other Interrogatories (e.g., an objection "to the phrase 'the prices you contend were fixed by LendingTree'"). Following these baseless objections, Plaintiff responds that "Plaintiff has insufficient information to identify with specificity any oral

Hon. Cathy L. Waldor, U.S.M.J.                                                                 Page 10
November 14, 2011

or written agreement(s) between LendingTree and any party other than Bankrate that may have
violated antitrust laws, except for the February 2, 2007 Agreements and any related
communications (including payments) between the parties."

Plaintiff obviously has not identified (because it cannot) any agreements pursuant to
which LendingTree violated the antitrust laws (excluding the allegations concerning the
February 2, 2007 Agreements). Nonetheless, ignoring the explicit request in the Interrogatory,
Plaintiff refuses to state that there are no such allegations. Thus, Plaintiff's response is
intentionally evasive and attempts to leave the door open for allegations that are obviously
without any basis in fact. However, if at this stage of the litigation, Plaintiff has "insufficient
information to identify with specificity," any oral or written agreement(s) between LendingTree
and any party other than Bankrate that may have violated the antitrust laws, Plaintiff should
directly respond to the Interrogatory and state that there are no such allegations.

Similarly, Interrogatory No. 3 provides: "Excluding your allegation that LendingTree
entered into the Agreements, do you contend that LendingTree had a role in any antitrust
violation, including, without limitation, during the periods prior to and/or following the
termination of the Agreements? If so, identify with specificity (i) LendingTree's role in any such
antitrust violation, (ii) all facts in support thereof, and (iii) the Bates-numbers of any documents
that support any such claim."

Plaintiff responds that "Plaintiff has insufficient information to identify with specificity if
LendingTree had a role in any antitrust violation during the periods prior to and/or following the
termination of the Agreement." However, Interrogatory No. 3 asks if Plaintiff "contends" that
LendingTree had a role in any antitrust violation during the periods prior to and/or following the
termination of the Agreement. The Interrogatory requires a "yes" or "no" answer (with a "yes"
requiring further information). Neither has been provided.

As stated above in connection with Interrogatory No. 2, if at this stage of the litigation
Plaintiff lacks sufficient information to identify with specificity if LendingTree had a role in any
antitrust violation during the periods prior to and/or following the termination of the Agreements,
Plaintiff should directly respond to the Interrogatory and state that there are no such allegations.
Indeed, at the August hearing, Judge Salas stated "I'm making myself abundantly clear to the
plaintiffs. We need to commit to what our theory of the case is . . . and it needs to be very clear.
I do not want evasive answers." Hearing Tr. at 12:10-13.

Based on the foregoing, Defendant demands that Plaintiff amend its responses to
Interrogatory Nos. 2 and 3.

**Plaintiff's Position:**

Plaintiff's Responses to these Interrogatories were adequate. The Interrogatories are
based on false premises and contain incomplete, inaccurate or misleading descriptions or
characterizations of facts, events and pleadings. The questions were deliberately formulated by
LendingTree in the form of ambiguous *circular reasoning*, *double-negative* or *double-entendre*,
so as to confuse the respondent and the Court. Not only are Plaintiff's responses both entirely

Hon. Cathy L. Waldor, U.S.M.J.                                                    Page 11
November 14, 2011

responsive and entirely truthful, but the nature of these Interrogatories implies that LendingTree is attempting to hide or preclude evidence of other anticompetitive conduct that it may have engaged in.

      As described below, in addition to the February 2, 2007 Agreements between LendingTree and Bankrate, it is certainly possible that *any related or unrelated communications* during the periods *prior to and/or following* the termination of the February 2, 2007 Agreements may have violated antitrust laws. As such, Plaintiff is not required to provide a "yes" or "no" answer merely based on speculation that would preclude any yet unknown potential violations, particularly given the secretive nature and massive scale of the antitrust conspiracy at issue.

