## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

_____

:

**BANXCORP,**                                                  :

:           **Civil Action No. 07-3398 (ES) (CLW)**

           **Plaintiff,**                    :

:                      **OPINION**

       **v.**                                       :

:

**BANKRATE INC.,**                                       :

:

          **Defendant.**                  :

_____   :

**SALAS, DISTRICT JUDGE**

This matter is before the Court by way of Bankrate Inc.'s ("Bankrate") Motion to Dismiss BanxCorp's Fourth Amended Complaint ("4AC") pursuant to Fed. R. Civ. P. 12(b)(6). (D.E. 210). This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), as well as 15 U.S.C. §§ 1 and 2. Venue is proper pursuant to 28 U.S.C. §§ 1391(b), (b)(2), as well as 15 U.S.C. §§ 15 and 22. The Court's decision is based on its review of the briefs and exhibits related to Bankrate's motion to dismiss, and the Court hereby decides the motion without oral argument pursuant to Fed. R. Civ. P. 78. For the following reasons, Defendant's motion to dismiss is GRANTED as to the First Claim and DENIED as to the Second, Third, and Fifth claims.

## I.      BACKGROUND

### A.      Parties and Claims

The underlying issue in this case is whether Defendant Bankrate has engaged in anticompetitive practices in violation of federal and state antitrust laws, resulting in economic injury to Plaintiff BanxCorp.

1

BanxCorp is a corporation organized and existing under the laws of Delaware with its office located in Scarsdale, New York. (4AC, D.E. 204 ¶ 1). Plaintiff owns and operates the website BanxQuote.com. (*Id.* ¶ 1). "From its inception in 1984 until the present, Plaintiff has done business under the trade name and registered trademark 'BanxQuote.'" (*Id.*). BanxCorp is a provider of bank rate tables listing interest rates from financial institutions. (Compl., D.E. 1 ¶ 14). It publishes those rates in print as well as online. (Def. Moving Br., D.E. 7 at 5, 7).

Defendant Bankrate is a corporation organized and existing under the laws of Delaware, with its principal executive offices located in North Palm Beach, Florida.[1] (4AC ¶ 2). Primarily, Bankrate publishes financial data and advice online, controlling numerous websites that aggregate financial information. (Def. Moving Br., D.E. 210 at 6). It also owns and operates FastFind.com, a lead rate aggregation company. (Def. Moving Br. at 5). Individually and in partnership with various major website operators, Bankrate also operates websites on which financial institutions such as banks and mortgage brokers list their rates for various financial products, including certificates of deposit and mortgage notes. When consumers visit these websites—such as Bankrate's own Bankrate.com—to view the rates, they are able to click on the name of the financial institution listing the rate in order to get more information or transact business with the financial institution. (4AC ¶¶ 36-49).

BanxCorp alleges that Bankrate, with its co-branding partners or its distributors, has engaged in price-fixing, predatory price-fixing, and exclusionary conduct that would guarantee Bankrate a monopoly in the Bank Rate Website market.[2] (*Id.* ¶¶ 279-297). Its alleged partners

---

[1] On September 28, 2011, this Court entered an Order substituting Bankrate, Inc., a Delaware Corporation, as successor-in-interest to Bankrate, Inc., a Florida Corporation. (D.E. 282).

[2] As defined by BanxCorp, the Bank Rate Website market "is the market for fee-based aggregated bank rate table listings with interactive functionalities on the Internet. It is often referred to as the 'Internet-based consumer banking marketplace,' or, simply, bank rate websites ("Bank Rate Websites"). The relevant geographic market for

in these schemes—its network—include approximately 130 co-branding partners, which together control more than 300 partner sites that compete against each other and against Bankrate.com. (*Id.* ¶ 19).  These partner-competitors include, among others, Dow Jones & Co., The New York Times, CNBC, CNN, MSNBC, Fox News, AOL, and Move Inc.  (*Id.* ¶ 20).  Plaintiff alleges that the co-branding partnership agreements granted Defendant the sole authority and/or exclusive right to sell rate table listings to its customers on the Internet at the same price on behalf of Defendant's "network," first on a flat fee basis (from the late 1990s until October 1, 2005), and after October 1, 2005, on a cost-per-click ("CPC") basis.  (*Id.* ¶ 21).  According to BanxCorp, "CPC or Cost-Per-Click is a fee paid by customers—the financial service providers—to list their rates on a Bank Rate Website.  CPC transactions are consummated and charged every time an end user—a consumer—clicks on a hyperlinked rate listing at a Bank Rate Website."  (*Id.* ¶ 21 n.3).

BanxCorp further alleges that since the late 1990s, Bankrate began giving away free rate listings to financial service providers and commingling free rate listings with paid rate listings, allowing Bankrate to charge far less than its competitors, often at a loss.  (*Id.* ¶ 19).  This alleged predatory pricing[3] essentially left most competitors with one of two choices: either exit the market or join Bankrate's network.  (*Id.* ¶ 22).  As Bankrate's predatory pricing scheme became effective, its network grew and some competitors, including BanxCorp, were left behind.

### B.   Procedural History

This case has a lengthy procedural history.   BanxCorp originally filed suit against

---

Bank Rate Websites is the whole of the United States."  (4AC ¶¶ 35-36).  These websites provide services and products similar to those offered by Bankrate, as described above.  *See* Part I.A.

[3] Throughout this Opinion, the Court refers to "predatory pricing" or "predatory price-fixing."  "This term has been used chiefly in cases in which a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.8 (1986) (citation omitted).  "In such cases, 'predatory pricing' means pricing below some appropriate measure of cost."  *Id.* (citation omitted).

Bankrate on July 20, 2007, alleging violations of federal and state antitrust laws based on various types of anticompetitive conduct. (Compl., D.E. 1 ¶ 14). That complaint alleged exclusive dealing, bundling, tie-in, and predatory pricing in violation of §§ 1 and 2 of the Sherman Act. (*Id.* ¶¶ 167-196). The Court ordered BanxCorp to amend the complaint to address significant deficiencies in its definition of the relevant market. *See BanxCorp v. Bankrate, Inc. ("BanxCorp I")*, Slip op. at 10 (D.N.J. July 7, 2008) (D.E. 20). It also granted leave to amend the bundling, tie-in, and LendingTree theories. *Id.* at 17.[4]

On August 21, 2008, BanxCorp filed its First Amended Complaint. ("1AC", D.E. 25). Subsequently, before the Court could rule on the pending motion to dismiss, BanxCorp withdrew that complaint and filed its Second Amended Complaint ("2AC", D.E. 37), alleging predatory price-fixing, exclusive dealing, bundling, vendor lock-in, and tie-in arrangements with competitors or distributors, as well as monopoly and attempted monopolization. (2AC ¶¶ 114-146). In a September 14, 2009 opinion, the court granted BanxCorp leave to correct deficiencies in its market definition "one final time" and "one—and only one—" opportunity to correct deficiencies in its tying, bundling, and vendor lock-in theories. *See BanxCorp v. Bankrate, Inc. ("BanxCorp II")*, Slip op. at 6, 8 (D.N.J. Sept. 14, 2009) (D.E. 75). The Court then stated that "[l]eave is not granted to amend portions of the complaint not addressed in this Opinion." *Id.* at 8. The Court held that the price-fixing and exclusive dealing theories were adequately pled. *Id.* at 6-7.

On October 19, 2009, BanxCorp filed its Third Amended Complaint ("3AC", D.E. 82),

---

[4] In this action and a related action, *BanxCorp v. LendingTree LLC*, No. 10-2467, BanxCorp alleged that in 2007, Bankrate "entered into an anticompetitive agreement with LendingTree, a competitor with a dominant position in the mortgage lead generation and aggregation ('Mortgage Lead Aggregation') market. Defendant and Lending Tree combined, conspired to form a cartel, and agreed to divide and allocate revenues, Internet traffic and clicks, customers, accounts, and products in the savings sub-market for Bank Rate Websites, in exchange for revenues, Internet traffic and clicks in the Mortgage Lead Aggregation market." (4AC ¶ 27).

abandoning its tying and bundling theories but elaborating on its massive price-fixing conspiracy theory, the new centerpiece of BanxCorp's lawsuit.  (3AC ¶¶ 15, 116-149).  It alleged a conspiracy between Bankrate and more than 100 co-branding partners that also allegedly entered into improper exclusive dealing relationships with Bankrate.  (*Id.* ¶ 280-287).

Discovery commenced in 2009 and is ongoing.  (*See* Sept. 1, 2011 Letter Order re: Pretrial Scheduling, D.E. 280).  During discovery, "thousands" of documents have changed hands.  (Def. Moving. Br. at 9).  On July 13, 2010, Judge Wigenton denied Bankrate's motion to dismiss the 3AC.  *See BanxCorp v. Bankrate, Inc.* ("July 13, 2010 Order") (D.N.J. Sept. 14, 2009) (D.E. 121).

On April 1, 2011, BanxCorp filed its 4AC (D.E. 204)—the complaint at issue in the instant motion—in which BanxCorp alleges that Bankrate consciously engaged in (1) illegal restraint of trade in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. § 1; (2) illegal mergers and acquisitions in violation of § 7 of the Clayton Act; and (3) conspiracy in restraint of trade in violation of § 56:9-3 of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-1 *et seq*.  (4AC ¶¶ 279-313).  In the 4AC, BanxCorp offers two theories of liability: (1) a predatory price-fixing conspiracy between Bankrate and its competitors, pursuant to which the parties allegedly conspired to set prices charged to financial institutions for rate table listings *below* Bankrate's average variable cost; and (2) exclusionary conduct based on Bankrate's contractual exclusive right to sell rate table listings for inclusion on rate tables that appear on co-branded web pages of online media outlets.  (4AC ¶ 280).

