**MORDECHAI I. LIPKIS, ESQ.**
350 BROADWAY, SUITE 1105
NEW YORK, NY 10013

TELEPHONE: 212-925-4023
FACSIMILE: 212-925-4702
E-MAIL: mlipkis@mlipkis.com

February 22, 2012

*Via ECF & Fax 973-776-7865*

Hon. Cathy L. Waldor, U.S.M.J.
United States Court for the District of New Jersey
King Federal Building & Courthouse
50 Walnut Street
Newark, New Jersey 07101

      Re:    *BanxCorp v. Bankrate Inc.*, Civ. No. 07-3398 (ES)(CLW)
             *BanxCorp v. LendingTree, LLC,* Civ. No. 10-2467 (ES-CLW)

Dear Judge Waldor:

      I am writing in response to the February 16, 2012 letter from counsel for Defendant Bankrate [Doc. No. 315], in which Bankrate suggests that Plaintiff BanxCorp cannot make a showing of need sufficient to justify the deposition of Bankrate's chairman Peter C. Morse.

      Considering Mr. Morse's *familiarity with and knowledge of the history of Bankrate, and his leadership of Bankrate over the last 17 years*, it is disingenuous for Defendant to attempt to portray Mr. Morse as a peripheral actor or innocent bystander in the context of Bankrate's monopolization and cartelization of the relevant market, as alleged by Plaintiff. As set forth below, there is no employee of either Bankrate or Morse Partners Inc. ("Morse Partners") that can testify with more unique or superior knowledge than Mr. Morse with respect to these issues and the building blocks of Bankrate's anticompetitive conduct and monopolization.

      The Sherman Act was particularly concerned with "trusts," often under the control of a single man called a trustee, a chairman, or a president. Hence Congress named them as a specific form of "combination" at which the statute was directed. As Senator Sherman explained:

> "[A]ssociated enterprise and capital are not satisfied with partnerships and corporations competing with each other, and have invented a new form of combination commonly called trusts, that seeks to avoid competition by combining the controlling corporations, partnerships, and individuals engaged in the same business, and placing the power and property of the combination under the government of a few individuals, and often under the control of a single man called a trustee, a chairman, or a president.

> "The sole object of such a combination is to make competition impossible. It can control the market, raise or lower prices, as will best promote its selfish interests, reduce prices in a particular locality and break down competition and advance

>prices at will where competition does not exist. Its governing motive is to increase the profits of the parties composing it.

21 Cong. Rec. 2569 (1890).

This case and Mr. Morse's role are reminiscent of *United States v. Alcoa*, 148 F.2d 416 (2d Cir. 1945), perhaps the most celebrated antitrust case in American history, involving claims of monopolization, cartelization, suppression of competition, a price squeeze, and other anticompetitive conduct. In this landmark decision, Judge Learned Hand, sitting by designation as the Supreme Court, concluded that *Alcoa* had in excess of 90% market share and was guilty of monopolization. As recognized by Judge Hand, "[a]lthough in many settings it may be proper to weigh the extent and effect of restrictions in a contract against its industrial or commercial advantages, this is never to be done when the contract is made with intent to set up a monopoly." *Id.* at 428. "Considering the interests in 'Limited' which [the controlling shareholders] Arthur V. Davis and both the Mellons had [referring to Andrew W. Mellon and Richard B. Mellon], it would perhaps have taxed our credulity to the breaking point to believe that they knew nothing about the formation of the 'Alliance.'" *Id.* at 441.

Such is the case here with Peter Morse, Bankrate's chairman and controlling shareholder for approximately 17 years, who kept replacing Bankrate's CEOs approximately every four years on average during that period.[1]

**The Substance of the E-Mails Confirms that Peter Morse Routinely Conducted *Bankrate*-Related Business through *Morse Partners***

It is indisputable that Mr. Morse routinely conducted Bankrate-related business from his Morse Partners offices in West Conshohocken, Pennsylvania and Hobe Sound, Florida, and that he routinely used a *morsepartners.com* e-mail address to conduct Bankrate-related business. This alone raises sufficient questions as to the role of Morse Partners, and as to what extent Bankrate and Morse Partners dealt at arm's length.

