# LAW OFFICES OF KRISTEN RENZULLI, PC

31 OVERLOOK DRIVE
CHAPPAQUA, NEW YORK 10514
914.263.7703
914.238.9506 FAX
kristen@renzullipc.com

May 18, 2012

*Via ECF and Fax (973-776-7865)*

Hon. Cathy L. Waldor, U.S.M.J.
United States Court for the District of New Jersey
50 Walnut Street
Newark, New Jersey 07101

> **Re:** ***BanxCorp v. Bankrate Inc.*, Civ. No. 07-3398 (ES)(CLW)**
> ***BanxCorp v. LendingTree, LLC*, Civ. No. 10-2467 (ES)(CLW)**

Dear Judge Waldor:

I write in response to defense counsel's letter dated May 17 [Doc. No. 330], and respectfully reiterate our request that the Court order Bankrate's CEO, Thomas Evans, to appear for his continued deposition at the Courthouse before the end of May. It is disingenuous for counsel to keep refusing to produce Mr. Evans for a further deposition, especially in light of the fact that Mr. Mehl has appeared for almost ten days of examination in this case and all depositions in this matter have routinely proceeded on the same schedule (i.e., 10 am to 5 pm).

On May 15th defense counsel acknowledged objecting to *virtually every question* during the May 9th deposition of Mr. Evans. Consequently, it was not feasible to call the Court during the deposition each time there was an improper objection or evasive answer. Defense counsel contends that *the only questions as to which the witness was instructed not to answer were questions that asked for expert or legal opinions lacking in essential foundational elements (e.g., "did co-brand agreements increase or decrease competition?"...).* For example, the witness was instructed not to answer the following: "*Did Bankrate's co-branding partnership agreements reduce or promote independent competition for the sale of Internet rate listings?*"

However, Mr. Evans had already publicly and clearly stated his opinion on this issue. In fact, a transcript of Bankrate's First Quarter 2007 Earnings Call (introduced during the deposition as exhibit EVANS # 12, see excerpts enclosed as Ex. A) corroborates that, on March 2, 2007, Mr. Evans made the following public declaration, to which Judge Salas referred twice in her December 30, 2011 Opinion [Doc. No. 298, at page 34; see enclosed Ex. B]: "***One of the things that is a tremendous gating item for us we believe is in terms of competition and barriers for competition is how does anybody else break into this if we have tied up all the best newspaper relations, the best co-brand relationships and we've got a dynamic organic traffic website. How does anybody else get into this business and compete with Bankrate?***"

Hon. Cathy L. Waldor, U.S.M.J.
May 18, 2012
Page 2

Thus, there can be no question that defense counsel violated Rule 30.

Respectfully submitted,

Kristen Renzulli

Encls.

cc:     All Counsel (*via ECF*)

# EXHIBIT A

# Seeking Alpha<sup>α</sup>

# Bankrate Q1 2007 Earnings Call Transcript

May 02, 2007 | about stocks: RATE

PLAINTIFF'S
EXHIBIT
12
5. 9. 2012 NW

TRANSCRIPT SPONSOR



Bankrate, Inc. (RATE)
Q1 2007 Earnings Call
May 2, 2007 11:00 am ET

**Executives**

Bruce J. Zanca - Senior Vice President
Thomas R. Evans - President, Chief Executive Officer
Edward J. Dimaria - Chief Financial Officer, Senior Vice President

**Analysts**

Colin W. Gillis - Canaccord Adams
Youssef H. Squali - Jefferies & Co.
Stewart Barry - ThinkEquity Partners
Andrew W. Jeffrey - SunTrust Robinson Humphrey
Heath P. Terry - Credit Suisse
Ross Sandler - RBC Capital Markets
Mark May - Needham & Company
Richard Fetyko - Merriman Curhan Ford

**Presentation**

**Operator**

Good day, ladies and gentlemen and welcome to the first quarter 2007 Bankrate earnings conference call. My name is Clarissa and I will be your coordinator for today. (Operator Instructions) I would now like to turn the presentation over to your host for today's conference, Mr. Bruce Zanca, Senior Vice President. Please proceed, sir.

**Bruce J. Zanca**

Thank you. Good morning, everyone. With me here in our New York office is the company's President and CEO, Tom Evans, and our Senior VP and CFO, Ed Dimaria.

Let me take a minute to go over the format of the call today. First, Tom will give us some results and color on the quarter. Ed will give us some details on the financial results and then we will have some time to answer your questions.

Before we begin, I need to take care of the legal prerequisites. Our attorneys have asked me to remind you that some of the statements made in this conference call, including those regarding the company's future prospects and revenue growth, its ability to continue to reduce costs and successfully implement strategic initiatives, constitute forward-looking statements within the meanings of the Securities Act of 1933 as amended in the Securities Exchange Act of 1934, as amended.

