

**R. Scott Thompson**
Member of the Firm
Tel 973 597 2532
Fax 973 597 2533
sthompson@lowenstein.com

June 1, 2012

**VIA ECF AND FEDEX**

Hon. Cathy L. Waldor, U.S.M.J.
United States District Court
District of New Jersey
M.L. King Federal Building & Courthouse
50 Walnut Street
Newark, New Jersey 07101

**Re: *BanxCorp v. Bankrate, Inc.*, Civ. No. 07-3398 (ES-CLW)**
***BanxCorp v. LendingTree, LLC*, Civ. No. 10-2467 (ES-CLW)**

Dear Judge Waldor:

This firm represents defendant Bankrate, Inc. in the referenced action. I write to request that the Court compel BanxCorp to produce certain communications with government agencies that were called for by Bankrate's document requests but not produced, requested during the deposition of Norbert Mehl but not produced, and requested again recently by follow up letter but not produced. A week ago, BanxCorp informed us that all communications to and from government agencies concerning its allegations against Bankrate are protected from discovery as confidential attorney work-product. This claim is obviously invalid. We ask that the court direct BanxCorp to produce the materials in question.

**Background**

At the deposition of Norbert Mehl on January 25, 2012, Mr. Mehl testified that he contacted various government agencies seeking to convince them that Bankrate had engaged in violations of the antitrust laws. The agencies he contacted include the United States Department of Justice, the New York State Attorney General, and the National Association of Attorneys General. Mr. Mehl testified that he corresponded with these entities and that he had a meeting with representatives of the New York Attorney General's office to whom he gave a Powerpoint presentation. These documents were plainly called for by the document requests served on BanxCorp years ago.[1] BanxCorp did not identify them when it produced documents; until Mr. Mehl's deposition we did not know they existed.

[1] Those requests called for the production of, among other things, all documents that refer or relate to the subject matter of the complaint. First Request for Production, No. 60.

In the course of Mr. Mehl's deposition, I requested that BanxCorp produce documents reflecting communications with government agencies that relate to Bankrate's purported antitrust violations, including all documents that related to any presentation made to representatives of the New York Attorney General. Relevant excerpts of Mr. Mehl's deposition transcript are attached as Exhibit A. BanxCorp failed to produce the requested documents, or to object to their production. We followed up with a letter; BanxCorp ignored that letter. We then sent a second second letter. Only then did BanxCorp advise us that it was refusing to produce the communications, claiming the protection of the work-product doctrine. Copies of the correspondence on this issue are attached as Exhibit B.

BanxCorp's assertion of the work-product doctrine is frivolous, and BanxCorp has not even attempted to justify its position. *See Westwood Prod., Inc. v. Great Am. E&S Ins. Co.*, 2011 WL 3329616, at *11 (D.N.J. Aug. 1, 2011) ("[T]he party asserting work product protection bears the burden to show the doctrine applies."). First, BanxCorp's correspondence with government agencies does not fall within the scope of the work-product protection because the correspondence plainly was not created by BanxCorp in anticipation of this litigation. Second, BanxCorp effectively surrendered any claim to protection when it voluntarily disclosed the information to a third-party without undertaking any effort to preserve confidentiality.

**<u>The Work-Product Doctrine Does Not Apply</u>.**

The work product doctrine allows a party to protect documents that it (or its representative) prepares in anticipation of litigation or for use at trial. Fed. R. Civ. P. 26(b)(3)(A). BanxCorp's communications with government agencies do not fall within the rule's definition, and they must be produced.

The documents at issue here can easily be broken into two categories: (1) the government agencies' communications to BanxCorp; and (2) BanxCorp's communications to government agencies. The work-product doctrine plainly does not apply to the first category. The doctrine only applies to documents created *by a party* or its representative, *i.e.*, BanxCorp; the doctrine does not give a party any right to protect information received from a third party like a government agency. *See Westwood*, 2011 WL 3329616, at *11 ("Documents created on behalf of non-party are not protected by the work product rule . . .the rule exists to protect the privacy of the preparations of attorneys and agents engaged in litigation."); *see also* 8 Wright & Miller, *Federal Practice & Procedure: Civil* § 2024 at 345-56 (2d ed. 1994) ("[D]ocuments prepared by one who is not a party to the present suit are wholly unprotected by Rule 26(b)(3) . . . .)

