# LAW OFFICES OF KRISTEN RENZULLI, PC

31 OVERLOOK DRIVE
CHAPPAQUA, NEW YORK 10514
914.263.7703
914.238.9506 FAX
kristen@renzullipc.com

June 4, 2012

*Via ECF, FedEx and Fax (w/o encls.)*

Hon. Cathy L. Waldor, U.S.M.J.
United States Court for the District of New Jersey
50 Walnut Street
Newark, New Jersey 07101

> **Re:** ***BanxCorp v. Bankrate Inc.*, Civ. No. 07-3398 (ES)(CLW)**
> ***BanxCorp v. LendingTree, LLC,* Civ. No. 10-2467 (ES)(CLW)**

Dear Judge Waldor:

We write in response to a letter from Defendant Bankrate's counsel dated May 29, 2012 (Doc. No. 335).

Throughout his first day of deposition on May 9, Mr. Evans refused to answer questions in an intelligent way and failed to offer meaningful testimony about most of the items specified in Plaintiff's notice of deposition, as shown in the attached <u>Exhibit A</u>.  Mr. Evans was not prepared or failed to answer the noticed topics fully, accurately, and non-evasively, as ordered by this Court a year ago on June 7, 2011.  Relevant portions of the transcript of this hearing before Judge Arleo (see June 7, 2011 Hr'g Tr. at 29:15-25, 30:1-7) are attached as <u>Exhibit B</u>.

It is well settled that "producing an unprepared witness is tantamount to a failure to appear" that is sanctionable under Rule 37(d).  *See Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.,* 228 F.3d 275, 304 (3d Cir. 2000).  Moreover, a witness who gives untruthful answers at a deposition ordered by the Court may be held in contempt for he is being, in effect, unresponsive.  *Andrews v. Holloway,* Civ. No. 95-1047(JBS) (D.N.J. 2009) (internal citations omitted).

While we need not recite every instance in which Mr. Evans' May 9 testimony was evasive, incomplete, untruthful and unhelpful on the specified topics, we believe that the following examples, in addition to those set forth in our May 29 correspondence (Doc. No. 334), amply illustrate our point.

For example, when asked to identify Bankrate's number one and number two competitors in terms of revenue from the sale of rate table listings in 2007 and 2008, Mr. Evans named its former co-branding partner, Zillow, and a few other companies.  See Evans Tr. at 28:24-25, 29:1-10, and 156-157.  However, according to Zillow's Form S-1 report filed with the S.E.C. on April 18, 2011, *Zillow did not begin to charge mortgage lenders for participation in its*

Hon. Cathy L. Waldor, U.S.M.J.
June 4, 2012
Page 2

*Mortgage Marketplace until January 2010. See* relevant portions of Zillow's Form S-1 S.E.C. filing, attached as Exhibit C. Consequently, Zillow's respective market share in the sale of internet rate table listings prior to 2010 was non-existent. This flatly contradicts the following sworn testimony of Mr. Evans (see Evans Tr. at 196:13-19):

> Q: What was Zillow's respective market share in the sale of internet rate table listings in 2006?
>
> A: Again, Zillow is a -- Zillow was a private company then, they're a public company now, and even as a public company now, they don't break out their -- their rate table revenue.

Similarly, when asked to list "all the independently operated internet consumer banking marketplace destination sites that were actively competing with Bankrate.com in the sale of internet rate table listings from 2004 to 2009?" Mr. Evans deceptively responded as follows (see Evans Tr. at 196:20-25, 197:1-13):

> A: I couldn't -- I -- I couldn't name them all, but all of the -- the aforementioned companies -- and I -- I'm sure there are others that I've -- I've forgotten, *but in addition to whatever -- 2009, whatever Google was doing at the time, because **Google has now, as you're probably aware, developed their own mortgage rate table marketplace** that they run on top of the Google listings and -- and drive a significant amount of traffic, and I assume revenue from that -- that product, that's called Google Advisor.*

The above sworn testimony is patently contradicted by Google's own announcement on February 1, 2012 that it "*closed down the mortgage search feature of Google Advisor*" due to poor performance; and also by the disclaimers on Google Advisor's website that "Google is not currently paid" for its rate table listings, as shown in the attached Exhibit D.

Bankrate failed to satisfy its duties under Rules 37 and 30, and should be sanctioned accordingly, in addition to being ordered to produce Mr. Evans for his continued deposition.

Respectfully submitted, ·

Kristen Renzulli

Encls.
cc:    All Counsel (*via ECF*)

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BANXCORP,

                          Plaintiff,

            v.

BANKRATE, INC.,

                          Defendant.

Civil Action No. 07-3398 (ES)

**NOTICE OF DEPOSITION OF
THOMAS R. EVANS**

**TO:**    R. Scott Thompson, Esq.
           Lowenstein Sandler PC
           65 Livingston Avenue
           Roseland, NJ 07068

**PLEASE TAKE NOTICE THAT**, pursuant to Fed. R. Civ. P. 30, testimony will be taken from Thomas R. Evans upon oral examination before a person duly authorized to administer oaths, on Monday, August 1, 2011, beginning at 9:30 a.m. at the law offices of Lowenstein Sandler, 1251 Avenue of the Americas, New York, New York 10020, with respect to the topics set forth in Schedule A attached hereto. The deposition will continue from day to day thereafter until completed.  This deposition will be stenographically recorded.

