<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| _____ | : |  |
| **BANXCORP,** | : | **Civil Action No. 07-3398 (ES) (CLW)** |
| **Plaintiff,** | : |  |
|  | : | **OPINION** |
| v. | : |  |
|  | : |  |
| **BANKRATE INC.,** | : |  |
|  | : |  |
| **Defendant.** | : |  |
| _____ | : |  |

<u>SALAS, Dɪsᴛʀɪᴄᴛ Jᴜᴅɢᴇ</u>

This matter is before the Court by way of Bankrate Inc.'s ("Bankrate") Motion to Dismiss BanxCorp's Fifth Amended Complaint ("5AC") pursuant to Fed. R. Civ. P. 12(b)(6). (Defendant Bankrate Inc.'s Brief in Support of its Motion to Dismiss Portions of the Fifth Amended Complaint with Prejudice ("Def. Mov. Br.") at 1, D.E. 306). This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), as well as 15 U.S.C. §§ 1 and 2. Venue is proper pursuant to 28 U.S.C. §§ 1391(b), (b)(2), as well as 15 U.S.C. §§ 15 and 22. The Court's decision is based on its review of the briefs and exhibits related to Bankrate's Motion to Dismiss, and the Court hereby decides the Motion without oral argument pursuant to Fed. R. Civ. P. 78. For the following reasons, Defendant's Motion to Dismiss is GRANTED in part and DENIED in part.

I.      **BACKGROUND**

A.      **Parties, Facts, and Procedural History**

The underlying issue in this case is whether Defendant Bankrate has engaged in

1

anticompetitive practices in violation of federal and state antitrust laws, resulting in economic injury to Plaintiff BanxCorp.  The parties, facts, and procedural history of this case are presented in the Court's December 30, 2011 Opinion dismissing part of the Fourth Amended Complaint ("4AC") and are not rehashed in this Opinion.  (*See* "December 30, 2011 Opinion", D.E. 298). However, the Court adds to its detailed account of the history of this case that on December 30, 2011, the Court dismissed the First Claim of the 4AC—alleging the existence of a predatory price-fixing conspiracy between Bankrate and its competitors—because Plaintiff failed "to adequately plead that the purported conspirators agreed to join a predatory price-fixing conspiracy for the purpose of forcing prices below a measure of cost." (*Id.* at 21).

### B.    Arguments

Bankrate moves to dismiss BanxCorp's First, Second, Third, and Fifth Claims (except as these claims concern Lending Tree).  (Def. Mov. Br. at 1).

Bankrate argues that BanxCorp's Sherman Antitrust Act § 1 claim should be dismissed because BanxCorp did not avail itself of its right to amend its predatory price-fixing conspiracy claim in the 4AC to cure the deficiencies identified by the Court in its prior Opinion.  Instead, Plaintiff has withdrawn its allegations that Bankrate and its partners conspired to price below cost and replaced those allegations with a new theory that Bankrate and its competitors conspired to divide markets and allocate customers.  Bankrate argues that plaintiff has failed to cure the previous deficiencies and therefore the § 1 claim must be dismissed with prejudice.  (*Id.* at 6).

Bankrate also argues that the market division and customer allocation theories in BanxCorp's 5AC are new and therefore barred by this Court's December 30, 2011 opinion and Judge Wigenton's September 14, 2009 Opinion.  (*Id.* at 7; *see* D.E. 298; D.E. 75).

Next, Bankrate argues that the § 1 market division and customer allocation theory claim

should be dismissed because, first, the 5AC "lacks any factual allegations 'plausibly suggesting a unity of purpose, a common design and understanding, or a meeting of the minds among Bankrate's partner-competitors to engage in' market division and customer allocation."  (Def. Mov. Br. at 8) (citation omitted).  Specifically, there is nothing in the contracts Plaintiff refers to that indicates that Bankrate's co-branding partners were prevented from competing in the same market as Bankrate.  (*Id.* at 11).  Second, Plaintiff does not have standing to bring this claim because "a competitor cannot suffer an antitrust injury where the conspiracy is alleged to have caused prices to increase above competitive levels."  (*Id.* at 12).

As to the Sherman Antitrust Act § 2 claim, Bankrate argues that the Court must dismiss this claim because Plaintiff has failed to allege that Bankrate engaged in the exclusionary conduct that § 2 requires.  In the 5AC, BanxCorp simply replaced instances of "average variable cost"—a phrase that it had been using since the beginning of this litigation—with "artificially low prices."  (*Id.* at 15).  Bankrate makes two separate arguments on this point.  First, the latter phrase is of "no legal significance."  (*Id.* at 16).  Second, to the extent that the phrase means "above-cost prices that are below general market levels," courts have rejected the notion that such pricing inflicts the type of injury cognizable under the antitrust laws.  (*Id.*) (citation omitted).  To the extent that the phrase includes pricing below average variable cost, as Plaintiff suggests, the phrasing appears calculated to confuse jurors.  (*Id.* at 16-18).  Moreover, the predatory pricing claim is insufficiently pleaded, supported only with conclusory statements and no evidence of actual predatory prices.  (*Id.* at 17-18).  And because the theory fails, and Plaintiff does not allege any other type of exclusionary conduct, Plaintiff's § 2 claim lacks an essential ingredient—exclusionary conduct—and must likewise fail.  (*Id.* at 19-20).

Finally, Bankrate argues that Plaintiff's claims under New Jersey's Antitrust Act must

fail because that Act mirrors the Sherman Act, and therefore the claims fail for the same reasons. (*Id.* at 20-21).

In its opposition brief, Plaintiff acknowledges that it has completely abandoned its § 1 predatory pricing theory. (Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss Portions of the Fifth Amended Complaint, ("Pl. Opp. Br."), at 1, D.E. 307). Plaintiff then argues that it has adequately pleaded its § 1 price-fixing and market allocation claims, which were "previously pleaded and allowed to proceed by this Court." (Pl. Opp. Br. at 10). Specifically, under this Court's decisions in this case, BanxCorp does have standing to sue as Bankrate's competitor. (*Id.* at 6-8). Further, BanxCorp argues that its § 1 price-fixing and market allocation conspiracies are sufficiently pleaded under the per se rule and the rule of reason. (*Id.* at 12-17). More than the mode of analysis, what is important here is that the Court recognizes that the challenged restraint impaired competition. (*Id.* at 24). Finally, BanxCorp argues that it has sufficiently pleaded the predatory and exclusionary conduct claims under § 2. (*Id.* at 33).

