# Exhibit A

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEW JERSEY
 2

 3   BANXCORP,                           .
                                         .
 4          Plaintiff,                   .
                                         .  Case No. 07-cv-03398
 5   vs.                                 .
                                         .  Newark, New Jersey
 6   BANKRATE, INC.,                     .  January 28, 2011
                                         .
 7          Defendant.                   .
                                         .
 8

 9                          TRANSCRIPT OF HEARING
10               BEFORE THE HONORABLE MADELINE COX ARLEO
                     UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
      For the Plaintiff:      NELSON E. CANTER, ESQ.
13                            Canter Law Firm P.C.
                              123 Main Street - 9th Floor
14                            White Plains, NY 10601
                              (914) 948-3011
15                            Email: Ncanter@canterlawfirm.com

16                            Mr. Norbert Mehl

17    For the Defendant:      R. SCOTT THOMPSON, ESQ.
                              Lowenstein Sandler PC
18                            65 Livingston Avenue
                              Roseland, NJ 07068-1791
19                            (973) 597-2500
                              Email: Sthompson@lowenstein.com
20
                              MICHAEL J. HAHN, ESQ.
21                            Lowenstein Sandler PC
                              65 Livingston Avenue
22                            Roseland, NJ 07068
                              (973) 597-2500
23                            Email: Mhahn@lowenstein.com

