UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BANXCORP,<br><br>     Plaintiff,<br><br>    v.<br><br>BANKRATE, INC.,<br>     Defendant | Civil Action No. 07-3398<br><br>Hon. Kevin McNulty, U.S.D.J. |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE THE DECLARATION OF NORBERT MEHL

Lawrence C. Hersh, Esq.
17 Sylvan Street, Suite 102B
Rutherford, NJ 07070
Tel. 201-507-6300
Fax 201-507-6311
lh@hershlegal.com

Mordechai I. Lipkis, Esq.
265 Canal St., Suite 222
New York, NY 10013
Tel. 212-925-4023
Fax 212-925-4702
mlipkis@mlipkis.com

*Attorneys for BanxCorp*

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................. ii

**PROCEDURAL BACKGROUND** ......................................................1

**ARGUMENT** ..................................................................................2

    A. DEFENDANT'S OBJECTIONS MUST BE DENIED BECAUSE IT
        FAILED TO CITE TO PARTICULAR PARTS OF MATERIALS IN THE
        RECORD IN VIOLATION OF RULE 56(c)(1) AND (2)............................2

    B. DEFENDANT'S OBJECTIONS MUST BE DENIED BECAUSE THE
        MEHL DECLARATION WAS MADE BY A LAY WITNESS WITH
        "PERSONAL KNOWLEDGE" AND "PARTICULARIZED
        KNOWLEDGE BY VIRTUE OF HIS EXPERIENCE" ...............................4

    C. DEFENDANT'S OBJECTIONS MUST BE DENIED BECAUSE THE
        MEHL DECLARATION *DOES NOT* CONTAIN STATEMENTS
        WITHOUT A BASIS IN PERSONAL KNOWLEDGE, SPECULATIVE
        CONCLUSIONS, OR LEGAL ARGUMENT.................................................6

    D. DEFENDANT'S OBJECTIONS MUST BE DENIED BECAUSE
        ALTHOUGH IT IS POSSIBLE FOR THE SAME WITNESS TO
        PROVIDE BOTH LAY AND EXPERT TESTIMONY IN A SINGLE
        CASE, AN EXPERT OPINION IS NOT ALWAYS NECESSARY
        WHENEVER THE TESTIMONY IS OF A SPECIALIZED OR
        TECHNICAL NATURE ............................................................................14

    E. DEFENDANT'S OBJECTIONS MUST BE DENIED BECAUSE EVEN IF
        PORTIONS OF THE MEHL DECLARATION WERE DEEMED EXPERT
        OPINION UNDER RULE 26(a)(2)(C), PLAINTIFF SATISFIED THE
        REQUIREMENTS OF RULE 26..............................................................16

    F. EVEN IF PORTIONS OF THE MEHL DECLARATION WERE DEEMED
        EXPERT OPINION UNDER RULE 26(a)(2)(C), PRECLUDING OR
        STRIKING THOSE PORTIONS IS NOT WARRANTED .........................17

**CONCLUSION**..................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ABB Air Preheater, Inc. v. Regenerative Envtl. Equip. Co., Inc.*
167 F.R.D. 668 (D.N.J. 1996) ....................................................................... 17, 19

*Ankney v. Wakefield*
Civ. No. 10-1290 (W.D. Penn. 2012) ................................................................1

*Anti-Monopoly, Inc. v. Hasbro, Inc.*
958 F.Supp. 895, 904 (S.D.N.Y. 1997) .............................................................16

*Brooke Group, Ltd. v. Brown & Willamson Tobacco Corp.*
509 U.S. 209 (1993) .........................................................................................16

*Canterna v. United States*
319 F. App'x 93, 99 (3d Cir. 2008) ...................................................................18

*Cutting Underwater Techs. USA, Inc. v. Con-Dive, LLC*
Civ. No. 09-387, 2011 WL 1103679 (E.D. La. March 22, 2011) .......................2

*Donlin v. Philips Lighting N. Am. Corp.*
581 F.3d 73 (3d Cir. 2009) ............................................................................ 4, 14

*Law v. Am. Capital Strategies, Ltd.*
No. 05-0836, 2007 WL 221671 (M.D. Tenn. Jan. 26, 2007) ...........................16

*Lightning Lube, Inc. v. Witco Corp.*
4 F.3d 1153 (3d Cir. 1993) ..............................................................................14

*Meyers v. Pennypack Woods Home Ownership Ass'n*
559 F.2d 894 (3d Cir. 1977) ............................................................................17

