NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BANXCORP, | Civil Action No.: 07-3398 (CCC) |
| Plaintiff, | |
| v. | **OPINION** |
| BANKRATE, INC., | |
| Defendant. | |

**CECCHI, District Judge.**

## I.    **INTRODUCTION**

This matter comes before the Court upon the motions of Plaintiff BanxCorp ("Plaintiff" or "BanxCorp") and Defendant Bankrate, Inc. ("Defendant" or "Bankrate") for summary judgment pursuant to Federal Rule of Civil Procedure 56.  ECF Nos. 389, 405, 466.  The parties opposed each other's motions (ECF Nos. 413, 417), and filed replies (ECF Nos. 419, 421).  In addition, Defendant filed a motion to strike the declaration of Norbert Mehl (ECF No. 416) and a motion to strike the report and opinions of Stan V. Smith, Ph.D (ECF No. 415).  Plaintiff opposed both motions (ECF Nos. 422, 423), and Defendant filed replies in response (ECF Nos. 426, 427).[1]  Oral argument was heard on the aforementioned motions in this matter.  ECF No. 473.  For the reasons set forth below, Defendant's motion for summary judgment is granted and Plaintiff's motion for

---

[1] In a prior Order (ECF No. 465), the Court addressed Plaintiff's submission (ECF No. 440) regarding discovery disputes and, upon agreement of the parties, reserved certain issues regarding the expert report of Mark Glueck and related sanctions requests.  The Court herein addresses those remaining issues.

summary judgment is denied.  Further, Defendant's motion to strike the declaration of Norbert Mehl is denied and Defendant's motion to strike the report and opinions of Stan V. Smith, Ph.D is moot.

## II.    BACKGROUND

### A.    Factual Background

This action arises from the parties' competition to maintain websites providing information to the general public about interest rates for financial products.

#### 1.    The Parties

Plaintiff BanxCorp was founded by Norbert Mehl in 1984 as a print and online publisher of financial information.  See Plaintiff's Statement of Material Facts ("PSMF"), ECF No. 410-1, ¶ 19; Defendant's Statement of Material Facts ("DSMF"), ECF No. 405-2, ¶ 149.  In 1995 or 1996, BanxCorp began operating a website, BanxQuote.com, which listed interest rates offered by different financial service providers ("FSPs").  See PSMF ¶¶ 25, 104; DSMF ¶¶ 152, 154. BanxCorp lost its value as a going concern and exited the market by December 31, 2010.  See PSMF ¶¶ 463-64.

Defendant Bankrate owns and operates a number of websites that publish financial data and advice.  DSMF ¶ 1; Plaintiff's Responsive Statement of Material Facts ("PRSMF"), ECF No. 417-1, ¶ 1.  In 1996, Bankrate began offering information concerning interest rates for various financial products on its flagship website, Bankrate.com.  See PSMF ¶ 26; DSMF ¶ 2.

#### 2.    The Relevant Product Market

Plaintiff labels the relevant product market in this litigation the market for "fee-based aggregated bank rate table listings with interactive functionalities on the internet" ("FABRTL"), and contends the relevant geographic market is the whole of the United States.  PSMF ¶¶ 1, 3.

2

During the time period at issue, both BanxQuote.com and Bankrate.com offered information concerning bank rates. A visitor to either of those websites could "interact" with the websites by typing in parameters for a particular financial product—such as a mortgage loan in the visitor's zip code—which would cause the website to generate a table listing interest rates for that financial product. See October 14, 2015 Oral Argument Transcript ("Tr.") 21:4-23:5, 90:9-20. Some or all of the bank rate listings in the table were hyperlinked to the FSP's website. See PSMF ¶ 8; DSMF ¶ 8. By clicking on the hyperlink for a rate, a visitor could navigate directly from BanxQuote.com or Bankrate.com to the website of the FSP offering that rate to consumers. PSMF ¶ 8; DSMF ¶ 8; Tr. 23:16. FSPs paid BanxCorp and Bankrate to have their interest rates appear on the rate tables in the form of hyperlinks. PSMF ¶ 7; DSMF ¶ 8.

Defendant Bankrate's rate tables differ from those of Plaintiff BanxCorp in one key respect: Bankrate's tables also contain a sample of competitive interest rates displayed in a form that Bankrate calls "editorial listings." See DSMF ¶ 94-95. Unlike the paid rate listings, these "editorial listings" are not offered for sale nor are they hyperlinked. See DSMF ¶ 95; Tr. 26:4-10.[2] According to Bankrate, the purpose of editorial listings is to provide consumers with additional context to make comparisons with paid rate listings and to make tables with comparatively few paid listings appear fuller. See DSMF ¶¶ 97-98.

### 3. The Parties' Businesses

#### a) The Parties' Pricing Models

Until October 1, 2005, both BanxCorp and Bankrate charged FSPs a flat fee for

---

[2] Plaintiff contends that "some of Bankrate's [editorial] listings are hyperlinked and others are not," PRSMF ¶ 8, but its evidence does not support that assertion.

hyperlinked rate listings to appear on a rate table. See PSMF ¶ 6; DSMF ¶¶ 109, 157. On October 1, 2005, Bankrate adopted a "cost-per-click" model where FSPs paid Bankrate each time a visitor to Bankrate.com clicked on the FSP's listing. See PSMF ¶ 6; DSMF ¶¶ 110, 112. In or about February 2006, BanxCorp also adopted a cost-per-click pricing model. PSMF ¶ 6; DSMF ¶ 122; PRSMF ¶ 122.