      As set forth in its Responses to Interrogatory No. 2, based on information currently in its possession, Plaintiff has insufficient information to identify with specificity any oral or written agreement(s) between LendingTree and any party other than Bankrate that may have violated antitrust laws, *except for the February 2, 2007 Agreements between LendingTree and Bankrate and any related communications (including payments) between the parties, in writing, by e-mail or other electronic means, by telephone, or in person.* As further set forth in its to Interrogatory No. 3, based on information currently in its possession, Plaintiff has insufficient information to identify with specificity if LendingTree had a role in any antitrust violation *during the periods prior to and/or following the termination of the Agreements as set forth in this Interrogatory*.

      Plaintiff further objected to the Interrogatories to the extent they assume facts not in existence, characterize facts yet to be proven, or are premised on incorrect legal theories. Nevertheless, while Plaintiff has not made such allegations in its pleadings to date, as falsely implied in LendingTree's Interrogatory Nos. 2 and 3, since factual discovery has not been completed and depositions have not even started, it is possible that new facts may be revealed at a later stage of discovery. As such, Plaintiff is not required to waive its right to raise any new allegations against LendingTree if deemed appropriate at a later stage.

      Moreover, in its purported deficiency letter dated October 24, 2011 served a week before the previous deadline for completion of factual discovery, LendingTree suddenly announced that "LendingTree is undertaking to identify, produce, and/or request materials beyond what has been requested by Plaintiff in discovery."

      As previously stated and merely by way of example, LendingTree's CEO Doug Lebda's approximately 6,800 pages of ESI and e-mails [labeled LT0076094-LT0082917] which revealed his direct involvement with Bankrate-related matters and his interaction with Bankrate's CEO Tom Evans, were inexplicably withheld or suppressed by LendingTree for over nine months until **September 20, 2011**, i.e., several days after the September 16, 2011 deadline set by the Court for Plaintiff's response to Bankrate's alleged deficiency notice. Notwithstanding, such evidentiary materials and information were originally requested pursuant to Plaintiff's Am. Doc. Subpoena to LendingTree issued on November 24, 2010.

      For example, one such withheld e-mail thread between LendingTree's and Bankrate's CEOs from February 16 to 19, 2008, stated as follows:

> "As a follow up to our discussion in NYC this week, your call with Doug today, and the message left with you tonight (tried to reach you direct on the way home), I wanted to propose what I believe to be the best solution to our collective short-term challenge." … "This looks fine, but we need to act quickly in march, or else we're stuck with no recourse and a lousy contract."   [Reference is made to documents labeled LT0080870 and LT0080900]

Another inexplicably withheld e-mail between LendingTree's and Bankrate's CEOs Doug Lebda and Tom Evans dated March 7, 2008, stated as follows:

> "As to the credit card opportunity, we would love to have a discussion with you about that. I would propose slightly better, but not unreasonable economics to what you suggested. Let me know who you would like us to follow up with and when those discussions ought to take place. I know you just announced a deal with CreditCards.com, so it may not be something you are able to address immediately. We would love to find more ways to work together." [Reference is made to document labeled LT0081854]

Based on the foregoing, Plaintiff's responses are both entirely responsive and entirely truthful and proper.

**3.     Interrogatory No. 4**

Interrogatory No. 4 provides "Excluding your allegation that LendingTree participated in a conspiracy to raise prices, do you contend that LendingTree took any other acts or omissions that harmed competition or BanxCorp?  If so, identify any such act(s) and/or omission(s).  Do not include in your response any alleged acts or omissions undertaken by Bankrate or any third-parties."

**LendingTree's Position:**

Plaintiff simply ignores the explicit request in this Interrogatory that it not include any alleged acts or omissions undertaken by Bankrate or any third-parties when responding to this Interrogatory.  Indeed, Plaintiff objects to Interrogatory No. 4 on the grounds that "Bankrate's and LendingTree's anticompetitive conduct must be taken as a whole . . .", and its response contains numerous statements that have nothing whatsoever to do with LendingTree.  For example, Plaintiff responds to the request to exclude allegations concerning Bankrate by discussing, *inter alia*, "the cumulative effect of *Bankrate's* acquisitions of competitors and more than 130 exclusionary partnership agreements with competitors over the course of more than a decade" (emphasis added), "*Bankrate's* Predatory Free Rate Listing Practices" (emphasis added); "CPC rate table listing prices charged to banks *by Bankrate*" (emphasis added); "*Bankrate's cartel* or network"; "*Bankrate's* market power became more concentrated" (emphasis added).