Subsequently, on April 11, 2011, Defendant Bankrate filed this motion pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  (D.E. 210). Specifically, Bankrate seeks an order dismissing: the First Claim for Relief (§ 1 of the Sherman

Act), except as it pertains to alleged agreements with LendingTree LLC; the Second and Third Claims for Relief (§ 2 of the Sherman Act) except as they pertain to alleged predatory pricing based on Bankrate's switch to cost-per-click pricing; and the Fifth Claim for Relief (the New Jersey Antitrust Act) consistent with Claims 1 through 3.[5]  (Def. Moving Br. at 1).

For the following reasons, Defendant's motion to dismiss is granted as to the First Claim and denied as to the Second, Third, and Fifth claims.

### C.    Arguments

Bankrate argues that BanxCorp's predatory price-fixing conspiracy and exclusive dealing claims are new claims never raised before and must therefore be dismissed because they violate Judge Wigenton's September 14, 2009 opinion and order in this case.  These claims, Defendant argues, are not based on newly discovered evidence or facts learned during the course of discovery.  (*Id.* at 3-4).

Bankrate also argues that the predatory price-fixing claim is legally defective.  First, BanxCorp fails to allege that any of Bankrate's co-conspirators agreed with Bankrate to set prices below cost in order to drive out competition.  Second, BanxCorp fails to provide any evidence that Bankrate priced its product below average variable cost or even market value. Third, the claim is based on contradictory and conclusory allegations.  Fourth, the predatory pricing theory is economically implausible, or makes no economic sense, and should therefore be dismissed on that basis alone.  (*Id.* at 13-20).

Next, Bankrate argues that the exclusionary conduct claim is equally legally defective.

---

[5] Bankrate's only reference to the New Jersey antitrust claims is the following: "Bankrate respectfully seeks an Order, pursuant to Fed. R. Civ. P. 12(b)(6), dismissing . . . the Fifth Claim for Relief (the New Jersey Antitrust Act) consistent with Counts One through Three."  (Def. Moving Br. at 1). Bankrate never revisits the New Jersey claims in its moving papers, and does not provide any guidance on whether analysis under the New Jersey statutes would be the same as under the federal statutes.  In light of the foregoing, the Court will not address the sufficiency of the pleading as to the New Jersey claims.

First, BanxCorp seemingly makes two contradictory statements. For purposes of the price-fixing claim, it alleges that the co-conspirators are also competitors; for purposes of the exclusionary dealing claim, it alleges that they are "distribution channels" for the product. These two distinct characterizations are, according to Bankrate, mutually exclusive. Further, even if the two characterizations could be harmonized, BanxCorp fails to provide proof of market foreclosure— a necessary element of the claim. (*Id.* at 20-25).

Finally, Bankrate argues that the "new" predatory price-fixing conspiracy and exclusionary conduct theories were brought in bad faith and with undue delay and the claims should therefore be dismissed on that basis alone. (*Id.* at 25-31).

In response, Plaintiff BanxCorp asserts that the predatory price-fixing and exclusionary dealing claims are not new and were in fact raised in the 3AC. The claims are simply pled here with more particularity based on facts recently discerned through discovery, from documents that were secretly withheld by Defendant. (Pl. Opp. Br., D.E. 214 at 2-3, 29). Therefore, its claims were not brought in bad faith or with undue delay. (*Id.* at 32).

Further, BanxCorp argues that inquiries into purpose, power, and effects are unnecessary once a particular restraint has been found to be a *per se* violation of § 1. BanxCorp asks this Court to find that the price-fixing and exclusionary dealing claims are *per se* violations of § 1. (*Id.* at 7, 10-13).

Further, BanxCorp asks this Court to bifurcate the *per se* issues presented here because bifurcation will "greatly narrow the scope of discovery," "streamline the issues to be decided at trial," and "serve the interests of judicial economy. (*Id.* at 8). It also asks this Court for leave to file a motion for summary judgment as an alternative to converting Defendant's Motion to Dismiss to a summary judgment motion. (*Id.* at 9). Finally, it asks this Court to consolidate this

action with *BanxCorp v. LendingTree LLC*, No. 10-2467 (D.N.J. June 2, 2005). (*Id.* at 32-34). Importantly, Plaintiff does not directly address any of Defendant's others arguments. The Court more specifically outlines and addresses the parties' arguments below.

## II.  LEGAL STANDARD

On a motion to dismiss pursuant to Rule 12(b)(6), "courts are required to accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008); *Burrell v. DFS Servs., LLC*, 753 F. Supp. 2d 438, 440 n.1 (D.N.J. Dec. 6, 2010) (holding that contradictory factual assertions on the part of defendants must be ignored). Courts must "determine whether, under any reasonable reading of the complaint, the Plaintiff may be entitled to relief." *Pinker v. Roche Holding Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002). But, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). "Courts are not required to credit bald assertions or legal conclusions draped in the guise of factual allegations." *McCargo v. Hall*, No. 11-553, 2011 WL 6725613, *1 (D.N.J. 2011) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997)). And while antitrust complaints are to be liberally construed, they are not altogether exempt from the federal rules. *See Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 179 (3d Cir. 1988) (citations omitted). A pleading that offers "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 129 S. Ct. at 1949 (citations omitted). Additionally, in evaluating a plaintiff's claims, generally "a court looks only to the facts alleged

in the complaint and its attachments without reference to other parts of the record." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).

In *Twombly*, the Supreme Court set forth the "plausibility" standard for overcoming a motion to dismiss. It refined this approach in *Iqbal*. A complaint satisfies the plausibility standard when the factual pleadings "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that pleads facts "'merely consistent with a defendant's liability, stops short of the line between possibility and plausibility of entitlement of relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

To determine the sufficiency of a complaint under *Twombly* and *Iqbal*, the Court must take the following three steps:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

The Court now proceeds with its analysis claim-by-claim, element-by-element under the three-step method set forth by the Third Circuit, granting the motion to dismiss as to the First Count based on Plaintiff's failure to plausibly allege the "object" of the conspiracy, and denying the motion to dismiss as to the Second, Third, and Fifth claims for relief.

With this standard in mind, the Court analyzes the parties' arguments on dismissal.

III.    DISCUSSION

A.    Threshold/Preliminary Matters

As a preliminary matter, Bankrate argues that BanxCorp's predatory pricing conspiracy and exclusive dealing claims are new claims, and therefore must be dismissed. BanxCorp responds that these claims were in fact discussed in the 3AC and are now being fleshed out based on new documents—some of them secretly withheld by Defendant—acquired through discovery after the filing of the 3AC. Notably, BanxCorp does not indicate which documents, when these documents were obtained, or what specific factual allegations they support in the 4AC. Under the following analysis, the Court finds that Plaintiff offers only a self-serving statement with nothing to support it.

Specifically, Bankrate argues that in the 3AC, BanxCorp alleged "that Bankrate and more than 100 online media outlets conspired to fix prices charged to financial institutions for hyperlinked interest rate table listings at above market levels." Now, according to Bankrate, Plaintiff abandons that theory and alleges "that Bankrate and more than 100 online media outlets conspired to charge *below-cost* prices for the advertising product at issue . . . for some (unidentified) period of time in order to drive competitors out of the market, then agreed to raise prices in order to recoup unidentified losses." (Def. Moving. Br. at 1-2). In other words, Bankrate argues that BanxCorp changed its theory from price-fixing to predatory pricing. This is simply not so.

The 3AC contains numerous paragraphs where its claim of predatory pricing, or pricing below average variable cost, is discussed in some detail. For example, BanxCorp alleges:

> Then, [Bankrate] secured CPC rate listing contracts with hundreds of financial service providers, most of them listing their rates exclusively on Bankrate.com and its network of Mirror Sites, by offering them predatory prices and free rate listings. It retained their loyalty and de-facto exclusivity by switching from a flat

fee to a CPC system, and *continued to price below its average variable cost—and at a significantly lower price than what any remaining competitor could afford to charge*, because the volume of traffic on Bankrate-dot-com and its Mirror Sites was large enough that it generated significant long-term profits, allowing Defendant to quickly start recouping its earlier losses in excess of $53 million. (3AC ¶ 91) (emphasis added).

A key to the development of its alleged monopoly was Bankrate's predatory pricing scheme.  In order to survive, Plaintiff BanxQuote and any other remaining struggling competitors were left with only two undesirable options: *either charge the same CPC as Bankrate—below any reasonably expected average variable or other measure of cost*—while having less traffic to offer to potential advertisers, or charge a lower CPC than Bankrate and lose even more money on each transaction.

(*Id.* ¶ 102 (emphasis added); *see also id.* ¶¶ 19(e), 19(g), 223-230, 240, 246).  Because the 3AC explicitly contains allegations of below-cost pricing, it cannot be said that claims in the 4AC allege below-cost pricing for the first time.[6]

Bankrate further argues that the exclusive dealing claim in the 4AC is new.  According to Bankrate, in its 3AC, BanxCorp alleged that Defendant "entered into 'exclusive dealing' arrangements with those same online media outlets."  (Def. Moving Br. at 1-2).  In the 4AC, Plaintiff alleges that "Bankrate's contracts with the online media outlets resulted in exclusion of BanxCorp from necessary distribution outlets, and are thus violative of antitrust laws prohibiting exclusionary conduct."  (*Id.* at 2).  Below, in Part III.C, the Court more fully discusses the exclusionary conduct allegations in the 4AC; however, the Court briefly notes that it finds that the allegations made in the 4AC are similar to the ones made in the 3AC.  (*Compare* 3AC ¶ 280 ("Bankrate has established de-facto exclusive dealing partnerships with approximately 100 co-branded Mirror Sites, thus foreclosing competition in the relevant market."), *with* 4AC ¶ 164

---

[6] Alternatively, Bankrate also argues—for the first time in its reply brief—that BanxCorp changed its theory from unilateral predatory pricing-fixing in the 3AC to a predatory price-fixing conspiracy in the 4AC.  (*See* Def. Reply Br. at 5).  Because Bankrate raises this argument on reply, the Court declines to address it here.  *See Dana Transp., Inc. v. Abelco Fin., LLC*, No. 04-2781, 2005 U.S. Dist. LEXIS 18086, at *16 (D.N.J. Aug. 17, 2005) ("The purpose of the reply brief is to respond to the opposition brief or explain a position that the respondent has refuted.") (citations omitted).