A limited sampling of approximately 90 e-mails to and from Mr. Morse, that were attached as an exhibit to the February 13, 2012 letter from Plaintiff's co-counsel Kristen Renzulli [Doc. No. 311-312], are proof positive that Mr. Morse routinely used a *morsepartners.com* e-mail address to conduct Bankrate-related business.

However, it appears that none of the e-mails produced by Defendant were retrieved from Mr. Morse's archives as previously ordered by the Court, but rather from other parties' archives. The Court's October 18, 2010 Supplemental Scheduling Order [Doc. No. 143] specifically stated

---

[1] According to public records and Bankrate's Schedule 14D-9 filed with the S.E.C. on August 24, 2009, a portion of Mr. Morse's shares were held in trust or by family members, including his wife Martha Ford Morse, a great-granddaughter of Henry Ford, founder of the Ford Motor Company, and of Harvey S. Firestone, founder of the Firestone Tire and Rubber Company. Peter Morse is the brother-in-law of William Clay "Bill" Ford, Jr., current Executive Chairman of Ford Motor Company.

Hon. Cathy L. Waldor, U.S.M.J.
February 22, 2012
Page 3

in relevant part, as follows:

> 10. On or before January 10, 2010, Defendant will produce all responsive e-mails sent and received for the period of January 1, 2003 through December 31, 2007 between Tom Evans and Peter C. Morse (Bankrate's Chairman) that pertain to the claims in Plaintiff's Third Amended Complaint. [It appears that only approximately 90 such e-mails were produced]
>
> 11. On or before January 10, 2010, the parties will meet and confer regarding reasonable search terms for the purpose of searching the internal e-mails sent and received for the period from January 1, 2005 through December 31, 2007 of three Bankrate's custodians to be selected by Plaintiff [one of which was Peter Morse]. Defendant will produce the e-mails resulting from these searches on or before February 15, 2010. [It appears that no e-mails from Mr. Morse's archives were produced]

As set forth in Appendix I of the parties' Oct. 7, 2011 Joint Letter (Doc. No. 283-1) ("App. I") (at page 7):

> On January 31 2011, pursuant to Paragraph 11 of the October 18 Order**,** the parties agreed in writing that Defendant would produce the internal e-mails of Peter Morse sent and received for the period from January 1, 2005 through December 31, 2007, based on the following search terms: "market share", "competitor", "competition", "revenue split", "revenue share", "rev share", "Bankaholic", "LendingTree", "HYSA", "CPA", "monopoly", "predatory" , "exclusive", "barrier", "rate increase", "% increase", "best month", "uniques", "unique visitors", "BanxQuote", and "Mehl".
>
> According to its September 16 Response, Defendant alleges that "it performed a thorough search of Mr. Morse's emails" applying the agreed upon search terms, and "produced every responsive document that was found." Nevertheless, Plaintiff is unable to find any such responsive documents, and Defendant failed to identify the Bates numbers of the allegedly responsive documents as instructed by Judge Salas during the August 10, 2011 Status Conference. More troubling is that Plaintiff is unable to find any e-mails of Peter Morse for the 5-year period spanning from January 1, 2003 through December 31, 2007 that pertain to the claims in Plaintiff's Third Amended Complaint, and would have been responsive to Paragraph 10 of the Court's October 18 Order. This is truly surprising considering that Defendant allegedly "performed a thorough search of Mr. Morse's emails".
>
> * * *
>
> Therefore, it begs the question as to what methodology, standards and procedures Defendant implemented when it allegedly "performed a thorough search of Mr. Morse's emails."

Hon. Cathy L. Waldor, U.S.M.J.
February 22, 2012
Page 4

*See* App. I, Plaintiff's Deficiency Claim No. I and related Deficiency Claim Nos. II, III, XIII, and XIV; *see also*, the subsection of App. I entitled "Document Retention Policies and Procedures of Bankrate and its Chairman Peter Morse" (at page 26), which states:

> In light of the foregoing Deficiency Claims, behind Defendant's failure to produce documents is the likelihood that Bankrate and its chairman Peter Morse destroyed or suppressed their records and documents on a massive scale. Perhaps most telling is that Defendant produced practically no e-mails of its chairman Peter Morse related to any of the issues in Plaintiff's Complaint despite "his familiarity with and knowledge of the history of Bankrate, and his leadership of Bankrate over the last 17 years," and given Defendant's declaration in its September 16 Response that "[t]here are no senior employees still with Bankrate who were with Bankrate during that time period," and that Defendant "performed a thorough search of Mr. Morse's emails."