It really is -- it is not -- in the advertising business, you have two anomalies. January is always a little slow, not for the consumer but for the advertiser, and December is always strong for the advertiser, not necessarily the consumer. So if you look at our December of last year, we had a great December. We had a better December than we had a January, notwithstanding the fact that we had dramatically more traffic in January. It is just the way the business runs.

So don't think it is going to happen again during the course of the year, and we are talking about what we are going to do next January to mitigate some of it.

**Ross Sandler - RBC Capital Markets**

Great, and just one last clarification; you guys stated that mortgage on the hyperlink side, mortgage represented about 47% and deposit about 40% for the first quarter. What were those two figures in 4Q?

**Thomas R. Evans**

In the fourth quarter, it was 42% deposit and 46% mortgage, so a little higher mortgage activity in Q1 than there was, on a comparable basis, in Q4.

**Ross Sandler - RBC Capital Markets**

Great. Thanks a lot.

**Operator**

Your next question comes from the line of Mark May of Needham & Company. Please proceed.

**Mark May - Needham & Company**

Thanks for taking my questions. I have a few of them. The first one is seasonality; last year on a sequential basis, it looks like both your graphic and hyperlink revenues and your page views were down sequentially in Q2. Would you expect a similar seasonal trend this year?

**Thomas R. Evans**

I don't think so, Mark. If you recall last year, we had a weird, as did all the other finance sites, sort of a weird anomaly where for about three weeks in late May, early June, there was a real slowdown in traffic. We experienced it and if you look at, and I hate to ever lead anybody to any ComScore or numbers like that, but other finance sites experienced the same thing.

We have not seen it, and all I can tell you is we have not seen it in April. We are just one day into May so it is too early to tell, but it did not happen in '05. Other than that three-week period in '06, everything else was sort of normal and it does not look like it.

**Mark May - Needham & Company**

The other question has to do with margins. Your online gross margins, very high, 85%, but they have been flat for the last three quarters. That said, you have been able to put up huge improvement in gross and operating margins in the last three quarters. It looks like primarily because of the lower mix of print revenue, which is a very low margin business, and I would imagine it is a drag on operating income. I would imagine you must be losing money on an operating basis in that business.

The question is why wouldn't you just wind that business down? Related to that, would you expect to see continued sequential declines in print revenue throughout the year, or do you think it flattens out from here?

**Thomas R. Evans**

Let me take it in the three parts. First of all, it is slightly profitable. It is slightly profitable. We are not losing money on print. It is not a huge contributor to the bottom line but it is not a money loser.

Having said that, how do you measure the value of being in 40 million circulation every single week in high-quality newspapers, whether it is the Philadelphia Inquirer or the Denver Post or the San Francisco Chronicle or the Atlanta Constitution or the Chicago Tribune, the L.A. Times, and the value of the awareness because every time we are in there, it say Bankrate.com? The amount of organic traffic that drives to the site -- 80% of our traffic comes in organically. Half of that is people typing in the Bankrate URL. I don't know where they see it. Perhaps they see it with some of our editorial listings in the Journal and the Times day to day and the other hundred newspapers that will list us editorially. Some of it has to be those mortgage and CD and money market guides that appear in the newspapers.

I like the business. It is absolutely something that we would not wind down because to me, it is like a $14 million, $16 million marketing

BX000600

campaign that we get paid for, and we get paid -- it is contextually relevant. It appears in real estate sections, in business sections. It is people who are looking for those kinds of financial products.

Listen, the newspaper business is challenging right now. Our guys are doing a really good job. It is not something we think is going to grow other than through adding new papers and through our FSIs, but it is definitely is not something that we would just --

**Mark May - Needham & Company**

Could you sell the business? Is it too integrated with your core offering that you could not sell it? I understand the argument not winding it down, but if you could sell it, given the -- playing devil's advocate -- given the readership trends in print and the ROI that you are seeing from marketing and other channels, primarily online, if you are able to sell the business and reinvest it in other growing marketing channels. But I agree winding it down probably doesn't make sense, but maybe I should have said could you sell the business.

**Thomas R. Evans**

We certainly have no plans to do that. One of the things that is a tremendous gating item for us we believe is in terms of competition and barriers for competition is how does anybody else break into this if we have tied up all the best newspaper relations, the best co-brand relationships and we've got a dynamic organic traffic website. How does anybody else get into this business and compete with Bankrate? I look at it as both an offensive marketing opportunity as well as a defensive opportunity. Again, I don't know how we value or figure out how much of our traffic comes from that. I'd hate to find out by selling the business that it was significant.