Nor does the doctrine apply to the second category of documents, e.g., BanxCorp's communications *to* government agencies. Those documents were not prepared in anticipation of litigation; in fact, any such documents are completely unrelated to litigating this lawsuit. In determining whether documents are prepared in anticipation of litigation, courts analyze "whether the documents were created for the primary purpose of the litigation itself . . . If the

documents were produced for purposes other than litigation, but prove useful in the litigation at issue, the documents are not protected by the work product privilege." *See Kane v. Mfr. Life Ins. Co.*, 2010 WL 2178837, at *8 (D.N.J. May 26, 2010) (citing *La. Mun. Police Employees Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 306-07 (D.N.J. 2008)). Documents and information disclosed to the government have nothing to do with this case.

Here, BanxCorp's presentation to representatives of the New York Attorney General's office, and its correspondence with other government entities was not undertaken for the purpose of litigating this case. BanxCorp was not conducting a factual investigation into Bankrate's conduct, evaluating its legal theories, or relying upon the governmental entities in any way as a "representative." Moreover, in contacting the government, BanxCorp was not communicating with investigators for the purpose of "the compilation of materials in preparation for trial," where the doctrine actually applies. *See Westwood*, 2011 WL 3329616, at *10. BanxCorp's only purpose in communicating with government agencies was to inform them of its misguided view of the world but not to litigate its lawsuit against Bankrate. Because the documents were not created for the purpose of litigation, they are not work product.

**<u>BanxCorp Surrendered any Claim to Protection by Disclosing Information</u>**.

BanxCorp disclosed the information at issue to third-party government agencies without taking any steps to insure that the information remained confidential. It cannot now claim confidentiality. "Generally, disclosure of confidential communication or attorney work product to a third party, such as an adversary in litigation, constitutes a waiver of privilege as to those items." *Schering Corp. v. Mylan Pharm., Inc.*, 2011 WL 3651343, at *3 (D.N.J. Aug. 18, 2011).

The reason the work-product doctrine exists is "to protect the privacy of the preparations of the attorneys and agents engaged in litigation." *Westwood*, 2011 WL 3329616, at *10. Here, there is no such privacy. BanxCorp disclosed information to outsiders without any effort to ensure its confidentiality. BanxCorp did not require government agencies to sign a confidentiality agreement, which would be indicative of an intent that the protected information remain confidential. There is no indication that BanxCorp even requested any protection from disclosure under New York's Freedom of Information Law ("FOIL") or any other applicable open records laws.

In fact, if BanxCorp had its way, the information it provided to the government would have been made publicly available to the world, including to Bankrate. BanxCorp provided information to government authorities in the hopes that the authorities would make the information public by filing a lawsuit. The fact that no government agency has done anything of the sort is irrelevant; the fact remains that BanxCorp did not intend that the information would be kept secret when it disclosed the information to government agencies. There is simply no basis for BanxCorp to now argue, after the disclosure, that the information is protected work product.



Bankrate respectfully requests that the Court order BanxCorp to produce documents exchanged and communications between BanxCorp and any government agency regarding Bankrate.

Respectfully submitted,

R. Scott Thompson

Enclosures
cc: Kristen Renzulli, Esq. (via ECF w/enc.)
Lawrence Hersh (via ECF w/enc.)
Daniel Brown, Esq. (via ECF w/enc.)
Michael Hahn, Esq. (via ECF w/enc.)
Eric Jesse, Esq. (via ECF w/enc.)



# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL NO. 07-3398

BANXCORP, Plaintiff,

v.