Dated: July 5, 2011

                          *s/Mordechai I. Lipkis*
                          Mordechai I. Lipkis, Esq.
                          350 Broadway, Suite 1105
                          New York, NY 10013
                          Telephone: 212-925-4023
                          mlipkis@mlipkis.com
                          *Attorneys for Plaintiff BanxCorp*

## Schedule A

## DEFINITIONS

A.      "Bankrate" refers to Defendant Bankrate, Inc.

B.      "Co-branding partner (or partnership)" refers to that term as it is used throughout the Third Amended Complaint.

C.      The terms "CPC," "customers," and "end users," refer to those terms as they are used throughout the Third Amended Complaint.

D.      "Rate table," or "rate table listings" refers to that term as it is used throughout the Third Amended Complaint.

## TOPICS

1.      Bankrate's co-branding partnership agreements and effects on competition.

2.      The marketing, sales, pricing, billing and revenue collection practices of Bankrate and its co-branding partners.

3.      Bankrate's competitors in the market for Internet rate table listings.

4.      Bankrate's display of free Internet rate table listings and effects on competition.

5.      Bankrate's commingling of free Internet rate listings with paid rate listings, conflicts of interest and effects on competition.

6.      Bankrate's agreements to allocate revenues with co-branding partners and effects on competition.

7.      Bankrate's agreements to divide markets with co-branding partners and effects on competition.

8.      Bankrate's agreements to allocate customers or products with co-branding partners and effects on competition.

2

9.     Bankrate's Internet traffic allocation and/or reporting practices, if any, with its co-branding partners and effects on competition.

10.    Bankrate's quarterly earnings conference calls since June 2004.

11.    Bankrate's investor presentations, public offerings and S.E.C. filings since June 2004.

12.    Bankrate's corporate restructurings since June 2004.

13.    Bankrate's growth strategy since June 2004.

14.    The business model introduced by Bankrate that turned what was a cost for partnership websites into a revenue source.

15.    The relevant market that Bankrate participates in which is subject to this action.

16.    Peculiar characteristics and functional attributes of bank rate websites, their customers and end users.

17.    Secular industry shift toward online advertising of banking products and consumers' increasing reliance on the Internet for shopping of financial products.

18.    Bankrate's and its competitors' market share in the relevant market subject to this action.

19.    Growth of Bankrate's Internet traffic and unique website visitors.

20.    Competition among Bankrate's co-branding partners.

21.    Competition between Bankrate and its partners.

22.    Competition between Bankrate's co-branded partner websites and Bankrate's own websites.

23.    Bankrate's dominance and market power in the relevant market subject to this action.

24.     Bankrate's erection of barriers to entry in the relevant market subject to this action.

25.     Bankrate's monopolization or attempted monopolization of the relevant market subject to this action.

26.     Bankrate's newspaper distribution network and its effects on Bankrate's Internet traffic.

27.     Bankrate's exclusionary newspaper distribution agreements and effects on competition.

28.     Bankrate's exclusionary agreements with partners and competitors, if any, and effects on competition.

29.     Bankrate's sole authority and/or exclusive right to sell rate table listings on the Internet on behalf of its co-branding partners.

30.     Bankrate's injury to competition.

31.     Bankrate's mergers and acquisitions and effects on competition.

32.     Bankrate's acquisitions of co-branding partners and effects on competition.

33.     Bankrate's paid search engine bids and listings and effects on competition.

34.     Bankrate's agreements with LendingTree LLC and effects on competition.

35.     Pricing for Bankrate's products and costs.

36.     Bankrate's switch from a flat fee pricing to a cost per click or CPC pricing structure since October 2005.

37.     Bankrate's cost per click or CPC price increases since October 2005 and recoupment of earlier losses.

38.     Bankrate's predatory pricing practices, if any, and effects on competition.

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on this date, the foregoing Notice of Deposition was served on counsel of

record for Defendant in this action by e-mail to:

> R. Scott Thompson, Esq.
> Lowenstein Sandler PC
> 65 Livingston Avenue
> Roseland, NJ 07068
> *sthompson@lowenstein.com*

Dated:  New York, New York
July 5, 2011

<u>*s/Mordechai I. Lipkis*</u>
Mordechai I. Lipkis, Esq.
350 Broadway, Suite 1105
New York, NY 10013
Telephone: 212-925-4023
mlipkis@mlipkis.com
*Attorneys for Plaintiff BanxCorp*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BANXCORP,

                          Plaintiff,

    v.

BANKRATE, INC.,

                          Defendant.

BANXCORP,

                          Plaintiff,

    v.

LENDINGTREE, LLC,

                          Defendant.