## II.   LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), "courts are required to accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008); *Burrell v. DFS Servs., LLC*, 753 F. Supp. 2d 438, 440 n.1 (D.N.J. Dec. 6, 2010) (holding that contradictory factual assertions on the part of defendants must be ignored). Courts must "determine whether, under any reasonable reading of the complaint, the Plaintiff may be entitled to relief." *Pinker v. Roche Holding Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002). But, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citations omitted). "Courts are not required to credit bald assertions or legal conclusions draped in the guise of factual allegations." *McCargo v. Hall*, No. 11-553, 2011 WL 6725613, at *1 (D.N.J. Dec. 20, 2011) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997)). Although antitrust complaints are to be liberally construed, they are not exempt from the federal rules. *See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 179 (3d Cir. 1988) (citations omitted). A pleading that offers "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (citations omitted). Additionally, in evaluating a plaintiff's claims, generally "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).

In *Twombly*, the Supreme Court set forth the "plausibility" standard for overcoming a motion to dismiss. *See Twombly*, 554 U.S. at 556-7. It refined this approach in *Iqbal*. A complaint satisfies the plausibility standard when the factual pleadings "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that pleads facts "'merely consistent with a defendant's liability, stops short of the line between possibility and plausibility of entitlement of relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

To determine the sufficiency of a complaint under *Twombly* and *Iqbal*, the Court must take the following three steps:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no

more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

The Court now proceeds with its analysis claim-by-claim, element-by-element under the three-step method set forth by the Third Circuit, granting the motion to dismiss as to the First Claim based on Plaintiff's failure to plausibly allege the "object" of the conspiracy, and denying the motion to dismiss as to the Second, Third, and Fifth claims for relief.

## III.   DISCUSSION

### A.   Threshold/Preliminary Matters

As a preliminary matter, Bankrate argues that BanxCorp has abandoned its § 1 predatory price-fixing conspiracy theory, in direct contravention of (1) this Court's December 30, 2011 warning that Plaintiff not attempt to "shift its theories of liability this late in the game" and (2) Judge Wigenton's September 14, 2009 opinion prohibiting Plaintiff from adding "additional causes of action or new theories of liability." (Def. Mov. Br. at 7, 11 (citing *BanxCorp v. Bankrate, Inc.* ("*BanxCorp III*"), No. 07-3398, slip op. at 44-45 (D.N.J. Dec. 30, 2011) and *BanxCorp v. Bankrate, Inc.* ("*BanxCorp II*"), No. 07-3398, slip op. at 8 (D.N.J. Sept. 14, 2009))). As a result, Bankrate argues that the § 1 claim should be dismissed. (Def. Mov. Br. at 7). In opposition, Plaintiff confirms that it has abandoned the predatory price-fixing conspiracy theory in its entirety. (Pl. Opp. Br. at 10). The Court takes this as a voluntary withdrawal with prejudice of Plaintiff's predatory price-fixing theory. *See Witcher v. Kerestes*, 410 F. App'x 529, 532 (3d Cir. 2011) ("Given that the District Court once permitted Witcher to amend his complaint and the amendment was, as the District Court observed, substantially similar to the original complaint, we do not find an abuse in discretion in the District Court's disallowance of a

second amendment."); *Holmes v. Gates*, 403 F. App'x 670, 674 (3d Cir. 2010) (where plaintiff

had three opportunities to amend her complaint and plaintiff did not do so, District Court did not

err in dismissing her complaint).   However, Plaintiff argues that it advances no new theories of

liability in the 5AC, and "[p]rice-fixing and market allocation claims under § 1 had been

previously pleaded and allowed to proceed by this Court."   (Pl. Opp. Br. at 10 (citing

4AC ¶ 280(b)-(d) ("Defendant has illegally restrained trade in the market for Bank Rate

Websites in violation of Section 1 of the Sherman Act [by] . . . entering into . . . exclusionary

agreements with partners and competitors that granted Defendant the sole authority and/or

exclusive right to sell rate table listings on the Internet at a fixed price [and] . . . by colluding and

entering into agreements to divide markets, and allocate revenues, customers[.]"); 3AC ¶ 117(a)

("Bankrate has illegally restrained trade in the market for Bank Rate Websites in violation of

Section 1 of the Sherman Act by (a) engaging in predatory pricing and exclusive dealings, and

forming a profit-sharing and Price-Fixing Cartel . . . and (b) by colluding and entering into

exclusive contracts with LendingTree to . . . divide markets, accounts, [and] customers[.]);

*BanxCorp II* at 6-7 (discussing the horizontal price-fixing claim)).

In her September 14, 2009 Opinion, Judge Wigenton found that the § 1 price-fixing claim

in Plaintiff's Second Amended Complaint was adequately pleaded.   It appears that these

allegations continued through the 3AC.   (*See, e.g.*, 3AC ¶¶ 15, ("More specifically, Bankrate has

engaged in predatory pricing and price-fixing agreements with competitors[.]"); ¶ 19(a)

("Bankrate conspired, colluded, and entered into horizontal Cost-Per-Click (herein "CPC") price-

fixing and profit-sharing agreements by organizing and becoming the ringleader of an illegal

cartel with approximately 100 co-branding partners (the "Price-Fixing Cartel") which also are

Bankrate.com's competitors[.]")).   These same allegations appear to have persisted through the

4AC.  (*See*, *e.g.*, 4AC ¶ 9 ("The centerpiece of this action is a massive predatory pricing, price-fixing, and market division conspiracy[.]"); ¶ 22 ("This enabled Defendant to essentially charge any fixed price across its "network" at will . . . by charging supra-competitive fixed prices, as Defendant subsequently did after 2006."); ¶ 24 ("From October 1, 2005 to the present, through its combined price-fixing and predatory pricing practices, Bankrate tripled its Hyperlink CPC prices[.]"); ¶ 28 ("On September 23, 2008 after first entering into a co-branding, price-fixing, market division . . . ."); ¶ 89 ("Hence, while there may have been other interchangeable products in the past, by entering into a price-fixing conspiracy among Bankrate and [its competitors] . . . ."); ¶ 92 ("This is a classic example of a per se violation of § 1 involving an agreement between competitors to fix prices, divide markets, and allocate revenues, customers, products and Internet traffic in the relevant market.")).  Accordingly, the Court finds that Plaintiff does not plead its § 1 price-fixing conspiracy claim for the first time in the 5AC, and that Plaintiff did not, in the past, abandon the claim only to re-plead it here.