24

25
```

1   much -- listen. It's a matter of how -- it's -- I'm asking a
2   separate question, first.
3           MR. CANTER: Yes, Your Honor.
4           THE COURT: Can you break it up between what did
5   you lose, what was your injury as a result of their acquiring
6   Bankaholic and MMIS, as opposed to price fixing?
7           MR. CANTER: Right. Your Honor, if it's acceptable
8   with the Court, because of Mr. Mehl's expertise on this
9   issue --
10          THE COURT: Sure, he can speak.
11          MR. CANTER: -- I would be more than happy to have
12  him -- to defer that question to him.
13          THE COURT: Sure.
14          MR. MEHL: Thank you.
15          Where -- I'll just be very brief. I -- what our
16  position is to be able to break down the actual damages or
17  the apportionment of damages between -- there are about 130
18  co-branding partners. We -- we don't have enough information
19  right now to say, okay, this particular partnership costs 2
20  and a half million in damages and this other one 3 -- 3.4
21  million. It would -- it would require an apportionment of
22  the damages. The -- we only know the total figure, how much
23  each particular --
24          THE COURT: And the total figure is you were shut
25  out of the market, 25 percent a year.

1    MR. MEHL: Well, right. The -- the breakdown for
2  each particular transaction from -- to the overall effect.
3  And I have -- it's not just the -- the fund machines, because
4  even without the co-branding agreements, bank -- we're
5  alleging that the plaintiff shut us out of the -- also
6  there's a market share of -- 80 percent.
7    THE COURT: The defendants shut you out of the
8  market, not the plaintiff. You're the plaintiff. Okay.
9    MR. MEHL: The defense. So if -- we would require
10 an expert plus the discovery. In addition as Mr. Canter just
11 mentioned, there are some documents that we subpoenaed
12 Bankaholics specifically and Lending Tree, and they're --
13 both parties are holding back these documents because they
14 say they're being reviewed by the defendant. So we don't
15 have the information right now in our possession.
16   THE COURT: Okay, I hear you. Let me hear from
17 Mr. Thompson. This issue has not been resolved, I take it?
18 That's why I jumped in.
19   MR. THOMPSON: This one hasn't been resolved,
20 Judge.
21   THE COURT: Okay.
22   MR. THOMPSON: None of what you just heard has
23 anything to do with the issues that we've asked about. In
24 order to allege and prove a claim under the antitrust laws,
25 the plaintiff has to show that it was injured by

1  anticompetitive conduct in a way that the antitrust laws
2  protect and that they're designed to protect.
3              So, for example, in a price-fixing case, the danger
4  that the antitrust laws protect against with respect to price
5  fixing is that competitors will get together and collusively
6  raise prices.
7              Now, traditionally that meant that the consumer was
8  hurt because the consumer paid higher prices.  And the
9  antitrust law's very clear:  A competitor does not normally
10 suffer an injury from a price-fixing conspiracy because a
11 competitor is in a position to benefit from others raising
12 prices above the equilibrium point.
13             So what we've asked BanxCorp to do, because it's
14 never been clear from the very beginning of this case, is
15 tell us how this price-fixing conspiracy led to your injury.
16 How is it that when we got together with 130 co-branding
17 partners -- allegedly -- and raised prices, that increase in
18 prices caused you damage, caused you harm.
19             That's -- I'm using the price-fixing conspiracy as
20 an example.  But the very same analysis is true with respect
21 to the two other components of their claim that we've asked
22 them to identify antitrust injury with respect to this
23 acquisition of two entities.  They claim that it increased
24 our monopoly power.  Well, the antitrust laws don't like
25 monopolies because they enable the monopolists to raise

1  prices.  And -- and again, that -- that's not something that
2  the competitor typically has standing to talk --
3              THE COURT:  Assert.
4              MR. THOMPSON:  -- about because they're not injured
5  by that.  So we've asked them, tell us what is it about these
6  particular aspects of your antitrust claims that caused you
7  injury.  And all we're getting back is we -- we went out of
8  business.  That's not an answer.
9              THE COURT:  Well, no, here's the thing:  It is an
10 answer.  It may be an answer that provides you a basis for a
11 motion for summary judgment at the end of the day because of
12 who they are and what they are asserting.  But that is what
13 they're asserting.  And given the construct that you've just
14 created, it's impossible for them to assert any other injury.
15 Their injury is you, by price fixing and collusion, made it
16 90 percent of the market, made it impossible for us to
17 compete.
18             Now, they -- that might not state the claim, and
19 you may prevail on summary judgment, but there's no other way
20 for them -- it is what it -- that is what their claim has now
21 turned out to be, that we as a competitor, were shut out of
22 the market by you.  And what you're really saying to me is
23 that doesn't state a claim given who they are because in the
24 real world, the compet- -- a compet- -- they're saying we're
25 all competing for consumers, and you -- you raised the price

1  to shut us out and then we were -- that's how it happened.
2  That -- that may not be -- that might be enough for your
3  motion or it may not be, and Judge Wigenton -- well, that's a
4  different way of looking at it in an Internet market for --
5  for this type of product.  I don't know, but it is what it is
6  is what I'm saying.  It's not a kind of case where they're
7  not articulating a theory.  It's just the theory doesn't
8  really jive with antitrust injury because they're not a
9  consumer, but they can't have the typical consumer injury
10 here because that's not who they are.
11          MR. THOMPSON:  Well, okay, I understand what you're
12 saying, and I sort of thought that might be what you would
13 say.  But then if that's -- if, in fact, what they are saying
14 your price fixing conspiracy raised prices --
15          THE COURT:  With competitors or co-branders.
16          MR. THOMPSON:  With your co-brand partners, allowed
17 you to raise prices which drove us out of the market, if
18 that's what they're saying, I want to see them say it,
19 because -- because the five pages of mumbo jumbo that we got,
20 doesn't really say that.  That -- the five pages that we got
21 doesn't really say anything.  And we -- and we got nothing in
22 response to two out of the three aspects that we were asking
23 about.
24          MR. CANTER:  Your Honor, perhaps Mr. Mehl can
25 clarify those --

1    THE COURT: Would you be willing to clarify that?
2    MR. MEHL: Of course. Especially for the -- we're
3 not claiming that it's the price fixing that drove us out of
4 the market. It's the predatory pricing that drove us out.
5    THE COURT: Isn't that the same thing? When you
6 say predatory pricing --
7    MR. MEHL: It's not the same thing.
8    THE COURT: Tell me how it's different.
9    MR. MEHL: Actually --
10   THE COURT: Tell me how it's different.
11   MR. MEHL: I'll explain. What we're claiming is
12 that they used price fixing to lower the price first. We're
13 not claiming that they drove us out of the market by raising
14 the price. They drove us out of the market by lowering the
15 price. Below cost. For years. Until they drove us out of
16 the market, and that's actually predatory pricing as well.
17 They continued to raise the prices after they drove everybody
18 out of the market to recoup the prior losses. They had
19 losses of more than $53 million. It's in all of their 10-Ks.
20   THE COURT: Any reason why it's not in this answer?
21   MR. MEHL: I'm sorry?
22   THE COURT: Any reason why that's not in this
23 answer?
24   MR. MEHL: I believe it is.
25   THE COURT: Where? Show me where it is.

1          MR. CANTER:  Page 4, Your Honor, perhaps?
2  Defendant's SEC filings, press releases, periodic earnings
3  calls with institutional investors, best and most reliably
4  describe its conduct in violation of federal and state
5  antitrust law prohibitions.
6          THE COURT:  Where are you reading from?
7          MR. CANTER:  Page 4.
8          MR. MEHL:  Page 4.
9          THE COURT:  What paragraph?
10         MR. MEHL:  Then -- it's in the middle of the page.
11         MR. CANTER:  Fifth one down, Your Honor.
12         MR. MEHL:  Then it shows one of the things --
13         THE COURT:  Wait whoa whoa whoa whoa.  Let's all be
14  on the same page.  I'm on page 4.
15         MR. CANTER:  Six -- six paragraphs down,
16  Your Honor, where it says --
17         THE COURT:  Defendants' own words?
18         MR. CANTER:  That's correct.
19         THE COURT:  You know, you have to -- you can't just
20  quote SEC filings and say that's a response to an
21  interrogatory.  If your theory is they drove prices down --
22         MR. MEHL:  I found it.
23         THE COURT:  -- that's what you -- you have to say
24  it.  You have a lot of stuff going on in this interrogatory.
25         MR. MEHL:  It's on the second paragraph on page 5,

1   Certification
2   I, SARA L. KERN, Transcriptionist, do hereby certify
3   that the 42 pages contained herein constitute a full, true,
4   and accurate transcript from the official electronic
5   recording of the proceedings had in the above-entitled
6   matter; that research was performed on the spelling of proper
7   names and utilizing the information provided, but that in
8   many cases the spellings were educated guesses; that the
9   transcript was prepared by me or under my direction and was
10  done to the best of my skill and ability.
11      I further certify that I am in no way related to any of
12  the parties hereto nor am I in any way interested in the
13  outcome hereof.

18  s/ *Sara L. Kern*                    February 1, 2011
19  Signature of Approved Transcriber              Date

22  Sara L. Kern, CET**D-338
    King Transcription Services
    65 Willowbrook Boulevard
23  Wayne, NJ 07470
    (973) 237-6080