*Newman v. GHS Osteopathic, Inc.*
60 F.3d 153 (3d Cir. 1995) ..............................................................................16

*Nicholas v. Pa. State Univ.*
227 F.3d 133 (3d Cir. 2000) ............................................................................18

*Quinn v. Consol. Freightways Corp. of Del.*
 283 F.3d 572 (3d Cir. 2002) ...............................................................................18

*Smith v. Interim Healthcare of Cincinnati, Inc.*
 Civ. No. 10-582, 2011 WL 6012971 (S.D. Ohio Dec. 2, 2011) ...........................2

*Thomas & Betts Corp. v. Richards Mfg. Co.*
 No. 01-4677, 2006 WL 1344084 (D.N.J. May 16, 2006) ...................................18

*US v. Kale*
 No. 10-2869 (3d Cir. 2011) ...............................................................................14


**Rules**
Fed. R. Civ. P. 26 ....................................................................................... 15, 17
Fed. R. Civ. P. 37(c)(1) ....................................................................................17
Fed. R. Civ. P. 56(c)(1) ......................................................................................2
Fed. R. Civ. P. 56(c)(2) ......................................................................................2
Fed. R. Evid. 701 ..............................................................................................15
Fed. R. Evid. 701 Advisory Committee's Notes for the 2000 Amendments...........15

Plaintiff BanxCorp d/b/a BanxQuote ("BanxCorp," "BanxQuote" or "Plaintiff" or "Pl.") respectfully submits this Brief in Opposition to Defendant Bankrate Inc.'s ("Bankrate" or "Defendant" or "Def.") Motion to Strike ("MTS") the Declaration of BanxCorp's CEO Norbert Mehl, dated February 28, 2013 ("Mehl Declaration" or "Mehl Decl.").

## PROCEDURAL BACKGROUND

The parties' respective motions for summary judgment were fully submitted on May 2, 2013. Plaintiff's papers in support of its summary judgment motion, and in opposition to Defendant's summary judgment motion, are incorporated by reference as if fully set forth herein.

On April 11, 2013 Bankrate filed improper motions to strike the expert report of Stan V. Smith, PhD (Doc. Nos. 415), and the Mehl Decl. (Doc. No. 416).

Consistent with other courts that have dealt with improper motions to strike after the 2010 amendments of Rule 56, the Court must construe Bankrate's MTS as objections under Rule 56(c)(2).

> "[A]fter the 2010 amendments to Federal Rule of Civil Procedure ("Rule") 56, it is no longer appropriate to attack the admissibility of summary judgment evidence by way of a motion to strike … Consistent with other courts that have dealt with improper motions to strike after the 2010 amendments, the court will construe plaintiff's motions to strike as objections under Rule 56(c)(2)."

*Ankney v. Wakefield*, Civ. No. 10-1290 (W.D. Penn. 2012) (citing *Smith v. Interim Healthcare of Cincinnati, Inc*., Civ. No. 10-582, 2011 WL 6012971, at *4 (S.D.

1

Ohio Dec. 2, 2011); *Cutting Underwater Techs. USA, Inc. v. Con-Dive, LLC*, Civ.

No. 09-387, 2011 WL 1103679, at *3 (E.D. La. March 22, 2011).

## ARGUMENT

**A.    DEFENDANT'S OBJECTIONS MUST BE DENIED BECAUSE IT FAILED TO CITE TO PARTICULAR PARTS OF MATERIALS IN THE RECORD IN VIOLATION OF RULE 56(c)(1) AND (2)**

In essence Defendant's brief in support of its MTS ("Def.'s MTS Br.") was

not made in good faith, but is a transparent ploy for delay by attempting to

suppress any evidence against it. Defendant's MTS improperly disregards Fed. R.

Civ. P. 56(c)(1) and (2), as it contains numerous misrepresentations without

supporting its assertions by (A) citing to particular parts of materials in the record,

including depositions, documents, electronically stored information... interrogatory

answers, or other materials; or (B) showing that the materials cited do not establish

the absence or presence of a genuine dispute, or that an adverse party cannot

produce admissible evidence to support the fact. *See,* Fed. R. Civ. P. 56(c)(1) and

(2). For example, Defendant omitted certain relevant material facts and paragraphs

of the Mehl Declaration and the record, which provided the foundation for Mr.