### b)   *Bankrate's Co-Branding Partnership Agreements*

Defendant Bankrate has developed "co-branding" partnerships with various media outlets, such as Bloomberg.com. See, e.g., PSMF ¶ 272; DSMF ¶ 61-62. Pursuant to those co-branding partnerships, the co-brand partners' websites display financial information provided by Bankrate. DSMF ¶ 62; PRSMF ¶ 62. A visitor to the co-brand partner's website who clicks on Bankrate's financial information content will be directed to a separate "co-brand website" containing FABRTL that Bankrate owns and manages. DSMF ¶¶ 62-65.[3] Bankrate's co-branding agreements typically contain exclusivity provisions that preclude the co-brand partner from displaying a competitor's FABRTL during the term of the agreement. See PSMF ¶ 298; DSMF ¶ 71.

### c)   *Bankrate's Paid Search Engine Marketing*

Bankrate also drives consumer traffic to its website through paid search engine marketing. DSMF ¶ 44; PRSMF ¶ 44. Bankrate bids at auction on certain search terms that a consumer might type into a search engine. See DSMF ¶ 45; PRSMF ¶ 45. In general, if Bankrate wins the bid for a search term, an advertisement for Bankrate.com will appear at the top of the search engine's paid search results list whenever a visitor to the search engine types in that search term. See DSMF

---

[3] Although Plaintiff purports to dispute the foregoing paragraphs in Defendant's Statement of Material Facts, it appears to accept Defendant's description of the basic mechanics of its co-branding partnerships. See PRSMF ¶¶ 62-65.

4

¶ 46; PRSMF ¶ 46. Each time a visitor to the search engine clicks on one of Bankrate's advertisements, Bankrate typically pays the search engine. See DSMF ¶ 47; PRSMF ¶ 47.

### d)    *Bankrate's Acquisitions of MMIS/Interest.com and Bankaholic*

In December 2005, Bankrate acquired Mortgage Market Information Services, Inc. ("MMIS") and its subsidiary, Interest.com (collectively, "MMIS/Interest.com"), a website that published and advertised interest rates. See PSMF ¶¶ 252, 254; DSMF ¶¶ 135, 139. In September 2008, Bankrate acquired Bankaholic, which owned Bankaholic.com, a website that provided consumers with non-hyperlinked interest rates. PSMF ¶ 259; DSMF ¶¶ 140, 142.

### B.    Procedural Background[4]

---

[4] The Court notes that Defendant moved to strike the declaration of Plaintiff's witness Norbert Mehl, ECF No. 416. The Court has considered Mr. Mehl's declaration and finds to the extent it was based on his personal knowledge, Defendant's motion to strike the declaration of Mr. Mehl is denied. Nevertheless, insofar as Mr. Mehl speculates about matters beyond his personal knowledge and offers legal conclusions, the Court finds Mr. Mehl's declaration unhelpful and disregards those portions of the declaration. See S.E.C. v. Adoni, 60 F. Supp. 2d 401, 402 (D.N.J. 1999) (denying motion to strike affidavits because "it would be more appropriate to disregard those portions of the affidavits that were not factual recitations based on personal knowledge."); D.N.J Civ. R. 7.2; Fed. R. Civ. P. 56(c)(4); Reynolds v. Dep't of the Army, No. 08-2944, 2010 WL 2674045, at *9 (D.N.J. June 30, 2010) (rejecting affidavit that reflected the affiant's "perceived view" of the facts rather than actual knowledge of them); PNY Tech., Inc. v. Samsung Elecs. Co., Ltd., No. 10-4587, 2011 WL 1630856, at *3 (D.N.J. Apr. 29, 2011) (noting that a declaration must present a basis in fact for the "conclusory assertion" that it was made on personal knowledge); Cant Strip Corp. of Am. v. Schuller Int'l Inc., No. 92-2212, 1995 WL 767805, at *4 (D. Ariz. Sept. 27, 1995) (opinions made by owners of plaintiffs in affidavits regarding relevant antitrust market and market power are not competent evidence but improper legal conclusions). Further, such deficiencies are problematic for lay witness testimony offered pursuant to Federal Rule of Evidence 701. See Fed. R. Evid. 701. Moreover, Plaintiff did not offer Mr. Mehl as an expert witness. See Pl. Opp. to Def.'s Mot to Strike, ECF No. 423, at 4. Therefore, Mr. Mehl may not offer testimony within the scope of Federal Rule of Evidence 702. See, e.g., Hirst v. Inverness Hotel Corp., 544 F.3d 221, 225 (3d Cir. 2008).

In addition, Plaintiff requested that this Court strike several of Defendant's declarations and the expert report of Mark Glueck. ECF No. 417-2. In the Court's September 26, 2014 Order deciding a motion to set aside a pretrial order of the Magistrate Judge (ECF No. 438), the parties agreed,

Presently before the Court is Plaintiff's Seventh Amended Complaint in this procedurally complex antitrust matter ("7AC" or "Seventh Amended Complaint"). ECF No. 378. The Seventh Amended Complaint asserts the following claims against Defendant Bankrate: monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count I); attempted monopolization in violation of Section 2 of the Sherman Act (Count II); anticompetitive mergers or acquisitions in

---

and the Court advised, that certain issues regarding the opinions of Mr. Glueck would be decided in conjunction with the parties' summary judgment motions. ECF No. 465, at 2, 4. The Court now decides this issue. The Defendant has informed the Court that it is "not relying upon Mr. Glueck's opinions in any way in connection with the pending summary judgment motions" and has asked this Court to "disregard the few citations to Mr. Glueck's reports contained in the summary judgment briefs." ECF No. 443 at n.2. Accordingly, the Court has disregarded any citation to Mr. Glueck's report in the summary judgment briefing and Plaintiff's motion to strike the expert report of Mr. Glueck is moot. Any related request for sanctions is inappropriate under the circumstances of this case where there appears to be no evidence to show that Defendant had any knowledge of the alleged issues surrounding Mr. Glueck. See Tr. 86:25-87:5; Ford Motor Co. v. Summit Motor Prod., Inc., 930 F. 2d. 277, 289 (3d Cir. 1991) (sanctions are prescribed only in exceptional circumstances where a party's conduct is unreasonable) (citation omitted).