Hon. Cathy L. Waldor, U.S.M.J.                                                    Page 13
November 14, 2011

      In sum, Plaintiff has ignored what was requested in Interrogatory No. 5, and thus does not at all answer the question posed in the Interrogatory, i.e., "do you contend that LendingTree took any other acts or omissions that harmed competition or BanxCorp." (and if so, identify any such act or omission. *See* Hearing Tr. at 12:10-13 ("I'm making myself abundantly clear to the plaintiffs. We need to commit to what our theory of the case is . . . and it needs to be very clear. I do not want evasive answers."). Based on the foregoing, Defendant demands that Plaintiff file an amended response to Interrogatory No. 4.

      **Plaintiff's Position:**

      Plaintiff's Responses to this Interrogatory were adequate. LendingTree's desperate and futile attempt to divorce itself from its joint and several liability with its co-conspirator Bankrate under Section 1 of the Sherman Act, speaks for itself. As previously stated, while the liability of each defendant may present separate and distinct issues entirely independent of each other, there is a single unified damage to the plaintiff. Plaintiff is therefore entitled to shift the burden of proof on the issue of causation to Defendant. *See generally Hall v. DuPont*, 345 F.Supp. 353, 370-380 (E.D.N.Y.1972); *see also Bogosian v. Gulf Oil Corp.,* 562 F.2d 434, 454 (3d Cir. 1977).

      Notwithstanding, subject to the foregoing objections, and as set forth in its Responses, Plaintiff re-states that too much sharing of instantaneously available information by collaborating horizontal competitors such as Bankrate and LendingTree made it very easy for them to engage in market division, customer and revenue allocation and price fixing. Bankrate's market division, customer and revenue allocation, and price fixing agreements with LendingTree increased their market share and profits during 2007 and 2008 at the expense of Plaintiff, and made competition against them in the relevant market uneconomical, if not impossible. Such agreement axiomatically increased their ability to control prices, fix prices, and offer Predatory Free Rate Listings[2] during 2007 and 2008. Finally, the integration of LendingTree into

---

[2] **Plaintiff's fn:** Plaintiff defines the expression "Predatory Free Rate Listings" as an anticompetitive practice engaged in by Bankrate and its co-branding partners/competitors including LendingTree, whereby they continuously offered Internet rate table listings free of charge to financial service providers and commingled these free rate listings with paid rate listings on the same Internet rate tables daily. Such free rate listings or product dumping had the effect of discouraging financial service providers from paying to list their rates at any price on Plaintiff's website or other independently competing websites. As a result, financial service providers were encouraged to list their Internet rates for free on Bankrate's and its partners' cartel or "network," including LendingTree, rather than having to pay to list their rates at any price on Plaintiff's or other independent competitors' Internet rate tables.

For example, Plaintiff refers to document labeled EB000944 produced by EverBank in response to a subpoena, which disclosed that as long as a bank paid Bankrate for at least one type of rate table, they could have their rates listed on all tables. According to document EB000944 Everbank appeared on all of Bankrate's Internet rate tables including free CD and money market rate listings, but only paid for clicks on the checking rate tables at a sharply reduced price of $2.40 per click, rather than Bankrate's higher price of $8.75 per click for CD rate listings or $9.50 per click for money market (MMDA) listings.