("Defendant's 130 co-branding partnership agreements granted Bankrate the exclusive right to sell Internet rate table listings to financial service providers nationally[.] . . . Subsequently . . . independent competitors were driven out of the market . . . ."). On July 13, 2010, Judge Wigenton denied Bankrate's motion to dismiss, and therefore the claim survived. *See BanxCorp v. Bankrate, Inc.* ("July 13, 2010 Order") (D.N.J. Sept. 14, 2009) (D.E. 121).

Finally, Bankrate alleges that the claims in the 4AC are "new," and therefore violate Judge Wigenton's September 14, 2009 opinion and order prohibiting new claims and setting forth which claims could be amended and which could not. Based on its review of Judge Wigenton's opinion, the Court is satisfied that the claims at issue in this motion are not barred by that ruling, in which amendments were permitted to the "definition of the relevant market and related sub-markets, [as well as claims related to] tying, bundling, and vendor lock-in." *Id.* n.1. Judge Wigenton also found that the exclusive dealing claims were adequately pled. Additionally, Judge Wigenton found that predatory price-fixing *was* a theory BanxCorp raised in the 3AC, and she did not determine the sufficiency of these related claims. Therefore, as long as the predatory price-fixing and exclusionary conduct claims in the 4AC are not facially different from the claims in the 3AC, Judge Wigenton's order would not have precluded claims in the 4AC. Based on this Court's review, the predatory price-fixing and exclusionary conduct theories raised in the 3AC do not appear to be facially different from the theories raised in the 4AC, and therefore the Court finds that the claims raised in the 4AC do not violate the September 14, 2009 order.[7] The Court now proceeds to its primary analysis.

---

[7] The Court also notes that on April 5, 2011, Judge Arleo granted BanxCorp's motion to amend the 3AC. That order did not limit BanxCorp's ability to modify the claims in its 3AC or bring new claims. (*See* Order Granting Motion for Leave to File an Amended Complaint, D.E. 209).

**B.     Sherman Act § 1: Contract or Conspiracy in Restraint of Trade**

**1.      Legal Standard: Sherman Act, 15 U.S.C. § 1**

BanxCorp brings its predatory price-fixing claim under § 1 of the Sherman Act.  Section 1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  Thus, plaintiffs asserting a § 1 claim "must allege four elements: '(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.'"  *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010).  Existence of a "contract, combination . . . or conspiracy" is the hallmark of a § 1 claim.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (citations omitted).  Over the years, courts have limited their attention to two essential elements: (1) that the defendant was a party to a "contract, combination . . . or conspiracy" and (2) that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade.  *See Burtch*, 662 F.3d at 221 (citing *In re Ins. Brokerage*, 618 F.3d at 315).

As to the first element, plaintiffs must establish the existence of an agreement or "concerted action," and therefore, in order to state a claim for conspiracy to engage in predatory pricing, BanxCorp must plead that the defendant and co-conspirators "conspired" to "price below some measure of cost."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  "Unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation."  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003).  "An agreement exists when there is a unity of purpose, a common design and understanding, a

meeting of the minds, or a conscious commitment to a common scheme." *West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)); *Howard Hess Dental Labs. Inc.*, 602 F.3d at 254).

A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two. Direct evidence of a conspiracy is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Ins. Brokerage*, 618 F.3d at 324 n.23 (citations omitted). "[D]irect evidence of conspiracy, if credited, removes any ambiguities that might otherwise exist with respect to whether the parallel conduct in question is the result of independent or concerted action." *Id.* at 324. "If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question of whether an agreement has been adequately pled." *West Penn,* 627 F.3d at 99 (citing *In re Ins. Brokerage*, 618 F.3d at 323).

Examples of direct proof of conspiracies that the Third Circuit has found sufficient include:

> (1) a direct threat to the plaintiff from a competitor that if he went into business his competitors would do anything they could to stop him, including cutting prices or supplies;

> (2) advising distributors that a supplier would cut off access if the distributor failed to maintain a certain price level;

> (3) a memorandum produced by a defendant conspirator detailing the discussions from a meeting of a group of alleged conspirators; and

> (4) a public resolution by a professional association recommending that its members withdraw their affiliation with an insurer.

*InterVest*, 340 F.3d at 162-63 (citations omitted).

In its evaluation of circumstantial evidence in an antitrust case, the Court must apply special considerations so that only reasonable inferences are drawn from the evidence. *InterVest,*

340 F.3d at 160. The reason is that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588. Certainly, "an actionable horizontal conspiracy does not require direct communication among the competitors." *In re Ins. Brokerage*, 618 F.3d at 331. But a § 1 claim of conspiracy "predicated on parallel conduct should be dismissed if 'common economic experience,' or facts alleged in a complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior." *Id.* at 326. Thus some courts have denominated certain factors which, if present, may indicate the existence of a conspiratorial agreement. *See id.* at 321. These factors include: "(1) evidence that the defendant had a motive to enter into a [conspiracy]; (2) evidence that the defendant acted contrary to its interests; and (3) 'evidence implying a traditional conspiracy." *Id.* Courts have cautioned that the first two factors may indicate that "defendants operate in an oligopolistic market," and because such a market contains very few sellers, each defendant would be aware of each other's actions. *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 121, 135 (1999) ("[E]vidence of action that is against self-interest or motivated by profit must go beyond mere interdependence."). Evidence of the third factor is "non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *In re Ins. Brokerage*, 618 F.3d at 322 (citations and quotations omitted).

The second element of a § 1 claim, an unreasonable restraint on trade, is analyzed under either the *per se* standard or the rule of reason standard. The *per se* illegality rule applies when a business practice "on its face, has no purpose except stifling competition." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001); *In re Ins. Brokerage*, 618 F.3d at 316 (citations

omitted) ("A *per se* rule is applied when the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.").  Agreements that fall under established *per se* illegality categories are "conclusively presumed to unreasonably restrain competition." *In re Ins. Brokerage*, 618 F.3d at 316 (citation and quotations omitted). "Paradigmatic examples are 'horizontal agreements among competitors to fix prices or to divide markets.'" *Id.* (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)).  *Per se* illegality "is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 830 (3d Cir. 2010) (citations and internal quotation marks omitted).

But plaintiffs pleading exclusively *per se* violations—as opposed to pleading rule of reason violations in the alternative[8]—must be careful.  "If the court determines that the restraint at issue is sufficiently different from the *per se* archetypes to require application of the rule of reason, the plaintiff's claims will be dismissed." *In re Ins. Brokerage*, 618 F.3d at 317; *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 7 n.2 (2006) (rejecting *per se* analysis and declining to conduct a rule of reason analysis where plaintiffs "ha[d] not put forth a rule of reason claim"). This is particularly true with certain restraints of trade that are "highly suspicious yet sufficiently idiosyncratic that judicial experience with them is limited." *In re Ins. Brokerage*, 618 F.3d at

---

[8] The Supreme Court has explained the rule of reason as follows:

> The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1.  Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.  Appropriate factors to take into account include specific information about the relevant business and the restraint's history, nature, and effect.  Whether the businesses involved have market power is a further, significant consideration.  In its design and function the rule distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885-86 (2007) (citations and internal quotations omitted).

317 (quotations omitted). In those cases, *per se* "condemnation is inappropriate, but at the same time, the 'inherently suspect' nature of the restraint obviates the sort of 'elaborate industry analysis' required by the traditional rule-of-reason standard." *Id.*

### 2. Plaintiff's Failure to Sufficiently Plead the Conspiracy Element of Its Predatory Price-Fixing Theory

Under the Third Circuit's three-step analysis, the Court begins by taking note of the elements of a conspiracy claim under § 1, which are (1) the existence of an agreement to engage in the alleged scheme, here, predatory (*i.e.*, below-rate) price fixing and (2) that the conspiracy imposed an unreasonable restraint on trade. *See Burtch*, 662 F.3d at 221. Because the Court finds that Plaintiff has insufficiently pled element one, the Court does not analyze the second element. Before moving to step two of the Third Circuit's three-step analysis, the Court briefly sets forth the standard for Plaintiff's required showing and the parties' arguments as to that showing.

To sufficiently plead the conspiracy element of its claim, Plaintiff must show the existence of an agreement among members of the conspiracy demonstrating "a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." *West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)); *Howard Hess Dental Labs. Inc.*, 602 F.3d at 254). The "unity of purpose" must point to the "common scheme" alleged in the complaint. *See id.* In this case, Plaintiff's 4AC alleges that the common scheme was predatory pricing. In the antitrust context, "predatory" means pricing below some measure of cost. *Matsushita*, 475 U.S. at 574; *Pac. Bell Tel. Co. v. Linkline Commc'n, Inc.*, 555 U.S. 438, 451 (2009) ("[T]o prevail on a predatory pricing claim, a plaintiff must demonstrate that . . . 'the prices complained of are below an appropriate measure of its rival's costs'") (citation omitted);

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 318 (2007) ("In a typical predatory-pricing scheme, the predator reduces the sale price of its product (its output) to below cost, hoping to drive competitors out of business."); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226 (1993) ("The mechanism by which a firm engages in predatory pricing—lowering prices—is the same mechanism by which a firm stimulates competition; because cutting prices in order to increase business often is the very essence of competition[,] mistaken inferences are especially costly, because they chill the very conduct the antitrust laws are designed to protect.") (internal quotations and citation omitted).