The limited number of e-mails between Mr. Evans and Mr. Morse produced by Defendant plausibly supports Plaintiff's allegation of suppression of evidence and spoliation.

**The Substance of the E-Mails Confirms that Peter Morse was Actively Involved in all Aspects of Bankrate's Business at Issue in this Litigation**

There can be no question that Mr. Morse was actively involved in all aspects of Bankrate's business at issue in this litigation. For example, in the 5AC and from the outset of this litigation, BanxCorp alleges that Bankrate's acquisition of MMlS/lnterest.com is a significant component of the alleged anticompetitive conduct upon which its Clayton Act Section 7 (prohibited acquisitions), and Sherman Act Section 2 (monopolization and attempted monopolization), claims rests.

The e-mails make clear how keenly interested and involved Mr. Morse was in that acquisition. On October 21, 2005, while visiting China to personally seek new markets for Bankrate (with the assistance of Citigroup) he wrote an e-mail to Mr. Evans stating as follows: "China looks interesting. There does[] not appear to be anyone in our space and very few companies that have any editorial credibility. So far, the banks and regulators seem to think the idea has merit. Many issues yet to consider. Look forward to reviewing what we learned with you. How's the West coast deal coming?" "[A] reference to the MMIS/lnterest.com transaction," according to Bankrate's counsel. *See* BR00028592, BR00028895, BR00028904, BR00028906. It is obvious from this exchange that even while abroad during a Bankrate-related business trip in a distant hemisphere, Mr. Morse was closely monitoring the progress of Bankrate's acquisition of what it deemed its nearest U.S.-based competitor at the time, MMIS/Interest.com.

The submitted e-mails pertaining to Mr. Morse, some of which are identified by Bates-number below, are related to Plaintiff's allegations. For example:

- BR00028749, BR00028591-BR00028592, BR00028597, BR00028602, BR00028648, BR00028779, BR00028809, BR00028828, BR00028875-BR00028879, BR00028890,

- BR00028891, BR00028906, BR00028929-BR00028936, BR00028954-BR00028956, and BR00029074, relate to acquisitions of competitors and growth strategies.
- BX000010 relates to merger negotiations between Bankrate and BanxQuote.
- BR00029232-BR00029238, relate to Bankrate's rate table listings and market, customer and revenue allocation with partners/competitors, such as Yahoo.
- BR00028593, BR00028824-BR00028825, BR00028888, BR00028891, BR00028908, and BR00038201, relate to CPC revenue and pricing strategies.
- BR00028591-BR00028592, BR00028648, and BR00028894-BR00028895, relate to negotiations with banks.
- BR00028659-BR00028660, BR00028752, and BR00042011, relate to LendingTree and its former parent IAC/Interactive.
- BR00028811, relates to concerns of competition from WSJ, a Bankrate co-branding partner.
- BR00038077, relates to concerns of competition from Tribune Media, a Bankrate co-branding partner.
- BR00038200, relates to concerns of competition from Yahoo, a Bankrate co-branding partner. [2]
- BR00038095-BR00038096, relate to partner traffic. [3]

**The Record Shows Peter Morse's Unique and Superior Knowledge of the Facts at Issue**

There is no employee of either Bankrate or Morse Partners that can testify with more unique or superior knowledge than Mr. Morse with respect to the following topics:

1. Information relating to Bankrate's and/or Mr. Morse's attempted monopolization of the relevant market prior to the appointment of Tom Evans as Bankrate's CEO on or about June 21, 2004.

2. Information relating to a meeting and merger negotiations between Bankrate's Chairman Peter Morse, Bankrate's former CEO Bill Anderson and Plaintiff's CEO Norbert Mehl at the offices of Milbank Winthrop & Co. in New York in 1998.