**Mark May - Needham & Company**

Just moving on, one other question. You talked about investments in website redesign and some added personnel. I know you don't give guidance on a quarterly basis, but you had about a $1 million upside to the consensus EBITDA number in the quarter. These sound like new investments since the last time you gave full-year guidance, so the question is are they new, would they be greater than $1 million, which was the upside to the street number, and what is your timing in terms of when the investments start to hit, or what quarter do they hit?

**Thomas R. Evans**

The first answer is no, they aren't new. Second answer is no, they aren't over $1 million. We have already started layering some of these expenses in. Some of it is headcount -- again, we are not talking about a tremendous number of people, but it is just something that we think -- you know, it is why we -- the management team is looking at how do we have the best year we could possibly have but also how do we set up our blocks for 2008?

When we redesigned the last time, it took us nine months. When we launched May 1 of '05, it took us nine months to launch that site. It is going to take a while for us to set up all the things that we want and to develop that site.

I think we have done a pretty good job of not adding a tremendous number of people and not adding a tremendous amount of headcount or costs when we do things. We'll look to do the same thing.

**Mark May - Needham & Company**

One very quick last housekeeping, Tom, I think you mentioned you had no rate increases during the quarter, although I think you took your normal rate care increase for graphical at the beginning of the year, if I remember. Did you say no rate increase because you were only talking about hyperlink or because you didn't see really the benefit of the rate card increases during the quarter?

**Thomas R. Evans**

I was speaking specifically about CPC. There were no rate increases. We did have a rate increase on graphic advertising and we had no problem pushing that across.

**Mark May - Needham & Company**

What would you say your average CPM increase, either sequentially or year over year?

**Thomas R. Evans**

We are going to decline on answering that. We just -- we have a lot of advertisers who listen to our -- we hear a lot of advertisers listen to our call now and I don't think it's in our interest to --

**Mark May - Needham & Company**

BX000601

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

_____

|  |  |
|---|---|
| **BANXCORP,** | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : |
|  | : |
| **BANKRATE INC.,** | : |
|  | : |
| Defendant. | : |

_____ :

Civil Action No. 07-3398 (ES) (CLW)

**OPINION**

**SALAS, DISTRICT JUDGE**

This matter is before the Court by way of Bankrate Inc.'s ("Bankrate") Motion to Dismiss BanxCorp's Fourth Amended Complaint ("4AC") pursuant to Fed. R. Civ. P. 12(b)(6). (D.E. 210). This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), as well as 15 U.S.C. §§ 1 and 2. Venue is proper pursuant to 28 U.S.C. §§ 1391(b), (b)(2), as well as 15 U.S.C. §§ 15 and 22. The Court's decision is based on its review of the briefs and exhibits related to Bankrate's motion to dismiss, and the Court hereby decides the motion without oral argument pursuant to Fed. R. Civ. P. 78. For the following reasons, Defendant's motion to dismiss is GRANTED as to the First Claim and DENIED as to the Second, Third, and Fifth claims.

## I.  BACKGROUND

### A.  Parties and Claims

The underlying issue in this case is whether Defendant Bankrate has engaged in anticompetitive practices in violation of federal and state antitrust laws, resulting in economic injury to Plaintiff BanxCorp.

1

sufficient to establish monopoly power.[11] The fact that less and less of Bankrate's traffic comes from its partners—and more and more results come from its own conduct—also supports the idea that Bankrate is dominant in the market.

BanxCorp's allegations also sufficiently answer each of Bankrate's arguments relating to exclusionary conduct. The first argument—that BanxCorp has failed to sufficiently plead that it was foreclosed from selling its products in the relevant market—is adequately rebutted by the following statements by BanxCorp: its statement of market share and revenue loss (*id.* ¶ 258); Mr. Evans's statement that "Bankrate does not have direct competitors" (*id.* ¶ 146); and Mr. Evans's statement that "one of the things that is a tremendous gating item for [Bankrate], we believe is in terms of competition, and barriers for competition, is how does anybody else break into this, if we have tied up all the best newspaper relations, the best co-brand relationships." (*Id.* ¶ 87).

Bankrate's second argument is that there was no market foreclosure. The plausibility of market foreclosure is supported by the inelasticity in the market described by Mr. Evans when he states that, despite a number of rate increases within three years, lenders "don't vote with their feet. They don't leave. They are not canceling. They are not finding alternatives." (*Id.* ¶¶ 69). *See Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 141 (3d Cir. 1998) ("A sufficient pleading 'requires something more, which may include . . . the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand.'") (citation omitted). Market foreclosure is further supported by Mr. Evans's statements implying market foreclosure, such as: "How does anybody else get into this business and compete with Bankrate? I look at it as both an offensive marketing opportunity, as well as a defensive opportunity." (4AC ¶ 87).

---

[11] *See* Part III.C.1 above.