BANKRATE, INC., et al., Defendants.

CONTINUED VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF NORBERT MEHL

VOL. 3 PAGE 344

T R A N S C R I P T of the stenographic notes of HOWARD A. RAPPAPORT, a Certified Shorthand Reporter of the State of New Jersey, Certificate No. XI00416, taken at the United States Courthouse, Martin Luther King, Jr. Building, Newark, New Jersey, on Wednesday, January 25, 2012, commencing at 10:08 a.m.



A P P E A R A N C E S:

KRISTEN RENZULLI, ESQ.
31 Overlook Drive
Chappaqua, New York 10514
kristen@renzullipc.com
For the Plaintiff

LOWENSTEIN SANDLER, P.C.
65 Livingston Avenue
Roseland, New Jersey 07068
BY: R. SCOTT THOMPSON, ESQ.,
For Defendant Bankrate, Inc.

SHEPPARD MULLIN
30 Rockefeller Plaza
New York, New York 10112
BY: ERIC O'CONNOR, ESQ.,
eocconor@sheppardmullin.com
For Defendant Lending Tree



I N D E X


| WITNESS | | PAGE |
|---|---|---|
| NORBERT MEHL | | |
| Direct examination by Mr. Thompson | | 347 |
| EXHIBITS | DESCRIPTION | FOR IDENT. |
| Mehl-11 | Distribution agreement | 371 |




THE VIDEOGRAPHER: Today is January 25th, 2012. This is tape number one, continued deposition of Norbert Mehl. Back on the record at 10:08 a.m.

N O R B E R T M E H L, having been previously sworn, testifies as follows:

DIRECT EXAMINATION (CONTINUING)

BY MR. THOMPSON:

Q Good morning, Mr. Mehl.

A Good morning.

Q You realize you are still under oath?

A Yes, I do.

Q Mr. Mehl, at any time from the time that you first suspected that Bankrate had violated the antitrust laws, did you ever make any kind of a report to any governmental authorities?

A Not until after we issued -- after the complaint was filed, and I think sometime in 2009 or 2010 when we issued, or served subpoenas.

We served a subpoena to the Department of Justice, the United States Department of Justice and to the Federal Trade

Commission. In that context we filed some papers with them.

In addition, we also filed, or contacted the New York State Attorney General and we actually had -- I'm trying to refresh my memory. At some point we contacted the National Association of Attorneys General, I think whoever was the one attorney or the coordinator, whatever his title is, for all the -- each of the state Attorney Generals.

This must -- I think we may have done this sometime in 2009. It was simply either we e-mailed a copy of the complaint that we filed or a copy of the opinion. I can't say for sure. I haven't looked at these papers, everything.

But I did have a meeting with, with the New York State attorney -- at the New York State Attorney General's office as a result of those contacts sometime in 2009, I believe, something around that time.

Q Who did you meet with from the New York Attorney General's office?

A It was the -- I don't remember all the names. There were at least -- we



actually did a presentation, a Powerpoint presentation before -- I think there were three people at the New York State Attorney General's office.

Must have been either the director or deputy director of the Antitrust Division, the top people in the Antitrust Division of the New York State Attorney General's office.

Q And you believe this was in 2009?

A Possibly. If not 2009, maybe 2008. I remember just vaguely, but it was around that time. That was one of the contacts. That was the only meeting that we had.

We had subsequent correspondence with them.

Q You had subsequent correspondence with --

A With the office of the New York State Attorney General.

Q Have you produced to us in this action copies of the correspondence with the New York Attorney General's office?

A I don't recall, and I don't even know if I'm allowed to or not. I'm not familiar



with this. I don't think that there has been a request for such -- the correspondence was just an e-mail, no other correspondence.

I think it had to do with maybe when an opinion was issued by this Court, maybe we simply forwarded a copy or something to that effect.

Q What was the purpose of your contacts with the New York Attorney General's office?