Civil Action No. 07-3398 (ES)(CLW)
Civil Action No. 10-2467 (ES)(CLW)

**NOTICE OF DEPOSITION OF
THOMAS R. EVANS**

**TO:**   R. Scott Thompson, Esq.
         Lowenstein Sandler PC
         65 Livingston Avenue
         Roseland, NJ 07068
         *Attorneys for Defendant Bankrate Inc.*

      **PLEASE TAKE NOTICE THAT**, pursuant to Fed. R. Civ. P. 30, testimony will be taken from Thomas R. Evans upon oral examination before a person duly authorized to administer oaths, on Wednesday, May 9, 2012, beginning at 10:00 a.m. at the law offices of Lowenstein Sandler, 1251 Avenue of the Americas, New York, New York 10020, with respect to all matters relevant to the subject matter involved in this action and the topics set forth in Schedule A attached hereto. The deposition will continue from day to day thereafter until completed.  This deposition will be recorded by audio, audiovisual or stenographic means.

Dated: May 4, 2012

                          *s/ Kristen Renzulli*
                          Kristen Renzulli, Esq.
                          Law Offices of Kristen Renzulli, PC

31 Overlook Drive
Chappaqua, NY 10514
914.263.7703
kristen@renzullipc.com

*Counsel for Plaintiff BanxCorp*

**Schedule A**

## DEFINITIONS

A.      "Bankrate" refers to Defendant Bankrate, Inc.

B.      "Co-branding partner (or partnership)" refers to that term as it is used throughout the Fifth Amended Complaint.

C.      The terms "CPC," "customers," and "end users," refer to those terms as they are used throughout the Fifth Amended Complaint.

D.      "Rate table," or "rate table listings" refers to that term as it is used throughout the Fifth Amended Complaint.

## TOPICS

1.      The allegations in the Fifth Amended Complaint.

2.      Bankrate's co-branding partnership agreements and effects on competition.

3.      The marketing, sales, pricing, billing and revenue collection practices of Bankrate and its co-branding partners.

4.      Bankrate's competitors in the market for Internet rate table listings.

5.      Bankrate's display of free Internet rate table listings and effects on competition.

6.      Bankrate's commingling of free Internet rate listings with paid rate listings, conflicts of interest and effects on competition.

7.      Bankrate's agreements to allocate revenues with co-branding partners and effects on competition.

8.      Bankrate's agreements to divide markets with co-branding partners and effects on competition.

9.      Bankrate's agreements to allocate customers or products with co-branding partners and effects on competition.

10.     Bankrate's Internet traffic allocation and/or reporting practices, if any, with its co-branding partners and effects on competition.

11.     Bankrate's quarterly earnings conference calls since June 2004.

12.     Bankrate's investor presentations, public offerings and S.E.C. filings since June 2004.

13.     Bankrate's corporate restructurings since June 2004.

14.     Bankrate's growth strategy since June 2004.

15.     The business model introduced by Bankrate that turned what was a cost for partnership websites into a revenue source.

16.     The relevant market that Bankrate participates in which is subject to this action.

17.     Peculiar characteristics and functional attributes of bank rate websites, their customers and end users.

18.     Secular industry shift toward online advertising of banking products and consumers' increasing reliance on the Internet for shopping of financial products.

19.     Bankrate's and its competitors' market share in the relevant market subject to this action.

20.     Growth of Bankrate's Internet traffic and unique website visitors.

21.     Competition among Bankrate's co-branding partners.

22.     Competition between Bankrate and its partners.

23.     Competition between Bankrate's co-branded partner websites and Bankrate's own websites.

24.     Bankrate's dominance and market power in the relevant market subject to this action.

25.     Bankrate's erection of barriers to entry in the relevant market subject to this action.

26.     Bankrate's monopolization or attempted monopolization of the relevant market subject to this action.

4

27.     Bankrate's newspaper distribution network and its effects on Bankrate's Internet traffic.

28.     Bankrate's exclusionary newspaper distribution agreements and effects on competition.

29.     Bankrate's exclusionary agreements with partners and competitors, if any, and effects on competition.

30.     Bankrate's sole authority and/or exclusive right to sell rate table listings on the Internet on behalf of its co-branding partners.

31.     Bankrate's injury to competition.

32.     Bankrate's mergers and acquisitions and effects on competition.

33.     Bankrate's acquisitions of co-branding partners and effects on competition.

34.     Bankrate's paid search engine bids and listings and effects on competition.

35.     Bankrate's agreements with LendingTree LLC and effects on competition.

36.     Pricing for Bankrate's products and costs.

37.     Bankrate's switch from a flat fee pricing to a cost per click or CPC pricing structure since October 2005.

38.     Bankrate's cost per click or CPC price increases since October 2005 and recoupment of earlier losses.

39.     Bankrate's predatory pricing practices, if any, and effects on competition.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this date, the foregoing Notice of Deposition was served on counsel for

Defendant Bankrate Inc. by e-mail to:

R. Scott Thompson, Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068
*sthompson@lowenstein.com*

Dated: Chappaqua, New York
May 4, 2012

*s/ Kristen Renzulli*
Kristen Renzulli, Esq.
Law Offices of Kristen Renzulli, PC
31 Overlook Drive
Chappaqua, NY 10514
914.263.7703
kristen@renzullipc.com

*Counsel for Plaintiff BanxCorp*

# EXHIBIT B

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEW JERSEY
 2

 3   BANXCORP,                          .
                                        .
 4          Plaintiff,                  .
                                        . Case No. 07-cv-03398
 5   vs.                                .
                                        . Newark, New Jersey
 6   BANKRATE, INC.,                    . June 7, 2011
                                        .
 7          Defendant.                  .
                                        .
 8

 9                       TRANSCRIPT OF HEARING
10            BEFORE THE HONORABLE MADLINE COX ARLEO
                    UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:      MORDECHAI I. LIPKIS, ESQ.
13                           350 Broadway, Suite 1105
                             New York, NY 10013
14
                             LAWRENCE C. HERSH, ESQ.
15                           17 Sylvan Street
                             Suite 102b
16                           Rutherford, NJ 07070
                             (201) 507-6300
17                           Email: Lh@hershlegal.com

18                           Mr. Norbert Mehl

19   For the Defendant:      R. SCOTT THOMPSON, ESQ.
                             Lowenstein Sandler PC
20                           65 Livingston Avenue
                             Roseland, NJ 07068-1791
21                           (973) 597-2500
                             Email: Sthompson@lowenstein.com
22
                             MICHAEL J. HAHN, ESQ.
23                           Lowenstein Sandler PC
                             65 Livingston Avenue
24                           Roseland, NJ 07068
                             (973) 597-2500
25                           Email: Mhahn@lowenstein.com
```

1    depositions?

2            MR. LIPKIS:  Yes.  There are the depositions of Tom

3    Evans, Elisabeth DeMarse, and Peter Morse.

4            MR. THOMPSON:  We actually haven't really discussed

5    these depositions in particular.  We have no objection to Tom

6    Evans.  He's our CEO, has been for the last six or seven

7    years.  Elisabeth DeMarse was the CEO before Mr. Evans or

8    shortly before Mr. Evans.  The relevancy is a little bit

9    remote, but we're -- we're willing to do our part to get her

10   produced.  She's no longer employed by the company.

11   Mr. Morse is the chairman of the board of the company, has

12   never played a role in operations.  And we do not consent to

13   having his deposition taken.  He's -- they've never made any

14   showing as to how --

15           THE COURT:  Okay.  Well, then, why don't we do

16   this?  Start with Evans and DeMarse.  Will they -- will you

17   also be -- is there topics -- 30(b)(6) topics you'd like to

18   have them respond to on behalf of the company?  Policies and

19   practices?

20           MR. LIPKIS:  Yes.

21           THE COURT:  Okay.  But I want you to send him a

22   30(b)(6) notice and list the topics.  That'll avoid at his

23   deposition him objecting way beyond the scope of -- these are

24   CEOs, they know about a lot of things.  I want the topics

25   that you intend to question him on written down as akin to a

1   30(b)(6) notice.  Mr. Thompson can respond, and you could --

2   determine the scope of the deposition before you begin,

3   because unlike other fact witnesses, a CEO of a company has a

4   lot of knowledge, and I think this -- given the history here,

5   we need to know exactly where the plaintiff is going in terms

6   of topics, not question by question, but topics, so that we

7   have a -- we have a more efficient deposition.

8          In terms of the chairman of the board, there's all

9   kind law about whether or not the chairman of the -- chairman

10  of a board of a company, who is not involved in the

11  decision -- in either the policies or the facts, should be

12  deposed.  And I think that after you take these first two

13  depositions, you can make a -- submit a letter brief to me

14  and you could tell me the topics and why you need to take

15  them, and Mr. Thompson can respond.  There may be someone

16  less -- someone other than the chairman that can testify on

17  those topics, and we'll have a hearing, and we'll decide

18  whether you take the third deposition.

19          MR. THOMPSON:  Your Honor, thank you, Your Honor.

20          Now, to make things a little more complicated, but

21  I would be remiss if I -- if I didn't because why not.

22          As Your Honor is aware, there is a motion to

23  dismiss the fourth amended complaint pending.

24          THE COURT:  Is that pending before?  --

25          MR. THOMPSON:  What we're contemplating and what --

# EXHIBIT C

Table of Contents

As filed with the Securities and Exchange Commission on April 18, 2011

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM S-1

*REGISTRATION STATEMENT*
*UNDER*
*THE SECURITIES ACT OF 1933*

# ZILLOW, INC.

(Exact name of registrant as specified in its charter)

| **Washington** | **7389** | **20-2000033** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**999 Third Avenue, Suite 4600**
**Seattle, Washington 98104**
**(206) 470-7000**
**www.zillow.com**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

Spencer M. Rascoff
**Chief Executive Officer**
Zillow, Inc.
**999 Third Avenue, Suite 4600**
**Seattle, Washington 98104**
**(206) 470-7000**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| **David F. McShea** | **Kathleen Philips** | **Horace L. Nash** |
|---|---|---|