As for Plaintiff's market division/customer allocation claim, it appears that although Judge Wigenton forbade Plaintiff from amending portions of the complaint not addressed in her September 14, 2009 Opinion, Judge Arleo later permitted Plaintiff to amend the 3AC and file the 4AC, after Plaintiff filed a motion to amend seeking to expand its market division/customer allocation theory.  (*See* Order Granting Motion for Leave to File an Amended Complaint, D.E. 209).  BanxCorp did in fact expand its market allocation theory in the 4AC to encompass not only Lending Tree, but also all of the members in Bankrate's "cartel."  (*See* 4AC ¶ 19 ("Bankrate conspired, colluded, and entered into horizontal predatory price-fixing, market allocation, and revenue-sharing agreements with competitors by organizing and becoming the ringleader of an illegal cartel[.]"); ¶ 26 ("During the fourth quarter of 2002 Bankrate entered into an exclusive

partnership agreement with The Wall Street Journal's WSJ.com website affiliate, suppressing and precluding competition, by granting Defendant the exclusive right to sell WSJ.com's rate table listings on the Internet at a fixed price on a "network" basis, and by dividing markets, and allocating revenues, customers, products[,] and Internet traffic."); *see also* 4AC ¶¶ 9, 17, 19, 27, 92, 109, 133, 156, 164, 216, 228, 280(d)-(f), 281, 305(d)-(f) (demonstrating, generally, that Plaintiff expanded its theory to include Bankrate's co-branding partners).  The expanded theory remains in the 5AC.  (*See, e.g.*, 5AC ¶¶ 16, 18, 25, 26, 101, 125, 136, 148, 188, 211, 217, 223, 228, 229, 233, 246-48, 253, 258, 297, 323) (demonstrating, generally, that Plaintiff expanded its theory to include Bankrate's co-branding partners).

Thus, BanxCorp's market division/customer allocation theory is not new to the 5AC, and is not being asserted in violation of a court order.  Accordingly, the Court will now proceed to evaluate the sufficiency of Plaintiff's claims.

### B.    Sherman Act § 1: Contract or Conspiracy in Restraint of Trade

#### 1.    Legal Standard: Sherman Act, 15 U.S.C. § 1

BanxCorp brings its market division/customer allocation claim under § 1 of the Sherman Act.  Section 1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  Thus, plaintiffs asserting a § 1 claim "must allege four elements: '(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.'"  *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010) (citations omitted).  Existence of a "contract, combination . . . or conspiracy" is the hallmark of a § 1 claim.  *In re Ins.*

*Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (citations omitted).  Over the years, courts have limited their attention to two essential elements: (1) that the defendant was a party to a "contract, combination . . . or conspiracy" and (2) that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade.  *See Burtch*, 662 F.3d at 221 (citing *In re Ins. Brokerage*, 618 F.3d at 315).

As to the first element, plaintiffs must establish the existence of an agreement or "concerted action," and therefore, in order to state a claim for conspiracy to engage in market division/customer allocation, BanxCorp must plead that the defendant and co-conspirators "conspired" to subdivide "some relevant market in which they had previously competed." *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 48 (1990) (citations omitted).  "Unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation."  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003).  "An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme."  *West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)); *Howard Hess Dental Labs. Inc.*, 602 F.3d at 254).

A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two.  Direct evidence of a conspiracy is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *In re Ins. Brokerage*, 618 F.3d at 324 n.23 (citations omitted).  "[D]irect evidence of conspiracy, if credited, removes any ambiguities that might otherwise exist with respect to whether the parallel conduct in question is the result of independent or concerted action."  *Id.* at 324.  "If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the

question of whether an agreement has been adequately pled." *West Penn*, 627 F.3d at 99 (citing

*In re Ins. Brokerage*, 618 F.3d at 323).

Examples of direct proof of conspiracies that the Third Circuit has found sufficient

include:

> (1) a direct threat to the plaintiff from a competitor that if he went into business his competitors would do anything they could to stop him, including cutting prices or supplies;

> (2) advising distributors that a supplier would cut off access if the distributor failed to maintain a certain price level;

> (3) a memorandum produced by a defendant conspirator detailing the discussions from a meeting of a group of alleged conspirators; and

> (4) a public resolution by a professional association recommending that its members withdraw their affiliation with an insurer.

*InterVest*, 340 F.3d at 162-63 (citations omitted).

In its evaluation of circumstantial evidence in an antitrust case, the Court must apply

special considerations so that only reasonable inferences are drawn from the evidence. *Id.* at

160. The reason is that "antitrust law limits the range of permissible inferences from ambiguous

evidence in a § 1 case." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,

588 (1986). Certainly, "an actionable horizontal conspiracy does not require direct

communication among the competitors." *In re Ins. Brokerage*, 618 F.3d at 331. But a § 1 claim

of conspiracy "predicated on parallel conduct should be dismissed if 'common economic

experience,' or facts alleged in a complaint itself, show that independent self-interest is an

'obvious alternative explanation' for defendants' common behavior." *Id.* at 326. Thus some

courts have denominated certain factors which, if present, may indicate the existence of a

conspiratorial agreement. *See id.* at 321. These factors include: "(1) evidence that the defendant

had a motive to enter into a [conspiracy]; (2) evidence that the defendant acted contrary to its

interests; and (3) 'evidence implying a traditional conspiracy." *Id.* at 322. Courts have cautioned that the first two factors may indicate that defendants operate "in an oligopolistic market," and because such a market contains very few sellers, each defendant would be aware of each other's actions. *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122, 135 (1999) ("[E]vidence of action that is against self-interest or motivated by profit must go beyond mere interdependence."). Evidence of the third factor is "non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *In re Ins. Brokerage*, 618 F.3d at 322 (citations and quotations omitted).