Mehl's personal and particularized knowledge:

> I am the founder, president and chief executive officer of BanxCorp
> d/b/a BanxQuote and its predecessors since 1984, and have been an
> active participant in the relevant market at issue since its inception.
> (Mehl Decl. ¶ 1)

2

**I make this declaration based upon my own personal knowledge and review of company documents maintained in the ordinary course of business, my personal knowledge and participation in the day-to-day affairs of the business, and my personal knowledge of the relevant market at issue in this action.** (Mehl Decl. ¶ 2) (emphasis added)

I am a multi-lingual entrepreneur engaged in the financial services, Internet media, real estate, luxury goods and hospitality markets. I was born in Zurich, Switzerland and raised in Buenos Aires, Argentina. I graduated from the School of Economic Sciences at the University of Buenos Aires. I have been deeply involved in international banking, foreign exchange and financial affairs since he was a teenager. At the age of 25, I was the managing partner of the Vitub-Construmetal engineering consortium that built a suspended steel structure and fiberglass sky-roof for the 1978 World Cup stadium at the seaside casino resort of Mar Del Plata on the South Atlantic coastline. My project management responsibilities involved the supervision of over 500 people and multiple sub-contractors. The project was officially declared of "National Interest" by the country's military junta. In 1984, upon moving to New York after a successful business career in South America, I established BanxQuote, which became the foremost provider of indexes and analytics that are used as a barometer of the U.S. banking, credit, mortgage and housing markets. (Mehl Decl. ¶ 3)

**With respect to the relevant market at issue, I have been deeply involved in all key aspects of this industry sector, including corporate finance and investment banking relationships, economic and market research, marketing, sales and business development, print and online media design and development, website design and development, computer hardware, software and vendor selection and procurement, information technology, database management, data storage, staffing and facilities management. My professional industry experience includes observing and analyzing interest rates, other economic and money market indicators, and the financial reports and asset-liability management practices of thousands of banks for over 25 years. BanxQuote and I have been frequently sought after and quoted by the media, public policymakers and major financial institutions,**

**as illustrated in the BanxQuote Press Kit and BanxQuote website screenshots attached in the accompanying Appendix as Exhibits E2-E3.** (Mehl Decl. ¶ 4)

Because of the rampant misrepresentations and omissions throughout Def.'s MTS Br., Bankrate's objections to the admissibility of the Mehl Declaration must be denied.

**B.   DEFENDANT'S OBJECTIONS MUST BE DENIED BECAUSE THE MEHL DECLARATION WAS MADE BY A LAY WITNESS WITH "PERSONAL KNOWLEDGE" AND "PARTICULARIZED KNOWLEDGE BY VIRTUE OF HIS EXPERIENCE"**

It is well settled by the Third Circuit, that,

"When a lay witness has particularized knowledge by virtue of [his/]her experience, [he/]she may testify — even if the subject matter is specialized or technical — because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702."

*Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009).

Defendant cannot have it both ways: on the one hand Defendant is asking the Court (a) to strike the Mehl Declaration for lack of personal knowledge or because he was not disclosed as an expert; and (b) to simply ignore the declarations and deposition transcripts of Bankrate's CEO Thomas Evans and its former CEO Elisabeth DeMarse, by mischaracterizing them as stray comments which are inadmissible evidence. On the other hand, Defendant submitted  two fraudulent expert reports by Mark Glueck, which are an inadmissible fabrication

by a lay witness who falsified his academic and professional credentials, as set forth at Plaintiff's Objections Under Rule 56(c)(2).

More specifically, on the one hand Defendant falsely claims that "[i]n support of its motion [for summary judgment], BanxCorp relies almost exclusively on the [Mehl] Declaration,"[1] which it characterizes as "little more than a recitation of the allegations set forth in various iterations of the complaint," "comprised almost entirely of conclusory speculation," "legal and factual arguments," and "statements that are outside of Mr. Mehl's personal knowledge." Def.'s MTS Br., at 1, 4.

On the other hand Defendant recognizes (1) BanxCorp's CEO Mr. Mehl's deep involvement in "key aspects of this industry sector"; (2) his "professional industry experience"; (3) "the media's interest in his opinion[s]"; and (4) that his biography "reads much like a portion of a CV that would normally be submitted with an expert report." Def.'s MTS Br., at 9.

_____

[1] The record shows that aside from relying on voluminous market data and other evidence, including Bankrate's S.E.C. filings and S.E.C. regulated public declarations of Bankrate's executives, Bankrate's price lists and co-branding agreements, price lists obtained in response to third-party subpoenas, etc., Plaintiff also relies on Mr. Mehl's 10 days of unimpeachable testimony (i.e., 8 days of depositions by Bankrate, and 2 days by LendingTree), covering practically every paragraph of the original and amended complaints (Appx Ex. G21-G26; Thomson 3/7/13 Cert. Ex. 35), Plaintiff's voluminous interrogatory responses prepared by Mr. Mehl, his *Adverse Impact Analysis: Injury to Consumers and Customers* (Appx Ex. B8 [Seventh Am. Complaint, Ex. G]; Ex. G26 (Mehl April 10, 2012 Deposition Tr. at 1083:24-1097:4); Mehl Decl. ¶¶ 79-81), and nearly two hundred thousand documents produced during discovery.