Plaintiff also requested that this Court strike the third-party declarations of Philip N. Mancuso, Alexandra Polson, and John Walsh for failure to identify these witnesses as required by Rule 26(a) or (c). ECF No. 417-2 at 18. Defendant states that Bankrate instead satisfied the requirements of Rule 26(e)(1)(A) because the additional declarants became known to Plaintiff "during the discovery process." See ECF No. 419-2 at 5. Courts do not exclude statements of witnesses who are made known through discovery. See, e.g., Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156 (3d Cir. 1995) (no abuse of discretion when district court refused to exclude testimony because other party knew names of witnesses and scope of their knowledge). Thus, the Court will not exclude the declarations of Philip N. Mancuso, Alexandra Polson, and John Walsh. Finally, Plaintiff argues that the declaration of Ms. Polson should be disregarded based on the "sham affidavit doctrine." ECF No. 417-2 at 21. The sham affidavit doctrine states that "a party may not create a material issue of fact or defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004). In the instant case, there is no applicable earlier sworn statement or deposition testimony by Ms. Polson. Plaintiff attempts to contradict Ms. Polson's declaration with an internal business document produced to Plaintiff in response to a Rule 45 Subpoena, which is not a sworn statement or deposition testimony. See Caro Assocs. II, LLC v. Best Buy Co., No 09-97, 2012 WL 762304, at *4 (D.N.J. Mar. 6, 2012) (sham affidavit doctrine did not apply where sworn testimony contradicted by email). Accordingly, the Court finds that the doctrine does not apply under these circumstances.

6

violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 (Count III); and violation of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-1 et seq. (Count IV). 7AC ¶¶ 296-321. Plaintiff seeks a declaratory judgment, injunctive relief, and treble damages. Id. at 109-10.

The parties each moved for summary judgment on all counts of the Seventh Amended Complaint. ECF Nos. 389, 405, 466. The Court heard oral argument on the parties' motions. ECF No. 473.

## III.   **LEGAL STANDARD**

Summary judgment is appropriate if the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" demonstrate that there is no genuine issue as to any material fact, and, construing all facts and inferences in a light most favorable to the non-moving party, "the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56); see also Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).

The moving party has the initial burden of showing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. Once the moving party meets this burden, the non-moving party has the burden of identifying specific facts to show that, to the contrary, there exists a genuine issue of material fact for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In order to meet its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citation omitted); see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (stating that "[t]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit"); Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 249 (1986). A fact is "material" if a dispute about that fact "might affect the outcome of the suit under governing [substantive] law," and a "genuine" issue exists as to that fact "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." Anderson, 477 U.S. at 248. The Court's role is to determine whether there is a genuine issue for trial, not to weigh the evidence and decide the truth of the matter. Id. at 249.

To survive summary judgment on an antitrust claim, "an antitrust plaintiff must produce economically plausible evidence supporting the elements of its claim." Harrison Aire, Inc. v. Aerostar Int'l, Inc., 423 F.3d 374, 380 (3d Cir. 2005) (citing Matsushita, 475 U.S. at 588). In addition, "antitrust law limits the range of permissible inferences that can be drawn from ambiguous evidence." Id. (citations and internal quotation marks omitted).

## IV.    DISCUSSION

### A.    Sherman Act: Monopolization

Section 2 of the Sherman Act "makes it unlawful to monopolize . . . interstate or international commerce." Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 306 (3d Cir. 2007) (citing 15 U.S.C. § 2). "Liability under § 2 requires '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" Id. at 306-07 (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).

"Monopoly power is the ability to control prices and exclude competition in a given market." Id. at 307 (internal citation omitted). A hallmark of monopoly power is the ability to "profitably raise prices without causing competing firms to expand output and drive down prices" in that market. Id. (citing Harrison Aire, 423 F.3d at 380). For the reasons set forth below, the Court finds that Plaintiff's evidence does not raise a genuine dispute of material fact as to whether

Bankrate unlawfully monopolized interstate commerce in violation of Section 2 of the Sherman Act.

### 1.    Possession of Monopoly Power

The existence of monopoly power may be proven through either direct or circumstantial evidence. See id.; Harrison Aire, 423 F.3d at 381. For the reasons set forth below, the Court finds Plaintiff adduces neither direct nor circumstantial evidence that Bankrate possessed monopoly power.

#### a)    *Direct Evidence*

Monopoly power may be proven through direct evidence of supracompetitive pricing and restricted output. Broadcom, 501 F.3d at 307 (citing United States v. Microsoft Corp., 253 F.3d 34, 51 (D.C. Cir. 2001)). Plaintiff's evidence does not support a reasonable inference that Bankrate charged supracompetitive prices and restricted output for the following reasons.