For further examples of LendingTree's and Bankrate's free rate listings, Plaintiff refers to documents labeled BX000061-BX000066, and BANX004256-4269. Plaintiff further refers to documents labeled BX0027074-BX0027077 displaying screenshots of Bankrate's website featuring national money market rate table listings of more than 40 *hyperlinked* rate listings which appear to be listed for free, except for only two banks, i.e., Ally Bank and Aurora Bank which are displayed with their logos on top of the first rate table page. By way of a further

Hon. Cathy L. Waldor, U.S.M.J.                                                      Page 14
November 14, 2011

Bankrate's network and centralized sales organization, further facilitated and enabled Bankrate's Predatory Free Rate Listing practices.

The CPC rate table listing prices charged to banks by Bankrate on behalf of its own websites as well as a cartel of hundreds of Bank Rate Website partners including LendingTree during 2007 and 2008, were consistently fixed across Bankrate's cartel or network. After Bankrate's agreements with LendingTree the market structure and Bankrate's market power became even more concentrated.

As a result of LendingTree's market allocation and price fixing agreement with Bankrate independent Bank Rate Websites were further forced to join Bankrate's cartel or exit the market, or were bought out by Bankrate, as in the case of Bankaholic.

By being designed to be overly large, Defendant's cartel including LendingTree, made competition against it uneconomical. In fact, no such competing and economically viable Bank Rate Website network of a meaningful or comparable scale has ever been able to be launched or established in the United States.   The Bankrate-LendingTree combination reduced the participants' ability or incentive to compete independently, limited independent decision making, and combined the control of or financial interests in production, key assets, or decisions regarding price, input, output, or other competitively sensitive variables.

Such anticompetitive conduct, growing monopolization and cartelization – supplemented by Bankrate's partnership agreements with its competitor LendingTree – prevented rivals such as Plaintiff from gaining competitive access to potential customers and end users, precluded Plaintiff from obtaining the necessary scale needed for efficient or viable levels of operation, raised Plaintiffs operating and marketing costs, and inhibited competition. Plaintiff was therefore induced to exit the market because Bankrate's monopolization and cartelization had the effect of diverting all traffic and sales in the relevant market to Bankrate's network with LendingTree's support.

As further set forth in its Responses, Plaintiff had properly objected to this Interrogatory since the various components and consequential effects of the monopolization, cartelization and anticompetitive conduct engaged in by Bankrate in addition to its agreements with LendingTree were interdependent of each other, and occurred continuously over the course of many years.  As such, Bankrate's and LendingTree's anticompetitive conduct must be taken as a whole, rather than considering each aspect or each of Bankrate's or LendingTree's cumulative antitrust violations in isolation, particularly due to the cumulative effect of Bankrate's acquisitions of competitors and more than 130 exclusionary partnership agreements in restraint of trade and transactions with competitors over the course of more than a decade.

Plaintiff further objected to this request on the grounds that the anticompetitive effects of Bankrate's transactions with its competitor LendingTree are interrelated and closely intertwined, and were best described in document labeled BX000601 pertaining to Bankrate's May 2, 2007

---

example, Defendant caused these same rate table listings featuring more than 40 *hyperlinked* free rate listings to be displayed daily throughout approximately 300 co-branded websites which are part of Bankrate's cartel or "network."

Hon. Cathy L. Waldor, U.S.M.J.                                                    Page 15
November 14, 2011

Q1-07 Earnings Conference Call specifically acknowledging how the February 2, 2007 deposits co-branding agreement that had been recently entered into between LendingTree and Bankrate erected barriers to entry in the relevant market, precluded rivals such as Plaintiff from obtaining the necessary scale needed for efficient or viable levels of operation, raised Plaintiff s operating and marketing costs, inhibited competition and induced Plaintiffs exit of the market, as follows:

> One of the things that is a tremendous gating item for us, we believe is in terms of competition, and barriers for competition, is how does anybody else break into this, if we have tied up all the best newspaper relations, the best co-brand relationships [such as LendingTree] and we've got a dynamic organic traffic website. How does anybody else get into this business and compete with Bankrate? I look at it as both an offensive marketing opportunity, as well as a defensive opportunity. [See document labeled BX000601]

Based on the foregoing, Plaintiff's responses are proper.