Therefore, to sufficiently plead a conspiracy among Bankrate and its co-branding partners, BanxCorp must plausibly allege that the conspirators agreed to enter a price fixing agreement for the purpose of "pricing below a measure of cost." *Id.* A party's failure to allege specifics as to the entrance and object of the agreement will lead to the dismissal of a conspiracy claim. *See Matsushita*, 475 U.S. at 595-96 (evidence that defendants agreed to fix minimum prices did not suggest predatory pricing conspiracy because such agreement indicated that defendants were seeking to place a floor under prices rather than to lower them, and evidence that tended to support the conspiracy "[said] little, if anything, about the existence of a conspiracy to charge below-market prices"); *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 340 (1991) (affirming dismissal of a complaint where evidence indicated that defendants had abolished the featherbedding practice that was the "object of [the] conspiracy"); *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 535 (1978) ("The object of the conspiracy was to restrict St. Paul's policyholders to 'claims made' coverage by compelling them to 'purchase medical malpractice insurance from one insurer only, to wit defendant, St. Paul, and that [such] purchase must be made on terms dictated by the defendant, St. Paul.'"); *In re Ins. Brokerage*, 618 F.3d at

321 ("[I]n many cases where an agreement exists, parallel conduct—such as setting prices at the same level—is precisely the concerted action that is the conspiracy's object. Accordingly, we must define the object of the horizontal agreement alleged in the complaint.") (citation omitted); *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 179 (3d Cir. 2010) ("Specifically, Great Western has failed to allege except in general terms the approximate time when the agreement was made, the specific parties to the agreement . . . the period of the conspiracy, or the object of the conspiracy."); *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 226 (3d Cir. 2008) ("Toledo also presented sufficient evidence that "the objects of and the conduct pursuant to th[e] contract or conspiracy were illegal."); *United States v. Sargent Elec. Co.*, 785 F.2d 1123, 1127 (3d Cir. 1986) ("The illegal object of a Sherman Act conspiracy must be identified in terms of an intended or achieved effect upon commerce in a relevant market.").

Under this standard, BanxCorp argues that it has adequately alleged that Bankrate engaged in predatory price-fixing—that is, pricing below some measure of cost—with its partner-competitors, a *per se* violation of § 1. (Pl. Opp. Br. at 10-14).[9] At its core, BanxCorp's theory rests on agreements between Bankrate and its co-branding partners to switch pricing methods for the purpose of creating below-market rates that made it impossible for competitors to sustain their business. After clearing competitors from the field, Bankrate could, and did, increase its prices at will, thereby harming consumers. (*Id.* at 14-16). Bankrate argues that

---

[9] Although it briefly mentions rule of reason analysis in the alternative in the 4AC, BanxCorp argues exclusively under the *per se* rule in its opposition brief. (*See* Pl. Opp. Br. at 1, 10-14) (4AC ¶ 281) ("Defendant's horizontal market allocation and predatory price-fixing conduct constitutes a *per se* violation of the Sherman Act, since the restraints are presumptively anticompetitive due to their predictable and pernicious anticompetitive effect, and limited potential for procompetitive benefit. In the alternative, these claims would require an analysis under the quick look approach, or at a minimum, under the rule of reason."). This is a risky strategy. *In re Ins. Brokerage*, 618 F.3d at 319 n. 16 (acknowledging that plaintiff permanently abandoned its rule of reason analysis argument where it pled rule of reason in its first amended complaint but argued exclusively for *per se* analysis in the second amended complaint and moving papers).

19

BanxCorp has failed to sufficiently plead that Bankrate and its co-branding partners shared a "unity of purpose" to price *below* any measure of cost, *i.e.*, to enter into a *predatory* price-fixing conspiracy. (Def. Moving Br. at 14-15). The Court finds that Defendant has the better of this argument.

At step two of the Third Circuit's three-step analysis, the Court identifies allegations that—without factual support—would not be entitled to the assumption of truth because they would be no more than mere conclusions. *See Burtch*, 662 F.3d at 221. The following is a list of predatory price-fixing allegations from the First Claim in the 4AC:

> Defendant has illegally restrained trade in the market for Bank Rate Websites in violation of Section 1 of the Sherman Act as follows:
>
> a. by engaging in predatory pricing;
>
> b. by entering into approximately 130 exclusionary agreements with partners and competitors that granted Defendant the sole authority and/or exclusive right to sell rate table listings on the Internet at a fixed price on behalf of Defendant's cartel, also referred to as a "network";
>
> c. by forming a predatory Price-Fixing Cartel with more than 100 partners and competitors that together control more than 300 websites;
>
> d. by colluding and entering into agreements to divide markets, and allocate revenues, customers, products and Internet traffic with approximately 130 partners and competitors that together control more than 300 websites, including promotional, placement and/or minimum payment guarantees;
>
> Defendant's horizontal market allocation and predatory price-fixing conduct constitutes a *per se* violation of the Sherman Act, since the restraints are presumptively anticompetitive due to their predictable and pernicious anticompetitive effect, and limited potential for procompetitive benefit. (4AC ¶¶ 280-281).

These allegations are conclusory with respect to the alleged predatory price-fixing conspiracy. They merely allege that Bankrate engaged in predatory pricing, formed a predatory price-fixing cartel, and colluded with partners to enter into agreements to divide the market.

Without more, these allegations evince no "unity of purpose" among Bankrate and its co-branding partners to depress prices. Such conclusory allegations are not entitled to the presumption of truth. *See Burtch*, 662 F.3d at 221. Therefore, the Court proceeds to step three of the Third Circuit's analysis to determine whether these bare allegations are echoed elsewhere in the 4AC by well-pled allegations, and whether those allegations "plausibly give rise to an entitlement for relief." *Id.* In its analysis below, the Court finds that although BanxCorp includes numerous allegations related to a conspiracy to fix prices, Plaintiff fails to adequately plead that the purported conspirators agreed to join a predatory price-fixing conspiracy for the purpose of forcing prices below a measure of cost, the key requirement under Plaintff's chosen theory.

The following is a list of allegations in the 4AC related to the nature of the conspirators' agreements from which the Court must determine whether Bankrate and its co-branding partners shared the requisite "unity of purpose":

> [C]o-branding partnership agreements granted Defendant the sole authority and/or exclusive right to sell rate table listings on the Internet at the same price on behalf of Defendant's cartel or "network," first on a flat fee basis (from the late 1990s until October 1, 2005), and after October 1, 2005 on a cost-per-click ("CPC"). . . . This enabled Defendant to essentially charge any fixed price across its "network" at will, either through predatory fixed pricing below cost until any remaining independent competitor was (a) forced to join Defendant's cartel; (b) forced to exit the relevant market; or (c) driven out of business; or by charging supra-competitive fixed prices, as Defendant subsequently did after 2006. (4AC ¶¶ 21-22).

> In order to create a monopoly, Defendant's Hyperlink CPC ("Hyperlink CPC") rate listing prices were fixed in lockstep throughout its network and initially set below Defendant's average variable cost. Then, after Defendant found itself secure in its monopoly, it started to ratchet up its prices. (*Id.* ¶ 23).

> Defendant started providing its rate tables to The Wall Street Journal's print edition and the WSJ.com co-branded website enabled Defendant's Central Sales Force to control and subsequently fix the CPC prices charged to financial service providers, in parallel with its network of Partner Sites. (*Id.* ¶ 142).

In addition to its own organic traffic websites Bankrate.com, Interest.com and Bankaholic.com, Defendant has assembled an Online Network of more than 300 Partner Sites through partnership agreements with approximately 130 competing counterparties. (*Id.* ¶ 155).

These approximately 130 co-branding agreements granted Defendant the sole authority and/or exclusive right to sell rate table listings on the Internet at a fixed price and collect and allocate CPC revenues on behalf of Defendant's cartel or "network" consisting of more than 300 websites. (*Id.* ¶ 156).

The purpose of the contracts, combination and conspiracy between Bankrate.com and the approximately 130 members of Defendant's cartel or "network," was to coordinate pricing for the mutual benefit of the members of the cartel, at the expense of independent competitors or potential competitors, buyers and sellers, and other market participants. (*Id.* ¶¶ 175).

In each of these paragraphs, BanxCorp fails to adequately allege the conspirators' intention to join a below-rate, predatory price-fixing scheme. For example, although BanxCorp alleges that Bankrate developed a co-branded website with WSJ.com that "enabled Defendant's Central Sales Force to control and subsequently fix the CPC prices charged to financial service providers," the allegation fails to explain how Defendant used its "control" to push down the CPC prices it charged to financial providers. Additionally, the allegation fails to evince an intention by WSJ.com to enter into the agreement *so that* Bankrate could push down pricing in a predatory manner. (*See id.* ¶ 142). Although Plaintiff alleges that Bankrate entered into co-branding agreements with 130 partners that "granted Defendant the sole authority and/or exclusive right to sell rate table listings on the Internet at a fixed price," the allegation fails to explain how Defendant used its exclusive authority to drive prices below some measure of cost. The allegation also fails to show how providing Bankrate with exclusive discretion over sales and pricing could mean that the purported co-conspirators had any intention of signing the contract *for the purpose* of having Bankrate push prices down. (*See id.* ¶ 156). Similarly, Plaintiff's allegation that Bankrate set prices "for the mutual benefit of the members of the

cartel," does not evince an intention on the part of the co-conspirators to have Bankrate set prices in a predatory, below-cost manner. (*See id.* ¶ 175).