3. Information relating to meetings and merger negotiations between Bankrate and

---

[2] This e-mail states as follows: "Peter   I talked with Mike Jensen this afternoon. He said that Yahoo has decided not to meet with us. I'm actually not surprised. It seems to me that they are very focussed on social network and ad platform opportunities and not on content. *They are also the one partner we have that I think will leave us and try to provide rate tables themselves.*" [Emphasis added]

[3] This e-mail makes reference to Mr. Morse's supervision of Bankrate's operations as follows: "Peter   I know you like to look at page view data once in a while, so I've attached the PV report for partner traffic for Q1. There's good and bad news. The bad news is that of our historical top three partners, one is gone (Netscape) and one has seriously cut back on our traffic to keep the traffic on their site (Yahoo). Our other in the top three, AOL, has been cutting back for two years now. The good news is that we have been able to increase some traffic at AOL thru getting them to use more content on a oneoff basis, and that CNN/Money has become a growing partner."

BanxQuote during 1998-2000 (by way of example, reference is made to a July 3, 2000 e-mail between Messrs. Mehl and Morse sent to pcm@mosrepartners.com; see BX000010).

4. Information relating to whether Bankrate and Morse Partners Inc. dealt at arm's length.

5. Information relating to Bankrate's relationship with Morse Partners, including (i) revenues shared by Bankrate and Morse Partners; (ii) loans made between the two companies; (iii) bank accounts where Bankrate assets were commingled with those of Morse Partners; (iv) employees shared by Bankrate and Morse Partners; (v) invoices or purchases orders issued by Bankrate to Morse Partners; (vi) invoices or purchases orders issued by Morse Partners to Bankrate; (vii) any office space shared between the two companies; (viii) office rent paid by Bankrate on behalf of Morse Partners or vice versa; and (vi) e-mail hosting or web hosting services shared between the two companies.

6. Information relating to current and past contracts between Morse Partners and Bankrate.

7. Information relating to any expenses, such as overhead, administrative costs, employment related expenses and any other expenditure, of Morse Partners paid by Bankrate.

8. Information relating to any expenses, such as overhead, administrative costs, employment related expenses, e-mail hosting or web hosting services costs and any other expenditure, of Bankrate paid by Morse Partners.

9. Information relating to communications between Bankrate and Morse Partners pertaining to or discussing (i) financial service providers, i.e., banks, mortgage brokers or other prospective or existing customers; (ii) co-brand partners or potential co-brand partners, and allocation of markets, customers, traffic and revenues with partners and competitors or potential competitors; (iii) Bankrate's market share; (iv) competitors or potential competitors of Bankrate; (v) purchasers or potential purchasers of any product sold by Bankrate; (vi) Bankrate's pricing strategies; (vii) Bankrate's merger or acquisition candidates or target companies; (viii) potential

buyers of, or investors in, Bankrate; (ix) Bankrate's market value before 2003; and (x) BanxCorp's market value before 2003.

10. Information relating to communications sent to or from a Morse Partners e-mail address where Bankrate business was conducted or otherwise discussed with third parties.

11. Information relating to internal or external Morse Partners communications or documents that mention or discuss Bankrate or a competitor of Bankrate.

12. Information relating to moneys received by Morse Partners from Bankrate.

13. Information relating to moneys received by Bankrate from Morse Partners.

14. Information relating to current and prior officers, directors, shareholders and owners of Morse Partners.

15. Information in the possession of Morse Partners relating to communications or documents that mention or discuss BanxCorp.

16. Information in the possession of Morse Partners that mention or discuss Bankrate.

17. Information relating to Morse Partners' document and ESI (electronically stored information, including e-mail) retention policies and procedures.

18. Information relating to Bankrate-related documents, ESI and e-mail previously maintained by Morse Partners that have been lost or destroyed, if any; how and when any such documents were lost or destroyed; and the circumstances of such loss or destruction.

Based on the foregoing, BanxCorp has made a showing sufficient to justify its request for Mr. Morse's deposition, either under a Rule 30(b)(1) Notice of Deposition to Bankrate Inc., or a Rule 45 Deposition Subpoena to Morse Partners Inc. Accordingly, Peter Morse should be compelled to be deposed.

Respectfully submitted,

Mordechai I. Lipkis

cc: Hon. Esther Salas, U.S.D.J. (*via ECF and Fax*)
All Counsel of Record (*via e-mail*)