A The purpose was to inform the governmental authorities, whether state or federal, of our allegations of Bankrate's antitrust infringement and the nature of their -- of the entire complaint and the damages that we were suffering.

And also to see -- the purpose was to see if -- to get the authorities interested in possibly enjoining or commencing their own investigations and/or their own action to be able to, to stop the -- all of the illegal contacts -- conduct that we alleged at the time, and to take their own action against Bankrate and possibly its officers in the discretion of



the authorities.

We believed there was, aside from a commercial or separate action, civil action, I believed, and I still believe, that there are grounds for criminal violations of the Antitrust Act on behalf of at least the senior officers of Bankrate, if not other people.

Q Did anybody accompany you to the meeting at the New York Attorney General's office?

A Yes. It was one of the former attorneys who actually was the lead attorney at Balestriere PLLC, Craig Lanza, L-a-n-z-a.

That's why I'm trying to place the time of the meeting. It was while he was still involved in the case. I know he left Balestriere somewhere around, I think it was in 2010. So it was sometime in 2009 or 2010. I don't remember exactly when.

But I went with Craig Lanza to the New York State Attorney General's office.

Q In New York City?

A Yes.

Q Did you ever receive any response to your presentation from the New York Attorney

General's office?
A Merely that they were looking at the case, or doing their own analysis, and they asked us to just keep them posted. Something to that effect. I don't remember the exact nature of the communication. But I would say it was cryptic.
Also, we didn't -- I did not want my attorney to take any initiative, and I didn't want to take any further initiative, just an initial contact.
The first step, we informed the authority and we let them just make their own analysis or evaluation or whatever.
Also, the other thing is I didn't want to pry into the -- into something that would be considered highly sensitive. I didn't expect any of the authorities to reveal to us what they were doing. I didn't want to ask.
If they wanted to know more, if they needed our input, they could contact us or they could do their own thing, whether the state or federal authorities.
Q What was the last contact that you had with the New York Attorney General's



office?
A I don't remember exactly, but I think it must have been around the time we were in contact with the Department of Justice. I think when we started communicating with the Department of Justice, we informed the New York State Attorney General's office again.
I can't remember the exact circumstances, but it was around that time. It must have been 2010 or maybe 2000 -- maybe late 2010 or early 2011.
Q And when you talk about contacting the Department of Justice, you are talking about the subpoenas that were sent?
A Correct. As a result of the subpoenas, the Department of Justice in particular -- first of, all they appointed the most senior investigators to the case. They were in contact with us.
We received correspondence from -- even from the head of the Antitrust Division of the Department of Justice. For the most part they were form letters.
But the investigators, they then delegated to some other division, I can't



remember exactly which one, there are different levels of departments, there were a number of people involved. They assigned the case to a particular person or a group of people. That was it.
Beyond that, like I said, I asked specifically -- my attorneys were aware of it, my subsequent attorneys, Nelson Cantor and Mordechai Lipkus, they were aware of this, but I asked them not to contact the authorities, not to do anything. We just remain passive, just wait and see. They have a lot of cases.
And also the questions of secrecy I didn't want to pry into. That was it.
Q Did you ever receive any documents from the Department of Justice?
A Well, documents, just letters. I believe we must have produced the responses, I can't recall for sure, but I believe we produced -- even we produced all the documents in response to third-party subpoenas. We produced the responses from the federal agencies as well.
They didn't produce to us actual documents, so to speak, other than form letters.