| **Andrew B. Moore** | **General Counsel** | **Alan C. Smith** |
| **Bradley D. Owens** | **Zillow, Inc.** | **James D. Evans** |
| **Perkins Coie LLP** | **999 Third Avenue, Suite 4600** | **Fenwick & West LLP** |
| **1201 Third Avenue, Suite 4800** | **Seattle, Washington 98104** | **1191 Second Avenue, 10th Floor** |
| **Seattle, Washington 98101-3099** | **(206) 470-7000** | **Seattle, Washington 98101** |
| **(206) 359-8000** | | **(206) 389-4510** |

**Approximate date of commencement of proposed sale to the public:**   As soon as practicable after this Registration Statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act of 1933, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act of 1933, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act of 1933, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer | ☐ | | Accelerated filer | ☐ |
|---|---|---|---|---|
| Non-accelerated filer | ☒ | (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

**CALCULATION OF REGISTRATION FEE**

BX0027887

| | | | | | |
|---|---|---|---|---|---|
| Adjusted EBITDA (unaudited) | $(10,373) | $(13,766) | $(12,236) | $ (4,908) | $  140 |

---

**Table of Contents**

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our audited financial statements and related notes to financial statements included elsewhere in this prospectus. In addition to historical financial information, the following discussion contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results may differ materially from those contained in or implied by any forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and elsewhere in this prospectus, particularly in "Risk Factors."*

**Overview**

We are the leading real estate information marketplace. We provide vital information about homes, real estate listings and mortgages through our website and mobile applications, enabling homeowners, buyers, sellers and renters to connect with real estate and mortgage professionals best suited to meet their needs. We are transforming the way consumers make home-related decisions.

Our living database of more than 100 million U.S. homes – homes for sale, homes for rent and homes not currently on the market – attracts an active and vibrant community of users. Individuals and businesses that use Zillow have updated information on more than 27 million homes and added more than 50 million home photos, creating exclusive home profiles available nowhere else. These profiles include rich detailed information about homes, including property facts, listing information and purchase and sale data. We provide this information to our users where, when and how they want it, both through our website and through our industry-leading mobile applications that enable consumers to access our information when they are curbside, viewing homes. Using industry-leading automated valuation models, we provide current home value estimates, or Zestimates, on more than 70 million U.S. homes, and current rental price estimates, or Rent Zestimates, on more than 100 million U.S. homes. Our products and services present residential real estate data in novel ways that have revolutionized the way consumers search for, find and understand home-related information and make real estate decisions.

We were incorporated in December 2004 and have continually introduced innovative products, achieving key product development and business milestones that have driven our revenue and traffic growth.

- On February 8, 2006, we launched the initial version of our website, Zillow.com, providing Zestimates on approximately 40 million U.S. homes. Two days later, we attracted our one millionth visitor.
- In November 2007, we announced our listings feed program, allowing real estate brokerages to directly feed their listings to our website. By June 2008, we were displaying 2.3 million for sale listings and have since grown our listings to provide extensive nationwide sale and rental listing information.
- In April 2008, we launched Zillow Mortgage Marketplace. By February 2009, mortgage lenders had provided over one million marketplace loan quotes. We began to charge mortgage lenders for participation in Zillow Mortgage Marketplace in January 2010.
- In October 2008, we launched our Premier Agent program. By the end of 2010, we had more than 8,000 paying Premier Agent subscribers.
- In April 2009, we released our first mobile application. We now operate the most popular mobile real estate applications across iPhone, iPad, Android and BlackBerry.
- In December 2009, we began displaying rental listings and enhanced this experience with the introduction of Rent Zestimates in March 2011.
- In December 2010, we began collecting and displaying consumer-generated real estate agent ratings and reviews. By March 2011, consumers had submitted more than 30,000 agent reviews.
- In February 2011, we launched a strategic relationship with Yahoo! Real Estate through which we provide real estate listings to Yahoo! Real Estate and have exclusive rights to sell subscription advertising and certain graphical advertisements for display throughout the Yahoo! Real Estate site.

---

**Table of Contents**

We generate revenues from local real estate professionals, primarily on an individual subscription basis, and from mortgage professionals and brand advertisers. Our revenues include marketplace revenues, consisting of subscriptions sold to real estate agents and advertising sold on a cost per click, or CPC, basis to mortgage lenders, and display revenues consisting of advertising placements sold primarily on a cost per thousand impressions, or CPM, basis.