The second element of a § 1 claim, an unreasonable restraint on trade, is analyzed under either the *per se* standard or the rule of reason standard. Horizontal market division/customer allocation agreements are analyzed under the *per se* standard. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). The *per se* illegality rule applies when a business practice "on its face, has no purpose except stifling competition." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001) (citations omitted); *In re Ins. Brokerage*, 618 F.3d at 316 (citations omitted) ("A *per se* rule is applied when the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output."). Agreements that fall under established *per se* illegality categories are "conclusively presumed to unreasonably restrain competition." *Id.* (citation and quotations omitted). "Paradigmatic examples are 'horizontal agreements among competitors to fix prices or to divide markets.'" *Id.* (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)). *Per se* illegality "is reserved for only those agreements that are so plainly anticompetitive that no

elaborate study of the industry is needed to establish their illegality." *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 830 (3d Cir. 2010) (citations and internal quotation marks omitted).

### 2. Plaintiff's Failure to Sufficiently Plead the Conspiracy Element of Its Market Division/Customer Allocation Theory

Under the Third Circuit's three-step analysis, the Court begins by taking note of the elements of a conspiracy claim under § 1, which are (1) the existence of an agreement to engage in the alleged scheme, here, market division/customer allocation, and (2) that the conspiracy imposed an unreasonable restraint on trade. *See Burtch*, 662 F.3d at 221. Below, because the Court finds that Plaintiff has insufficiently pleaded element one, the Court does not analyze the second element. Before moving to step two of the Third Circuit's three-step analysis, the Court briefly sets forth the standard for Plaintiff's required showing and the parties' arguments as to that showing.

To sufficiently plead the conspiracy element of its claim, Plaintiff must show the existence of an agreement among members of the conspiracy demonstrating "a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." *West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)); *Howard Hess Dental Labs. Inc.*, 602 F.3d at 254). The "unity of purpose" must point to the "common scheme" alleged in the complaint. *See id.* In this case, Plaintiff's 4AC alleges that the common scheme was market division/customer allocation. In the antitrust context, "market division/customer allocation" means Plaintiff "had to show that [Bankrate and its co-conspirators] had subdivided some relevant market in which they had previously competed." *Palmer*, 498 U.S. at 48. Although "[t]he case law is clear that a market division need not be an agreement that each firm

13

will stay completely out of the assigned territory of the other[,]" it must require that participants "refrain from . . . (2) selling in one another's territories, (3) soliciting or selling to one another's customers, or (4) expanding into a market in which another participant is an actual or potential rival."  12 Herbert Hovenkamp, Antitrust Law ¶ 2030 at 210, 214 (2d ed. 2005) (citing *United States v. Topco Assocs.*, 405 U.S. 596 (1972); *United States v. Sealy, Inc.*, 388 U.S. 350 (1967)).

A party's failure to allege specifics as to the entrance and object of the agreement will lead to the dismissal of a conspiracy claim.  *See Matsushita*, 475 U.S. at 595-96; *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 340 (1991) (affirming dismissal of a complaint where evidence indicated that defendants had abolished the featherbedding practice that was the "object of [the] conspiracy"); *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 535 (1978) ("The object of the conspiracy was to restrict St. Paul's policyholders to 'claims made' coverage by compelling them to 'purchase medical malpractice insurance from one insurer only, to wit defendant, St. Paul, and that [such] purchase must be made on terms dictated by the defendant, St. Paul.'") (citation omitted); *In re Ins. Brokerage*, 618 F.3d at 321; *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 179 (3d Cir. 2010) ("Specifically, Great Western has failed to allege except in general terms the approximate time when the agreement was made, the specific parties to the agreement . . . the period of the conspiracy, or the object of the conspiracy."); *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 226 (3d Cir. 2008) ("Toledo also presented sufficient evidence that "the objects of and the conduct pursuant to th[e] contract or conspiracy were illegal.").

Under this standard, BanxCorp argues that it has adequately alleged that Bankrate engaged in market division/customer allocation with its partner-competitors, a *per se* violation of § 1.  (Pl. Opp. Br. at 8).  At its core, BanxCorp's theory rests on agreements between Bankrate

14

and its co-branding partners (*e.g.*, Move, Inc.) to divide markets and allocate customers for the purpose of reducing competition in those markets and ultimately driving up prices. (*See* 5AC ¶¶ 228-230). After clearing competitors from the field, Bankrate could, and did, increase its prices at will, thereby harming consumers. (Pl. Opp. Br. at 19). Bankrate argues that BanxCorp has failed to sufficiently plead that Bankrate and its co-conspirators shared a "unity of purpose" to divide markets or allocate customers. (Def. Mov. Br. at 10). Specifically, Bankrate argues that not one of the co-conspirators agreed to refrain from competing in the same market as Bankrate. (*Id.*). The Court agrees with Defendant.

At step two of the Third Circuit's three-step analysis, the Court identifies allegations that—without factual support—would not be entitled to the assumption of truth because they would be no more than mere conclusions. *See Burch*, 662 F.3d at 221. The following is a list of market division/customer allocation allegations from the First Claim in the 5AC:

> Defendant has illegally restrained trade in the market for Bank Rate Websites in violation of Section 1 of the Sherman Act as follows:
>
> A. Market Division and Allocation Agreements with Competitors
>
> (i) Defendant has entered into agreements to divide markets, and allocate customers, products, revenues and Internet traffic with approximately 130 partners and competitors that together control more than 300 websites which compete against each other as well as against Defendant's own Bank Rate Websites Bankrate.com, Interest.com and Bankaholic.com; and
>
> (ii) Defendant has entered into approximately 130 agreements with partners and competitors that granted Defendant the sole authority and/or exclusive right to sell rate table listings on the Internet throughout the United States on behalf of each member of Defendant's cartel, also referred to as a "network." Such agreements constitute a territorial market allocation of products and customers throughout the United States.
>
> As set forth in more detail above (see paragraphs 207-263) , under the "per se" standard, Plaintiff is able to demonstrate (1) that Bankrate contracted, combined or conspired with others through concerted action, and (2) that Plaintiff was injured as a proximate result of that conspiracy.

Alternatively, under the "rule of reason" standard, Plaintiff is also able to demonstrate in turn (1) that Bankrate contracted, combined or conspired with others through concerted action; (2) that Plaintiff was injured as a proximate result of that conspiracy; (3) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; and (4) that the objects of and the conduct pursuant to that contract or conspiracy were illegal.