Therefore, the Mehl Declaration cannot be stricken, because it was made by a lay witness with "personal knowledge," and "particularized knowledge by virtue of his experience."

## C. DEFENDANT'S OBJECTIONS MUST BE DENIED BECAUSE THE MEHL DECLARATION *DOES NOT* CONTAIN STATEMENTS WITHOUT A BASIS IN PERSONAL KNOWLEDGE, SPECULATIVE CONCLUSIONS, OR LEGAL ARGUMENT

Contrary to Defendant's preposterous assertion that "the Mehl Declaration is nothing more than a complaint in affidavit's clothing," the record shows that Mr. Mehl had created detailed business plans and narratives of the dynamics of the market at issue, long before the complaint was filed, as set forth below.

For example, Mr. Mehl testified that "I had prepared a document so that I could shop for a law firm to represent me in the filing of the complaint," and that "I played a role in drafting ... the narrative of the facts." He further testified that, "I had to create an objective narrative of the dynamics of the market. It actually took me months ... I consider myself an expert in the relevant market. There were very few people that understood the market better than I did, other than possibly ... the top people at [B]ank[rate], Peter Mor[se], Elizabeth D[e]marse[], and Tom Evans and the previous CEO." Appx Ex. G21 (Mehl January 23, 2012 Deposition Tr. at 104:8-16, 106:5-19, 108:16-24).

As a matter of fact, Defendant actually referred to a BanxCorp business plan dated April 1999 that had been prepared by Mr. Mehl *several years prior to the*

6

*commencement of this action*, setting forth in great detail the industry background, market trends, the one-stop shopping concept and transaction cycle for financial services based on BanxQuote's "hosting on average an aggregate of more than 400,000 user sessions per month," its website's interactive functionalities for consumers, its dynamically updated real-time database system for its financial institution customers, an analysis of spending for online advertising, the relevant market products, services and pricing models, licensing and co-branding models, and BanxQuote's and its competitors business and marketing practices. (*See,* Thompson Cert. Ex. 51).

Mr. Mehl further testified as follows:

"I actually developed or created and managed the overall content of the website from A to Z including the design, the navigation … for instance, one of the elements that drove the traffic to our website had to do with the functionality and the interactivity of the website as well as the navigation, ... a website like ours that focused on financial information and interest rates and people coming in and out chasing a rate and trying to generate a transaction, required a completely different functionality and approach, so I was instrumental in developing the functionality and the navigation of the site ...

I just described the steps. We focused on the functionality of the site, the navigation, having the most up-to-date rates and information, and it had to do with the ease of use, or the user friendliness, of the interface of the website. That is what distinguished our website from any other competitors, so for a long time, probably even **by 2005 or 2006, BanxQuote was perceived as the most user friendly website in the relevant market ... the visitors that came to our site did not come for entertainment or for fun. They came with a very specific objective. They were looking [] to enter a transaction with a bank, so**

7

*it had to do with the ease of use, finding what they needed, [step] one, [step] two, [step] three, getting some general information …*

*it was an ongoing process … it had to do with all the steps I described*, in addition to being featured occasionally on different media and licensing or data and talking to banks and talking to -- just mainly to banks and financial institutions that would be sensitive to our type of information …

*We continuously added new functionality to the website and new automation tools which enabled the banks to update their rates remotely* on their own with sophisticated user name and password technologies, and also by *continuously improving the navigation of our website to make it more user friendly*, refresh the user interface, and overall keep *enhancing the overall user experience*, so that's how it is defined in the industry." (emphasis added)

Appx Ex. G26 (Mehl April 10, 2012 Deposition Tr. at 985:7-988:15, 1001:21-1002:4). Thus, Defendant's objections to the Mehl Declaration are meritless.