First, there is no evidence Bankrate ever charged supracompetitive prices. Supracompetitive prices "are prices that are at least a small but significant amount above competitive levels." In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 537 n.28 (D.N.J. 2004); see also Harrison Aire, 423 F.3d at 380. Here, Plaintiff cannot show supracompetitive pricing because there is no evidence establishing a baseline measure of competitive pricing in the market for FABRTL. Plaintiff contends merely that Bankrate increased prices for FABRTL between 2005 and 2009 without experiencing a decline in demand for its product. See PSMF ¶¶ 32-34. Proof of increased prices alone, however, is insufficient to establish supracompetitive pricing. See Xerox Corp. v. Media Scis., Inc., 660 F. Supp. 2d 535, 549 (S.D.N.Y. 2009) (evidence of price increases did not establish supracompetitive prices); In re Ebay Seller Antitrust Litig., No. 07-01882, 2010 WL 760433, at *5 (N.D. Cal. Mar. 4, 2010) ("Evidence that eBay has raised prices over a period

of years, and that several of its employees believe that the company may have raised them too high, proves nothing with respect to whether the prices are supracompetitive."). Cf. Harrison Aire, 423 F.3d at 381 (holding that evidence a defendant charged prices higher than those of its aftermarket competitors is insufficient to support a reasonable inference of monopoly power, as "a firm's comparatively high price may simply reflect a superior product"). Without some quantitative measure of competitive market prices, a factfinder could not determine whether Bankrate's prices exceeded competitive levels.

Second, even if Plaintiff were able to show supracompetitive pricing, its claim would still fail because there is no evidence of decreased output. "A predator has sufficient market power when, by restricting its own output, it can restrict marketwide output and, hence, increase marketwide prices." Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995) (citing Phillip Areeda & Donald F. Turner, Antitrust Law ¶ 501, at 322 (1978)). Here, Plaintiff's evidence illustrates the converse: from 2002 through February 5, 2008, Bankrate's output grew due to increases in the number of advertisers. See PSMF ¶¶ 32, 35.

### b)    *Circumstantial Evidence*

The existence of monopoly power may also be inferred through the "structure and composition of the relevant market." Broadcom, 501 F.3d at 307 (citation omitted). To support such an inference, "a plaintiff typically must plead and prove that a firm has a dominant share in a relevant market, and that significant 'entry barriers' protect that market." Id. (citations omitted). For the reasons set forth below, the Court finds that Plaintiff has also failed to adduce circumstantial evidence of Bankrate's monopoly power.

### i.    Proposed Relevant Market

As a threshold matter, the Court must consider whether Plaintiff has met its burden of

defining the relevant market.  See U.S. Horticultural Supply v. Scotts Co., 367 F. App'x 305, 309 (3d Cir. 2010) (citation omitted).  A plaintiff fails to meet its burden if it does not define its proposed relevant market in terms of "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  Id. (citing Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)).  Reasonable interchangeability measures the extent to which "one product is roughly equivalent to another for the use to which it is put."  Id. (internal citation and quotation marks omitted).  "The greater the positive cross-elasticity of demand between two products is, the closer substitutes they are."  SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1063 (3d Cir. 1978) (citation omitted).

Plaintiff purports to establish a market for FABRTL through (1) a statement that the Federal Trade Commission ("FTC") issued regarding Google's proposed acquisition of DoubleClick; (2) statements by Bankrate's CEO, Thomas Evans, that FSPs were continuing to purchase FABRTL despite Bankrate's price increases; (3) Bankrate's price increases; and (4) "the distinct look and feel" of FABRTL.  See Pl. Br. in Support, ECF No. 410, at 11-14; Pl. Br. in Opp., ECF No. 417, at 16 (citing Appendix H8, ECF No. 417-4), 22.  This evidence, however, is inadequate to establish interchangeability of use or cross-elasticity of demand.[5]

First, the FTC's statement regarding Google's proposed acquisition of DoubleClick is

---

[5] Plaintiff also argues that its expert, Stan V. Smith, provides testimony with respect to issues related to the relevant market.  Pl. Br. in Reply, ECF No. 421, at 6.  Mr. Smith admits that his knowledge in this regard is limited to the market as defined in the Seventh Amended Complaint, without referring to "other publicly available revenue figures pertaining to the relevant market from other companies identical to Banxcorp or Bankrate."  ECF No. 390-3 at 11-12; see also id. at 7 ("The evolution of the market for Bank Rate Websites is described in the 7AC . . . . I am not providing any opinion regarding these issues."); id. ("The structure of the relevant market before and after the alleged monopolization is set forth in the 7AC . . . . I am not providing any opinion regarding these issues.").

inadequate to establish Plaintiff's proposed relevant market. The statement explains the FTC's decision to close its investigation into whether the acquisition would violate federal antitrust law. Pl's Appendix Ex. H8, ECF No. 417-4. To the extent the statement is relevant at all to this Court's inquiry, it appears to undermine rather than support Plaintiff's argument that there is a market limited to FABRTL. The statement identifies a discrete advertising sector comprising advertising space sold by "publishers in the online advertising business"—a broad category that could include FABRTL suppliers as well as suppliers of other forms of advertising. Id. at 3. Moreover, the FTC's statement is insufficient because it does not purport to test interchangeability or cross-elasticity of demand with regard to FABRTL. Indeed, it does not even reference FABRTL.

Second, Mr. Evans's anecdotal statements that Bankrate was able to raise prices without driving away FSPs do not substitute for quantitative data showing interchangeability or cross-elasticity. See U.S. Horticultural Supply, Inc. v. Scotts Co., No. 04-5182, 2009 WL 89692, at *18-19 (E.D. Pa. Jan. 13, 2009) (finding that "statements from industry actors" and "marketing documents" were insufficient to establish a relevant market absent quantitative evidence of price increases or price stability in substitute products in response to an increase in the defendant's prices).