## 4.     Interrogatory No. 5

Interrogatory No. 5 provides: "Identify when in 2007 "Plaintiff was unable to attract new customers or retain existing customers even by offering to sell Internet rate listings at less than half the CPC prices charged by Bankrate," and identify with specificity any and all instances when Plaintiff offered to sell Internet rate listings at less than half the CPC prices charged by Bankrate.  If no documents exist which are responsive to this request, identify them by Bates-number."

**LendingTree's Position:**

Plaintiff's response over four pages contains a regurgitation of Plaintiff's allegations against Bankrate and LendingTree, but does not in any way answer the question that has been posed.  Accordingly, we demand that Plaintiff provide a supplemental response to Interrogatory No. 5 that is responsive to the request in which:

(a)   Plaintiff identifies when in 2007 Plaintiff was unable to attract new customers or retain existing customers even by offering to sell Internet rate listings at less than half the CPC prices charged by Bankrate;

(b)   Plaintiff identifies with specificity any and all instances when Plaintiff offered to sell Internet rate listings at less than half the CPC prices charged by Bankrate; and

(c) If documents exist which are responsive to this request, Plaintiff identify them by Bates-number.[3]

---

[3] To the extent that Plaintiff accuses Defendant of "circular reasoning" in its request to identify documents by Bates-Number based on what Plaintiff obviously knows was a typographical error, we also demand that Plaintiff supplement its response if it is withholding information based on this objection.

Hon. Cathy L. Waldor, U.S.M.J.                                                          Page 16
November 14, 2011

### Plaintiff's Position:

Plaintiff's Responses to this Interrogatory were adequate. Contrary to LendingTree's misrepresentations, in its Responses to this Interrogatory, Plaintiff indeed identified when in 2007 Plaintiff was unable to attract new customers or retain existing customers even by offering to sell Internet rate listings at less than half the CPC prices charged by Bankrate, and identified with specificity when Plaintiff offered to sell Internet rate listings at less than half the CPC prices charged by Bankrate.

As set forth in pages 19 to 24 of its Responses, which are recited herein, Plaintiff refers to documents labeled BX000061-BX000066, BX000143-BX000152, BX0021739-BX0023613, BX0024094-BX0025581, BX003959-BX003963, BX004195-BX004195, BX000342-BX000368.

Plaintiff's Responses further state that as a result of Bankrate's monopolization and cartelization of the relevant market with LendingTree's support, by 2007 there was no longer a free market. In order to create a monopoly, Bankrate's prices for its products were fixed in lockstep throughout its network and initially set below cost. Then, after competition was suppressed and Bankrate and its cartel partners, including LendingTree, found themselves secure in their monopoly and cartelization of the market, they started to ratchet up their prices and could afford to effectively start charging supra-competitive prices. Bankrate's 130 co-branding partnership agreements with competitors, including LendingTree, granted Bankrate the sole authority and/or exclusive right to sell rate table listings on the Internet at the same price on behalf of the cartel or "network."

This enabled Bankrate, LendingTree and the other cartel members to essentially charge jointly any fixed price across their "network" of interdependent partners/competitors at will, while concurrently engaging in Predatory Free Rate Listings as defined above [see fn 1], designed to discourage financial service providers from paying Plaintiff to list their rates at any price. Furthermore, Plaintiff and any other remaining independent competitors were forced out of the market because Bankrate's monopolization and cartelization had the effect of diverting all traffic and sales in the relevant market to Bankrate's network, including LendingTree. As a result, there was no longer an unfettered competitive market price in the relevant market.