In an effort to support its allegations with direct evidence, BanxCorp further alleges that Bankrate and its purported co-conspirators planned and carried out its anticompetitive conduct by:

> a. Participating in meetings, conversations and communications with competitors to discuss the CPC prices to be charged to financial service providers for listing their rates on a Bank Rate Website;

> b. Agreeing with competitors at the same level of market structure to charge Bank Rate Website Hyperlink CPC prices at certain levels to be sold to certain financial service providers;

> c. Issuing CPC price quotations in accordance with the agreements reached;

> d. Agreeing to let Bankrate sell Bank Rate Website Hyperlinks on behalf of each partner in the Price-Fixing Cartel at CPC prices *they knew to be fixed* pursuant to the conspiracy described above . . . . (*Id.* ¶ 161) (emphasis added).

> [F]acilitat[ing] explicit or tacit collusion through practices such as the exchange or disclosure of competitively sensitive information or through increased market concentration. (*Id.* ¶ 177(k)).

In further support of these allegations, BanxCorp cites to a series of contracts and meetings that supposedly demonstrate the requisite "unity of purpose" among Bankrate and its co-branding partners. The Court first evaluates the contracts, and then the meetings.

As to the contracts, BanxCorp cites language like the following, which appears in numerous co-branding contracts:

> Bankrate shall have the exclusive right to sell and collect fees for advertisements, including Hyperlink Advertisements within Rate Tables and Display Advertisements on the Rate Query Pages, the Rate Results Pages, the Linked Bankrate Site, and, with the exception of the Leaderboard, the Bankrate Content Pages (collectively, the "Bankrate Advertisements"). MSI shall not interfere with Bankrate Advertisements in any manner. (4AC Ex. A, D.E. 169-1, at *1, 33) (Contracts between Move Sales, Inc. and Bankrate dated July 24, 2007 and August 1, 2008).

For two reasons, the Court finds that the exclusivity provisions of these contracts—the only provisions that arguably evince direct evidence of the co-conspirators' intent—fall short of providing adequate support that the purported co-conspirators entered into the agreements for the purpose of pricing below-market. First, the exclusivity provision—"Bankrate shall have the exclusive right to sell and collect fees"—gives discretion to Bankrate, but does not explain whether Bankrate is to increase prices, decrease prices, or keep them the same. This provision, therefore, shows no intention on the part of the co-branding partner to enter an agreement so that Bankrate would push prices in any particular direction. Additionally, the agreement does not demonstrate an intention to give Bankrate pricing discretion so that they would alter pricing for purposes of driving competitors out of business. Second, the provision explicitly states that the purported co-conspirator "shall not interfere with Bankrate Advertisements in any manner." Based on this language, even if Bankrate alone had the intention to use its discretion to price below a particular measure of cost to drive competitors from the marketplace, the agreement explicitly demonstrates how such a choice would be Bankrate's alone, and nothing in the complaint demonstrates that Bankrate's co-branding partners had any knowledge of this hypothetical intention. The exclusivity provision of the contracts—providing discretion to Bankrate to set prices in no particular direction, and explicitly forbidding the co-branding partner from interfering at all with the prices—clearly falls short of the types of direct evidence set forth in *Intervest*. *See* 340 F.3d at 162-63 (listing threats to cut prices or cut off supply as examples of direct evidence that demonstrate a predatory price-fixing conspiracy). Here, the exclusivity provisions demonstrate only an intention by co-branding partners to give discretion to Bankrate.

As to meetings, *Intervest* explains that "a memorandum produced by a defendant conspirator detailing the discussions from a meeting of a group of alleged conspirators" would be

sufficient direct evidence of a predatory price fixing conspiracy. *Id.* at 163. Here, the meetings discussed in the complaint fall short of that standard:

> There is enough factual matter . . . to prove that Defendant Bankrate and approximately 130 horizontal competitors and partners [have engaged in anticompetitive conduct by] [p]articipating in meetings, conversations and communications with competitors to discuss the CPC prices to be charged to financial service providers for listing their rates on a Bank Rate Website. (4AC ¶ 161);

> This plan was summarized by [Bankrate's CEO, Tom] Evans, during its Q3 2006 Earnings Conference Call, as follows: "Our plan is to grow our paid search budget in a methodical and thoughtful way so that the money is spent in concert with ad sales demand so as to generate high rates of return. We expect to grow that spending, quarter by quarter, until we reach the point where we see returns diminishing below a targeted level. The benefits of doing so are pretty obvious. It drives additional traffic to the site that we are working concurrently to monetize. As we grow this capability, it should increase both our traffic and our revenue." (*Id.* ¶ 194) (Statement by CEO Evans during Q3 2006 Earnings Conference Call).

These two allegations are the closest BanxCorp comes to providing evidence of meetings where discussions about anticompetitive activity may have been held between Bankrate and the co-conspirators. Any other mentions of meetings in the 4AC concern Board meetings or merger discussions between Bankrate and BanxCorp, (*id.* ¶¶ 30 n.9, 125-28, 146 n.34, 269 n.47). The allegations above, reviewed in connection with BanxCorp's other allegations, fall short of providing adequate support that the purported co-conspirators met, conversed, or communicated for the purpose of pricing below-market. First, BanxCorp offers no evidence that the object of the conspiracy was discussed at these meetings. Second, they offer no evidence that would tend to prove that co-branding partners were even present at these meetings. Indeed, the allegation relating to Mr. Evans's statement during the Q3 Earnings Conference Call demonstrates, at most, an intent on *Bankrate's* part to price below cost. There is no mention in either of these paragraphs of any role played by co-branding partners in Bankrate's pricing determinations. BanxCorp's allegation of "meetings, conversations, and communications" is entirely conclusory

and is not the type of direct evidence of a predatory price-fixing conspiracy that the Third Circuit has found sufficient. *See InterVest*, 340 F.3d at 162-63 (citations omitted) (listing "a memorandum produced by a defendant conspirator detailing the discussions from a meeting of a group of alleged conspirators" and "a public resolution by a professional association recommending that its members withdraw their affiliation with an insurer" as sufficient to prove this element).

In an effort to support its allegations of a predatory agreement with circumstantial evidence, BanxCorp generally alleges that before the execution of co-branding agreements, prices were higher, but after executing the co-branding agreements, prices decreased, and therefore the agreements must have been executed with the intention of predatory pricing:

> Prior to October 1, 2005 Defendant as well as Plaintiff and other Bank Rate Websites charged financial service providers a flat monthly fee to list their rates. (4AC ¶ 178).

> On October 1, 2005, exercising Defendant's sole authority and exclusive right to sell rate table listings on the Internet at a fixed price on behalf of its entire cartel or "network" of Partner Sites, Bankrate introduced a predatory CPC pricing structure, thus taking unfair advantage of its dominant position in the relevant market and suppressing competition even further. . . . After October 1, 2005 participating financial service providers now pay Bankrate each time a consumer clicks on its Bank Rate Websites' rate listings or telephone number icons. (*Id.* ¶ 179-180).

> Based on the foregoing, the structure of the relevant market at the time and other related cost factors, Bankrate's CPC price starting on October 1, 2005 was set below its average variable cost. (*Id.* ¶ 182).

The Court finds that the allegations fall short of adequately showing an intention on the part of the co-branding partners to join a conspiracy for the purpose of pushing prices down, because the mere existence of similar contracts signed by numerous parties during the same time frame does not on its own demonstrate intent. *See In re Ins. Brokerage*, 618 F.3d at 322 (citing *Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) ("finding that allegations that the

defendants used similar contractual language did not plausibly imply conspiracy because 'similar contract language can reflect the copying of documents that may not be secret'"). Additionally, because BanxCorp does not allege that the co-conspirators set prices themselves, or played a role in setting prices, there is no circumstantial evidence suggesting parallel conduct from which the Court can discern a possible price-*reduction* agreement. *See In re Ins. Brokerage*, 618 F.3d at 322 (discussing parallel conduct as circumstantial evidence of conspiracy).

Plaintiff fails to provide any evidence—direct or circumstantial—plausibly suggesting a unity of purpose, a common design and understanding, or a meeting of the minds among Bankrate's partner-competitors to engage in predatory pricing, *i.e.*, pricing below cost. Accordingly, because the Plaintiff has failed to adequately allege the first element of its § 1 claim, the Court will not address the second element.

Although the Court has found that Plaintiff's § 1 claims based on its predatory price-fixing theory should be dismissed, it will briefly address Bankrate's remaining arguments.

### 3.    Contradictory Statements

Bankrate argues that the predatory price-fixing claim is premised on contradictory allegations, because the 4AC alleges, on the one hand, that Bankrate's pre-2002 pricing scheme was predatory and, on the other hand, the market remained competitive at the same time. Specifically, Bankrate argues:

> Bankrate began pricing below average variable cost in 2005. Notwithstanding that allegation, BanxCorp also pleads that Bankrate began providing "free Internet rate listings . . . to financial service providers since 1996" as well as "below-cost rate listing fees." BanxCorp further alleges that before 2002 the relevant market was competitive; no single market participant had a greater than 25% market share; and "participating financial service providers were charged competitive flat monthly fees to list their rates on a Bank Rate Website.

(Def. Moving Br. at 16) (citations omitted). Bankrate argues that these seemingly contradictory

factual allegations "make it impossible to understand the basis for the predatory price-fixing claim and thus render the claim meaningless." *Id.* Bankrate cites to Ninth and Eleventh Circuit cases to support its argument. BanxCorp does not address the argument in its brief.

The quoted paragraphs, read alone and in the context of the Complaint and the conspiracy alleged, indicate that these paragraphs and allegations do not contradict each other. It appears that BanxCorp is alleging that Bankrate initially charged below variable cost beginning in the mid-1990s with its monthly flat fee model. The market remained healthy as Bankrate attempted to set up its field-clearing predatory pricing scheme until at least 2002, when the market became anti-competitive. Then by 2005, when Bankrate had successfully cleared competitors from the field, they began pushing up rates. This story, when accepted as true, would not be contradictory on its face, and would be supported by the evidence alleged by BanxCorp: that Bankrate entered its first anticompetitive contract with The Wall Street Journal in 2002 (4AC ¶¶ 26, 137, 139, 140, 141) (the Wall Street Journal contract); that Bankrate became profitable thereafter (4AC ¶ 131) (profitability in 2002); and that rate increases followed. (4AC ¶ 71) (rate increases).