Like I said, we could tell from the letters they were form letters or cryptic letters. It showed that they were reviewing the case, but there is nothing revealed about their intentions or whatnot in any of the communications.
Q Did you send to the Department of Justice a copy of the complaint in this case?
A I don't remember if we sent it or there was a reference to a complaint. It was clearly we had to reveal what the nature of the case was. So one of the versions we sent. Probably, I would imagine, the third amended complaint and some of the Court opinions.
Q Did you send any e-mails to the Department of Justice? When I say you, I mean Banxcorp generally including its lawyers.
A Again, in the context of the subpoenas. I believe when they were asking, or -- I don't remember if we needed to follow up after they were served or they contacted us and we responded, but there was some e-mail correspondence.
I don't know if we produced it. It was just strictly limited to the issues in the subpoena. The issues in the subpoenas and

the issues in the complaint, both of them.
Q Was your contact with the Association of the Attorneys General a written contact, a verbal contact or both?
A We may have sent the same e-mail that we sent to the New York State Attorney General to the national office and to other Attorney Generals, but I remember having had one telephone conversation with the National Association of Attorney Generals.
The conversations were cryptic. They don't reveal what they are planning to do or what their intentions are. They just listened to me. They said they would look into it. Thank you. We will be in touch. Keep you posted, et cetera, et cetera, or they suggested to contact so and so and so and so.
In any event, at the time I believe the deputy director of the Antitrust Division in New York, either the director or the deputy director, was the acting president, I believe, of the national association, at least with respect to antitrust investigations.
Eventually we just felt it was



sufficient with the contact that was made.
Q When was the last contact Banxcorp had with the Department of Justice?
A It's probably about a year ago. I'm guessing. Maybe less, but not very recently.
Q Was it in connection with a response to your subpoena?
A It was all in connection with the same issues. I don't remember. The subpoena and the complaint, it was all connected.
Q Okay.
MR. THOMPSON: I believe all of this -- all of these documents reflecting communications with any governmental authority, including the Powerpoint presentation that was made to the New York Attorney General's office, is called for by various document requests.
To the extent they are not, I'm making a request that they be produced here. I will follow up with a letter.
MS. RENZULLI: Okay.
Q Mr. Mehl, you know, yesterday we were talking about -- I'll give you a chance to finish your note.



A Yes, go ahead.
Q Are you all set?
A Yes.
Q By the way, did you do anything to prepare yourself for your testimony today since we were together yesterday afternoon until four o'clock?
A Not anything subsequent, no.
Q Yesterday we were talking about Banxcorp's allegation that Bankrate priced the relevant product below some measure of cost.
Do you recall some discussion about that?
A Yes.
Q And I believe you testified that Banxcorp alleges that Bankrate priced the relevant product below cost for some period of time beginning in October 2005 until sometime in 2006.
Is that an accurate description of Banxcorp's allegation?
A Can you repeat the question?
Q Well, I'll ask it generally. I don't want to cover – I'm going to draw an objection asked and answered.



I'm trying to figure out what Banxcorp's allegation is about the time period during which Banxcorp alleges that Bankrate priced the relevant product below cost.
A The period of 2005 to 2006 would be a good example. I don't want to say -- to limit myself to this is the only period.
At least that is the period that it presents some issues which we believe -- during this period we believe we can make a plausible case that the pricing was made by Bankrate below, below cost.
Q Well, what I'm asking you now is to tell me all of the times during which Banxcorp alleges that Bankrate priced the relevant product below cost.
MS. RENZULLI: Objection.
We haven't completed discovery in this case yet, but to the extent that you can answer that, Norbert, go right ahead.
A I would be guessing now. I don't want to guess.
It's possible they priced below cost even before that when they were charging a flat fee.

# Exhibit B



**Eric Jesse**
Associate
Tel 973 597 2576
Fax 973 597 2577
ejesse@lowenstein.com

May 24, 2012

*VIA E-MAIL & U.S. MAIL*

Kristen Renzulli, Esq.
Law Offices of Kristen Renzulli, PC
31 Overlook Drive
Chappaqua, New York 10514

**Re: BanxCorp v. Bankrate, Inc.
Civil Action No. 07-03398**

Dear Ms. Renzulli:

I write to follow up on my May 11, 2012 letter to you in which I reiterated a document request that Scott Thompson made on the record during Mr. Mehl's January 25, 2011 deposition. (Mehl Dep. Tr. 357.) At the January deposition and again through my letter Bankrate requested that BanxCorp produce communications and documents exchanged between BanxCorp and governmental agencies that concerned Bankrate's purported antitrust violations. Because the documents were initially requested in January, I asked for their production by May 21, 2012. A copy of my May 11 letter is enclosed.