We have experienced significant revenue growth over the past three years. In 2008, 2009 and 2010 we focused on growing our marketplace revenues, which accounted for the majority of our revenue growth over that period. This growth in marketplace revenues helped us achieve an overall 70% compound annual growth rate from 2008 to 2010. The increase in marketplace revenues resulted from growth in our Premier Agent program and the commencement of charging mortgage lenders for participation in Zillow Mortgage Marketplace. Our Premier Agent program established a significant source of more predictable subscription-based revenue that complements our display revenues, and created a diversified revenue mix.

In 2008, 2009 and 2010, we generated revenues of $10.6 million, $17.5 million and $30.5 million, respectively, representing growth of 49%, 65% and 74%, respectively. We believe achieving these levels of revenue growth were primarily the result of significant growth in the following areas:

BX0027911

# EXHIBIT D

# MT MORTGAGE TECHNOLOGY

(http://www.nationalmortgagenews.com/technology/)

**By** Austin Kilgore

FEB 1, 2012 6:06pm ET

# Google Closes Mortgage Rate Search

**By** Austin Kilgore

FEB 1, 2012 6:06pm ET

After significantly reducing its geographic footprint in November, Google "discontinued" its mortgage rate advertising platform Wednesday, just two years after the search engine entered the online rate search and lead generation market.

4TH ANNUAL
Best Practices in
LO$$ MITIGATION

Register Now
Call (212) 803-8456
July 19-20, 2012
Dallas/Addison Marriott Quorum | Dallas, TX

The platform, originally called "AdWords Comparison Ads," and was later, "Google Advisor Mortgage," once it was rolled into Google's suite of financial services search products, was shut down due to poor performance, according to a prepared statement from the search engine company.

"We've been prioritizing our product efforts across Google, which means taking a hard look at products that haven't been as successful as we would have hoped," spokeswoman Winnie King said in an email. "To that end, we've closed down the mortgage search feature of Google Advisor and are focused on building continued improvements into the rest of the product."

In a follow-up call, King said the decision was limited to the mortgage search platform and doesn't impact the other Google Advisor product searches, which include credit cards, certificates of deposit and checking and savings accounts. King could not say whether the U.K. version of the mortgage search platform would continue.

In November, Google shut down Google Advisor Mortgage in all but Alabama, Alaska, California, Pennsylvania and Washington D.C. At the time, both lenders who paid to advertise their rates on the platform, as well as mortgage technology vendors who were integrating product and pricing engines into Google's platform, believed the closure was a temporary suspension of the platform, rather than a precursor to its ultimate demise.

"It was explained to me as being a temporary transition to allow them to better focus in on a smaller market and then once they've proven out the enhancements that they want

BX0027360

to make, they want to thoughtfully broaden it back to the stage where it is national again," said Bruce Backer, president of Appleton, Wis.-based PPE vendor LoanSifter, in a December interview with *Mortgage Technology*.

Since *Mortgage Technology* first reported on Google's wavering involvement in the mortgage rate search market, lenders and vendors say they've been strong-armed into not speaking publicly about the platform.

Multiple lender advertisers and PPE vendors declined to speak to Mortgage Technology for this story, citing pressure from Google.

One lender, who spoke to *MT* on condition of anonymity, said his company was still advertising its rates on the site on Tuesday, but when he tried to log on to the system Wednesday, he received a message that the platform was shut down.

Lenders didn't receive prior notice of the shutdown and when they tried to reach Google representatives, the lender said he received an automated message warning of slow response times due to the flood of inquiries. The lender believes the small scope of the rate search product may have contributed to its decline.

"It could be that it was too small for them to deal with," the lender said, adding "mortgage is also kind of a dirty word across the industry."

The rate search platform's closure comes a year after Google disabled a feature that let users search for sale and rental properties on Google Maps.

Advertising representatives for real estate listing portal Zillow, which runs a competing mortgage rate search platform called the Zillow Mortgage Marketplace, jumped on the news, alerting lenders via email of the demise of Google's platform.

Word of Google's plans to create a mortgage rate search product first surfaced in August 2009, when LendingTree, which offers its own mortgage rate search product, sued Mortech, alleging the Lincoln, Neb.-based PPE vendor was violating a noncompete agreement by helping Google launch its rate search platform. The federal lawsuit was later settled out of court.

In an October 2009 post to its Inside AdWords blog (http://adwords.blogspot.com/2009/10/introducing-adwords-comparison-ads.html) , Google first openly discussed the rate search platform. Google formally launched the rate search portal in January 2010.



© 2012 National Mortgage News and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

BX0027361

# National MortgageNews

(http://www.nationalmortgagenews.com)



**By** Austin Kilgore

FEB 3, 2012

MORTGAGE BYTES

# Lessons Learned and Opportunities Missed

Austin Kilgore

FEB 3, 2012 11:59am ET

The writing was on the wall in October, when the industry gathered in Chicago for the Mortgage Bankers Association's annual convention.



4TH ANNUAL
Best Practices in
LO$$ MITIGATION

Register Now
Call (212) 803-8456
July 19-20, 2012
Dallas/Addison Marriott Quorum  |  Dallas, TX

In the exhibition hall of 200 or so companies, one booth sat conspicuously empty among the vast wonderland of vendor swag, product demos and business card fish bowls—perhaps sticking out even more because it was directly across from LOS vendor Ellie Mae's three-stall-wide outpost.