Defendant's anticompetitive conduct has had a significant adverse effect on competition in the market for Bank Rate Websites, causing direct and proximate harm to the financial service providers—the customers, and to consumers—the end users. In particular, as a result of Defendant's conduct, both financial service providers (the customers) and consumers are denied freedom of choice with respect to Bank Rate Websites: Financial service providers have no effective economic choice but to list their rates with Defendant and consumers have virtually no alternative Bank Rate Website sources other than Defendant's, through its captive Price-Fixing Cartel. Thus, consumers and financial service providers become almost exclusively dependent on Bankrate for access to Bank Rate Websites.

(5AC ¶¶ 297-300).

These allegations are conclusory with respect to the alleged market division/customer allocation conspiracy. They merely allege that Bankrate engaged in market division and customer allocation, yet they fail to allege that Bankrate's co-conspirators agreed not to compete with Bankrate. Without more, these allegations evince no "unity of purpose" among Bankrate and its co-branding partners to divide markets or allocate customers. Such conclusory allegations are not entitled to the presumption of truth. *See Burtch*, 662 F.3d at 221. Therefore, the Court proceeds to step three of the Third Circuit's analysis to determine whether these bare allegations are echoed elsewhere in the 4AC by well-pled allegations, and whether those allegations "plausibly give rise to an entitlement for relief." *Id.* In its analysis below, the Court finds that although BanxCorp includes numerous allegations related to dividing markets and allocating customers, Plaintiff fails to adequately plead that the purported conspirators agreed not to compete with each other in a market in which they once competed or were intending to

compete, the key requirement under Plaintiff's chosen theory.

The following is a list of allegations in the 5AC related to the nature of the conspirators' agreements from which the Court must determine whether Bankrate and its co-branding partners shared the requisite "unity of purpose":

16. Bankrate did not obtain a monopoly in the market for Bank Rate Websites as a result of a superior product. Rather, it created its monopoly through blatant anticompetitive conduct including price fixing, market division, customer, product, revenue and traffic allocation, and partnerships with competitors as described below.

18. Bankrate conspired, colluded, and entered into horizontal price-fixing, market allocation, and revenue-sharing agreements with competitors by organizing and becoming the ringleader of an illegal cartel, also referred to as a "network" or "Online Network" with approximately 130 co-branding partners which together control more than 300 partner sites ("Partner Sites"), that compete against each other and against Defendant's own websites Bankrate.com, Interest.com and Bankaholic.com (collectively, the "Price-Fixing Cartel").

25. As set forth in more detail below, Plaintiff had regularly provided its BanxQuote rate tables to The Wall Street Journal ("WSJ") for 17 consecutive years, first in print and later also online. During the fourth quarter of 2002 Bankrate entered into an exclusive partnership agreement with The Wall Street Journal and its WSJ.com website affiliate, suppressing and precluding competition, by granting Defendant the exclusive right to sell WSJ.com's rate table listings on the Internet at a fixed price on a "network" basis, and by dividing markets, and allocating revenues, customers, products and Internet traffic.

101. However, since approximately 1996 Defendant started offering back-office rate aggregation services not merely for free to other independent website operators if they agreed to join its cartel or "network," but even paid these competitors or potential competitors off through co-branding revenue allocation agreements. Therefore, these independent website operators no longer had any incentive or a need to handle their own redundant back-office services.

188. Bankrate persuaded Move, Inc. to join its Price-Fixing Cartel entering into a market allocation and revenue-sharing partnership agreement, as evidenced by Defendant's press release issued on September 6, 2007.

211. As would be required under either the "per se" or "rule of reason" standard, Plaintiff has presented on the record direct evidence that (i) Defendant has entered into agreements to divide markets, and allocate customers, products, revenues and Internet traffic with approximately 130 partners and competitors that together

control more than 300 websites which compete against each other as well as against Defendant's own Bank Rate Websites Bankrate.com, Interest.com and Bankaholic.com; and (ii) Defendant has entered into approximately 130 agreements with partners and competitors that granted Defendant the sole authority and/or exclusive right to sell rate table listings on the Internet throughout the United States on behalf of each member of Defendant's cartel, also referred to as a "network."

217. With the largest competitors in the market, Bankrate and its more than 130 co-branding partners, coming together in the form of a revenue-sharing market allocation cartel, it became impossible for independent competitors such as Plaintiff to remain in business.

## II. THE MARKET ALLOCATION AND PRICE-FIXING CONSPIRACY
A. Defendant's Collusive Market Allocation and Price-Fixing with Competitors
223. There is enough factual matter, as more fully described below, to prove that Defendant Bankrate and approximately 130 horizontal partners/competitors possessing market power in the relevant market with an approximately 95% market share, (i) have entered into agreements to divide markets, and allocate customers, products, revenues and Internet traffic (ii) have fixed and are fixing prices in the relevant market, (iii) in parallel, by agreement, through acquiescence, and concerted action rather than independent action, (iv) are acting in a uniform manner, (v) have severely limited and impeded competition in the relevant market, (vi) have injured and adversely affected Plaintiff, competition, consumers, and financial service providers as a proximate result of the concerted action, (vii) while carrying out a conspiracy with Bankrate as its ringleader.

228. Defendant's 130 co-branding partnership agreements granted Bankrate the exclusive right to sell Internet rate table listings to financial service providers nationally [a territorial market allocation of products and customers throughout the United States] on behalf of hundreds of competing websites—at a fixed price—collect fees from customers, and allocate revenues among each competing member of the cartel on a network basis.

229. Such agreements axiomatically enabled Defendant to control prices, fix prices, decrease prices through fixed pricing and offer free giveaways of Internet rate table listings (at no cost to Defendant's partners).  These alliances and practices among competitors effectively nullified competition.  Moreover, the resulting territorial market division and allocation of products, customers and revenues between Bankrate and 130 competitors cannot possibly be deemed a unilateral or pro-competitive conduct.

233. This is a classic example of a per se violation of § 1 involving an agreement between competitors to fix prices, divide markets, and allocate revenues, customers, products and Internet traffic in the relevant market.