For example, by interpolating certain false premises, Def.'s MTS Br., at 4, contends that "Mr. Mehl describes a hypothetical 'Bank Rate Website' transaction cycle without offering the testimony of a single consumer. (Mehl Decl. ¶ 17)." Defendant further contends that "[i]t is unclear how Mr. Mehl could ever establish personal knowledge on behalf of the vast number of consumers who use the Internet to shop for banking products. (See also Mehl Decl. ¶ 23) ('no one entering a Bank Rate Website . . . would confuse it with another type of website, market or medium')." Defendant's argument falsely implies that testimony of consumers would have been necessary to describe the typical transaction cycle of bank rate websites such as Plaintiff's BanxQuote.com or Defendant's Bankrate.com.

8

However, as set forth above, considering that Mr. Mehl had been personally involved in all aspects of the business and website design and development, generating on average 400,000 user sessions per month by 1999, and he kept "enhancing the overall user experience" on an ongoing basis, he had no need to rely on sworn *testimony* from consumers to further substantiate the Mehl Declaration. In addition, Mr. Mehl had also personally prepared and designed the *Distinct Functional Attributes of Typical Bank Rate Websites* (Table 3) and a diagram of the *Typical Transaction Cycle of Bank Rate Websites* (Figure 1), which had been part of the public record since the filing of the Third Am. Complaint, and were attached as Exhibit J to the Seventh Am. Complaint ("7AC").

For the same reasons, Defendant's objections are unavailing with respect to Mehl Decl. ¶ 18 ("Marketplace One-Stop-Shopping and Selling Experience" and transformation of "the consumer shopping experience"), and Mehl Decl. ¶ 38 ("Because visitors to Bank Rate Websites are 'in-market' or 'ready-to-buy' *consumers*, Bank Rate Website *customers* enjoy a greater efficiency and less waste in reaching and converting clients as compared to other advertising sites and mediums." [emphasis added]). (*See,* Def.'s MTS Br., at 5). As set forth above, Mr. Mehl clearly has personal and particularized knowledge of this market's customer and consumer experiences and behavior (see, BanxCorp 1999 business plan and Mr. Mehl testimony). In addition, this information was publicly available (see, e.g.,

9

Appx Ex. B3 [7AC, Ex B, Bankrate's 2003 Corporate Profile dated June 26, 2003]).

Def.'s MTS Br., at 5, mischaracterizes and largely omits material facts contained in Mehl Decl. ¶ 30, which states the following facts:

> *Market Concentration:* By 2008 Bankrate controlled over 90% of the relevant market share. This assessment is based on my in-depth knowledge of the relevant market; publicly available online audience measurement services and analytical tools such as comScore, Nielsen, Alexa and Compete or other media; the public declarations of Bankrate's CEO Thomas Evans during quarterly earnings conference calls and at a board meeting (in which he stated that Bankrate does not have any competitors); Mr. Evans' failure to identify any independent competitor with a market share in excess of 1% or 2%, and Bankrate traffic and revenue growth and statistical data from 2000 through 2008. In addition, had there been any competitor with a market share – *for the sale of Internet rate table listings* – in excess of 1% or 2%, that information would have been known by other market participants.
>
> **I am not aware of any independent competitor, either privately held or publicly traded, with a relevant market share in excess of 1% or 2% – *for the sale of Internet rate table listings* – in 2008, nor am I aware of any such independent competitors *who in the aggregate* may have had a relevant market share in excess of 10% in 2008.** It is highly unlikely that such competitive market intelligence and information can remain secret for an extended period of time.
>
> Finally, in response to subpoenas served by BanxCorp on various large banks who were among the most active relevant market customers and market participants, such as Ally Bank, HSBC's ad agency JWT, Banco Popular/E-Loan, and Aurora Bank (a former subsidiary of Lehman Brothers Bancorp), neither of them was able to produce any copies of invoices for purchases of Internet rate table listings from any Bank Rate Website other that Bankrate, nor were they able to identify any independent competitors of Bankrate in the relevant market. (bold emphasis added)

Def.'s MTS Br., at 5-6, states that "Mr. Mehl makes the inflammatory statement that 'Bankrate has abused[2] its market power,'" suggesting that this is a legal argument. However, Mr. Mehl indeed made a statement of fact.