Third, evidence of Defendant's price increases alone cannot establish cross-elasticity of demand between Defendant's FABRTL and other products. Plaintiff's analysis lacks necessary information about the prices of potentially substitutable products and the demand for such products. See U.S. Horticultural Supply, 367 F. App'x at 310-11 (holding the plaintiff's market definition was legally inadequate where the plaintiff's expert report lacked "specific information relating to price increases or price stability for substitute products in relation to a rise in the price of [the defendant's product]").

12

Fourth, the Court does not find that evidence of the "distinct look and feel" of FABRTL, without more, provides sufficient grounds to identify a distinct FABRTL market. The case on which Plaintiff relies illustrates merely that the "distinct look and feel" of a product may contribute to a finding of a distinct product market when offered in conjunction with other forms of economic evidence. See F.T.C. v. Staples, Inc., 970 F. Supp. 1066, 1075-77 (D.D.C. 1997). As Plaintiff fails to offer such economic evidence, the Court does not find that the purported unique aesthetic qualities of FABRTL support a finding that FABRTL comprises a distinct market. See Menasha Corp. v. News Am. Mktg. In-Store, Inc., 354 F.3d 661, 664 (7th Cir. 2004) (noting that physical differences between products do not necessarily create separate economic markets for those products).

Accordingly, Plaintiff's evidence fails to support its proposed FABRTL market with "'reference to the rule of reasonable interchangeability and cross-elasticity of demand' and is, therefore, legally insufficient." U.S. Horticultural Supply, 367 F. App'x at 310-11 (quoting Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997)).

ii.    Dominant Share of the Market

Even if Plaintiff's proposed relevant market were legally sufficient, Plaintiff has failed to show Defendant has a dominant share of that market. To prove market share, Plaintiff states that 79 million U.S. households used online banking in 2011 and that Bankrate had 170 million visitors to its sites, from which Plaintiff concludes that Bankrate has a 90% market share. See Pl's Br. in Opp., ECF No. 417, at 18. Not only is the Court unable to decipher Plaintiff's math, but Plaintiff's metrics are irrelevant. Market share must be based on sales of FABRTL to FSP advertisers, not on web visitors, because it is undisputed that FSPs, not web visitors, actually purchase FABRTL. See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 999 (11th Cir. 1993) ("When assessing

13

market shares for the purpose of ascertaining market power the appropriate measure of a firm's share is the quantity of goods or services actually sold to consumers."); TransWeb, LLC v. 3M Innovative Properties Co., 16 F. Supp. 3d 385, 409-10 (D.N.J. 2014) (expert testimony analyzing the plaintiff's and defendant's "actual costs and sales data" was needed to show the defendant had a dominant share of the relevant market).  Moreover, even if the number of web visitors were an appropriate measure of sales of FABRTL to FSPs, Plaintiff's evidence concerns Bankrate's website as a whole—which contains various forms of financial information and commentary other than FABRTL[6]—without specifying the proportion of those visitors who visit pages containing FABRTL, specifically.

### iii.    Barriers to Market Entry

Finally, there is no evidence of significant barriers to entry for market competitors. "Barriers to entry are factors, such as regulatory requirements, high capital costs, or technological obstacles, [which] prevent new competition from entering a market in response to a monopolist's supracompetitive prices."  Broadcom, 501 F.3d at 307 (internal citations omitted).  Plaintiff's argument regarding entry barriers appears to rely on the following statement by Bankrate's CEO, Thomas Evans:

> One of the things that is a tremendous gating item for us, we believe is in terms of competition, and barriers for competition, is how does anybody else break into this, if we have tied up all the best newspaper relations, the best co-brand relationships and we've got a dynamic organic traffic website.  How does anybody else get into this business and compete with Bankrate? I look at it as both an offensive marketing opportunity, as well as a defensive opportunity.

PSMF ¶ 340. Mr. Evans's statement, which, at most, suggests Bankrate may have perceived there to be high barriers to entry, does not substitute for actual evidence of high barriers to entry.  "The

---

[6] See DSMF ¶ 1, PSMF ¶ 1.

antitrust statutes do not condemn, without more, such colorful, vigorous hyperbole." Advo, Inc. v. Phila. Newspaper, Inc., 51 F.3d 1191, 1199 (3d Cir. 1995) (rejecting antitrust claim based on isolated statements made in the defendant's business plan). Plaintiff provides no testimony from other market participants, expert testimony, or quantitative data indicating would-be competitors were unable to enter the market due to Bankrate's alleged supracompetitive prices. Moreover, BanxCorp CFO and Senior Vice President Batsheva Mehl conceded that there were in fact low barriers to entry for Banxcorp in the FABRTL market. Certification of R. Scott Thompson, "Thomson Cert," Ex. 9, Tr. 192:13-19. Accordingly, the Court finds Plaintiff has failed as a matter of law to establish circumstantial evidence of monopoly power.

### 2. Willful Acquisition or Maintenance of Monopoly Power

Willful acquisition or maintenance of monopoly power "must be accompanied by some anticompetitive conduct on the part of the possessor." Broadcom, 501 F.3d at 308 (citing Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004)). Anticompetitive conduct is "generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." Id. (citing LePage's Inc. v. 3M, 324 F.3d 141, 147 (3d Cir. 2003)). Conduct is only anticompetitive, however, where it harms "the competitive process itself," not merely a competitor's business. Id. (citing Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224 (1993)).

Plaintiff contends that Defendant engaged in the following forms of anticompetitive conduct: (1) predatory pricing of FABRTL, including offering FSPs free editorial rate listings; (2) predatory bidding of keywords on internet search engines; and (3) entering into co-branding

15

agreements that foreclosed competition.[7] See Pl. Br. in Support, ECF No. 405-1, at 30 (citing 7AC ¶ 16). For the reasons set forth below, the Court finds that Plaintiff's evidence is insufficient to raise a question of material fact as to Bankrate's alleged anticompetitive conduct.