For example, during its Q3-07 Earnings Call, Bankrate acknowledged the following: "As I said, I was looking at this e-mail from one of our lenders who said if—his last line is, if lenders aren't making money off Bankrate, then they are doing something wrong. And some people have better business models and obviously better at converting than others, but because of that, we are pretty confident about our ability to push rates. And again, nobody calls us and goes, hey, thanks for the rate increase, can I have another? But the fact is that they don't vote with their feet. They don't leave. They are not canceling. They are not finding alternatives." [See document labeled BX000535]

On June 11, 2007, Bankrate and its 130 partners, including LendingTree, implemented a 15% price increase on their CPC Program Pricing, effective as of July 1, 2007. On August 2, 2007, during its Q2-07 Earnings Call, Bankrate acknowledged the following: "While we don't

want to be either arrogant or naive, the fact is we really haven't seen any exodus of advertisers. In fact, it's been just the opposite. We continue to grow our rate table-advertising base and have more lenders on the table than we did last quarter, and more than we had last year. Hyperlink revenue for the quarter, as Ed said, was up 31%, while the number of advertisers on our rate tables continue to grow for the seventh straight quarter as more and more advertisers are finding the Bankrate tables the go-to place for reaching end market consumers who click and convert. As of yesterday, August 1, we had 811 advertisers on our rate tables. Given that strength, given that demand, you are aware that we previously announced a 15% price increase for mortgage and home equity hyperlink clicks effective July 1. As Ed said, there's more news on the pricing front. This last week we announced to deposit advertisers a price increase effective August 15 of 25% per CD click, and 20% per money market click. Again, the increases are driven by advertiser demand and our belief that Bankrate provides a unique environment that advertisers find very valuable. And you should know that neither increase has resulted in a decline in the number of advertisers." [See document labeled BX000502]

On November 2, 2007, during its Q3-07 Earnings Call, Bankrate again acknowledged the following: "On July 1st, we implemented a 15% CPC price increase for mortgage, home equity and other debt-related products. On August 15th, we implemented a 25% CPC price increase for CDs and a 20% price increase for money market accounts. The level of demand for these products continues to be very high. We now have over 800 CPC advertisers on the tables with demand continuing to grow every day." [See document labeled BX0002400]

On February 5, 2008, during its Q4-07 Earnings Call, Bankrate again acknowledged the following: "Cost per click or CPC rate search revenue came in at $10.3 million in Q4 2007, compared to $7.4 million in Q4 2006, representing an increase of 39%. The increase was achieved through more CPC clicks, as well as higher CPC rates. As I mentioned, CPC proved to be solid all year long, with CPC revenues for the full fiscal year coming in at $36.9 million, a $10.2 million, or at 38% increase over the $26.7 million we posted for fiscal 2006… We continue to benefit from the move.com relationship as well. Also, we opened our 2008 CPC rate search business with a 20% increase for deposit clicks effective January 1st, 2008." [See document labeled BX0002443]

During that same February 5, 2008 Earnings Call, Bankrate's CEO Tom Evans added the following: "I can tell you, in fact, that January of 2008, is the best month we've had in the history of the company. We've had the highest unique visitors, the highest page views, the highest CPC revenue, the highest display revenue and the best month we've ever had for Bankrate Select [LendingTree's quid-pro-quo mortgage lead generation website partner] … And just to give you a sense, January traffic was more than 50% above the best month we've ever had, and 70% above last January. CPC revenue for January was more than 50% above November, the best CPC month we've ever had, and more than doubled last January CPC revenue." [See document labeled BX000539]

On May 3, 2008, during its Q1-08 Earnings Call, when asked about the number of CPC advertisers in the first quarter of 2008, Bankrate further acknowledged the following: "We had well over a thousand CPC advertisers." [See document labeled BX000582]

Hon. Cathy L. Waldor, U.S.M.J.                                                    Page 18
November 14, 2011

By 2007 the extent of Bankrate's market power, monopolization and cartelization was such that Plaintiff was unable to attract new customers or retain existing customers even by offering to sell Internet rate listings at less than half the CPC prices charged by Bankrate.

Plaintiff further states that from April 1, 2007 until February 28, 2008 the price charged by BanxCorp for its Internet rate listings generally ranged from $2.50 per click to $3.50 per click for CD and money market rate listings, while Bankrate's comparable prices ranged from $5.55 to $7.70 per click.