### 4. Economic Implausibility

Bankrate argues that even if BanxCorp's predatory price-fixing theory was adequately pled, the claim is still subject to dismissal because it would make no economic sense for Bankrate's partner-competitors to join in a predatory price-fixing scheme where they share 50% of profits made from charging incredibly low rates. (Def. Moving Br. at 17).

The Court need not address the merits of Bankrate's economic motive argument. It is well settled that at the summary judgment stage a court may dispose of an antitrust conspiracy claim in "the absence of any plausible motive to engage in the conduct charged[.]" *Matsushita*, 475 U.S. at 596 (1986). *Matsushita* and *Regency Oldsmobile, Inc. v. General Motors Corp.*, 723

F. Supp. 250 (D.N.J. 1989), on which Bankrate relies, were both postured at summary judgment. *See Matsushita*, 475 U.S. at 576; *Regency*, 723 F. Supp. at 252. The Court is unaware of any case in this Circuit that allows for dismissal of a claim based on implausible economic theories *at the pleading stage*. In any case, the facts pled here are not so implausible as to affect the sufficiency of the pleading. (*See* 4AC ¶ 109) ("Therefore, these independent website operators no longer had any incentive or a need to handle their own redundant back-office services."); Neither party has offered any cases to the contrary, or even addressed this issue in its brief. The Court sees no reason to address the issue now. Similar to the Third Circuit's approach in *Howard Hess*, the Court sees no reason to decide which line of cases—those addressing economic implausibility at the pleading stage, versus those addressing it at the summary judgment stage—is correct. *See Howard Hess*, 602 F.3d at 257 n. 9) ("We need not decide here which line of cases has it right.") (emphasis added).

### C. Sherman § 2: Monopolization or Attempt to Monopolize

#### 1. Legal Standard: Sherman Act, 15 U.S.C. § 2

BanxCorp brings its monopolization claim under § 2 of the Sherman Act, which provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony." 15 U.S.C. § 2 (2006). The offense of monopoly has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

As to the first element, the Supreme Court has defined monopoly power as "the power to

control prices or exclude competition." *United States v. du Pont & Co.*, 351 U.S. 377, 391 (1956). "The existence of such power ordinarily may be inferred from the predominant share of the market." *Grinnell Corp.*, 384 U.S. at 571 ("87% of the accredited central station service business leaves no doubt that the congeries of these defendants have monopoly power"); *see, e.g.*, *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) ("over two-thirds of the entire domestic field of cigarettes" and "over 80% of the field of comparable cigarettes" constituted "a substantial monopoly").

Monopoly power may be proven by direct or indirect evidence. "'The existence of monopoly power may be proven through direct evidence of supracompetitive prices and restricted output.'" *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (citations omitted). "To support an inference of monopoly power, a plaintiff typically must plead and prove that a firm has a dominant share in a relevant market, and that significant 'entry barriers' protect that market." *Id.* (citations omitted). "Barriers to entry are factors, such as regulatory requirements, high capital costs, or technological obstacles, [which] prevent new competition from entering a market in response to a monopolist's supracompetitive prices." *Id.* (citing *Matsushita*, 475 U.S. at 591 n.15 ("[W]ithout barriers to entry it would presumably be impossible to maintain supracompetitive prices for an extended time.")).

"Proving the existence of monopoly power through indirect evidence requires a definition of the relevant market." *Id.* "The scope of the market is a question of fact as to which the plaintiff bears the burden of proof." *Id.* (citations omitted). "Competing products are in the same market if they are readily substitutable for one another; a market's outer boundaries are determined by the reasonable interchangeability of use between a product and its substitute, or by their cross-elasticity of demand." *Id.* (citing *Brown Shoe Co. v. United States*, 370 U.S. 294,

325 (1962)). Failure to define the proposed relevant market in these terms may result in dismissal of the complaint (or claim). *See Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436. (3d Cir. 1997).

As to the second element, "the acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the part of the possessor." *Broadcom,* 501 F.3d at 308 (citing *Verizon Commcn's Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 407 (2004)). "Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Id.* (citation omitted). "Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." *Id.* (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985)). "Conduct that merely harms competitors, however, while not harming the competitive process itself, is not anticompetitive." *Id.* (citing *Brooke Grp.*, 509 U.S. at 224 (1993) ("It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.'") (citations omitted)).

## 2. Sufficiency of Plaintiff's § 2 Monopoly Claim

BanxCorp alleges that Bankrate has obtained a monopoly in the relevant market.[10] Specifically, it alleges:

> Bankrate has monopoly power in the market for Bank Rate Websites, having since 2003 captured and maintained a market share of approximately 95%. (4AC ¶ 287).

> Bankrate is maintaining and extending its monopoly power through the predatory and exclusionary conduct described above, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. (*Id.* ¶ 288).

---

[10] Based on this Court's review of the moving papers, Bankrate does not appear to be challenging the definition of the relevant market. Therefore, the Court accepts BanxCorp's definition of the relevant market for purposes of deciding this motion.

Substantial barriers to entry exist in the relevant market. (*Id.* ¶ 289).

There is no legitimate business justification for Bankrate's monopolization conduct. (*Id.* ¶ 290).

Defendant's anticompetitive conduct has had a significant adverse effect on competition in the market for Bank Rate Websites, causing direct and proximate harm to financial service providers—the customers—and to consumers—the end users. (*Id.* ¶ 291).

The anticompetitive actions of Defendant have directly injured BanxQuote in its business and property and its injuries and damages are ongoing. (*Id.* ¶ 292).

Bankrate challenges this monopolization claim "except as [it] pertain[s] to alleged predatory pricing based on Bankrate's switch to cost-per-click ("CPC") pricing." However, it makes the Court's job in evaluating the challenge particularly difficult by not discussing the specific elements of a monopoly claim. Instead, it attacks the theories underpinning the claims themselves. Bankrate does not direct any arguments at the monopoly claims specifically. Raising such global pleading arguments makes it unclear to the Court which arguments relate to which claims, and therefore, the specific basis on which Bankrate believes that BanxCorp has failed to plead particular elements of either the § 1 or § 2 claims. *See In re Hypodermic Prods. Antitrust Litig.*, No. 05-1602, 2007 WL 1959224, *9 (D.N.J. June 29, 2007). Discussing the specific elements of a § 2 monopoly claim is particularly important because it is possible for a plaintiff to unsuccessfully plead a § 1 conspiracy claim but sufficiently plead a § 2 unilateral action claim in the same complaint. *See, e.g.*, *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 110-12 (3d Cir. 1992) (considering § 2 of the Sherman Act claims after rejecting claims based on the same evidence under § 1 of the Sherman Act). Nevertheless, the Court attempts to evaluate BanxCorp's claims in light of Bankrate's arguments. Importantly, in its opposition brief, BanxCorp responds to Bankrate's challenge by discussing a supposed distinction between

monopoly and monopoly power and reiterating evidence presented in the 4AC. (Pl. Opp. Br. at

26-28).

BanxCorp offers statistics to support the first element, possession of monopoly power.

Specifically, BanxCorp alleges:

> BanxQuote's market share and consequential revenues have declined at a rate of approximately 25% annually, year after year, for at least four years, while its costs of capital increased and its access to the capital markets was foreclosed. Furthermore, Defendant drove Plaintiff out of business, as well as any other independent competitors, who did not either agree to be acquired or join its "network" or cartel, such as for example Bankaholic, MMIS/Interest.com, LendingTree, Move.com, Realtor.com, Ratecatcher.com and BankCD.com. (4AC ¶ 258).

> Bankrate controls over 95% of the relevant market share. (*Id.* ¶ 91(a)).

> In January 1999, approximately 44% of the total traffic to Bankrate.com originated from its co-branding partners. (*Id.* ¶ 135).

One of BanxCorp's exhibits also indicates that by 2002, only 30% of Bankrate's total traffic

originated from its co-brand sites. (*Id.* Ex. B at 1). Finally, it describes the current market after

monopolization to be:

> a. Market Concentration: Bankrate controls over 95% of the relevant market share.

> b. Price-Fixing Cartel: more than 300 competing Partner Sites joined Bankrate's Price-Fixing Cartel.

> c. Lack of Competitive Pricing: Prices charged to customers became inelastic.

> d. Independent Competitors Pushed Out or Acquired: Independent Bank Rate Websites were forced to join Bankrate's Price-Fixing Cartel or exit the market, or were bought out by Bankrate, as in the case of MMIS/Interest.com and more recently Bankaholic. (4AC ¶ 91).

The allegations above, when accepted as true, are sufficient to plead the first element of

this claim. The level of market share, 95%, is higher than what the Supreme Court has found

sufficient to establish monopoly power.[11]  The fact that less and less of Bankrate's traffic comes from its partners—and more and more results come from its own conduct—also supports the idea that Bankrate is dominant in the market.

BanxCorp's allegations also sufficiently answer each of Bankrate's arguments relating to exclusionary conduct.  The first argument—that BanxCorp has failed to sufficiently plead that it was foreclosed from selling its products in the relevant market—is adequately rebutted by the following statements by BanxCorp: its statement of market share and revenue loss (*id.* ¶ 258); Mr. Evans's statement that "Bankrate does not have direct competitors" (*id.* ¶ 146); and Mr. Evans's statement that "one of the things that is a tremendous gating item for [Bankrate], we believe is in terms of competition, and barriers for competition, is how does anybody else break into this, if we have tied up all the best newspaper relations, the best co-brand relationships." (*Id.* ¶ 87).