To date, BanxCorp has failed to produce the requested documents and, in fact, has not even responded to our request in anyway. I write, again, to request that BanxCorp produce the documents requested during Mr. Mehl's deposition and in my May 11 letter no later than May 29, 2012. If BanxCorp fails to make production by that date, we will have no choice to raise this issue with Judge Waldor.

Best regards,

Eric Jesse

Enclosure
20928/2
05/24/12 20661553.1

cc: R. Scott Thompson, Esq. (via e-mail)
Michael J. Hahn, Esq. (via e-mail)



**Eric Jesse**
Associate
Tel 973 597 2576
Fax 973 597 2577
ejesse@lowenstein.com

May 11, 2012

*VIA E-MAIL & U.S. MAIL*

Kristen Renzulli, Esq.
Law Offices of Kristen Renzulli, PC
31 Overlook Drive
Chappaqua, New York 10514

**Re: BanxCorp v. Bankrate, Inc.
Civil Action No. 07-03398**

Dear Ms. Renzulli:

I write to follow up on Scott Thompson's document request during Mr. Mehl's January 25, 2012 deposition. During his deposition, Mr. Mehl stated that he had communications with various governmental agencies regarding Bankrate's alleged antitrust violations. (Mehl Dep. Tr. 347-357.) Mr. Thompson requested production of BanxCorp's communications with, and presentations to, all governmental agencies, (id. 357:13-21), but BanxCorp has failed to produce such documents.

Therefore, I write to again request that BanxCorp produce the following documents with regard to Bankrate's purposed antitrust violations, including but not limited to:

- Any and all communications or documents exchanged between BanxCorp and any governmental authority, including but not limited to the New York State Attorney General, the National Association of Attorneys General, the U.S. Department of Justice, and the Federal Trade Commission.

- Any and all notes and memoranda memorializing any communications or meetings with any governmental authority.

- Any and all presentations to any governmental authority, including but not limited to the New York State Attorney General.

Because BanxCorp's production of these documents is long overdue, please produce these documents within 10 days.

Best regards,

Eric Jesse

20928/2
05/11/12 20550912.1

cc: R. Scott Thompson, Esq. (via e-mail)
Michael J. Hahn, Esq. (via e-mail)



**Jesse, Eric**

**From:** Thompson, R. Scott
**Sent:** Friday, May 25, 2012 5:17 PM
**To:** 'kristen@renzullipc.com'
**Cc:** 'dbrown@sheppardmullin.com'; Hahn, Michael J.; Jesse, Eric; 'mlipkis@mlipkis.com'
**Subject:** Re: BanxCorp v. Bankrate, Inc.

It is hard to believe that your client is making you assert a claim of work-product immunity with respect to (1) letters sent to you by the government and (2) materials that have been sent to the government (for which, of course, any possible claim of privilege or immunity from discovery was waived upon voluntary disclosure to a third party). This is not a good-faith objection. We will present the issue to Judge Waldor.

Have a good weekend.

**From:** Kristen Renzulli [mailto:kristen@renzullipc.com]
**Sent:** Friday, May 25, 2012 01:50 PM
**To:** Thompson, R. Scott
**Cc:** dbrown@sheppardmullin.com <dbrown@sheppardmullin.com>; Hahn, Michael J.; Jesse, Eric; mlipkis@mlipkis.com Lipkis <mlipkis@mlipkis.com>
**Subject:** BanxCorp v. Bankrate, Inc.

Scott,

With respect to your request for communications and documents exchanged between BanxCorp or its counsel with government antitrust enforcement agencies, be advised that such information will not be produced, as it is protected under the work-product doctrine pursuant to Rule 26(b)(3).