The space was reserved by Google to promote Google Advisor Mortgage, a lead generation product where lenders pay to advertise their latest rate quotes and connect with prospective borrowers. Whether MBA officials knew that Google wasn't going to show up is anyone's best guess, but if they did, it wasn't in time to change the giant posters, program guides and expo maps that are printed well in advance of the event.

We now know why Google wasn't at the MBA annual. There's no reason to promote a product that's on the chopping block.

Google's decision to shutter the Advisor Mortgage platform isn't incredibly shocking, as the product's footprint was significantly reduced to just a handful of states in November. But just like its absence from the MBA's exhibit hall, Google didn't let anyone in on its plans until it had already made its move.

Google said the platform shut down due to poor performance. Lenders and product and pricing engine vendors who have worked on the platform, as well as officials at competing rate search platforms, have speculated that given the sophisticated nature of the mortgage business, the return on investment didn't justify the effort of maintaining the rate search product relative to the bank account and credit card search products on Google Advisor—though it should be noted that according to one lender, the mortgage search was the only revenue generating feature of Google Advisor.

BX0027362

One industry expert suggested that Google may replace the search platform with a competing lending operation—a move that's technically feasible, but highly unlikely. Maybe the industry is just too tainted right now for Google to feel comfortable being actively involved in home finance—though that won't likely stop it from taking lenders' money for traditional keyword search ads.

Here's another theory—Google couldn't figure out the collaborative nature of the mortgage industry and its technology sector.

That Google didn't notify its paying advertisers and the PPE vendors who helped keep rate quotes current that it was first scaling back and later, shutting down the platform—leaving them to make the discovery on their own—has participants baffled, not to mention frustrated.

The veil of secrecy—including a stranglehold on how and what lenders and vendors can say about Google—and the general attitude that "Google knows best" when it came to the platform is indicative of a bigger problem when large technology companies try to make a big splash in the mortgage space.

It's a lesson that Microsoft learned a decade ago.

When Microsoft, Freddie Mac, Bank of America, Chase, GMAC and Wells Fargo unit Norwest Mortgage announced the creation of HomeAdvisor Technologies in March 2000, the partnership was heralded as a revolution for the way consumers would shop for and purchase homes and mortgages. But the venture never fully got off the ground.

An early sign that Microsoft's plans were coming unraveled came six months in, when B of A and Wells Fargo decided to pull out of the initiative. In addition, many small lenders were critical of the arrangement, Freddie Mac's role in particular.

By February 2001, Microsoft was shedding the mortgage technology unit of HomeAdvisor and significantly scaling back its plans, focusing solely on real estate shopping.

Critics at the time pointed to Microsoft's heavy-handed approach and the lack of influence that the mortgage industry players had in the direction of HomeAdvisor Technologies as the reasons the partnership didn't work, according to an article published in an industry trade journal shortly after the program ended.

While Advisor Mortgage outlasted HomeAdvisor by about a year, the same criticism could be said now about Google.

Even as it leaves the mortgage industry, Google has yet to loosen its grip. Lenders and vendors won't comment about the platform, claiming Google's strong-armed them into keeping quiet. The few brave executives who spoke to *MT* on condition of anonymity did so knowing they risked a serious dressing-down if their names ever got out.

Many small to midsize lenders rejoiced at HomeAdvisor's demise, but the end of Google

BX0027363

Advisor Mortgage is far less gratifying.

The platform Google built was easy to use and consumer friendly. It put an emphasis on borrower privacy, forcing lenders to wait until rate shoppers invited lenders to contact them. While that reduced the number of leads lenders received, it also significantly improved lead quality.

Unfortunately, the end of Advisor Mortgage is a missed opportunity for lenders, consumers and Google, but it doesn't mark the end of online rate search. Companies like BankRate, Equifax, LendingTree and Zillow will continue to offer technology to connect lenders and consumers.

It's unlikely that any lender that was advertising on Advisor Mortgage will face any long-term negative effects. Any company in the unlikely position of putting all its lead gen eggs in the Google basket can easily switch to another rate search platform.

It is possible that lenders may see Google's departure as a reason to stay away from the online lead generation channel; though those lenders need only look at the ever-increasing impact of Internet shopping to dispel that notion.

But that's not the point.

A lot of work—not to mention a federal lawsuit that LendingTree filed against PPE vendor Mortech—went into Advisor Mortgage. Mortech and other PPE vendors participated with little to no financial incentive, dedicating their resources to the initiative to provide new opportunities for their lenders and to have a shot at working with an Internet giant.

Now, all the effort seems wasted, or at least unappreciated, by a disinterested behemoth. The lenders and vendors who participated in Advisor Mortgage deserved more than to be cast off with such flippant disregard.