In each of these paragraphs, BanxCorp fails to adequately allege the conspirators' intention to refrain from competing in the same market as Bankrate.  For example, although ¶ 101 alleges that Bankrate and cartel members entered into agreements that no longer provided the members with "any incentive or a need to handle their own redundant back-office services," ¶ 101 does not allege that these members refrained from competition in the market in an effort to reduce their competition with Bankrate.  Nor does ¶ 101 allege that Bankrate in any way retreated from a certain market.  The same is true of ¶ 228, which alleges that Bankrate obtained the exclusive right to sell rate table listings, but does not allege that Bankrate withdrew or even reduced competition in a market or that, again, the competitor retreated from a market in order to reduce its competition with Bankrate.

As direct evidence in further support of the above allegations, BanxCorp cites to contracts that supposedly demonstrate the requisite division of markets and customers and decisions not to compete in certain markets among Bankrate and its co-branding partners.  The Court now evaluates the contracts.

BanxCorp cites to contractual language like the following, which appears in numerous co-branding contracts:

> Bankrate Sells All Other Advertisements.  Bankrate shall have the exclusive right to sell and collect fees for advertisements, including Hyperlink Advertisements within Rate Tables and Display Advertisements on the Rate Query Pages, the Rate Results Pages, the Linked Bankrate Site, and, with the exception of the Leaderboard, the Bankrate Content Pages (collectively, the "Bankrate Advertisements").  MSI shall not interfere with Bankrate Advertisements in any manner.  At a minimum, MSI shall make available to Bankrate the Display Advertising placements described in Exhibit A.  All Bankrate Advertisements shall comply with Bankrate's applicable policies, available at www.bankrate.com/terms.

(Ex. 1 to Letter from BanxCorp, D.E. 169-1, at *5) (Contract between Move Sales, Inc.

and Bankrate dated July 24, 2007).[1]

 2. Exclusivity Obligations.

 i. Exclusivity.  During the Term, MSI agrees that it shall not provide, via any MSI Site, information from any third-party that is substantially similar to:

 (a) the Rates Pages, Rate Tables, or the Rate/Averages Box related to "mortgage" and "home equity loan and lines of credit" products; or

 (b) Bankrate Financial Content related to "mortgage" and "home equity loan and lines of credit" products.  (Ex. 1 to Letter from BanxCorp, D.E. 169-1, at *7) (Contracts between Move Sales, Inc. and Bankrate dated July 24, 2007).

(Pl. Opp. Br. at 17-18 n.6-7 (citing to D.E. 169 Ex. 1 and D.E. 185 Ex. II-G) (reflecting model language found in these contracts and citing to two specific contracts as support)).[2]  For two reasons, the Court finds that the exclusivity provisions of these contracts—the only provisions that arguably evince direct evidence of the co-conspirators' intent—fall short of providing adequate support that the purported co-conspirators agreed to refrain from competing in the same market as Bankrate.

 First, these provisions do not appear to limit the co-conspirators' ability to post their own rates on their own websites or on the websites of third-parties (*i.e.*, BCRS Data Corp. and RateCatcher are not prohibited under the contracts from posting their own rates).  The provisions only appear to limit the co-conspirators' ability to interfere with Bankrate's content or include third-party content on the co-conspirators' own sites.  These exclusivity provisions, therefore, show no intention on the part of a co-branding partners to enter agreements requiring them to exit the market.  Indeed, the language regarding exclusivity obligations only discusses the co-conspirator's inability to provide some (though not all) third-party information (*i.e.*, "information

---

[1] In support of its argument here, Plaintiff points to certain contracts it attached to or submitted with the 4AC.  (*See* Pl. Opp. Br. at 18 n.6).

[2] Specifically, in ¶¶ 232 n.49 and 19 n.2, Plaintiff cites to a contract between Bankrate and BCRS Data Corp. (Letter from BanxCorp, Ex. 7, D.E. 170-2, at *33) and a contract between Bankrate and RateCatcher, (*id.* at *42).

from any third-party that is substantially similar to: (a) the Rates Pages, Rate Tables, or the Rate/Averages Box related to 'mortgage' and 'home equity loan and lines of credit' products; or (b) Bankrate Financial Content related to 'mortgage' and 'home equity loan and lines of credit' products.").  (Ex. 1 to Letter from BanxCorp, D.E. 169-1, at *7, Contract between Move Sales, Inc. and Bankrate dated July 24, 2007).

Second, although the exclusivity provisions explicitly state that the purported co-conspirators "shall not interfere with Bankrate Advertisements in any manner," the contracts are silent on the co-conspirators' ability to post their own rates or advertisements on their own websites.  The exclusivity provisions of the contracts—explicitly forbidding the co-branding partner from interfering at all with the prices—clearly fall short of the types of direct evidence set forth in *InterVest*.  *See* 340 F.3d at 162-63 (citations omitted) (listing the following as examples of direct evidence: "(1) a direct threat to the plaintiff from a competitor that if he went into business his competitors would do anything they could to stop him, including cutting prices or supplies; (2) advising distributors that a supplier would cut off access if the distributor failed to maintain a certain price level; (3) a memorandum produced by a defendant conspirator detailing the discussions from a meeting of a group of alleged conspirators; and (4) a public resolution by a professional association recommending that its members withdraw their affiliation with an insurer").  Here, the exclusivity provisions demonstrate only an intention by co-branding partners to allow Bankrate to sell and collect fees for advertisements and to limit third-party content (*i.e.*, mortgage rate tables, and the like) that may appear on a co-branded website.[3]

---

[3] The Court also notes that in ¶ 188 of the 5AC, Plaintiff points to a press release in support of its allegation of market division/customer allocation.  Plaintiff cites to a hyperlink purportedly pointing to the press release, but does not include the press release in the exhibits attached to the 5AC.  The Court is unable to consider the content of the press release because (1) the hyperlink appears to be inactive, (2) the press release does not appear to have been

Plaintiff fails to provide any evidence—direct or circumstantial—plausibly suggesting a unity of purpose, a common design and understanding, or a meeting of the minds among Bankrate's partner-competitors to engage in market division/customer allocation. Accordingly, because the Plaintiff has failed to adequately allege the first element of its § 1 claim, the Court will not address the second element.

Although the Court has found that Plaintiff's § 1 claim based on its market division/customer allocation theory should be dismissed, it will briefly address Bankrate's standing argument.