Defendant is attempting to misconstrue the Mehl Declaration by taking certain words out of context. For example, the Mehl Decl. states:

> Bankrate's free rate listings or product dumping had the effect of discouraging financial service providers from paying BanxQuote or other independent competitors to list their rates. Certainly banks preferred to list their rates for free on Bankrate.com and the Bankrate Online Network, rather than having to pay to list their rates on BanxQuote or other independent competitors' rate tables. Consequently, BanxQuote was forced to exit the relevant market because the monopoly established by Defendant diverted all traffic to Bankrate's network. (Mehl Decl. ¶ 84)

> *Bankrate has abused its market power* with the central purpose of unfairly and artificially handicapping the market share of Plaintiff and other independent competitors in the marketplace, and constrained them from expanding to reach the minimum efficient levels of scale necessary to compete with Defendant. (Mehl Decl. ¶ 85) Defendant's anticompetitive conduct foreclosed, precluded and drove Plaintiff out of the relevant market, by causing Plaintiff to suffer a severely contracted operating scale, raising Plaintiff's operating and marketing costs and leaving it unable to attract any meaningful Internet consumer traffic, transaction volume, customers, co-branding partners, revenues, profits, or investors. (Mehl Decl. ¶ 86) (emphasis added)

The foregoing statement, at Mehl Decl. ¶ 84, is consistent with his deposition testimony:

---

[2] There is nothing inflammatory about Mr. Mehl's statement, nor is it a legal argument. The Merriam Webster Dictionary defines the term "abusing" as follows: "to put to a wrong or improper use," or "to use so as to injure or damage."

11

> "I have seen actually websites that offered free rate listings with the
> hopes that they would attract more traffic, and they failed miserably,
> so the empirical evidence showed that that model, if you will, does not
> work ... One example actually is bankingmyway.com, which is owned
> by TheStreet.com, which is Elisabeth DeMarse, the former CEO of
> Bankrate, just became the CEO of, so they attempted to 16 penetrate
> the market by offering free rate listings, and to my knowledge they
> have failed; and, in fact, the proof of that is that they were unable to
> sell any rate listings on their own, and they had to subcontract the sale
> to a third party, which was Informa, so you have a proof positive of
> my argument ...
>
> and by the way, that's what Bankrate did. They lowered their rate
> [listing price], or they offered free rate listings. They ended up losing
> $53 million … They started offering rates for free left and right,
> lowering the price, et cetera, et cetera, so they run out of money, and
> the stock was delisted, and they were sued by the shareholders in a
> class action suit."

Appx Ex. G26 (Mehl April 10, 2012 Deposition Tr. at 1027:5-22, 1028:6-17).

Moreover, defense counsel repeatedly questioned Mr. Mehl throughout his

deposition about issues of fact related to monopolization and market power. For

example, Mr. Mehl testified as follows:

> Q:    My question is, what is the time by which BanxCorp alleges
>       Bankrate achieved monopoly power?
>
> A:    There are several stages. In the complaint we made an
>       allegation that Bankrate at some point had reached about a 95
>       percent market share in the revenue market. It was based on
>       certain metrics. The expression metrics is used in this industry.
>
>       We gave a lot of detail. They were all based on the Bankrate
>       10K filings and the annual reports and press releases and public
>       declarations.

Based on that assessment, that would support this allegation that Bankrate achieved an unregulated and illegal control throughout the United States. It is all synonymous.

If the question is whether Bankrate had the market power before obtaining a 95 percent market share, the answer is yes. Bankrate had market power even when it had 65 percent market share of the entire market.

The reason -- what I'm driving at is that in 2005 Bankrate acquired what it defined as its nearest competitor.

Appx Ex. G22 (Mehl January 24, 2012 Deposition Tr. at 257:25-258:22).

Mr. Mehl further testified for example, that "almost immediately after Bankrate announced its acquisition of what it deemed [] its nearest competitor in the mortgage rate table sector, which was MMIS/Interest.com ... from the little that I knew at that time of the concept of monopolization and market power ... I was forced to exit the market [] without any question." Appx Ex. G25 (Mehl March 8, 2012 Deposition Tr. at 806:13-807:3).

In addition to having deposed Mr. Mehl over the course of ten days as a factual lay witness on the very same issues summarized in the subsequent Mehl Declaration, Plaintiff provided multiple rounds of responses (prepared primarily by Mr. Mehl) and voluminous supplemental responses to extraordinarily lengthy, complex and detailed Interrogatories, which together with Mr. Mehl's extensive testimony were subjected to strictures far beyond Rule 701.

13

Therefore, Defendant cannot in good faith assert that the Mehl Declaration contained statements proffered without a basis in personal knowledge; nor does it contain statements that are merely speculative conclusions unsubstantiated by facts; nor does it contain legal rather than factual statements.