### a)    *Predatory Pricing*

A plaintiff asserting a predatory pricing claim must prove two elements: (1) the defendant reduced the prices of its product to below an appropriate measure of its costs; and (2) there is a likelihood that the defendant had a dangerous probability of recouping losses incurred from below-cost pricing. See ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 272 (3d Cir. 2012) (citing Brooke Grp., 509 U.S. at 222-24). "Regardless of the measure of a defendant's costs on which a plaintiff premises a predatory pricing claim, a plaintiff cannot anchor its case on theoretical speculation that a defendant is pricing below that measure. Indeed, '[a]s a practical matter, it may be that only direct evidence of below-cost pricing is sufficient to overcome the strong inference that rational businesses would not enter into conspiracies . . . .'" Advo, 51 F.3d at 1198 (alteration in original) (quoting Matsushita, 475 U.S. at 584 n.8 (emphasis added)).

Plaintiff advances three theories of predatory pricing. First, it asserts that Bankrate priced FABRTL below cost when it launched its cost-per-click pricing structure in 2005, driving competitors out of the market and eventually allowing Bankrate to raise prices profitably. Second, it contends that Bankrate provided editorial listings for free, allowing it to undercut competitors. See Pl. Br. in Support, ECF No. 405, at 34-36. Third, it argues that Bankrate's practice of waiving licensing fees as part of its co-branding partnerships was anticompetitive. None of these

---

[7] Plaintiff refers to Defendant's alleged predatory practices as "akin to a price squeeze." Pl. Br. in Opp., ECF No. 410, at 3.

contentions, however, raises a genuine dispute of material fact because there is no evidence Bankrate priced FABRTL below cost.

First, Plaintiff's contention that Bankrate priced FABRTL below cost in 2005 relies on statements by Bankrate's CEO that he believed that Bankrate's product was "underpriced relative to value," or "under market." PSMF ¶ 54. At best, these statements could show Bankrate's prices were below "general market levels," which is insufficient to demonstrate predation. See Advo, 51 F.3d at 1198 (internal citation and quotation marks omitted); see also ZF Meritor, 696 F.3d at 273 ("Low, but above-cost, prices are generally procompetitive . . . ." (internal citation omitted)). Plaintiff also asserts that Bankrate priced FABRTL below cost because its cost-per-click pricing for certain keywords was below the average of the top five maximum bids for those same keywords on Yahoo!. See PSMF ¶ 345. However, Plaintiff must demonstrate Bankrate priced FABRTL below some appropriate measure of its own costs; search engines like Yahoo! provide an inappropriate measure of, or comparison to, Bankrate's costs. See Advo, 51 F.3d at 1198-99 ("Despite extensive discovery, Advo apparently is unable to produce any direct evidence that PNI offered to distribute circulars at prices below any relevant measure of [its] cost . . . . This omission provided sufficient grounds for granting summary judgment.").

Second, Plaintiff's argument that Bankrate engaged in predatory conduct by giving away its editorial listings for free also fails as a matter of law. There is no evidence that Plaintiff offered editorial listings to FSPs in connection with the sale of its paid, hyperlinked listings. Even if Plaintiff had proffered such evidence, to demonstrate that promotional pricing—such as a "free first listing"—is predatory, Plaintiff must demonstrate that Defendant's overall prices were below cost. Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co., 833 F.2d 606, 614 (6th Cir. 1987); see also Morgan v. Ponder, 892 F.2d 1355, 1362 (8th Cir. 1989). As discussed above, Plaintiff has

17

failed to do so and, accordingly, cannot show that Bankrate's editorial listings were predatory.

Plaintiff's third argument fails for the same reason. Plaintiff asserts that Bankrate licensed FABRTL to its co-branding partners for free but offers no evidence that Bankrate's co-branding agreements led to below-cost pricing of Bankrate's FABRTL. Accordingly, Plaintiff's evidence is inadequate to show predatory pricing.

### b) *Predatory Bidding*

Plaintiff next alleges that Bankrate engaged in predatory bidding of search-engine keywords. In a predatory bidding scheme, a monopolist bids up the market price of a critical input to such high levels that rival buyers cannot survive and, as a result, the monopolist acquires or maintains monopoly power. See ZF Meritor, 696 F.3d at 279 (citing Weyerhauser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 320 (2007)). "'If all goes as planned,' once rivals have been driven out, the predatory bidder will reap . . . profits to offset the losses that it suffered during the high-bidding stage." Id. (quoting Weyerhauser, 549 U.S. at 321). Therefore, to establish predatory bidding, "[a] plaintiff must prove that the alleged predatory bidding led to below cost pricing of a predator's outputs." Id. (alteration in original) (citing Weyerhauser, 549 U.S. at 325).

There is no evidence that Bankrate's bids on search-engine terms led to below-cost pricing of Bankrate's FABRTL. Plaintiff contends that internal Bankrate documents show that Bankrate's return on investment ("ROI") for its paid search advertising was negative in early 2007. See PSMF ¶¶ 354, 355. That argument, however, relies on incomplete evidence. Specifically, Plaintiff points to a single column in Bankrate's spreadsheets labelled "Partial ROI," which does not include the revenue generated from Bankrate's page views. See id.; Pl. Ex. G8 at BR00125297. The entire spreadsheet shows clearly that Bankrate's total return on investment was consistently positive. See

18

Pl. Ex. G8 at BR00125297. Accordingly, the Court finds no basis on which a rational factfinder could conclude Bankrate engaged in predatory bidding.