From March 1, 2008 onward the price charged by BanxCorp for its Internet rate listings was generally $4.00 per click for CD and money market rate listings, while Bankrate's comparable prices ranged from $7.70 to $9.50 per click.

Because the customers, i.e., financial service providers were unable to find alternatives since any independent competitors including Plaintiff were forced to exit the market, Bankrate was able to raise prices through both monopolization and cartelization without being required to reduce output.  Of course a monopolist such as Bankrate was only able to do this because it no longer faced any competitors with sufficient power to bid the market or hypothetical equilibrium price down.

Moreover, the cartel members were prevented from cheating each other because Defendant's 130 co-branding partnership agreements granted Bankrate the exclusive right to sell Internet rate table listings to financial service providers nationally on behalf of hundreds of competing websites - at a fixed price - collect fees from customers, and allocate revenues among each competing member of the cartel on a network basis.  As a result, the monopolist Bankrate and the members of its cartel, including LendingTree, did not need to worry about setting the supra-competitive prices too high.

Based on the foregoing, Plaintiff's responses are proper.

**5.**      **Interrogatory No. 7**

Interrogatory No. 7 provides: "Identify by Bates-number each and every document that you contend supports your contention that LendingTree entered into, and participated in, conspiracy in violation of the antitrust laws."

**LendingTree's Position:**

Plaintiff refuses to respond to this interrogatory, stating "LendingTree is free to do the work itself."  However, Judge Salas explicitly stated "I am instructing the plaintiff[] to identify by Bates stamp ranges those documents that are responsive to counsel's inquiries."  Hearing Tr. at 6:1-3; 7:17-20 (same).  Therefore, Defendant demands that Plaintiff amend its response to Interrogatory No. 7.

Hon. Cathy L. Waldor, U.S.M.J.                                            Page 19
November 14, 2011

**Plaintiff's Position:**

Plaintiff's Responses to this Interrogatory were adequate. In its Responses Plaintiff objected to this Interrogatory on the grounds that it is inappropriate for LendingTree to purport to require Plaintiff to conduct such unduly burdensome, overly broad and extensive research involving the analysis, classification and identification of nearly *two hundred thousand documents* that have already been produced to date by the parties and nonparties in this litigation.

According to the Court's Discovery Dispute Scheduling Order dated August 31, 2011, "Plaintiff BanxCorp must respond to Defendant Bankrate's supplemental interrogatories and document requests with specific reference to bates stamped ranges *to the extent possible.*" [Emphasis added]  The foregoing approximately *two hundred thousand documents* have been produced by Plaintiff to date in response to LendingTree's specific requests, including documents produced by LendingTree itself.  Therefore, it is unreasonable for LendingTree to now ask Plaintiff to identify by Bates-number each and every document which LendingTree itself produced or demanded to be produced by Plaintiff, presumably on the grounds that each of these documents are relevant to Plaintiff's claims.  Otherwise, it may be presumed that LendingTree's overbroad request for such documents and production of such documents may have been frivolous to begin with.

Plaintiff further objected to this Interrogatory on the grounds that LendingTree's and Bankrate's antitrust liability under Section 1 of the Sherman Act is joint and several.  Subject to the foregoing, and without purporting to be an all-inclusive and exhaustive list of documents, Plaintiff refers to documents labeled  BX001-BX0023613,  BR00000001-BR00125268, LT0000001-LT0082917, CD-ROMs containing copies of third-party documents received in response to BanxCorp subpoenas in the Bankrate Action.

Based on the foregoing, Plaintiff's responses are proper.