Bankrate's second argument is that there was no market foreclosure.  The plausibility of market foreclosure is supported by the inelasticity in the market described by Mr. Evans when he states that, despite a number of rate increases within three years, lenders "don't vote with their feet.  They don't leave.  They are not canceling.  They are not finding alternatives."  (*Id.* ¶¶ 69). *See Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 141 (3d Cir. 1998) ("A sufficient pleading 'requires something more, which may include . . . the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand.'") (citation omitted).  Market foreclosure is further supported by Mr. Evans's statements implying market foreclosure, such as: "How does anybody else get into this business and compete with Bankrate?  I look at it as both an offensive marketing opportunity, as well as a defensive opportunity." (4AC ¶ 87).

---

[11] *See* Part III.C.1 above.

Bankrate's final argument—that a one-year contract is not restrictive to the effect condemned by the antitrust laws—is correct, but that fact alone is insufficient to negate the second element of a § 2 antitrust claim. As Bankrate argues, it is true that a one-year contract, taken alone, does not violate the antitrust laws. *See LePage's Inc. v. 3M*, 324 F.3d 141, 180 (3d Cir. 2003) ("Even assuming, however, that 3M did have exclusive contracts with some of the customers, LePage's has not demonstrated that 3M acted illegally, as one-year exclusive contracts have been held to be reasonable and not unduly restrictive.") (citation omitted). However, the mere fact that the one-year exclusivity provision in the co-branding agreement does not violate the antitrust laws does not mean that BanxCorp's allegations do not demonstrate that Bankrate unreasonably restrained competition, when viewed in totality. *See id.* at 162 (holding that a court should consider a defendant's anticompetitive conduct "as a whole rather than considering each aspect in isolation"); *Fed. Trade Comm'n v. Motion Picture Adver. Serv. Co.*, 344 U.S. 392, 395-96 (1953) (stating that the FTC had found that the term of one-year exclusive contracts had become a standard practice and would not be an undue restraint on competition, but holding that evidence sustained the Commission's finding that the distributor's exclusive screening agreements with theater operators unreasonably restrained competition). As in *Federal Trade Commission*, allegations in the 4AC, taken together, when accepted as true, plausibly support a showing of the first element, monopoly power. *See id.* at 396-97.

The second element requires a showing of maintenance of the monopoly power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570-71. Conduct that would satisfy this element includes conduct that would foreclose competition, allow Bankrate to gain a competitive advantage, or destroy a competitor. BanxCorp's allegations of price-fixing and exclusionary

conduct, as discussed above, clearly support this element enough to present a claim that is plausible on its face, because "conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." *Broadcom*, 501 F.3d at 308 (citation omitted).  For example, Plaintiff alleges:

> During the summer of 2002, Bankrate offered WSJ to enter into a revenue-sharing agreement, waiving the annual license fees that WSJ had been paying BanxQuote, in order to break up and take over the WSJ-BanxQuote contracts, by persuading WSJ to join Defendant's "network." This agreement essentially granted Defendant the exclusive right to sell rate table listings on the Internet on behalf of WSJ.com on a "network" basis.  Defendant's conduct did not make any economic sense but for the harm it caused to Plaintiff and other competitors.  (4AC ¶ 137).

This allegation mentions conduct—an agreement that allowed Bankrate to set rates in exchange for waiving annual license fees—that would certainly impair the opportunities of rivals for whom waiving license fees was not feasible and who were, as a consequence, excluded from doing business with the Wall Street Journal.  Taken as true, this practice would either foster anticompetitive behavior or not further competition because it would force competitors to suffer losses until either Bankrate or its competitor was driven out of the market.

The closest Bankrate comes to challenging this element is its argument that the exclusionary conduct theory is legally defective because the factual allegations underlying the theory "are at odds with the facts alleged in the balance of the 4AC, and with the facts alleged in this case in every version of the complaint filed since 2008."  (Def. Moving Br. at 20).  Bankrate argues that in its conspiracy claim, BanxCorp alleges that Bankrate and its media co-branding partners are competitors who entered into *per se* illegal horizontal price fixing agreements through the co-brand contracts.  In the exclusionary conduct claim, however, BanxCorp alleges that it was denied access to an essential distribution channel—the media outlets—as a result of Bankrate's agreements with those media outlets.  Bankrate argues that these allegations are

36

mutually exclusive.  *Id.*  It is not possible, Bankrate argues, for the media outlets to be horizontal competitors of Bankrate and BanxCorp in the relevant market, but at the same time to be the "key internet traffic pipeline" needed to "permit Plaintiff and other independent firms to compete in the relevant market."  *Id.* (citation omitted).  "Stated another way, co-brand contracts that provided Bankrate with the 'sole authority and/or exclusive right to sell rate table listings on the Internet at a fixed price . . .' cannot be a *per se* illegal price-fixing agreements between [horizontal] competitors and also be the very same [vertical] gating item that prevents BanxCorp from distributing its product."  (Def. Moving Br. at 20) (citing 4AC ¶ 280(b)).  Plaintiff does not address this argument in its opposition brief.

It is true that pleading contradictory facts to support different claims is grounds for dismissal of those claims.  *See Bailey-El v. Fed. Bureau of Prisons*, 246 F. App'x 105, 109 (3d Cir. 2007); *Georges v. Ricci*, No. 07-5579, 2008 WL 2036799, at *3 (D.N.J. May 9, 2008).  But BanxCorp does not appear to be advancing completely contradictory theories.  BanxCorp appears to be arguing that Bankrate engaged in both horizontal and vertical exclusionary conduct with a whole host of entities.  Horizontally, it engaged in anticompetitive conduct with its competitors—*i.e.*, other businesses, such as LendingTree—that aggregated rate tables and offered the same services to their customers as Bankrate.  (*See, e.g.*, 4AC Ex. A at 1, Contracts between Move Sales, Inc. and Bankrate dated July 24, 2007 and August 1, 2008).  Vertically, it allegedly engaged in exclusionary conduct through exclusive dealing contracts with media outlets such as the New York Times.  (*See* 4AC ¶ 159 ("Bankrate has locked up the largest and most important newspapers for print distribution of its rate tables, consisting of 500+ newspapers nationwide, which are linked through credit captions to its website Bankrate.com, thus providing significant brand value, publicity and promotional support for its Bank Rate Website."); ¶ 160

(alleging that BanxCorp also provides a geographic breakdown of the media outlets)).  Although BanxCorp's horizontal/vertical distinction is not a model of clarity, the allegations do not appear to be contradictory in the way Bankrate describes.  Therefore, the Court finds that BanxCorp has sufficiently pled its monopoly claim under § 2.

### 3. Sufficiency of Plaintiff's § 2 Attempted Monopoly Claim

To state a claim for attempted monopolization, a plaintiff must establish "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

As to the first element, "a firm engages in anticompetitive conduct when it attempts to exclude rivals on some basis other than efficiency" or when it competes "on some basis other than the merits." *West Penn*, 627 F.3d at 108-09 (citing *Aspen Skiing*, 472 U.S. at 605). "Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." *Id.* at 108 (citing *Broadcom*, 501 F.3d at 308).  "'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *LePage's*, 324 F.3d at 152 (citation omitted).  Allegations raised under § 1 may be a proper basis on which to predicate a § 2 claim.  *See, e.g.*, *Matsushita*, 475 U.S. at 590 ("These observations apply even to predatory pricing by a single firm seeking monopoly power."); *Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1198-99 (3d Cir. 1995) (determining whether plaintiff satisfied this element by analyzing only plaintiff's allegation of § 1 predatory pricing conspiracy).

As to the second element—specific intent to monopolize—"a mere intention to prevail

over rivals or improve market position is insufficient. Even an intent to perform acts that can be objectively viewed as tending toward the acquisition of monopoly power is insufficient, unless it also appears that the acts were not 'predominantly motivated by legitimate business aims.'" *Penn. Dental Ass'n v. Med. Serv. Ass'n of Penn.*, 745 F.2d 248, 260-61 (3d Cir. 1984) (quoting *Times Picayune Publ'g Co. v. United States*, 345 U.S. 594, 627 (1953)). "Direct evidence of specific intent need not be shown; it may be inferred from predatory or exclusionary conduct." *Penn. Dental Ass'n*, 745 F.2d at 261 (citing *Interstate Circuit*, 306 U.S. at 208).

As to the third element, "'[a] dangerous probability of monopoly may exist where the defendant firm possesses a significant market share when it undertakes the challenged anticompetitive conduct.'" *Barr Labs.*, 978 F.2d at 112 (quotation and citation omitted). However, alleging market share alone is insufficient to properly plead attempted monopolization. *Crossroads Cogeneration*, 159 F.3d at 141. A sufficient pleading "requires something more, which may include 'the strength of competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand.'" *Id.* (citation omitted). The existence of monopoly power may be proven through direct evidence of supracompetitive prices and restricted output. *Broadcom*, 501 F.3d at 307.