Kristen Renzulli, Esq.
Law Offices of Kristen Renzulli, PC
31 Overlook Drive
Chappaqua, New York 10514
914.263.7703
914.238.9506 Fax
kristen@renzullipc.com

The content of this e-mail transmission and its attachments, if any, may contain information that is attorney work product, privileged and/or confidential and is only for the use of the intended recipient. If you are not the intended recipient, any disclosure, copying, distribution, use of and/or reliance on the content of this communication is strictly prohibited. If you received this e-mail communication in error, please notify us immediately by telephone and/or reply e-mail and delete the e-mail and destroy any printed copy thereof. Thank you.

**Jesse, Eric**

---

**From:** Thompson, R. Scott
**Sent:** Tuesday, May 29, 2012 12:52 PM
**To:** Kristen Renzulli
**Cc:** dbrown@sheppardmullin.com; Hahn, Michael J.; Jesse, Eric; mlipkis@mlipkis.com Lipkis
**Subject:** RE: BanxCorp v. Bankrate, Inc.

Kristen:

Whether the communications were made in anticipation of litigation is completely irrelevant. You cannot claim work-product protection for a voluntary disclosure of information to the government; disclosure results in waiver of any claim of protection. Moreover, 26(b)(3)(B) explicitly excepts from coverage a party's previous statements about the subject-matter of the litigation. And, of course, you cannot possibly claim work-product protection for communications made by the government to you because you did not create those communications; they were created by a third-party, so if there could be a claim of protection it would belong to the third-party and not you. Rule 26(b)(3) only applies to trial preparation materials created "by" a party.

This is first-year law school stuff. The claim of protection is not being made in good faith. Rule 26(b)(3)(B) states that the *mandatory* fee award provision of Rule 37(a)(5) applies if we have to move to get this stuff. "Mandatory" means that the court will be required to award us fees if we have to make a motion. Please don't make us do that.

Scott

R. Scott Thompson
Member of the Firm
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey 07068
Tele: 973-597-2532
Fax: 973-597-2533
sthompson@lowenstein.com
www.lowenstein.com

**From:** Kristen Renzulli [mailto:kristen@renzullipc.com]
**Sent:** Tuesday, May 29, 2012 7:14 AM
**To:** Thompson, R. Scott
**Cc:** dbrown@sheppardmullin.com; Hahn, Michael J.; Jesse, Eric; mlipkis@mlipkis.com Lipkis
**Subject:** BanxCorp v. Bankrate, Inc.

Scott,

I am not privy to the communications between BanxCorp's former counsel or Mr. Mehl with law enforcement agencies, but it is my understanding that these communications were in anticipation of litigation and in anticipation of any such agency's possible assistance or aid by way an amicus brief, or otherwise, at some point during current or anticipated litigation. As such, there has been no waiver of immunity, and such information will not be produced, as it is protected under the work-product doctrine pursuant to Rule 26(b)(3). See *In re Ford Motor Co.*, 110 F.3d 954, 962 n.7 (3d Cir. 1997) (holding that the literal language of Rule 26(b)(3) requires that the material be prepared in anticipation of *some* litigation, not necessarily in anticipation of the *particular* litigation in which it is being sought). See also, *United Coal Co. v. Powell Constr. Co.*, 839 F.2d 958, 966 (3d Cir. 1988).

Kristen Renzulli, Esq.

Law Offices of Kristen Renzulli, PC
31 Overlook Drive
Chappaqua, New York 10514
914.263.7703
914.238.9506 Fax
kristen@renzullipc.com

The content of this e-mail transmission and its attachments, if any, may contain information that is attorney work product, privileged and/or confidential and is only for the use of the intended recipient. If you are not the intended recipient, any disclosure, copying, distribution, use of and/or reliance on the content of this communication is strictly prohibited. If you received this e-mail communication in error, please notify us immediately by telephone and/or reply e-mail and delete the e-mail and destroy any printed copy thereof. Thank you.