© 2012 National Mortgage News and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

BX0027364

Search                                                                                          Sign in



Images
Videos

Maps
| **Home** | Credit cards | CDs | Checking | Savings |
News

Shopping
Gmail                Helping you make financial decisions.
More ▾               Google Advisor makes it easy to find financial offers from multiple providers, compare them side by side, and apply online.

                                                                    Latest update: February 1, 2012 at 6:43 PM PST

### Today's rates

| **Credit cards** | **CDs** | **Checking** | **Savings** |
| --- | --- | --- | --- |
| Apply for a credit card that's right for your priorities. | Earn money on your savings with high interest Certificates of Deposit. | Manage your money with online or local accounts. | Maximize your dollar with a high interest savings account. |
| Select from 90+ cards » | Select from 80+ CDs » | Select from 70+ banks » | Select from 90+ banks » |

### Featured offers

**Lowest purchase APR credit cards**                                        See all 98 cards »

|  |  |  |
| --- | --- | --- |
| **Citi Diamond Preferred Card** | **Citi Platinum Select MasterCard** | **Discover Motiva card** |
| 0% intro APR | 0% intro APR | 0% intro APR |
| for first 21 months | for first 21 months | for first 15 months |
| 11.99% – 21.99% variable APR afterwards | 11.99% – 21.99% variable APR afterwards | 10.99% – 19.99% variable APR afterwards |

**Highest interest rate checking accounts**                                 See all 199 checking accounts »

|  |  |  |
| --- | --- | --- |
| **Super Reward Checking** | **Power Checking** | **Rewards Checking** |
| 2.26% APY | 2.00% APY | 1.25% APY |
| Min. to open: $25 | Min. to open: $0 | Min. to open: $100 |

### How it works

**Fast, up-to-date offers**

We show you top offers available from multiple providers in less than a second.

**Get customized offers**

With just a few clicks, see offers that meet your criteria and compare them side by side.

**See offers, avoid spam**

See offers without submitting personal information, and contact providers only when you're ready to move forward.

Learn more

The information on this page is based on any information (e.g. state/county) you have entered previously.

The information displayed here was provided directly from the issuer and/or collected from the issuer's website. Check the details pages for each offer for the data source and update time. Google is not currently being paid for these listings. While every effort is made to keep information on this page accurate and updated, the rates and information shown on this page may be variable, be out of date, or may no longer be applicable to you. Always check the issuer's website for the latest information applicable to you.

©2012 Google    Help    Privacy Policy    Report a bug

BX0027365

https://www.google.com/advisor/home[2/2/2012 10:58:20 AM]

| Search | Sign in |
|---|---|

 Google advisor

Images
Videos
Maps
**Home** | Credit cards | CDs | Checking | **Savings**
News
Shopping
Gmail
More ▾

## Choose a category below:

Latest update: February 2, 2012 at 7:29 AM PST

[ Local savings accounts ]  [ Highest interest rate ]

### Savings rates                                                    See all savings accounts »

| Bank | Highest APY | Avg. APY this week | Avg. APY last week | Rates over 3 months |
|---|---|---|---|---|
| Local | 1.01% | 0.339% | 0.340% | |
| All | 1.10% | 0.640% | 0.637% | |

Calculated from offers currently listed in Google Advisor.

### Banks near me                                                    See all 100 savings accounts »

STATE FARM FEDERAL CREDIT UNION
**Share Savings**
**1.01% APY**
Min. to open: $5
Min. balance: $5


**Investor Money Market Account**
**1.00% APY**
Min. to open: $2,500
Min. balance: $2,500

 ALLIANT
**High-Yield Savings**
**1.00% APY**
Min. to open: $5
Min. balance: $100

### Highest interest rate                                             See all 176 savings accounts »

 incrediblebank
**Incredible Money Market Account**
**1.10% APY**
Min. to open: $2,500
Min. balance: $2,500

 direct
**Airline Rewards Savings**
**1.05% APY**
Min. to open: $100
Min. balance: $1

 STATE FARM FEDERAL CREDIT UNION
**Share Savings**
**1.01% APY**
Min. to open: $5
Min. balance: $5

### Savings interest rates trends

**Compare historic interest rates for these banks:**

Local    All

We record the interest rates of offers listed in Google Advisor over time, so you can compare interest rates today to rates from the past.

---

**Looking for a particular bank?**

Compare over **185** offers from **90** banks, including:

  
  
  

**Show offers from:**

All Banks   [ Go ]

**More information**

**Are these savings offers sponsored?**

**No they are not.** Google is not currently paid for showing these offers. We work directly with banks and search the web for available banking rates. By default, we show banks with the highest APY at the top of your results.

**How often do you update rates?**

We update the savings account rates listed in Google Advisor every business day to make sure that the rates that you see are up-to-date.

BX0027366

The information displayed here was provided directly from the issuer and/or collected from the issuer's website. Check the details pages for each offer for the data source and update time. Google is not currently being paid for these listings.

While every effort is made to keep information on this page accurate and updated, the rates and information shown on this page may be variable, be out of date, or may no longer be applicable to you. Always check the issuer's website for the latest information applicable to you.

©2012 Google     Help     Privacy Policy     Report a bug

BX0027367