### 3.    Standing

Bankrate argues that Plaintiff lacks standing to bring its market division/customer allocation claim because the Supreme Court has held "that a competitor cannot, as a matter of law, suffer an antitrust injury from a . . . market/customer allocation agreement because the effect of both is to raise prices." (Def. Mov. Br. at 12). The Court rejects this argument, because the United States Supreme Court has held in favor of a Plaintiff asserting market division/customer allocation, after expressly acknowledging that prices rose due to the agreement. *See, e.g.*, *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 47, 49 (1990).

### C.    Sherman Act § 2: Monopolization or Attempt to Monopolize

### 1.    Legal Standard: Sherman Act, 15 U.S.C. § 2

BanxCorp brings its monopoly claim under § 2 of the Sherman Act, which provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any

---

included in the attached exhibits, and (3) no argument has been made that such document would be integral to the complaint. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.") (emphasis omitted) (citations and internal quotations omitted).

other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony." 15 U.S.C. § 2. The offense of monopoly has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

Bankrate appears to challenge BanxCorp's ability to prove only the second element of its monopoly claim. (*See* III.C.2 at 22, *infra*). As to the second element, "the acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the part of the possessor." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007) (citing *Verizon Commcn's Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 407 (2004)). "Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Id.* (citation omitted). "Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." *Id.* (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985)). "Conduct that merely harms competitors, however, while not harming the competitive process itself, is not anticompetitive." *Id.* (citing *Brooke Grp.*, 509 U.S. 209, 224 (1993) ("It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.'") (citations omitted)).

## 2.    Sufficiency of Plaintiff's § 2 Monopoly Claim

BanxCorp alleges that Bankrate has obtained a monopoly in the relevant market. Specifically, it alleges:

Bankrate has monopoly power in the market for Bank Rate Websites, having since 2003 captured and maintained a market share of approximately 95%.

Bankrate is maintaining and extending its monopoly power through the predatory and exclusionary conduct described above, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

Substantial barriers to entry exist in the relevant market.

There is no legitimate business justification for Bankrate's monopolization conduct.

Defendant's anticompetitive conduct has had a significant adverse effect on competition in the market for Bank Rate Websites, causing direct and proximate harm to financial service providers—the customers—and to consumers—the end users.

The anticompetitive actions of Defendant have directly injured BanxQuote in its business and property and its injuries and damages are ongoing.

(5AC ¶¶ 305-10).

Bankrate argues that this claim must be dismissed because Plaintiff has failed to allege that Bankrate engaged in exclusionary conduct as required under § 2. The predatory pricing claim is insufficiently pleaded, supported only with conclusory statements. (Def. Mov. Br. at 17-18). And because the theory fails, and Plaintiff does not allege any other type of exclusionary conduct, Plaintiff's § 2 claim lacks an essential ingredient—exclusionary conduct—and must likewise fail. (*Id.* at 19-20). Bankrate appears to challenge only the second element in the monopoly analysis—the willful acquisition or maintenance of monopoly power. (Def. Mov. Br. at 14-20).

The second element requires a showing of maintenance of the monopoly power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570-71. Conduct that would satisfy this element includes conduct that would foreclose competition, allow Bankrate to gain a competitive

advantage, or destroy a competitor.   BanxCorp plausibly pleads the element of unilateral

predatory pricing, because "conduct that impairs the opportunities of rivals and either does not

further competition on the merits or does so in an unnecessarily restrictive way may be deemed

anticompetitive." *Broadcom*, 501 F.3d at 308 (citation omitted).  For example, Plaintiff alleges:

> Since the late 1990s Bankrate engaged in an anticompetitive and predatory campaign to cut off Plaintiff's and other competitors' air supply by giving away free rate listings to financial service providers, and by commingling free rate listings with paid rate listings at a significant loss in order to gain a monopoly.

(5AC ¶ 17).

> As mentioned below, the prices for Google.com keywords such as "best CD rate," "money market account," "best mortgage rate," and "best home equity loan rate," ranged from $7.22 per click to $19.35 per click, which is more than double the CPC price that Bankrate charged for its Bank Rate Website CPC rate listings (see paragraph 170).

(*Id.* ¶ 64).

> "We opened our 2008 CPC rate search business with a 20% increase for deposit clicks effective January 1st, 2008.  Cost per click or CPC rate search revenue came in at $10.3 million in Q4 2007, compared to $7.4 million in Q4 2006, representing an increase of 39%.  The increase was achieved through more CPC clicks, as well as higher CPC rates.  As I mentioned, CPC proved to be solid all year long, with CPC revenues for the full fiscal year coming in at $36.9 million, a $10.2 million, or at 38% increase over the $26.7 million we posted for fiscal 2006."

(*Id.* ¶ 78 (quoting, but without providing a citation, Bankrate's Senior Vice President and

CFO, Edward DiMaria, during a February 5, 2008, Fourth Quarter 2007 Earnings

conference call)).

> According to Bankrate's press release dated October 3, 2005 (http://investor.bankrate.com/releasedetail.cfm?ReleaseID=236165), Bankrate's CPC Pricing Program was set up as follows: "The Bankrate cost-per-click pricing is organized in tiers.  Pricing in the Bankrate mortgage interest rate tables ranged from $1.75 to $5.25 per click.  The CPC pricing for other financial products categories ranged from $1.75 to $6.00 per click."

(*Id.* ¶ 167).

> The CPC rate table listing prices charged to banks by Defendant on behalf of its own websites Bankrate.com, Interest.com and Bankaholic.com, as well as a cartel of hundreds of Bank Rate Website partners, were consistently fixed across Bankrate's "network" and ranged from $3 per click at the end of 2005, to more than $9 per click in 2010 (an unchallenged series of price increases in excess of 300%), in violation of Section 1 of the Sherman Act.

(*Id.* ¶ 221). These allegations mention conduct—giving away free rate listings or pricing below some measure of cost—that would certainly impair the opportunities of rivals for whom offering free or below-cost prices was not feasible and who were, as a consequence, excluded from doing business. Taken as true for purposes of this motion, this practice would either foster anticompetitive behavior or not further competition because it would force competitors to suffer losses until either Bankrate or its competitor was driven out of the market. Accordingly, the Court finds that Plaintiff has sufficiently pleaded its monopoly claim based partially on unilateral predatory pricing.