**D.    DEFENDANT'S OBJECTIONS MUST BE DENIED BECAUSE ALTHOUGH IT IS POSSIBLE FOR THE SAME WITNESS TO PROVIDE BOTH LAY AND EXPERT TESTIMONY IN A SINGLE CASE, AN EXPERT OPINION IS NOT ALWAYS NECESSARY WHENEVER THE TESTIMONY IS OF A SPECIALIZED OR TECHNICAL NATURE**

The Third Circuit has held that Rule 701 "does not mean that an expert is always necessary whenever the testimony is of a specialized or technical nature." *Donlin v. Philips Lighting, supra; US v. Kale,* No. 10-2869 (3d Cir. 2011).

For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See, e.g., Lightning Lube, Inc. v. Witco Corp*. 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. Fed. R. Evid. 701 Advisory Committee's Notes for the

14

2000 Amendments. It is also "logical that in preparing a [declaration] the author may incorporate documents that were prepared by others, while still possessing the requisite personal knowledge or foundation to render his lay opinion admissible under Fed. R. Evid. 701." *Lightning Lube, supra*, at 1174.

The amendment does not distinguish between expert and lay witnesses, but rather between expert and lay testimony. Certainly it is possible for the same witness to provide both lay and expert testimony in a single case. *Id.* (citation omitted). Moreover, Plaintiff here did not attempt to evade "the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 … by simply calling an expert witness in the guise of a layperson," nor can the Mehl Declaration be construed as "essentially surprise expert testimony." *cf. Id.* (citations omitted).

Indeed, as set forth above, Mr. Mehl's 10-day testimony, Plaintiff's voluminous interrogatory responses prepared by Mr. Mehl, his *Adverse Impact Analysis: Injury to Consumers and Customer*s (Appx Ex. B8 [7AC, Ex. G]; Ex. G26 (Mehl April 10, 2012 Deposition Tr. at 1083:24-1097:4); Mehl Decl. ¶¶ 79-81), and the entire foundational factual basis for the Mehl Declaration, were subjected to strictures and scrutiny far beyond Rule 701.

In any event, as observed by the Supreme Court, "expert opinion evidence ... has little probative value in comparison with the economic factors" that may dictate a particular conclusion. *Matsushita*, 475 U.S., at 594, n.19. "[W]hen

15

indisputable record facts contradict or otherwise render [an expert] opinion unreasonable, it cannot support a jury's verdict … Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." *Brooke Group, Ltd. v. Brown & Willamson Tobacco Corp*., 509 U.S. 209, 241-242 (1993); *see also, e.g., Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F.Supp. 895, 904 (S.D.N.Y. 1997) ("[E]xperts are not always essential to defining the relevant market[.]").

**E.     DEFENDANT'S OBJECTIONS MUST BE DENIED BECAUSE EVEN IF PORTIONS OF THE MEHL DECLARATION WERE DEEMED EXPERT OPINION UNDER RULE 26(a)(2)(C), PLAINTIFF SATISFIED THE REQUIREMENTS OF RULE 26**

As noted in Def.'s Opposition to Plaintiff's Rule 56 Objections, at 5,

"there is no need as a matter of form to submit a supplemental disclosure to include information already revealed by a witness in deposition or otherwise through formal discovery." 8A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2049.1 (3d ed.). Accordingly, courts do not exclude statements of witnesses who are made known through discovery. *See, e.g*., *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 156 (3d Cir. 1995) (no abuse of discretion when district court refused to exclude testimony when other party knew names of witnesses and scope of their knowledge); *Law v. Am. Capital Strategies, Ltd.*, No. 05-0836, 2007 WL 221671, at *8 (M.D. Tenn. Jan. 26, 2007) (refusing to strike declarations because declarants were disclosed in depositions).

Defendant was certainly well aware of the subject matter and the scope of Mr. Mehl's knowledge and expertise,[3] which is precisely why Defendant already had the opportunity to subject Mr. Mehl to the strictures of Rule 702, including 10

---

[3] *See,* Def.'s MTS Br., at 8-9.

16

days of grueling deposition testimony (and excruciatingly detailed and complex written interrogatory responses on behalf of BanxQuote). (*See, e.g.,* fn1 above; Appx Ex. G21-G26; Thomson 3/7/13 Cert. Ex. 35). Defendant has not claimed that Mr. Mehl failed to provide a summary of the facts and his opinions. In fact, Defendant itself refers to the subject matter of the Mehl Declaration as "little more than a recitation" (see, Def.'s MTS Br., at 1) of previously set forth facts and allegations, all of which were already the subject of Mr. Mehl's deposition testimony. *See,* Def.'s MTS Br., at 8-9. Therefore, Defendant's objections must be denied.