### c)    *Co-Branding Agreements*

Finally, Plaintiff argues Bankrate's co-branding agreements with other online media outlets were anticompetitive because they foreclosed competition in the FABRTL market. To prove foreclosure of competition, "it is not necessary that all competition be removed from the market. The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." United States v. Dentsply Int'l, Inc., 399 F.3d 181, 191 (3d Cir. 2005). To that end, "[c]ourts routinely observe that 'foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent.'" B & H Med., L.L.C. v. ABP Admin., Inc., 526 F.3d 257, 266 (6th Cir. 2008) (quoting Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 68 (1st Cir. 2004)).

Plaintiff contends that most of Bankrate's co-branding arrangements were anticompetitive because they lasted from two to eight years, PSMF ¶ 272, and allowed Bankrate to provide rate tables exclusively to its co-branding partners for the duration of the contract. See, e.g., PSMF ¶ 309. These contentions, however, do not raise a genuine issue of material fact regarding anticompetitive conduct.

First, Plaintiff's evidence establishes only that most of Bankrate's co-branding relationships, not the contractual agreements themselves, lasted from two to eight years. In fact, it is undisputed that most of the co-branding contracts had one-year terms. See DSMF ¶ 83. Such short-term contracts "present little threat to competition." See ZF Meritor, 696 F.3d at 286. Further, Plaintiff does not claim it was barred from entering into co-branding contracts with

19

Bankrate's former co-branding partners once those partners' contracts with Bankrate expired.[8] Accordingly, there is no evidence indicating that Bankrate's co-branding relationships "effectively foreclosed the business of competitors." LePage's, 324 F.3d at 157.

Second, the contracts' exclusivity provisions cannot by themselves establish anticompetitive conduct. See, e.g., Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 76 (3d Cir. 2010) ("[E]xclusive supply contracts or exclusive dealing agreements have been frequently upheld when challenged on antitrust grounds."); Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 111 (3d Cir. 1992) (noting the "existence of legitimate business justifications for the [exclusive dealing] contracts"); Menasha, 354 F.3d at 663 (explaining that competition to be an exclusive supplier "is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress" (citation omitted)); Microsoft, 253 F.3d at 69 ("Permitting an antitrust action to proceed any time a firm enters into an exclusive deal would both discourage a presumptively legitimate business practice and encourage costly antitrust actions.").[9]

Moreover, the record is devoid of the quantitative evidence necessary to show market foreclosure. There is no evidence, for example, of the scope of possible co-brand partners or the

---

[8] At oral argument, Plaintiff appeared to argue that it had difficulty obtaining co-branding partners because potential co-branding partners preferred to work with Bankrate due to Bankrate's higher web traffic. Tr. 114:17-115:4. However, Plaintiff fails to explain how Bankrate's apparent success at maintaining co-branding partnerships is distinguishable from "development as a consequence of a superior product, business acumen, or historic accident." See Broadcom, 501 F.3d 297 at 307 (internal quotation marks and citation omitted). Moreover, the Third Circuit has rejected the argument, when offered "without some limiting principle," that a defendant's superior market reputation is a barrier to entry. See Advo, 51 F.3d at 1201-02.

[9] The Court also notes that some of the co-branding agreements Plaintiff identifies relate to advertising in print newspapers and are therefore outside the scope of Plaintiff's proposed FABRTL market. See PSMF ¶ 237.

20

percentage of total FABRTL advertising revenue generated by co-branding partnerships. Without such data, it would be impossible to determine whether Bankrate's co-branding agreements foreclosed a substantial percentage of the market. See, e.g., B & H Med., 526 F.3d at 266-67 (affirming summary judgment on the plaintiff's exclusive dealing claim where the plaintiff lacked evidence of the sales revenue generated by the purported exclusive-dealing agreement).

Accordingly, the Court finds that Plaintiff has failed to raise a genuine issue of material fact regarding the elements of its monopolization claim and, therefore, grants summary judgment to Defendant on that claim.

**B.  Sherman Act: Attempted Monopolization**

Section 2 of the Sherman Act also prohibits attempted monopolization. See 15 U.S.C. § 2. A defendant has attempted monopolization under Section 2 of the Sherman Act where it "(1) . . . has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Broadcom, 501 F.3d at 317. As to the second element, specific intent to monopolize need not be shown through direct evidence; "it may be inferred from predatory or exclusionary conduct." Penn. Dental Ass'n v. Med. Serv. Ass'n of Penn., 745 F.2d 248, 261 (3d Cir. 1984) (citations omitted). As to the third element, "a dangerous probability of monopoly may exist where the defendant firm possesses a significant market share when it undertakes the challenged anticompetitive conduct." Barr Labs., 978 F.2d at 112 (internal quotation marks and citation omitted).

As discussed above, Plaintiff has failed to show Bankrate's conduct was predatory or exclusionary. Accordingly, there is no basis on which to infer Bankrate had specific intent to monopolize. To the extent Plaintiff proffers the foregoing statements by Bankrate's CEO as direct evidence of specific intent, its evidence is insufficient. Again, "[t]he antitrust statutes do not

condemn, without more, such colorful, vigorous hyperbole . . . . Isolated and unrelated snippets of such language 'provide no help in deciding whether a defendant has crossed the elusive line separating aggressive competition from unfair competition.'" Advo, 51 F.3d at 1199 (quoting Morgan, 892 F.2d at 1359).