### III.

### CONCLUSION

**LendingTree's Position:**

Based on the foregoing, the Court should order Plaintiff to amend its responses Interrogatory Nos. 1, 2, 3, 4, 5, and 7 to cure the deficiencies noted above.[4]

---

[4] In letters to this Court, Plaintiff has claimed that the Interrogatories were improperly served after a purported May 2, 2011 deadline and that I represented that discovery is complete.  However, Plaintiff's claim concerning the May 2, 2011 deadline was previously rejected by Magistrate Judge Arleo, and the actual quote from the August 10, 2011 conference is as follows "And, Your Honor, just to be clear again, when I said two weeks, I was referring to interrogatory deficiencies. I may also be done with discovery, but I'm not going to know that for quite some time. I just got –", to which Judge Salas responded "I'll allow you to supplement, Counsel. Do the best with what you have."  *See* August 10, 2011 Hearing Transcript at 8:5-10 (emphasis added).

Hon. Cathy L. Waldor, U.S.M.J.                                                        Page 20
November 14, 2011

**Plaintiff's Position:**

Based on the foregoing, LendingTree's alleged deficiencies pertaining to Interrogatory Nos. 1, 2, 3, 4, 5, and 7, should be rejected by the Court.  The alleged deficiencies lack merit.

Moreover, on October 24, 2011, after the Court convoked the parties to a joint conference for scheduling of depositions, LendingTree served its baseless deficiency letter as a means to endlessly delay depositions, as a diversionary and dilatory tactic, and to forestall any sanctions due to LendingTree's own discovery violations. [5]

Respectfully submitted,

_(signature)_

_____                                    s/ Sean Kirby
Mordechai Lipkis                                           Sean Kirby
MORDECHAI I. LIPKIS, ESQ.                                  Daniel Brown
350 Broadway, Suite 1150                                   SHEPPARD, MULLIN, RICHTER
New York, New York 10013                                   & HAMPTON, LLC
(212) 925-4023                                             30 Rockefeller Plaza
mlipkis@mlipkis.com                                        New York, New York 10112
*Counsel for Plaintiff BanxCorp*                           (212) 653-8700
                                                           dbrown@sheppardmullin.com
                                                           *Counsel for Defendant LendingTree LLC*

cc:     Hon. Esther Salas, U.S.D.J. (*via ECF*)
        All counsel of Record (*via ECF*)

---

[5] **Plaintiff's fn:** In response to LendingTree's closing footnote, as previously stated, Plaintiff objected to these Interrogatories on the grounds that they were belatedly served by LendingTree on **September 20, 2011,** after the two week deadline agreed upon during the parties' August 10, 2011 Status Conference, and after the **September 16, 2011** deadline for BanxCorp and Bankrate to respond to supplemental discovery requests and deficiencies, as Ordered by the Court on September 1, 2011.  Nevertheless, LendingTree, presumably acting in concert with Bankrate (pursuant to an indemnification clause in their February 2, 2007 Agreements subject to Plaintiff's antitrust claims in both actions [reference is made to documents labeled LT0000002-LT0000087]), has unfairly sought a "second bite at the apple" by deliberately delaying service of these Interrogatories until after the deadline set by the Court.  In addition, during the August 10, 2011 conference with Judge Salas, LendingTree's counsel indicated that LendingTree may also be done with discovery.   Moreover, pursuant to Paragraph 17 of the Pretrial Scheduling Order entered in Civil Action No. 10-2467 on April 4, 2011, as amended by order dated June 29, 2011, which governs proceedings in these consolidated actions, "the parties may serve interrogatories limited to twenty-five (25) single questions and requests for production of documents **on or before May 2, 2011,** to be responded to within thirty (30) days of receipt."  There is no information on the record showing that "the May 2, 2011 deadline [for interrogatories] was previously rejected by Magistrate Judge Arleo," as alleged by LendingTree.

This should come as no surprise, given LendingTree's proclivity for ambiguity and deception as part of its diversionary and dilatory tactics.  For example, the record shows [Doc. No. 125 in the LendingTree action] that on June 20, 2011 at 9:42 p.m., after the filing of a lengthy Joint Status Letter on the eve of a telephone status conference with Magistrate Judge Arleo that had been scheduled for June 21 at noon, LendingTree served yet another untimely and baseless deficiency letter.