The allegations discussed under the Court's § 1 analysis sufficiently support the first element of this claim. BanxCorp alleges that Bankrate purposefully predatorily priced its rate listings below cost—and sometimes for free—in order to acquire customers from competitors and drive competitors out of the market. It further alleges that Bankrate entered into agreements with its distributors who gave Bankrate the exclusive right to advertise its tables throughout the United States. This predatory pricing theory is the type of conduct that the Third Circuit has found sufficient to satisfy this element. *See, e.g., Advo*, 51 F.3d at 1198-99 (determining whether

plaintiff satisfied this element by analyzing only plaintiff's allegation of § 1 predatory pricing conspiracy). Mr. Evans's statements—"[w]e think we are in some cases under priced relative to the value. And we think that we will try to reconcile that and rectify that over time" (4AC ¶ 69), and "[s]ome of the guys that are our partners, they're also competitors" (*id.* ¶ 169)—support a unilateral predatory pricing theory under this element because they serve as acknowledgement on Bankrate's part that its prices were below what is needed to attract customers; Bankrate intended to increase its prices after reaching a certain threshold; and it was doing business with competitors in the same market.[12]

The second element—specific intent to obtain a monopoly—is equally satisfied. BanxCorp offers several statements by Bankrate's CEO, Tom Evans, which would indicate a specific intent on the part of Bankrate to obtain a monopoly. The statements include:

> And some people have better business models and obviously better at converting than others, but because of that, we are pretty confident about our ability to push rates. And again, nobody calls us and goes, hey, thanks for the rate increase, can I have another? But the fact is that they don't vote with their feet. They don't leave. They are not canceling. They are not finding alternatives. We think we are a fair value. (4AC ¶ 69).

> [T]he fact is we really haven't seen any exodus of advertisers. In fact, it's been just the opposite. We continue to grow our rate table-advertising base and have more lenders on the table than we did last quarter, and more than we had last year. . . . As of yesterday, August 1, we had 811 advertisers on our rate tables. Given that strength, given that demand, you are aware that we previously announced a 15% price increase for mortgage and home equity hyperlink clicks effective July 1. As Ed said, there's more news on the pricing front. This last week we announced to deposit advertisers a price increase effective August 15 of 25% per CD click, and 20% per money market click. . . . And you should know that neither increase has resulted in a decline in the number of advertisers."

(*Id.* ¶ 76; *see also id.* ¶ 87 ("One of the things that is a tremendous gating item for us, we believe is in terms of competition, and barriers for competition, is how does anybody else break into this,

---

[12] Defendant's attacks on the predatory pricing and exclusionary conduct theories are dealt with throughout this opinion and are not addressed here.

if we have tied up all the best newspaper relations, the best co-brand relationship[.]"); *id.* ¶ 146 ("Defendant's CEO Tom Evans acknowledged at a board meeting that Bankrate does not have direct competitors."); *id.* ¶ 81 (reporting more than a thousand advertisers in the first quarter of 2008)).  Defendant does not raise any argument tailored to attacking this element.

The last element—that there is a dangerous probability of success—has also been sufficiently pled.  The allegations found sufficient to satisfy the first element of the monopoly claim apply here with equal force.  They include BanxCorp's allegation of Bankrate's 95% market share, Bankrate's ability to drive independent, non-compliant competitors—such as Bankaholic, MMIS/Interest.com, LendingTree, Move.com, Realtor.com, Ratecatcher.com and BankCD.com—out of the market, and the increase in traffic from 1999 to 2002 to Bankrate.com from sources other than Bankrate's co-branding partners.  Mr. Evans's statements, referenced above for the propositions that the market is inelastic and that Bankrate has no direct competitors as a result of Bankrate's conduct also support this claim.  The same is true for Mr. Evans's statements tracking an increase of advertisers from 811 in 2007 to more than 1,000 in 2008. (4AC ¶¶ 76-81).  Defendant's argument that Plaintiff has failed to sufficiently plead market foreclosure, and that there was no market foreclosure, are unpersuasive for the same reasons as explained earlier in this opinion in Part III.C.2, where the Court discussed the sufficiency of BanxCorp's § 2 monopoly claim.

## IV.   DISMISSAL WITHOUT PREJUDICE

Fed. R. Civ. P. 15(a)(2) allows a party to amend its pleading by leave of court when justice so requires.  Leave to amend pleadings is to be freely given.  Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).  The decision to grant leave to amend rests within the discretion of the court.  *Id.*  Leave to amend may be denied on the basis of undue

delay or bad faith.  *Id.*  "Only when these factors suggest that amendment would be 'unjust' should the court deny leave."  *Arthur v. Maersk, Inc.*, 434 F.3d 196, 203 (3d Cir. 2006) (internal citations omitted).

In determining whether an amendment should be denied for undue delay, the Court must "focus on the plaintiffs' motives for not amending their complaint to assert [the proposed] claim earlier[.]"  *Adams v. Gould*, 739 F.2d 858, 868 (3d Cir.1984).  "There is no presumptive period in which a motion for leave to amend is deemed 'timely' or in which delay becomes 'undue.'"  *Coulson v. Town of Kearny*, No. 07-5893, 2010 WL 331347, *3 (D.N.J. Jan. 19, 2010).  "The passage of time, without more, does not require that a motion to amend a complaint be denied; however, at some point, the delay will become 'undue,' placing an unwarranted burden on the court[.]"  *Adams*, 739 F.2d at 868.  "Delay may become undue when a movant has had previous opportunities to amend the complaint."  *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir.2001).  In other words, the Court should also consider whether "new information came to light or was available earlier to the moving party."  *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 280 (3d Cir. 2004).

Allegations of bad faith must pertain to Plaintiff's motives for not amending sooner, not to Plaintiff's alleged litigation strategy.  *See Adams*, 739 F.2d at 868 ("The question of undue delay, as well as the question of bad faith, requires that we focus on the plaintiffs' motives for not amending their complaint to assert this claim earlier; the issue of prejudice requires that we focus on the effect on the defendants.").

Bankrate argues that Plaintiff's new claims should be dismissed because of BanxCorp's undue delay and bad faith in bringing its current claims, and that "BanxCorp has not added claims it inadvertently omitted, of which it was unaware, or which it only learned of through

discovery." (Def. Moving Br. at 27). Rather, it has attempted "to reformulate theories of liability that it has admitted are unsupportable (namely, price-fixing and exclusive dealing), and to change the elements of another claim (predatory pricing) that is implausible as pled. *Id.* Bankrate also argues that BanxCorp's bad faith is reflected in its pleading the exclusionary conduct claim in a conclusory manner. *Id.* at 29. "No specific facts are alleged in support of the claim because BanxCorp knows it cannot do so in good faith." *Id.* BanxCorp does not offer any factual allegations that "explain in any way how Bankrate's agreements with its co-brand[ing] partners prevented BanxCorp and competitors from selling their product to financial service providers." *Id.* at 30.

BanxCorp responds that there was no undue delay or bad faith on its part in bringing these claims because it could not have raised them earlier. It argues that the very documents on which its claims in this complaint were based were "secretly kept in the exclusive possession of Defendant and its partners." Further, the passage of time alone did not unfairly disadvantage or deprive Bankrate of the opportunity to present facts or evidence that it would have offered had the claims been raised earlier. (Pl. Opp. Br. at 28-30).

As explained in its discussion of previous decisions in this action, BanxCorp's claims do not appear to be new or different. In this complaint, BanxCorp alleges that Bankrate conspired with its partner-competitors, under § 1, to engage in predatory pricing. Under § 2, BanxCorp alleges that Bankrate unilaterally obtained a monopoly or attempted to obtain a monopoly through predatory pricing and exclusionary conduct. Based on the Court's review of the 3AC, it appears that these claims were also raised in the previous pleading. In that pleading, for example, BanxCorp alleged:

> The centerpiece of this action is a massive predatory pricing and price-fixing conspiracy between Bankrate and 100 of America's leading websites. More

specifically, Bankrate has engaged in predatory pricing and price-fixing agreements with competitors, entered into a market division agreement, and engaged in mergers and acquisitions with other competitors that have helped create and enhance its monopoly power in the relevant market. (3AC ¶ 15).

Bankrate's exclusionary conduct has effectively boxed BanxQuote and other competitors out of the market for Bank Rate Websites. The few remaining competitors in the relevant market at the moment are weak and increasingly starved of opportunities to attract meaningful traffic, transaction volume, and revenues. (*Id.* ¶ 100).

Bankrate's exclusionary practices, combined with its monopoly power, have been used by Defendant as leverage to gain market share, foreclose competition, and potentially extend its dominance beyond the relevant market. (*Id.* ¶ 107(p)).

The sufficiency of that pleading is not for this Court to determine. The Court is satisfied that these claims and theories were raised before and were not dismissed by Judge Wigenton. *See "BanxCorp II"*, Slip op. at 2, 7 (holding that predatory price-fixing conspiracy and exclusive dealing theory were adequately pled).

As to Bankrate's argument that BanxCorp has acted in bad faith by pleading the exclusionary conduct theory in a conclusory manner, the Court has already determined that this theory, as it relates to the § 2 claims, has been adequately pled and therefore the bad faith issue is moot.

Finally, the Court notes Bankrate's frustration with BanxCorp's pleading strategy:

Given that this is BanxCorp's fifth attempt to plead the complaint, what was once deemed as sloppy pleading can now be seen for the strategic ploy that it is. BanxCorp uses imprecision and vagueness in order to intentionally muddle its pleadings to make the motion to challenge the pleading more complex, and as an excuse to expand the scope of discovery beyond the relevant market identified in interrogatories. Underlying all else, BanxCorp uses imprecision to keep an avenue open, so that when BanxCorp later decides on a new permutation of a theory of liability, it will point to a stray allegation in the complaint as a purported basis for the new theory. It should not be allowed to continue that game. (Def. Moving Br. at 31).

BanxCorp should take heed that the Court will not be amenable to any attempts by

BanxCorp to shift its theories of liability this late in the game.  But, for the foregoing reasons, the Court finds that Plaintiff has not unduly delayed in bringing the claims.

**V.      CONCLUSION**

For the foregoing reasons, Defendant's motion is GRANTED as to the First Claim and DENIED as to the Second, Third, and Fifth claims. Plaintiff's § 1 predatory pricing conspiracy claim is dismissed without prejudice.  The Court grants BanxCorp fifteen days to amend its First Claim, and only its first claim.  An appropriate Order will follow.


*s/Esther Salas*
**Esther Salas, U.S.D.J.**