Bankrate argues that this claim must be dismissed because Plaintiff relies on the predatory pricing claim, which this Court found in its December 30, 2011 Opinion to be insufficiently pleaded and was not repleaded under § 1 in the 5AC. (Def. Mov. Br. at 17-18). Defendant is mistaken. In its December 30, 2011 opinion, this Court dismissed the § 1 predatory pricing conspiracy claim, but rendered no judgment on the claim framed as a unilateral predatory pricing claim. The monopoly claim in the 4AC was partly premised on the predatory-pricing theory. (*See* 4AC ¶ 288 ("Bankrate is maintaining and extending its monopoly power through the predatory and exclusionary conduct described above, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2."); *see also BanxCorp III* at 43 ("Under § 2, BanxCorp alleges that Bankrate unilaterally obtained a monopoly or attempted to obtain a monopoly through predatory pricing and exclusionary conduct."). The Court therefore did not prohibit Plaintiff from

reasserting that theory as a *unilateral* action theory here under § 2 while abandoning the predatory price-fixing conspiracy claim previously brought under § 1.

Because the predatory pricing theory is sufficient to support Plaintiff's § 2 monopoly claim, the theory is also sufficient to support the attempted monopoly claim.[4]

### D.   New Jersey Antitrust Claims

Bankrate argues that BanxCorp's claims under the New Jersey Antitrust Act (N.J.S.A. § 56:9-1, *et. seq.*) fail for the same reasons as under the federal antitrust laws because New Jersey's antitrust laws mirror the federal laws.  (Def. Mov. Br. at 20-21).  The parties agree that the New Jersey Antitrust Act essentially mirrors the Sherman Antitrust Act.  Neither party engages in any substantive analysis under the New Jersey Antitrust Act.  (*See* Def. Mov. Br. at 20-21; Pl. Opp. Br. at 40).

"[T]he language of the relevant portions of the New Jersey Antitrust Act is virtually identical to that of the Sherman Antitrust Act and [the] New Jersey Act itself mandates that it 'shall be construed in harmony with the ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it.'"  *St. Clair v. Citizens Fin. Grp.*, 340 F. App'x 62, 65 n.2 (3d Cir. 2009).  Thus, courts look to federal jurisprudence on the Sherman Act when analyzing the New Jersey Antitrust Act.  *Desai v. St. Barnabas Med. Ctr.*, 510 A.2d 662, 671 (N.J. 1986); *Patel v. Soriano,* 848 A.2d 803, 826 (N.J. Super. Ct. App. Div. 2004).  "Accordingly, the state law antitrust claims are only viable if the corresponding federal claims are sufficient."  *St. Clair*, 340 F. App'x at 65 n.2.

---

[4] Bankrate does not tailor any of its arguments specifically to Plaintiff's Attempted Monopoly claim.  In fact, Defendant argues the following as to the Third Claim: "With predatory pricing no longer pled as a basis for its § 2 claims, BanxCorp has not pled any anticompetitive conduct to support its § 2 claims and the Court should therefore dismiss BanxCorp's Second and Third Claims for relief."  (Def. Opp. Br. at 20).

The elements necessary to make out a successful claim for monopoly under the New Jersey Antitrust Act are identical to the elements of monopoly under § 2 of the Sherman Antitrust Act.  *Id.* at 65-66 ("[T]o state a claim of monopolization in contravention of Section 2 of the Sherman Act and its analog, the New Jersey Antitrust Act § 56:9-4, a plaintiff must allege: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.") (citing *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 141 (3d Cir. 1998) and *Patel*, 848 A.2d at 829-30).  In the same vein, the elements necessary to make out a successful claim for conspiracy to restrain trade under the New Jersey Antitrust Act are essentially identical to the elements of a successful § 1 Sherman Act claim.  *Id.* at 65 ("To state a claim under either Section 1 of the Sherman Act or the New Jersey Antitrust Act § 56:9-3, a complainant must allege that two or more entities formed a combination or conspiracy. . . . [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. . . . Furthermore, [w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.") (internal quotations and citations omitted); *N.J. Carpenters Health Fund v. Philip Morris, Inc.*, 17 F. Supp. 2d 324, 339-40 (D.N.J. 1998) (overruled on other grounds); *Gregory Mktg. Corp. v. Wakefern Food Corp.*, 504 A.2d 828, 832 n.4 (N.J. Law. Div. 1985) (juxtaposing the language of § 3 of the New Jersey Antitrust Act, N.J.S.A. § 56:9-3, to § 1 of the Sherman Act) (overruled on other grounds).

Accordingly, the Court finds that Plaintiff's market division/customer allocation conspiracy claim fails under the New Jersey Antitrust Act because it fails under § 1 of the Sherman Antitrust Act.  By the same reasoning, the Court finds that Plaintiff's monopoly and

28

attempted monopoly claims, insofar as they are partially based on unilateral predatory pricing, are sufficiently pleaded under the New Jersey Antitrust Act. *See TransWeb, LLC v. 3M Innovative Props. Co.*, No. 10-4413, 2011 WL 2181189, at *20 (D.N.J. June 1, 2011) (stating, in the context of an attempted monopoly claim asserted under the Sherman and New Jersey Antitrust Acts, that "[b]ecause New Jersey's antitrust statutes are construed in harmony with federal antitrust statutes, the Court need not separately analyze the state law claims") (citing *Dicar, Inc. v. Stafford Corrugated Prods., Inc.*, No. 05-5426, 2010 WL 988548, at *9 n.7 (D.N.J. Mar. 12, 2010); *Only v. Ascent Media Grp., LLC*, No. 06-2123, 2006 WL 2865492, at *5, *8 (D.N.J. Oct. 5, 2006)); *Acme Mkts., Inc. v. Wharton Hardware & Supply Corp.*, 890 F. Supp. 1230, 1238 n.6, 1242 n.10 (D.N.J.1995)).

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion is GRANTED as to the First Claim and DENIED as to the Second and Third Claims. Further, Defendant's motion is GRANTED in part and DENIED in part as to Fifth Claim. Plaintiff's § 1 predatory pricing conspiracy claim is dismissed with prejudice. The Court grants BanxCorp fifteen days to amend its First Claim, and only its First Claim. An appropriate Order will follow.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**