### F. EVEN IF PORTIONS OF THE MEHL DECLARATION WERE DEEMED EXPERT OPINION UNDER RULE 26(a)(2)(C), PRECLUDING OR STRIKING THOSE PORTIONS IS NOT WARRANTED

As further noted in Def.'s Opposition to Rule 56 Objections, at 7-8,

Even when witnesses are not explicitly identified in the four corners of Fed. R. Civ. P. 26(a) disclosures or properly disclosed under Fed. R. Civ. P. 26(e), the Court has the discretion to consider the witnesses' statements if the non-disclosure is "harmless" or "substantially justified." *See* Fed. R. Civ. P. 37(c)(1); *Newman*, 60 F.3d at 156 ("[Rule 37] does not leave the court without discretion."). Under these circumstances, the Third Circuit has cautioned district courts to "exercise particular restraint in considering motions to exclude evidence," because it has "a distinct aversion to the exclusion of important testimony absent evidence of extreme neglect or bad faith on the part of the proponent of the testimony." *ABB Air Preheater, Inc. v. Regenerative Envtl. Equip. Co., Inc.*, 167 F.R.D. 668, 671-72 (D.N.J. 1996); *see also Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977) ("[T]he exclusion of critical evidence is an 'extreme' sanction . . . not

17

normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence."), *overruled on other grounds by Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985).[4] In fact, though the district court's exclusion of evidence under Fed. R. Civ. P. 37 is subject to an abuse of discretion standard on appellate review, a district court can "abuse[] its discretion if [its] exclusion of testimony results in fundamental unfairness in the trial of the case." *See Newman*, 60 F.3d at 156 (internal quotation marks omitted); *see also Quinn v. Consol. Freightways Corp. of Del.*, 283 F.3d 572, 577-78 (3d Cir. 2002).

When considering whether to exclude witness testimony under Fed. R. Civ. P. 37(c), the Third Circuit considers the prejudice or surprise to the opposing party, the ability of the party to cure that prejudice, the likelihood of disruption to trial by allowing the evidence, and bad faith. *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000); *Newman*, 60 F.3d at 156. The Third Circuit has also considered the importance of the evidence. *Thomas & Betts Corp. v. Richards Mfg. Co.*, No. 01-4677, 2006 WL 1344084, at *3 (D.N.J. May 16, 2006) (citing *Meyers*, 559 F.2d at 904.)

Based on the foregoing factors, the Court should not exclude the Mehl Declaration. Defendant suffers no prejudice or surprise whatsoever. As discussed above, Defendant was aware of the subject matter and scope of Mr. Mehl's knowledge and expertise. In fact, Defendant has not claimed any prejudice or surprise. Just as the plaintiff in *Canterna v. United States*, Defendant has "not explained how [its] case could have been presented in a more positive light had [it] gained access to the [information] earlier in the proceedings." 319 F. App'x 93, 99 (3d Cir. 2008). As set forth above, Defendant itself refers to the subject matter of

---

[4] Courts will only exclude evidence when lesser sanctions are ineffective. *See Meyers*, 550 F.2d at 905.

the Mehl Declaration as "little more than a recitation" (see, Def.'s MTS Br., at 1) of previously set forth facts and allegations, all of which were the subject of Mr. Mehl's deposition testimony.

Because Defendant suffers no prejudice, there is no prejudice that need be cured. The third factor identified by the Third Circuit, trial disruption, is not at issue here. There is also no evidence of any bad-faith or willfulness on Plaintiff's part, which must be present for the Court to exclude the Mehl Declaration. *See Quinn*, 283 F.3d at 577-78; *see also ABB Air Preheater*, 167 F.R.D. at 671-72. In fact, Defendant identifies none. *Meyers*, 550 F.2d at 905 (no bad-faith by plaintiff found where defendant did not allege any).

Therefore, even if portions of the Mehl Declaration were deemed expert opinion under Rule 26(a)(2)(C), precluding or striking those portions is not warranted.

**<u>CONCLUSION</u>**

Based on the foregoing, Plaintiff respectfully requests that this Court deny Defendant's Motion to Strike the Mehl Declaration.

Dated:   May 6, 2013

Respectfully submitted,

By:   *<u>/s/ Lawrence C. Hersh</u>*
Lawrence C. Hersh, Esq.
17 Sylvan Street, Suite 102B
Rutherford, NJ 07070

19

Tel. 201-507-6300
lh@hershlegal.com

Mordechai I. Lipkis, Esq.
265 Canal St., Suite 222
New York, NY 10013
Tel. 212-925-4023
mlipkis@mlipkis.com

*Attorneys for Plaintiff BanxCorp*