Finally, there is no evidence Bankrate had a dangerous probability of achieving monopoly power because, as discussed above, there is no evidence of high barriers to market entry. "[W]ithout barriers to entry it would presumably be impossible to maintain supracompetitive prices for an extended time." Matsushita, 475 U.S. at 591 n.15. Accordingly, Plaintiff has failed to proffer evidence from which a reasonable jury could conclude Defendant attempted monopolization.

### C.    Clayton Act

Section 7 of the Clayton Act proscribes acquisitions whose effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. In order to establish a prima facie violation of Section 7, a plaintiff must demonstrate that the acquisition "produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market . . . ." United States v. Phila. Nat'l Bank, 374 U.S. 321, 363 (1963). Thus, "[d]etermination of the relevant product and geographic markets is a necessary predicate to deciding whether a merger contravenes the Clayton Act." United States v. Marine Bancorporation, Inc., 418 U.S. 602, 618 (1974) (internal quotation marks and citation omitted).

Plaintiff alleges that Bankrate's acquisition of two firms, MMIS/Interest.com and

Bankaholic, violated Section 7 of the Clayton Act.  See 7AC ¶¶ 308-312.[10]  As discussed above, Plaintiff has failed as a matter of law to establish its proposed relevant market.  Accordingly, it cannot show Bankrate's acquisitions violated Section 7.  See Marine Bancorporation, Inc., 418 U.S. at 618.

Even if Plaintiff had established a relevant market, Plaintiff's evidence is inadequate to show that Bankrate acquired an undue market share.  Plaintiff merely estimates the relative values of Bankrate and MMIS/Interest.com at the time of the acquisition.  See PSMF ¶ 258.  However, because Plaintiff offers no evidence of the total value of the FABRTL market, such estimates cannot establish that Bankrate's share of the FABRTL market became undue as a result of the MMIS/Interest.com acquisition.  Moreover, Plaintiff proffers no quantitative evidence regarding Bankrate's acquisition of Bankaholic.[11]  Accordingly, the Court finds Plaintiff has failed to raise a genuine issue of material fact as to its Clayton Act claim.

### D.    New Jersey Antitrust Act

The New Jersey Antitrust Act is construed in accordance with federal jurisprudence on the

---

[10] Insofar as Plaintiff's summary judgment briefing references other acquisitions, those acquisitions were not pleaded in the Seventh Amended Complaint and are therefore not properly before this Court.  The Court notes that a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."  See Baklayan v. Ortiz, No. 11-3943, 2012 WL 3560384, at * 3 (D.N.J. Aug. 15, 2012) ("The Third Circuit has made clear that a plaintiff may not amend his complaint through arguments raised in an opposition brief.") (citation omitted).

[11] Plaintiff also points to a statement by Bankrate's former CEO, Elisabeth DeMarse, that "Bankrate had an acquisition strategy aimed at buying number 1 and number 2 in every category [] in the consumer finance markets."  See PSMF ¶ 246.  However, Ms. DeMarse's testimony concerns Bankrate's acquisition of creditcards.com, see Pl. Appx. G27 at Tr. 87:14-20, 88:12-24, which is not at issue in the Seventh Amended Complaint, see 7AC ¶¶ 308-312.

Sherman Act. See N.J.S.A. 56:9-18 (mandating that the New Jersey Antitrust Act "shall be construed in harmony with the ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it"); St. Clair v. Citizens Fin. Grp., 340 F. App'x 62, 65 n.2 (3d Cir. 2009); Desai v. St. Barnabas Med. Ctr., 510 A.2d 662, 671 (N.J. 1986). "Accordingly, the state law antitrust claims are only viable if the corresponding federal claims are sufficient." St. Clair, 340 F. App'x at 65 n.2. Banxcorp's claims for relief under the New Jersey Antitrust Act mirror its claims under Section 2 of the Sherman Act and Section 7 of the Clayton Act. As this Court has already found those claims cannot survive summary judgment, it must also grant summary judgment to Defendant on Plaintiff's New Jersey Antitrust Act claim.

## V.    CONCLUSION[12, 13]

Having reviewed the record, briefing, and the parties' positions as presented at oral argument, the

---

[12] Defendant also argues that (1) Plaintiff lacks antitrust injury and therefore standing under the antitrust laws, (2) many of Plaintiff's claims are time barred, and (3) Plaintiff lacks Article III standing to seek injunctive relief. As detailed at length throughout this Opinion, Plaintiff has failed to demonstrate that Defendant engaged in the type of anti-competitive practices barred by antitrust law, and thus Plaintiff cannot establish an antitrust injury in this case. See Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) ("[A] plaintiff must prove the existence of an antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful . . . injury, although causally related to an antitrust violation, nevertheless will not qualify as an antitrust injury unless it is attributable to an anti-competitive aspect of the practice under scrutiny.") (internal citations and quotation marks omitted). Defendant also raised arguments regarding the timeliness of Plaintiff's claims and Plaintiff's request for injunctive relief. The Court need not consider Defendant's additional arguments because Defendant is entitled to summary judgment on all counts of the Seventh Amended Complaint.

[13] Defendant moved to strike the declaration of Plaintiff's witness, Stan V. Smith. ECF No. 415. Mr. Smith's declaration contains his opinions on damages, which is not relevant given the procedural posture. Thus, Defendant's motion to strike the declaration and opinions of Mr. Smith is moot.

Court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment. Further, Defendant's motion to strike the declaration of Norbert Mehl is denied and Defendant's motion to strike the report and opinions of Stan V. Smith, Ph.D is moot.

An appropriate Order accompanies this Opinion.

DATED: March 21, 2019

CLAIRE C. CECCHI, U.S.D.J.

25